ROSS, J.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

BLOOM, M.J.

NICHOLAS ZIMMERMAN

JURY TRIAL DEMAND

Plaintiff

1983, 1985 and 1986 Complaint

V.

FORMER Superintendent STEVEN Racette,
FORMER First Deputy D. Quinn, FORMER
Deputy of Security Brown, SHU Sergeant
Orzech, SHU Sergeant Randall, Officer C.
Gadway, SHU Lieutenant Rief, Officer
Mallioux, Doctor Robert Adams, Nurse
Administrator Johnson, Officer C. Stickney,
Officer R. Lee, Deputy of Security E. Bell,
Superintendent Michael Kirkpatrick, Hearing
Officer Lieutenant Minard, Commissioner's
Hearing Officer Bullis, Director of S.H.U
Albert Prack, SHU Sergeant Delisle,
Sergeant Hicks, Librarian K. Delisle,
Deputy of Programs Macintosh, Unit Chief
of Mental Health J. Woldren, Officer S.
Beaudette, Captain P. Devlin, Director
of SHU Bezio, Director of SHU
Venettozzi, Nurse Administrator C.
Simpson, Clinton's Head Mail Clerk,
Doctor Galanie, Doctor Sawyer.

Defendants.

THIS LAWSUIT IS DRAFTED
AND LITIGATED BY NICHOLAS
ZIMMERMAN AND THE F.O.C.I.S
PARALEGAL GROUP OF NEW YORK.

A 1983 Civil Rights Complaint,
Motion For Summary Judgement
and Request For PReliminary
Injuction, Combined.

CV 17 - 1764

RECEIVED
MAR 24 2017
PRO SE OFFICE

1 of

## INTRODUCTION

1. Plaintiff Nicholas Zimmerman [ FootNote 1 - see FootNote Section at end of this document. Hereinafter the word "FootNote" will be abbreviated with the letters "F.N." followed by the corresponding FootNote Number ] is a New York State prisoner currently confined to solitary at Clinton Correctional Facility in upstate Dannemora, New York. He brings this action against the above named defendants because the defendants (similar to the defendants in Zimmerman V. Wolczyk 9:15-cv-1437 and Zimmerman V. Todd 12-CV-0763) have initiated and continued a massive inter-departmental conspiracy to violate Mr. Zimmerman's First Amendment Right to Freedom of Speech, Fourth Amendment Right to be free from Unreasonable Seizure and Confinement, Sixth Amendment Right to the Effective Assistance of Counsel and to Access the Courts, Eighth Amendment Right to be free from Cruel and Unusual Punishment and Fourteenth Amendment Right to Due Process of Law and Equal Protection. The defendants have also violated several New York State Laws, Rules, Regulations and Policies in continuing their conspiracy. Mainly, the defendants have formed this conspiracy to stop the Plaintiff's operations of www.FREENicholasZimmerman.com which include a book entitled My Side of The Story - The Investigation - Part I, a CD entitled Puzz Pacino Presents: New York's Illest as well as several other items, products, literature, content, etc.... that are all adverse to the Department of Corrections public image. The above products and website are all a subsidiary of Mr. Zimmerman's

family-owned business, Madison Avenue Entertainment Group. The defendants intent was to also stop Mr. Zimmerman's litigation and promotion of the "Clean Up The Clinton Special Housing Unit (S.H.U) Campaign" which was, among other things, a letter writing campaign to force S.H.U. staff to perform even the most basic hygiene tasks such as sweeping and moping the company.

2. As a result of this conspiracy, Plaintiff has been sentenced to a combined total of two years (24 months) of solitary confinement time and loss of good time, as well as other privileges. In light of the dramatic change in which society views solitary confinement in terms of Eighth Amendment violations, the ruling in Peoples V. Fischer 11-CIV-2694 that found two years of solitary confinement time for the non-violent act of possessing U.C.C. materials was unconstitutional, the massive settlement that flowed from Judge Shiedlin's ruling that forced D.O.C.C.S to change their entire disciplinary guidelines for S.H.U sentences and the conditions of confinement for all solitary units in New York State, the pending legislation in the H.A.L.T. Solitary Confinement Act (A.4401/S.2659) which now has 41 Sponsors in the Assembly and 13 Sponsors in the Senate, this court should find that the two years that Plaintiff was sentenced to for the simple non-violent act of "Running a business", "solicitation", "possessing grievance documents", etc... is unconstitutional and inconsistent with 8th Amendment principles. The court should take notice that at no time did the defendants claim that their egregious conduct

3 of

and total disregard for the law was based on security concerns with regard to Plaintiff's status as an alleged escape risk.

## JURISDICTION

3. This is a Civil Rights action brought under 42 USC 1983, 1985 and 1986. This court has jurisdiction under 28 USC 1331 and 1343. The Plaintiff is entitled to declaratory relief pursuant to 28 USC 2201, Et seq. Plaintiff also invokes the pendant jurisdiction of this court.

## PLAINTIFF PARTIES

4. Nicholas Zimmerman
02-A-1663
Clinton Correctional Facility
P.O. Box 2001
Dannemora N.Y. 12929

## DEFENDANT PARTIES

5. All defendant parties listed below are either former or current employees of Clinton Correctional Facility, P.O. Box 2001, Dannemora N.Y. 12929. All process can be served at the Clinton Address. As to those defendants that do not work at Clinton, I have provided individual addresses for them below.

4 of

6. Steven Racette
   Former Supt. of Clinton C.F.

7. D. Quinn
   Former First Deputy of
   Clinton C.F.

8. Deputy Brown
   Former Deputy of Security
   at Clinton C.F.

9. Sergeant Orzech
   Current S.H.U Sergeant
   at Clinton C.F.

10. Sergeant Randall
    Current SHU Sergeant
    at Clinton C.F.

11. Officer C. Gadway
    Current Corrections
    Officer at Clinton C.F.

12. Lieutenant Rief
    Current LT. at Clinton C.F.

13. Officer Mallioux
    Current Corrections Officer
    at Clinton C.F.

14. Doctor Robert Adams
    Current Doctor at Clinton C.F.

15. Doctor Johnson
    Current Doctor and possibly
    Nurse Administrator at
    Clinton C.F.

16. Officer C. Stickney
    Current Corrections Officer
    at Clinton C.F.

17. Officer R. Lee
    Current Corrections Officer
    at Clinton C.F.

18. Deputy E. Bell
    Current Deputy of Security
    at Clinton C.F.

19. Michael Kirkpatrick
    Current Superintendent of Clinton

20. Lieutenant Minard
    Current Hearing Officer at
    Clinton C.F.

21. Hearing Officer Bullis
    Current Commissioners Hearing
    Officer at Clinton C.F.

22. Sergeant Delisle
    Current S.H.U. Sergeant
    at Clinton C.F.

23. Sergeant Hicks
    Current S.H.U. Sergeant
    at Clinton C.F

24. Librarian K. Delisle
    Current Librarian at
    Clinton C.F.

25. Deputy Macintosh
    Current Deputy of Programs
    at Clinton C.F.

26. J. Woldron
    Current Mental Health
    Unit Chief at Clinton C.F.

27. Doctor Sawyer
    Current Psychiatrist
    at Clinton C.F.

28. Doctor Galanie
    Current Psychiatrist
    at Clinton C.F.

29. Officer S. Boudette
    Current SHU Corrections
    Officer at Clinton C.F.

30. Captain P. Devlin
    Current Security Captain
    at Clinton C.F.

31. C. Simpson
    Current Nurse Administrator
    at Clinton C.F.

6 of

32. Head Mail Clerk

    Current Mail Clerk at

    Clinton C.F.

33. Norman Bezio

    Former Director of the

    Special Housing Unit

    Department of Corrections

    State Office Campus

    1220 Washington Ave.

    Albany, NY 12226

34. Albert Prack

    Former Director of the

    Special Housing Unit

    Department of Corrections

    State Office Campus

    1220 Washington Ave.

    Albany, NY 12226

35. D. Venettozzi

    Current Director of the

    Special Housing Unit

    Department of Corrections

    State Office Campus

    1220 Washington Ave.

    Albany, N.Y. 12226

36. The defendants here are being sued in their individual capacities and in their official capacities for declaratory and monetary damages as officials of the New York State Department of Corrections. Plaintiff is currently working to obtain full name and official position for defendants of which their identifying information is insufficient.

7 of

## ADMINISTRATIVE REMEDIES

37. I did present the facts relating to this complaint to the grievance committee, superintendent, commissioner, director of special housing unit, etc... All grievances and appeals were denied.

38. At the present time I have a 1983 Complaint pending in the Western District (see Zimmerman V. Todd 12-CV-0763), in the Northern District (see Zimmerman V. Wolczyck 9:15-CV-1437), in the N.Y.S. Court of Claims (Zimmerman V. State of New York, Claim No. 127969) and a case that has reached final disposition (see Zimmerman V. Wolczyck 9:06-CV-176).

## VERIFICATION

39. I affirm under the penalties of perjury that the aforementioned statements, and the following statements, are all true to the best of my knowledge and recollection, except as to those statements that are based upon information and belief, but even then, I believe those statements to be true.

## Summary Judgement -and- Preliminary Injunction

40. Since I have supported my 1983 Complaint with caselaw, statutes, exhibits, reports, affidavits, etc... I am asking this court to accept it as a motion for Summary Judgement and Preliminary Injunction as well.

8 of

## Subjects of Relevant Law

### The First Amendment Rights of Prisoners

It is already well established that prisoners before, and even after conviction, still retain their constitutional entitlement to exercise their First Amendment Right to Freedom of Speech. This right empowers the prisoner to file grievances, complaints and lawsuits against employees of the Department of Corrections, to contact the media, to receive visits and mail from family members and friends, to practice their religious beliefs and to appeal their criminal convictions, among other things. Similarly, people in the free world also possess a First Amendment Right to correspond with a prisoner. See Davis V. Goord 320 F3D 346 (2nd Cir. 2003) Procunier V. Martinez 94 Sct. 1800 (1974) Kimberlin V. Quinlan 774 F.Supp 1 (D.D.C 1991) O'Lone V. Estate of Shabazz 482 U.S. 342 (1987) Pratt V. Rowland 770 F.Supp 1399 (N.D.Cal. 1991) Bounds V. Smith 97 Sct. 1491 (1977) Overton V. Bazzetta 123 Sct. 2162 (2003) Douglas V. California 83 Sct. 814

Several federal courts have also recognized these entitlements to include the right of prisoners to be free from retaliation and government interference in the pursuit of their litigation. See Graham V. Henderson 89 F.3D 75 @ 80 ("This court has held that retaliation against a prisoner for pursuing a grievance violates the right to petition the government for the redress of grievances guaranteed by the First and Fourteenth Amendments" and is actionable under 1983". Citing Franco V. Kelly 854 F.2D 584, 2nd Cir. 1988." Intentional obstruction of a prisoner's right to seek redress of grievances

9 of

is precisely the sort of oppression that section 1983 is intended to remedy." @ 589. Citing Morello V. James 810 F. 2D 344 @ 347 2nd Cir. 1987." The Right to petition government for redress of grievances - in both Judicial and Administrative forums - is among the most precious of the liberties safeguarded by the Bill of Rights.")

The Right of Freedom of Speech has also been extended to include the right of prisoners to publish a book, receive internet generated research through the mail, to get married, engage in the practice of legitimate business, to do a television interview, to publish their articles in newspapers under a byline, etc.. See Jordan V. Pugh 504 F.Supp2D 1109 (2007 Colorado) Mumia Abu-Jamal V. Price 154 F3D 128 (3ed Cir. 1998) Clement V. California Dept. of Corrections 220 F.Supp 2D 1098 (California 2002) Turner V. Safely 482 U.S. 78 (1987) Hammer V. Ashcroft 42 Fed. Appx. 861 (7th Cir. 2002) While the Dept. of Corrections has a legitimate interest in preventing prisoners from publishing (or obtaining) writings that promote or involve "ongoing criminal activity, escape plans, advocate threats and violence", "fraud, extortion or that have an impact on the prison population or burden prison resources" (See Mumia Abu-Jamal V. Price 154 F3D 128 @ 135) prisoner published literature that does not promote any such activity should be permitted. (I.d.)

In recent years courts have supported prisoners pursuit of legitimate business practices and book publishing, either through conventional means, or through new internet based self-publishing or blogging. They have also severely penalized the Dept. of Correction(s) when they hamper a prisoner's attempt at doing so — especially when it seems the governments agenda is to stop the prisoner from promoting a message to the public that is constitutionally accepted and protected. (See Jimmat V. Manson 554 F Supp 1363, Connecticut 1983, investigating whether D.O.C's transferred Jimmat to another facility in retaliation for his writings and criticism of DOCS." However provocative Jimmats columns may be in the prison environment, they are, in most instances, an attempt to bring to the publics attention matters of serious concern to the society at large, and thus are clearly entitled to first amendment protection." See Mumia Abu-Jamal V. Price 154 F3D 128, 3ed Cir. 1998, investigating whether DOCS sentenced Jamal to disciplinary confinement and illegally read all of his personal and legal mail in retaliation for his writings and criticism of DOCS. "Although Jamal's articles, books and radio commentaries may have generated controversy beyond prison walls, unless they amount to fraud, extortion or threats to those outside the prison, valid objectives dwindle." @ 135. See Medina V. City of Philadelphia 2004 U.S. Dist. Lexis 9137, 2004, investigating whether DOCS confiscated Medina's manuscripts about the "Latin Kings" in retaliation for writing a book about gangs." Defendants (DOCS) state that the govt.

has an interest in prohibiting 'gang-related materials' in CFCF ..... and opine that the confiscated manuscripts constitute 'Recruit materials' ..... and promote the continuance of member-ship in a gang ..... Plaintiff (Medina) counters that .... the book is not gang related in the sense of prison security, especially since it remains within the confines of his cell..... Nothing in the record, however, suggests that plaintiff was conducting recruiting activities within the prison, distributing these materials outside of his cell, or even showing them to anyone ... (DOCS) admitted that the material contained nothing that would incite the prison population to commit violence against other prisoners." See Bretches. V. Kirkland 335 Fed. Appx. 675 (2009) (9th Cir.) investigating whether DOCS banned Mr. Bretches book from being published "because of its content." Drawing all reasonable inferences in Bretches favor, Bretches complaint and its supporting documents demonstrate that the prison officials decision to ban Bretches from publishing his book was intermingled with their determination that the content of his work was unsuitable..... We cannot conclude that the decision barring Bretches from publishing his book furthers an important or substantial interest unrelated to the suppression of Bretches expression." @ 677 (See Cassels V. Stalder 342 F Supp 2d. 555 (Louisiana, 2004) investigating whether DOCS retaliated against Cassels because (his mother) uploaded a message to the internet seeking legal assistance on his behalf. "Plaintiff conveyed information over the telephone to his mother

12 of.

who then placed the information on the internet to seek legal counsel for her son .... Plaintiff alleges that placing an ad on the internet seeking legal help was a constitutionally protected right.... Defendants argue .... that they have a legitimate security concern in preventing prisoners from spreading rumors and false information about employees [ on the internet. ] However, the vague language in Rule 30 K [which prohibits prisoners from spreading rumors] effectively shuts all avenues of communication with respect to any information that prison officials define as 'rumor' .... Allowing Plaintiff to communicate information to parties outside the prison in order to obtain legal counsel does not adversely impact guards or other inmates. Additionally, it also does not impact prison resources. Thus, the only accommodation necessary is to allow inmates ability to communicate freely when seeking legal assistance. ..... Therefore, Plaintiff was engaged in a protected activity when he was seeking legal counsel.... and applying Rule 30 K to Plaintiff resulted in the suppression of a fundamental right, namely the right to access courts and seek counsel. Hence, Rule 30 K is overbroad, vague and unconstitutional as applied." @ 565 - 567 . See Jordan V. Pugh 504 F. Supp 2d 1109 (2007, Colorado) investigating whether Rule 28 C.F.R 540.20(b), which prohibits prisoners from publishing articles in newspapers under a byline, is unconstitutional. "Bureau of Prisons (BOP) regulation prohibiting federal inmates from publishing under bylines violated First Amendment, despite BOP's concerns of creating 'Big Wheel' inmates who presented security risk, chilling

effect on performance or speech of prison staff, or permitting inmates to conduct business; where myriad of similar publishing opportunities were available to inmates, there were no particular security risk associated with inmate publishing under byline in news   media .... BOP had adequate authority to screen and exclude dangerous content coming into prison, and there was nothing linking inmates outgoing news media correspondence to inmates conducting business. @ 1109 See also "Byline Behind Bars: Fame, Frustration & First Amendment Freedom, By Clay Calvert, Loyola of Los Angeles Entertainment Law Review, Vol. 28:71, discussing and supporting the Jordan V. Pugh decision by Judge Marcia S. Krieger. "This article addresses the case of Jordan V. Pugh. It strives to do more, however, than simply explore and analyze the legal issues and arguments raised in this unique and intriguing case of first impression. In particular, it attempts to place the byline battle between Mark Jordan and the officials at the Supermax detention facility in Florence within a broader journalistic, cultural, and First Amendment Context." @ 75

## The Conspiracy Doctrine

As this court is already aware, federal law forbids anyone from conspiring to violate another person's rights. Section 1985(3) of 42 U.S.C. states: "If two or more persons in any State or Territory conspire ..... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection

14 of

of the laws, or of equal privileges and immunities under the laws.... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any-one or more of the conspirators." See Rosembert V. Borough of East Lansdowne 14 F.Supp.3D 631 (2014) @ 652 quoting 42 U.S.C. 1985 (3). Additionally, federal law prohibits the failure to stop a conspiracy from happening as well; Section 1986 of 42 U.S.C states: "Every person who, having Knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful acts be committed; shall be liable to the party injured." Rosembert @ 652

In order to state a claim for conspiracy under section 1983, "a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Gale V. Storti 608 F.Supp. 2D 629, 635 (E.D. Pa. 2009) (quoting Pfannstiel V. City of Mario, 918 F.2D 1178; 1187 (5th Cir. 1990) ) (abrogated on other grounds) A plaintiff must allege that there was an agreement or meeting of the minds to violate his constitutional rights. Id. (citing Startzell V. City of Philadelphia 533 F3D 183, 205 (3rd Cir. 2008).

In order to state a claim under section 1985 (3), "a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based

discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. Lake V. Arnold 112 F3D 682, 685 (3ᴱᴰ Cir. 1997) (citing Griffin V. Breckenridge, 403 U.S. 88, 102-03, 91 Set. 1790, 29 L. Ed. 2d 338 (1971)

        Section 1986 provides an additional cause of action for those able to state a claim under section 1985. Section 1986 provides a cause of action against persons who are aware of a section 1985 conspiracy, but fail to intervene. In order to state a claim under section 1986, a plain-tiff must allege that: (1) the defendant had actual knowledge of a section 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a 1985 violation, (3) the defen-dant neglected or refused to prevent a 1985 conspiracy, and (4) a wrongful act was committed. Clark V. Clabaugh 20 F3D 1290, 1295 (3ᴿᴰ Cir. 1994) The success of a section 1986 claim is contingent upon the existence of a viable section 1985 claim. Murphy V. Yates 2005 WL 2989630, at *2 n. 2 (E.D. Pa. Aug. 8, 2005) (quoting Moyer V. Borough of North Wales, 2000 WL 875704, at *4 (E.D. Pa. June 22, 2000).

### The IntraCorporate Conspiracy Doctrine
    There is yet another, but final hurdle, that a plaintiff must overcome in establishing a conspiracy claim. The plaintiff must be able

to defeat the "intracorporate conspiracy doctrine". Under this doctrine, "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of their employment, are legally incapable of conspiring with each other" Fitzgerald V. City of Troy, N.Y. 2012 WL 5986547 at *23 (quoting Jefferson V. Rose, 869 F. Supp. 2D 312, 317-18, E.D.N.Y.) Where "all alleged co-conspirators are employed by the same municipal entity, the intracorporate conspiracy doctrine precludes a conspiracy claim. Fitzgerald @ 24 (citing Baines V. Masiello 288 F. Supp. 2D 376, 394-95 (W.D.N.Y 2003) (holding that the conspiracy claim brought against the "Common Council, the Mayor and the City Clerk" was barred by the intra-corporate conspiracy doctrine) Broich V. Inc. Vill. of South Hampton, 650 F. Supp. 2D 234, 247 (E.D.N.Y. 2009) (holding that conspiracy claims against the Village Board trustees, mayor and former and current chief of police are barred by the intracorporate conspiracy doctrine)" See Trombly V. O'Neill 929 F. Supp. 2D 81 (2013 N.D.N.Y.) The claim must also fail "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers and employees, each acting within the scope of their employment" Chillemi V. Town of Southampton 943 F. Supp. 2d 365 (E.D.N.Y. 2013) @ 381 (quoting Dilworth V. Goldberg 914 F. Supp. 2d 433, 465 (S.D.N.Y. 2012) (quoting Herrmann V. Moore 576 F2d 453, 459 (2nd Cir 1978) see also Hartline V. Gallo 546 F3D 95, 99 n. 3 (2nd Cir. 2008) affirming the dismissal of a 1985 conspiracy claim where defendants were all Southampton P.D. employees.

17 of

The intracorporate conspiracy doctrine has been found to apply to New York State DOCCS employees as well. See Richard V. Fischer 38 F. Supp 3D 340 (W.D.N.Y 2014) "The intracorporate conspiracy doctrine bars conspiracy claims against employees of entities such as DOCCS." @ 353. See also Liner V. Fischer 2013 U.S. Dist. LEXIS 88147 @ 36 (SDNY June 24th 2013), Vega V. Artus 610 F Supp 2d 185, 205-06 (N.D.N.Y. 2009), Cole-Hoover V. N.Y. DOCCS, 2010 U.S. Dist. LEXIS 60002 @ 12 (W.D.N.Y. June 17th 2010), Borrello V. N.Y.S DOCCS 2004 U.S. Dist. LEXIS 19926 @ 8 (W.D.N.Y. Sept. 27, 2004) all cases in agreement that the intracorporate bar applies to DOCCS employees. However, the bar is not absolute, and it has several exceptions to it that allows a conspiracy case to proceed to trial.

"An exception to the doctrine exists where a plaintiff alleges facts that tend to show the defendants were pursuing personal interests wholly separate and apart from the entity." Hartline V. Gallo 2006 WL 2850604 @ 9 (E.D.N.Y. Sept. 30, 2005) rev'd on other grounds 546. F3D 95 (2nd Cir. 2008) See also Chance V. Reed 538 F. Supp. 2d 500, 509 (D.Conn. 2008) (explaining that it is possible for a conspiracy to exist despite the intracorporate doctrine "when the individual defendants are alleged to have been motivated by an independent personal stake in achieving the organizations objective." Also see Coggins V. County of Nassau 988 F Supp 2d 231 (2013) @ 249 Chamberlain V. City of White Plains 986 F Supp 2d 363 (2013) @ 388 Dilworth V. Goldberg 914 F Supp.2d 433 (2012) @ 466.

Exhibit A

<u>NICHOLAS ZIMMERMAN</u>
<u>02-A-1663</u>
<u>Clinton C.F.</u>
<u>P.O. Box 2001</u>
<u>Dannemora N.Y. 12929</u>

May 9th 2016

Attention: Media Review Committee
Subject: Confiscated Documents By C.O. C. Stickney
Reason: Requesting The Release of My Documents

Dear Media Review Committee,

Starting in September of 2015, I began a letter writing campaign regarding multiple unhygenic, unsafe, and life-threatening conditions that are currently in place in Clinton's Special Housing Unit (S.H.U) Many prisoners joined me in filing the complaints (that I admit to drafting for them) with the I.G.R.C, Superintendent, Correctional Association, World Health Organization, Center For Disease Control and many other organizations. I also started a Class-Action Lawsuit that several prisoners signed up to be apart of.

As a result of the progress of the campaign, Sgt. Delisle and his S.H.U staff officers started to retaliate against the prisoners. Delisle first issued a memorandum stating that if any prisoner is found to have food in his cell he would face disciplinary action.

1 of 4

Of course there is nothing in the Directive to suggest such a violation, but Delisle and company pushed forward with their Rogue regulation, in any event. Next came the showers, which "all of a sudden" after we started the campaign, the waters was ice cold for months. Mail delays upward of three to four weeks followed, but not before we were denied the right to buy deodorant and shampoo from commissary, something the Directive has allowed us to do for years. Of course, the prisoners suffered less food in their trays, but the worst form of retaliation came when Delisle either ordered (or failed to prevent) the in-cell radiators from reaching 40-60 degrees on days when the outside temperature was 50-60 degrees, thus leaving prisoners to bake in well over 100 degree heat. Because of the magnitude and severity of this level of retaliation, I decided to document all of this abuse in a second letter-writing campaign, which brings us to my reasons for writing you.

In my second complaint regarding the retaliation, I asserted that Supt. Kirkpatrick and Deputy Bell were well aware of the unhygenic practices in the S.H.U, the retaliation that flowed from the prisoner complaints and that they allowed it to continue. Two days after filing this latest complaint, Officer Stickney came to see me; which is odd since Stickney does not work the S.H.U. Stickney said that "Superintendent Kirkpatrick sent me to confiscate all of those 'Shotgun Grievances' you have been filing.

(2 of 4)

None of those grievances pertain to you and they are causing problems." (I later interpreted "Shotgun Grievances" to mean "powerful grievances," I guess?) (Officer) Stickney then searched my cell for (approximately (3) hours reading and confiscating hundreds of pages of my personal, religious, legal and business documents. On (his Contraband Receipt) dated (April 25th, 2016, Stickney claimed the documents were "taken for Media Review". Assuming your office has my files, I am asking that they be released to me immediately based on the following arguments.

POINT I:  Media Review Directive 4572 Part III (B) states "When there is a good faith belief that a publication already belonging to or in the possession of an inmate violates one or more of the Media Review guidelines, said publication shall be confiscated and referred to FMRC for review and decision."

There was no "good faith belief" on the part of Stickney to take my documents, because nothing in my documents represent a threat to the safety and security of the facility, incite violence or disobedience against law enforcement, give instructions regarding the use of firearms, explosives or weapons, does not contain information written in code or about escape methods, drugs, gangs, rioting, etc. (see 4572 Part II) The fact that my documents had already passed mailroom and media review scrutiny should give the assumption that they are permissable, especially since I am on mailwatch for life!

3 of 4

**POINT II:** Stickney was only ordered by Superintendent Kirkpatrick to take my documents because they wanted to retaliate against me for the letter writing campaign. I have been through the "confiscation process" sever all times (since I've been in prison and "always" immediately followed after I filed a grievance or lawsuit against a staff member or got into (a dispute with an () officer. This latest abuse) of Directive 4572, now by the Superintendent himself, is reprehensible! If the warden of the facility is engaging in acts of retaliation against his prisoners, (just imagine () () what he is allowing his (officers to do? It should () be noted that many of the documents that was taken from me are dated between 6 to 12 months ago. I had more than twenty cell searches since this time (and no officer confiscated my documents. Stickney was only sent to my cell to take my documents (after) the second grievance was filed, naming Bell and Kirkpatrick as co-conspirators.

Based on the foregoing, and since we are past the 10-Day deadline in order to () (review the files, I am asking that my documents be released (directly) to me by someone in the M.R.C. Please do not mail them to me because they might be discarded by an officer. Thanks for your time and attention to this matter and I look forward to your response. Sincerely,
Cc: Guidance, Ministerial Services

4 of 4

**I.G.R.C. Response:**        **Code   25**        **CL - 69531-16**

        The facility investigation has revealed that; the grievant received a MBR on 4/25/16 form the staff name in the instant complaint. The grievant can address his cell search issues and the returning of his confiscated papers with the hearing officer during his hearing.
The grievant's complaint with a written date of 4/19/16 concerning various SHU issues was filed as CL-69379-16. The grievance has been appealed to CORC.

Date returned to offender: _____    I.G.R.C. Members: _____

Chairperson: _____    _____

    _____

*Return within 7 days and check appropriate boxes.*

[✓] I disagree with IGRC response and wish to appeal to the Superintendent.

[ ] I have reviewed deadlocked responses. Pass-Thru to Superintendent.

[ ] I agree with the IGRC response and wish to appeal to the Superintendent.

[ ] I apply to the IGP Supervisor for review of dismissal.

Grievant's Signature: _____    Date: 6 - 8 - 16

Grievance Clerk's Receipt: _____    Date: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To be completed by Grievance Clerk

Grievance Appealed to the Superintendent: _____
                                                        Date

Grievance forwarded to the Superintendent for action: _____
                                                        Date

*An exception to the time limit may be requested under Directive #4040, section 701.6(g).

I.G.R.C./2b

| NEW YORK STATE | Corrections and Community Supervision | GRIEVANCE NO CL- 69531-16 | | DATE FILED 5/20/2016 |
|---|---|---|---|---|
| | | FACILITY CLINTON CORRECTIONAL FACILITY | | POLICY DESIGNATION I |
| **INMATE GRIEVANCE PROGRAM** MICHAEL KIRKPATRICK SUPERINTENDENT | | TITLE OF GRIEVANCE Papers Taken On Search | | CLASS CODE 25 |
| | | SUPERINTENDENT'S SIGNATURE | | DATE 6/30/16 |
| GRIEVANT ZIMMERMAN, N. | | DIN 02A1663 | | HOUSING UNIT SHU 27 |

The facility investigation has revealed that; the grievant received a MBR on 4/25/16 from the staff named in the complaint. The grievant can address his cell search issues and the returning of his confiscated papers with the hearing officer during his hearing.

The grievant's complaint with a written date of 4/19/16 concerning various SHU issues was filed as CL-69379-16. The grievance has been appealed to CORC.

I concur with the response from IGRC.

PD/klb

## APPEAL STATEMENT

If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C.

I am appealing because I disagree with this decision and I am relying on the arguments in my original complaint

7-7-16
DATE

GRIEVANT'S SIGNATURE

GRIEVANCE CLERK'S SIGNATURE

DATE

*An exception to the time limit may be requested under Directive #4040, section 701.6 (g)
Form 2133 (02/15)

5/29/16

To: Deputy Bell

From: Nicholas Zimmerman /02A1663 / SHU 27 Cell

Subject: Confiscated Documents

Reason: Requesting Review

Dear Deputy Bell,

As per our conversation on Thursday 5/26/16 in which I explained to you that officer Stickney took active legal documents from me as part of his search on April 25th 2016. You said you would allow for me to review the documents such that I could locate the ones that was legal in front of your designee so that I could retrieve them from the bunch of documents that was confiscated. I ask that you allow me to conduct this review (as soon as possible) as I have already been seperated from my files for more than a month and I have countless impending deadlines in several courts. In addition, several of the business and personal documents that was taken relate to my lawsuit in Zimmerman V. Todd 1:12-cv-0763 and Zimmerman V. Todd 915cv1437 in which I am arguing that I have a First Amendment Right to conduct a business. (I am using the majority of my files as exhibits in my lawsuits. As these

documents pose no credible threat to your security, I am asking that they be returned to me as well. In addition, as I stated to you during our conversation, Hearing Officer Minard never found the documents in question to be "Contraband" (nor was I charged with this violation) and never ruled that he was "confiscating" the files. Therefore, I should be allowed to possess them.

In closing, I ask again that I be allowed to review and retain my files.

P.S. Please respond in writing.

Sincerely,

P.S. Another showing that the files don't pose a threat is that Minard never mentioned or relied on the documents as justification for giving me six months of SHU in the "Statement of Evidence Upon." Moreover, none of the documents were used, discussed or read into the record at the hearing and Stickney only relied on four of the documents in his misbehavior report, but more than 250 documents were confiscated? Therefore, since my documents bare no rational connection to the hearing packet and record of appeal, I am asking that they be returned to me.

2 of 2



**NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

## MEMORANDUM

**TO:**      Zimmerman, N.      02A1663      SHU-27

**FROM:**    J. Miller, Disciplinary Lieutenant

**DATE:**    5/25/16

**SUBJECT:**  Contraband

    Your recent communication regarding the disposition of recently confiscated articles was referred to my office for review and response. Be advised that, in accordance with Directives 4932 and 4910A, any materials deemed contraband by the Hearing Officer will be held in the Contraband Locker for 90 days pending the outcome of any appeal and then will be disposed of as authorized by the DSS.

J. Miller, Disciplinary Lieutenant

JM/kal

cc:    File

Clinton Correctional Facility, 1156 Route 374, P.O. Box 2000, Dannemora, N.Y. 12929-2000 | (518)492-2511 | www.doccs.ny.gov

164

Exhibit B

To: Deputy Bell, Supt. Kirkpatrick                    8/1/16
From: Nicholas Zimmerman / 02A1663

As you already know my disciplinary infraction for April 25th, 2016 by Stickney and Delisle was REVERSED and the charges for solicitation and correspondence violation were completely dismissed. Since this all charges relating to "running a business" WERE expunged, I am asking for the return of all my business documents that was taken from me.

Sincerely,

04/27/16                  STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES   PAGE   1
DCP604                       SUPERINTENDENT  HEARING DISPOSITION RENDERED

                CLINTON GEN                              TAPE NUMBER _16·31·4_

DIN: 02A1663 NAME: ZIMMERMAN, NICHOLAS              LOCATION: SH-UU-027

INCIDENT DATE & TIME:        04/25/16   09:40 AM    TIER 3

REVIEW DATE:                 04/25/16              BY: LT  DAVIS, A J

DELIVERY DATE & TIME:        04/27/16   10:12 AM  BY: CO  SHANLEY, T J

HEARING START DATE & TIME: _5/3/16  4:48 ᵖᵐ_ BY: _Actg Capt Mc____l_

HEARING END DATE & TIME: _5/20/16  12:05pm_ BY: _Actg Capt Mc____l_
WAS THERE NEED FOR A FORMAL MENTAL HEALTH/INTELLECTUAL CAPACITY ASSESSMENT? Y /Ⓝ
DOES THIS MISCONDUCT MEET THE CRITERIA FOR WORKPLACE VIOLENCE?  Y /Ⓝ
CHARGE
NUMBER      DESCRIPTION OF CHARGES              REPORTED BY            DISPOSITION

105.13      GANGS                          CO   STICKNEY, C J          _Not Guilty_
------      ------------------------------ ----  -------------------

103.20      SOLICITING                     CO   STICKNEY, C J          _Guilty_
------      ------------------------------ ----  -------------------

180.11      FACILITY CORRESPONDENCE VIOL                              _Guilty_
------      ------------------------------

103.10      BRIBERY OR EXTORTION           SGT  DELISLE, J D           _Guilty_
------      ------------------------------ ----  -------------------

103.20      SOLICITING                                                _Guilty_
------      ------------------------------

113.27      OTHER INMATE CRIME INFO.                                  _Guilty_
------      ------------------------------

180.11      FACILITY CORRESPONDENCE VIOL                              _Guilty_
------      ------------------------------

ANY GUILTY DISPOSITION WILL RESULT IN A MANDATORY DISCIPLINARY SURCHARGE IN THE
AMOUNT OF FIVE($5.00) DOLLARS BEING ASSESSED AUTOMATICALLY AGAINST THE INMATE.

PENALTY                      PENALTY  START   RELEASE  SUSPEND   DEFERRED RESTITUTION
CODE    DESCRIPTION          MO DAYS  DATE     DATE    MO DAYS   MO DAYS  $$$$ . ¢¢

| A000 | Special Housing | 180 | 2-27-18 | 8-30-19 | | | |
| ~~B000~~ | ~~Keeplock~~ | ~~240~~ | ~~4-30-19~~ | ~~12-20-19~~ | | Removed per FOS Lamanna 5/24/16 | |
| D000 | Loss of Recreation | 240 | 2-27-18 | 10-25-18 | | | |
| E000 | Loss of Packages | 240 | 2-27-18 | 10-25-18 | | | |
| G000 | Loss of Phone | 240 | 2-27-18 | 10-25-18 | | | |

**NEW YORK STATE**
**DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION**
**THE HARRIMAN STATE CAMPUS - BUILDING 2**
**1220 WASHINGTON AVENUE**
**ALBANY, N.Y.  12226-2050**

ANTHONY J. ANNUCCI                          JOSEPH BELLNIER
ACTING COMMISSIONER                         DEPUTY COMMISSIONER
                                            CORRECTIONAL FACILITIES

**REVIEW OF SUPERINTENDENT'S HEARING**

NAME:  ZIMMERMAN, NICHOLAS            NO.  02A1663

HEARING FACILITY:  CLINTON

ON BEHALF OF THE COMMISSIONER AND IN RESPONSE TO YOUR RECENT

LETTER OF APPEAL, PLEASE BE ADVISED THAT YOUR SUPERINTENDENT'S HEARING OF

MAY 20, 2016,      HAS BEEN REVIEWED AND MODIFIED ON JULY 22, 2016.

DISMISS CHARGE(S): 103.10, 103.20, 113.27, 180.11, 180.11.

PENALTIES:
100 DAYS SPECIAL HOUSING UNIT
100 DAYS LOSS OF RECREATION
100 DAYS LOSS OF PACKAGES
100 DAYS LOSS OF PHONE

D. VENETTOZZI
DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM

CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES

APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.

CC: Inmate legal mail SH-VU-027

RECEIVED
JUL 25 2016
INMATE RECORDS



**NEW YORK STATE** | **Corrections and Community Supervision**

*Exhibit C*

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

## MEMORANDUM

**TO:**       Zimmerman, N.    02A1663    SHU-27

**FROM:**    J. Miller, Disciplinary Lieutenant

**SUBJECT:**  Inmate letter dated 8/1/16

**DATE:**     9/30/16


    Your recent communication concerning the disposition of property confiscated on 4/25/16 was referred to my office for investigation and response. Be advised that, in accordance with Department Directives 4932 and 4910A, the confiscated materials were deemed to be contraband as you were found guilty of charge 103.20 Soliciting, and have been destroyed.


J. Miller, Disciplinary Lieutenant


JM/kal


cc:   DSS Bell
      File



1 of 1 DOCUMENT

Copyright 2015 The New York Times Company
The New York Times

August 12, 2015 Wednesday
Late Edition - Final

SECTION: Section A; Column 0; Metropolitan Desk; Pg. 1

LENGTH: 1954 words

HEADLINE: Brutal Interrogations After Two Escaped

BYLINE: By MICHAEL SCHWIRTZ and MICHAEL WINERIP

BODY:

Night had fallen at the Clinton Correctional Facility in far northern New York when the prison guards came for Patrick Alexander. They handcuffed him and took him into a broom closet for questioning. Then, Mr. Alexander said in an interview last week, the beatings began.

As the three guards, who wore no name badges, punched him and slammed his head against the wall, he said they shouted questions: "Where are they going? What did you hear? How much are they paying you to keep your mouth shut?" One of the guards put a plastic bag over his head, Mr. Alexander said, and threatened to waterboard him.

Hours earlier, Richard W. Matt and David Sweat had made their daring escape from the unit -- called the "honor block" -- where they were housed. Now it appeared that Mr. Alexander, a fellow convicted murderer who lived in an adjoining cell, was being made to suffer the consequences.

For days after the June prison break, corrections officers carried out what seemed like a campaign of retribution against dozens of Clinton inmates, particularly those on the honor block, an investigation by The New York Times found. In letters reviewed by The Times, as well as prison interviews, inmates described a strikingly similar catalog of abuses, including being beaten while handcuffed, choked and slammed against cell bars and walls.

They were also subjected to harsh policies ordered by the State Department of Corrections and Community Supervision: Dozens of inmates, many of whom had won the right to live on the honor block after years of good behavior, were transferred out of Clinton to other prisons. Many were placed in solitary confinement, and stripped of privileges they had accrued over the years -- even though no prisoners have yet been linked to Mr. Matt's and Mr. Sweat's actions.

Indeed, it is prison employees who have been implicated: One has pleaded guilty to aiding the escape; another faces criminal charges; nine officers have been suspended; and the leadership of the prison, in Dannemora, has been

Brutal Interrogations After Two Escaped The New York Times August 12, 2015 Wednesday

removed.

More than 60 inmates have filed complaints with Prisoners' Legal Services of New York, an organization that assists indigent prisoners. And 10 members of an inmate council at Clinton signed a letter last month to state corrections officials making similar allegations.

"We have been daily getting complaints along these lines from around the state," said Michael Cassidy, a lawyer for Prisoners' Legal Services.

After The Times published its findings, the corrections department released a statement saying the inmate complaints had been under investigation for several weeks and had "also been referred to the state inspector general."

"Any findings of misconduct or abuse against inmates will be punished to the full extent of the law," the statement continued.

Several inmates interviewed by The Times said they had been visited by members of the department's Office of Special Investigations.

Frantic Questioning

The accounts suggest that as corrections officers frantically pressed for information that could lead to the capture of the two prisoners, and perhaps exonerate themselves for the security lapses that contributed to the breakout, they resorted to brutal tactics that most likely violated department regulations.

Victor Aponte, who worked in the prison tailor shop where Mr. Matt also had a job, said a guard with an American flag tattoo, known at the prison as Captain America, tied a plastic bag around Mr. Aponte's neck in an interrogation and tightened it until he passed out. Reggie Edwards, who supervised the tailor shop, said corrections officials put him in solitary confinement for three weeks and threw out most of his belongings, including his family photographs and his wedding ring.

After a three-week manhunt, a federal agent shot and killed Mr. Matt on June 26. Two days later, a State Police officer shot Mr. Sweat, and he was captured.

Mr. Alexander got the news at Shawangunk Correctional Facility in Ulster County, where he had been transferred. He said he had earned his place on the Clinton honor block because he had not been written up for any serious infractions since entering the prison system in 2004. He occupied the cell next to Mr. Matt, who was in prison for murdering his boss and then cutting up the body. (Long before he cut his way out of prison, Mr. Matt was known around Clinton by the nickname Hacksaw.)

For Mr. Alexander, his cell's location apparently made him a target for investigators.

The night of the escape, Mr. Alexander said, he worked late at the tailor shop, and when he returned to his cell around 9:45 p.m., Mr. Matt gave him bowls of salad and fried chicken that had been bought at the commissary. "He told me: 'Don't worry about it. I'll get the bowls from you in the morning,' " Mr. Alexander recalled.

He said he was awakened around 5:15 a.m. for the morning count. "The officer comes banging on the bars," he said. "He goes to Matt's cell and bangs on the bars, and then he leaves and he bangs on Dave's bars." When there was no response, he said, a sergeant and several guards rushed up and down the cellblock shouting to one another that two inmates were gone.

"The sergeant comes over to me: 'You hear something? You had to hear something,' " Mr. Alexander recalled.

It would be several hours before the first details of the escape were made public. Around 11 a.m., Gov. Andrew

Brutal Interrogations After Two Escaped The New York Times August 12, 2015 Wednesday

M. Cuomo toured the honor block and inspected the holes the inmates had cut in the backs of their cells with hacksaw blades.

Governor's Stare

The governor then stopped to question Mr. Alexander.

"Must have kept you awake with all that cutting, huh?" Mr. Cuomo asked, according to video of the exchange. Then, Mr. Alexander said, the governor "gave me his best tough-guy stare and walked off."

Later, the governor said he would be "shocked" if any corrections officers had been involved.

Twice during the day of the escape, Mr. Alexander said he was questioned by investigators from the State Police and the corrections department inspector general's office.

Then, around 8 p.m., he was handcuffed and taken to a broom closet where, he said, three corrections officers whom he had never seen before interrogated him. An officer wearing a jacket with the initials C.I.U. -- Crisis Intervention Unit -- sat down and asked him, "Do you know the difference between this interview and those other interviews?" Mr. Alexander recalled.

This time, the officer warned, there were only uniformed guards in the room, Mr. Alexander said.

"The officer jumps up and grabs me by my throat, lifts me out of the chair, slams my head into the pipe along the wall," he said. "Then he starts punching me in the face. The other two get up and start hitting me also in the ribs and stomach."

With each punch, Mr. Alexander said, the officers shouted another question.

"The whole time he's holding me up by my throat," he added.

When Mr. Alexander repeatedly insisted that he had no information, one officer pointed to a plastic bag hanging on some pipes, asked if he knew what it was for and said, "You know what waterboarding is?" Mr. Alexander recalled.

The officer then put the bag over his head and started beating him again, Mr. Alexander said.

He said the interrogation lasted about 20 minutes, and he was then taken, bleeding, back to his cell.

Later, Mr. Alexander said, the same officer "began quietly taunting and threatening me, telling me, 'Don't worry, Fat Boy, we'll be seeing you really soon.' "

In a letter to Prisoners' Legal Services, Mr. Aponte, who also worked in the tailor shop, described going through a similar interrogation two days later.

One officer stood in front of a window blocking the view into the room, he wrote, while another guard in a C.I.U. windbreaker tied a garbage bag around his neck, "using the plastic bag as a hanging noose."

"I don't know how long he hung me up like that because I passed out," Mr. Aponte wrote.

Mr. Aponte, along with several other inmates, said they were initially denied medical care. Days later, when he was finally taken to the prison clinic, officers warned him not to tell the medical staff how he got his injuries, he wrote in a letter.

"The sergeant tells me that I've been in prison for a long time and I should know better, that if I didn't tell the nurse that was going to examine me that nothing has happened that they were going to kill me for real this time," he

wrote.

Paul Davila, another resident of the honor block, wrote in his complaint that after he was beaten during an interrogation, he was pressured to "sign a report stating, 'I was not assaulted.' "

"Left with no other choice," he wrote, "I signed."

In the two weeks after the escape, inmates from Clinton's honor block were dispersed, many of them sent to solitary confinement at other prisons. Some said they were beaten during their transfers by officers from the department's Correctional Emergency Response Team, known as CERT.

"The CERT team rushed into my cell, threw me down on the bed, twisted my wrist and yelled at me not to resist," an inmate, Manuel Nuñez, wrote in a letter, adding that later they "assaulted me while I was cuffed, chained and shackled."

Gantlet of Guards

He said when he and other inmates were lined up to board a corrections bus, officers passed by, punching them.

During an interview last week at Sing Sing Correctional Facility in Westchester County, Mr. Nuñez showed reporters purple scars around his right ankle that he said were the result of CERT officers' intentionally shackling him too tightly.

Some of the former honor block residents have lost privileges that had taken years to earn at Clinton. Mr. Edwards, who had supervised 50 inmates at the prison tailor shop, had been able to earn as much as $45 a week. Since being moved to Sing Sing, he has been working as a porter making $3 a week. "They took everything from me," he said. "They did everything they could to blame the ones who stayed."

Mr. Alexander said that days after being beaten up, he was moved, first to the Upstate Correctional Facility in Franklin County and then to Shawangunk Correctional Facility. In the process, he said he lost his TV, his diaries, family photos and a decade's worth of letters from his mother and aunt that he had laminated with packing tape for safekeeping.

Despite all this, Mr. Alexander and many others interviewed said they did not resent the two escapees. Mr. Sweat was serving life in prison with no possibility of parole for shooting a sheriff's deputy in the back 20 times and then running him over. Faced with that kind of time, some said, they may well have considered escape.

"I can't say what I'd do; I didn't have the time Sweat has," said Mr. Alexander, who has spent 11 years in prison and will be eligible for parole in 2023. "So no, I don't resent them. Maybe I should, but I don't."

Inmates said the freedoms awarded on the honor block were not what led to the escape. Investigators have found that it was a corrections officer and civilian supervisor who smuggled in the tools that aided Mr. Matt and Mr. Sweat. And because of security lapses, officials say, Mr. Sweat was able to spend night after night preparing an escape route, cutting through the backs of their cells, a brick wall and a steel steam pipe.

Investigators and inmates say that instead of making hourly rounds of the cellblock each night, as they were supposed to do, most guards slept through much of their shift.

"Laziness caused that incident, not privileges," Mr. Davila said.

Inmates joked that the only ones walking the cellblocks on the overnight shift were the cockroaches.

Brutal Interrogations After Two Escaped The New York Times August 12, 2015 Wednesday

**URL:**
http://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html

**GRAPHIC:** PHOTOS: Officers at the state prison in Dannemora, N.Y., where two killers broke out in June.
(PHOTOGRAPH BY MARK LENNIHAN/ASSOCIATED PRESS) (A1)
David Sweat, far left, and Richard W. Matt broke out of the prison from the honor block. No other inmates have yet
been implicated in their escapes. (PHOTOGRAPH BY NEW YORK STATE POLICE/EUROPEAN PRESSPHOTO
AGENCY)
Top, the Clinton Correctional Facility in Dannemora, N.Y., which Gov. Andrew M. Cuomo visited after two men
escaped in June. He suggested that nearby inmates must have heard something. (PHOTOGRAPHS BY MARK
LENNIHAN/ASSOCIATED PRESS
 DARREN McGEE/ OFFICE OF THE GOVERNOR, VIA REUTERS) (A15)

**LOAD-DATE:** August 12, 2015



1 of 1 DOCUMENT

Copyright 2015 The New York Times Company
The New York Times

October 2, 2015 Friday
Late Edition - Final

SECTION: Section A; Column 0; Metropolitan Desk; Pg. 1

LENGTH: 1769 words

HEADLINE: In Beatings, Inmates Feared a 'Captain America'

BYLINE: By MICHAEL SCHWIRTZ and MICHAEL WINERIP; Susan C. Beachy contributed research.

BODY:

Inmates at the Clinton Correctional Facility in northern New York said the guards who beat them in the days after a brazen escape in June wore no name badges and did not identify themselves.

But one guard, the inmates said, stood out. He had a large tattoo of the American flag down his left arm and was known around the prison as Captain America.

No officer has been publicly implicated in any wrongdoing since an investigation by The New York Times nearly two months ago found what appeared to be a campaign of retribution against dozens of Clinton inmates after the escape at the prison.

Now, through interviews with inmates, The Times has identified Captain America as Chad Stickney, a gang intelligence officer and onetime steward in the state corrections officers' union.

The inmates' willingness to come forward and be named speaks to their growing frustration with the pace of the investigation into their allegations. Amid worsening violence at the prison, some inmates said they had been subjected to further harassment after speaking out.

In the frantic days after the prison break, inmates said in letters and interviews with The Times that guards handcuffed them, took them for questioning into areas of the prison with no cameras, punched them and slammed them against the wall. One inmate described having a plastic bag pulled over his head and being threatened with "waterboarding."

Victor Aponte, 60, who is serving a life sentence for kidnapping and rape, said it was the officer known as Captain America who tied a plastic bag around his neck like a noose during an interrogation and pulled it so tightly that Mr. Aponte passed out.

In Beatings, Inmates Feared a 'Captain America' The New York Times October 2, 2015 Friday

Later, Mr. Aponte said, he had asked around at the prison and had learned that the guard was Officer Stickney. Three other prisoners who were at Clinton at the time of the escape, Rashad Scott, Eddie Matos and Luis Zenon, also told The Times that Officer Stickney was Captain America.

Mr. Zenon, along with another inmate, Paul Davila, also named a second prison employee, Kevin Norcross, as being present during some beatings. Mr. Davila said that Mr. Norcross had identified himself as a member of the internal affairs unit with the State Department of Corrections and Community Supervision. While Mr. Norcross did not take part in the beatings, the inmates said, he witnessed them.

Inmate accounts are frequently viewed skeptically by investigators. The Times interviewed six inmates at two different prisons for this article, and while they gave consistent accounts, their version of events could not be independently verified.

Officer Stickney did not respond to repeated requests for comment, nor did Mr. Norcross.

Neither Officer Stickney nor any other officer accused of taking part in beatings after the escape has been criminally charged. James Miller, the spokesman for the corrections officers' union, said that no officer had been disciplined in connection with the allegations and that Officer Stickney has had a clean disciplinary record in his 18 years as a corrections officer.

Michael Powers, the president of the corrections officers' union, said in a statement that had there been cases of brutality, officers from state, federal and local law enforcement agencies working inside the prison after the escape would have been aware of it.

"It is troubling and irresponsible to report allegations against officers as fact," Mr. Powers said. "Most New Yorkers would question the validity of accusations coming from convicted violent felons, who have long criminal histories and nothing to lose by making such claims."

Officer Stickney, who was chief steward for the corrections officers union at the Ogdensburg Correctional Facility before moving to the Clinton prison in 2012, has been sued three times for alleged assault and harassment.

One of the lawsuits was terminated after the inmate who filed it died. Two others are still active, including a suit filed in September by Terry Daum, an inmate who claimed that Officer Stickney punched him several times in the head and grabbed his genitals during a search. The lawsuit also said "Stickney utilized his hand to aggressively rub plaintiff's rectum like a credit card swipe and then attempted to jam his fingertips into plaintiff's rectum."

Four months after two convicted murderers, Richard W. Matt and David Sweat, escaped through the tunnels under the prison in Dannemora, N.Y., Clinton remains a tense place. There have been at least three major brawls among inmates, with officers using tear gas and, in one case, live ammunition to bring the prison under control, according to the corrections department.

The state's inspector general is expected in the coming months to release a report detailing security lapses that led to the escape. And the corrections agency has promised to investigate inmates' claims of abuse.

Asked at a recent news conference whether there was a problem with brutality by guards in the state prison system, Gov. Andrew M. Cuomo said that while there might be a few isolated incidents, officers were doing a "good job."

"State prisons are filled with very dangerous people," Mr. Cuomo, a Democrat, said. "They are policed by a relatively small number of correction officials, who are unarmed, I might add. It is a very, very difficult job. They have to make sure they get a certain amount of respect in the job, otherwise they get hurt."

The Correctional Association of New York, an inmate advocacy group with a legislative mandate to monitor the prisons, recently interviewed 30 Clinton inmates who described continuing abuse. Of those, two said they had been assaulted by Officer Stickney before the escape; one of the two claimed a plastic bag had been placed over his head during an interrogation.

After complaining about the beatings to investigators, lawyers and reporters, the inmates appear to have suffered further consequences.

Mr. Aponte, who described being choked by Officer Stickney, said in a prison interview in September that after the publication of the article in The Times, he was visited by a corrections department investigator who sought more information. Mr. Aponte said he told the investigator who Captain America was.

The status of that investigation is unclear. But Mr. Aponte said that after speaking with The Times, he was locked in his cell for 23 hours a day and not told why. Patrick Alexander, another inmate who spoke with The Times, was confined to his cell for a disciplinary infraction he believes was fabricated.

After speaking with investigators, Mr. Aponte wrote a letter to the authorities requesting a transfer to another prison because he feared for his safety. He received no response for more than a month.

"I'm afraid of retaliation," he said in an interview in September. "I know how they operate."

After The Times inquired about Mr. Aponte's request, corrections officials transferred him this week.

The prison break in early June set off a manhunt. Mr. Matt was killed by a federal agent three weeks later; two days after that, Mr. Sweat was captured.

The escape highlighted serious security failings at Clinton. Investigators say officers would routinely sleep during overnight shifts, allowing Mr. Matt and Mr. Sweat to spend hours each night searching the prison's underground tunnels for a way out.

Joyce E. Mitchell, a former civilian employee at Clinton, was sentenced this week to a minimum of two years and four months in prison after pleading guilty to providing Mr. Matt and Mr. Sweat with hacksaws and other tools. A guard at the prison has also been criminally charged. Nine officers were suspended after the escape, and the prison's leadership team, including the superintendent, was removed.

No inmates have been charged in the breakout.

In a memorandum dated Sept. 16, the corrections department warned officers not to punish inmates who spoke to the news media. "An inmate who has been interviewed by representatives of the news media shall not be subject to departmental discipline or any other adverse action," the memo said.

Mr. Alexander said that was exactly what happened to him after he told The Times that officers had beaten him and threatened to use waterboarding during an interrogation shortly after the escape.

At Shawangunk Correctional Facility, where he was transferred, Mr. Alexander said he had been verbally harassed by officers who referred to him as the "Clinton inmate" and called him a snitch.

He has also been subjected to frequent frisking by guards, he said, and kept his boots untied so that they could be removed quickly during searches.

In a September interview, Mr. Alexander said that he had not been compensated for personal possessions lost during his transfer from Clinton, including photo albums, journals, a hot plate, a lamp, beard trimmers and a 13-inch color television.

In Beatings, Inmates Feared a 'Captain America' The New York Times October 2, 2015 Friday

On Aug. 25, Mr. Alexander said that within a few hours of signing a consent form to be interviewed by CNN, he had been singled out by guards to provide a urine sample. Though he had never had a drug infraction during his 11 years in prison, or any other serious disciplinary issue, according to his records, an officer said he was suspected of using marijuana.

A week later, according to prison records, the test came back positive for THC, the psychoactive compound in marijuana.

The corrections department uses a drug test called EMIT that some medical professionals say can yield a false positive for THC. The results from the test given to Mr. Alexander should have been verified using a second method, said Dr. Louis Baxter, director of the American Board of Addiction Medicine. The Times provided Dr. Baxter with a copy of Mr. Alexander's urinalysis records. "This test I reviewed could have been positive because of the use of ibuprofen," he wrote in an email.

The corrections department said in a statement that the drug-testing method had been challenged in court and found reliable. Mr. Alexander, the statement said, was one of four inmates chosen to be tested as part of an investigation into drug use at Shawangunk.

At a prison hearing, Mr. Alexander said he had not used marijuana and accused officers of falsifying the test results to punish him for speaking to the media.

The hearing officer found him guilty, confined him to his cell for 30 days and stripped him of privileges, including using the phone and the commissary, for 90 days.

The officer also wanted the television removed from his cell, but Mr. Alexander said that would not be necessary because the corrections department had already lost it.

URL:
http://www.nytimes.com/2015/10/02/nyregion/prison-guard-known-as-captain-america-is-feared-on-upstate-cell-block.html

GRAPHIC: PHOTO: Prisoners at the Clinton Correctional Facility said officers assaulted them during interrogations. (PHOTOGRAPH BY JACOB HANNAH FOR THE NEW YORK TIMES) (A28)

LOAD-DATE: October 2, 2015

NICHOLAS ZIMMERMAN
02-A-1663
Clinton C.F.
P.O. Box 2001
Dannemora N.Y. 12924



March 13th, 2017

United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn N.Y. 11201
Subject: Black Entrepreneur V. The Department of Corrections
Reason: Filing my 1983 Civil Rights Lawsuit

Dear U.S. District Court,

Enclosed please find pages 1-18 of my 1983 Civil Rights Complaint. As you will see, the Complaint is incomplete. On April, 25th, 2016, officer C. Stickney searched my cell and illegally confiscated my business, legal and personal documents in retaliation for exercising my Rights to file grievances against Clinton staff and encouraging/assisting others to do the same. (See Exhibit A - Grievance about confiscated documents and administrative decisions.) Included in the confiscated documents was my completed 1983 Civil Rights Complaint. I wrote several letters and had several conversations with Deputy Bell and

1 of 3

Superintendent Kirkpatrick regarding my confiscated documents and based on these conversations I came to the conclusion that both parties had directed Stickney to take my documents. For months, they lead me to believe that if my disciplinary charges related to the documents were reversed by Central Office they would return my files. When the charges were reversed and dismissed (to everyone's surprise) (see Exhibit B - Decision by Central Office) the Deputy of Security still ordered all of my documents to be destroyed. (See Exhibit C - LT. Miller's letter confirming destruction of documents.)

Since the confiscation of my documents I have done the best I could to re-construct my (entire) lawsuit over from scratch. Every few months officers search my cell and steal a handful of my documents and I am then forced to rewrite those pages again. Therefore, by way of this letter, I am asking for an adjournment of 90 days in which to file my completed complaint. I promise to do everything that I can to finish the lawsuit within that time frame.

As far as Venue is concerned, several courts have held that Venue is proper in the District where the plaintiff lived before his incarceration or where he plans to live after release. Flanagan V. Shively 783 FSupp 922 affirmed 980 F2D 722. O'Brien V. Schweiker 563 FSupp 301. Venue is also proper in the District

2 of 3

Where the defendants maintain their offices, either in the State capitol or in the district where their regional offices are located. Taylor V. White 132 FRD 636. Oneil V. Battisti 472 F2D 789. Therefore, since I lived in Brooklyn before my incarceration (and I plan to return there) and since the Dept. of Corrections has regional offices in the Eastern District, I am requesting permission to file my case in this District.

In conclusion, I am attaching a copy of an article regarding Officer Stickney's brutal actions during the 2015 escape attempt. As you will see, DOCCS had years of prior knowledge about Stickney's assaultive behavior yet they continued to employ him anyway. And most times, as in my case, Clinton Administrative officials kept Stickney around and used him to instill fear in certain political prisoners and jailhouse lawyers. I will elaborate more on this issue in the forthcoming complaint. Lastly, in the event that my request is granted to file a late claim, I ask that my case be filed as The Black Entrepreneur V. The Department of Corrections as I currently do business under the title "The Black Entrepreneur".

P.S. It is important to note that the first constitutional violation in my complaint occurs on April 20th 2014 which is why I need an adjournment on my three year deadline to file.

Sincerely,

x _____

Nicholas Zimmerman

The Honorable Black Entrepreneur

PrisonInmates.com/NicholasZimmerman 02A1663

3 of 3

Clinton

Correctional Facility

NEOPOST
03/22/2017
US POSTAGE $003.03

ZIP 12929
1M11272305

Eastern District Court
Cadmann Plaza East
Klyn, N.Y. 11201

Clinton Correctional Facility
P.O. Box 2001
Dannemora N.Y. 12929
Nicholas Zimmerman / 02A1663

* Legal Mail *

To: U.S.
225
Broo