**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

NICHOLAS ZIMMERMAN,

                    Plaintiff,

        v.                                                        No. 9:17-CV-375
                                                                  (TJM/CFH)
STEVEN RACETTE, et al.,

                    Defendants.

─────────────────────────────────

**APPEARANCES:**                          **OF COUNSEL:**

Nicholas Zimmerman
02-A-1663
Wende Correctional Facility
P.O. Box 1187
Alden, New York 14004
Plaintiff pro se

Attorney General for the                  BRIAN W. MATULA, ESQ.
    State of New York                     Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Nicholas Zimmerman ("plaintiff"), an inmate who was, at all

relevant times, in the custody of the New York State Department of Corrections

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants former Superintendent of Clinton Correctional Facility ("Clinton") Steven Racette ("Supt. Racette"); former Deputy of Security at Clinton Brown ("Brown"); current Superintendent of Clinton Michael Kirkpatrick ("Supt. Kirkpatrick"); Current Deputy of Programs at Clinton Macintosh ("Mcintosh"); Clinton Special Housing Unit ("SHU") Director Donald Venettozzi ("Venettozzi"); Clinton Deputy Zerniak ("Deputy Zerniak"); Lieutenant ("Lt.") Rief ("Lt. Rief"); Sergeant ("Sgt.") Mark Orzech ("Sgt. Orzech"); Sgt. Kevin Randall ("Sgt. Randall); Sgt. Justin Delisle ("Sgt. Delisle"); Correction Officer (C.O.") Jimmy Mailloux ("C.O. Mailloux")[2]; C.O. Christopher Gadway ("C.O. Gadway"); C.O. Chad Stickney ("C.O. Stickney"); C.O. Richard Lee ("C.O. Lee"); C.O. Stephen Beaudette ("C.O. Beaudette"); C.O. P. Devlin ("C.O. Devlin"); J. Miller ("Miller"); Deputy Supt. Keysor ("Keysor"); former Clinton doctor Richard Adams ("Dr. Adams"); New York State Office of Mental Health (OMH) doctor Sohail Gillani ("Dr. Gillani")[3]; Clinton Senior Librarian Kristen Delisle ("Librarian Delisle"); and DOCCS investigator Lisa J. Clemons ("Clemons"), violated his constitutional rights under the First and Eighth Amendments. See Dkt. No. 14 ("Amen. Compl.").[4]

---

[2]  The Clerk of the Court is respectfully directed to modify the docket to reflect that the correct spelling of this defendant's name is "Mailloux," not "Mallioux."  See Dkt. No. 68-29.

[3]  The Clerk of the Court is respectfully directed to modify the docket to reflect that the correct spelling of this defendant's name is "Gillani," not "Galanie."  See Dkt. No. 68-25.

[4]  Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. 1915A(b), Senior District Judge Thomas J. McAvoy dismissed 26 causes of action without

2

Presently pending before the Court is defendants' motion for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. See Dkt. No. 68. Plaintiff opposed the motion. See Dkt. No. 75.[5] Defendants filed a reply. See Dkt. No. 80. For the reasons that follow, it is recommended that defendants' motion for partial summary judgment be granted.

## I. Background

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II.A., infra. At all relevant times, plaintiff was an inmate incarcerated at Clinton.

---

prejudice and 23 defendants from the action. See Dkt. No. 17 at 59-60, 61. The Court held that the following claims survived sua sponte review: plaintiff's (1) Eighth Amendment claims against Sgt. Randall, Lt. Rief, and Brown related to his conditions of confinement in SHU Cell number 13; (2) Eighth Amendment claims against C.O. Lee, Sgt. Orzech, and Sgt. Delisle related to a Shield Order; (3) Eighth Amendment claims against Deputy Zerniak, Miller, and Venettozzi related to the length of plaintiff's SHU confinement at Clinton; (4) Eighth Amendment deliberate medical indifference claim against Dr. Gillani; (5) First Amendment claims against C.O. Gadway, C.O. Lee, and Clemons related to mail tampering; and (6) First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, Dr. Adams, Supt. Racette, Brown, Keysor, Devlin, Macintosh, and Supt. Kirkpatrick. See id. at 60-61.

[5] Plaintiff styled his responsive submission as a "Summary Judgment and Preliminary Injunction Motion." See Dkt. No. 75 at 1. However, upon careful consideration, the Court concludes that plaintiff's "Summary Judgment" motion is simply a typed reiteration of his hand-written Affidavit in Support of his Amended Complaint, as the facts and arguments set forth therein are the same in both filings. See Dkt. No. 14-1; Dkt. No. 75. In addition, as plaintiff's submission does not contain a Statement of Material Facts, it does not comply with N.D.N.Y.L.R. 7.1(a)(3). Further, the Court concludes that plaintiff's "Preliminary Injunction Motion" is merely a reiteration of the relief requested in the Amended Complaint. See Dkt. No. 75 at 67; Dkt. No. 14-1 at 73-74 (requesting identical relief in his Affidavit in support of his Amended Complaint to that stated in his "Preliminary Injunction Motion."). In fact, plaintiff's current "Preliminary Injunction Motion" is identical to the preliminary injunction motion that the Court previously denied on its initial review of the Amended Complaint. See Dkt. No. 16 at 1-2; Dkt. No. 17 at 62. Moreover, the only new documents contained in plaintiff's filing in Dkt. No. 75 are his responses in opposition to defendants' motion. See Dkt. Nos. 75-1, 75-2. Accordingly, the Court will treat plaintiff's submission as a response in opposition to defendants' motion for partial summary judgment and not as a cross motion for summary judgment or preliminary injunction motion.

## A. Plaintiff's Recitation of the Facts[6]

### 1. Plaintiff's Property

On April 14, 2014, plaintiff was transferred from Attica Correctional Facility ("Attica") to Clinton. See Dkt. No. 14-1 at 2 ¶ 2.  On April 25, 2014, C.O. Mailloux escorted plaintiff from his cell to the "property area" to allow plaintiff to take inventory of his property that had been mailed from Attica to Clinton.  Id. at 7 ¶ 11.  At the direction of Sgt. Orzech, when C.O. Mailloux let plaintiff out of his cell, he informed plaintiff that allowing him to inventory his property was a "privilege and if [plaintiff] g[a]ve [him] a hard time, [he would] put [plaintiff] back in [his] cell." Id.  Once they arrived at the property area, plaintiff was given only some of his property bags, which had been transferred from Attica to Clinton.  See id. at 2 ¶ 3.  Sgt. Orzech informed plaintiff that the Inspector General's ("IG") Office was holding his additional property bags.  See id.  At plaintiff's request, see id., Sgt. Orzech noted, in writing, on plaintiff's property transfer form that the IG was holding plaintiff's remaining property bags and indicated, "not all property received by Attica C.F. (late bags held by IG per phone message from Attica)." Dkt. No. 14-4 at 1.  The property transfer form also contains a checked box which

---

[6] Defendants' partial motion for summary judgment requests dismissal of only plaintiff's: (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams; (2) First Amendment mail tampering claim against Clemons; and (3) Eighth Amendment medical indifference claim against Dr. Gillani.  See Dkt. No. 68-3 at 6-12.  Accordingly, only the facts relevant to those claims will be recited herein.  In addition, to the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

states "I am not leaving active legal case materials behind and have been instructed to include all active legal materials in my 4-bag limit." Id. (capitalization omitted).

At some point while plaintiff was in the property area, C.O. Mailloux and plaintiff had a verbal disagreement and plaintiff told C.O. Mailloux that he "always like[d] to work with staff before filing a grievance about an issue." Id. at 7. In response to plaintiff's statement, C.O. Mailloux escorted plaintiff back to his cell "without being able to inspect [or] inventory" his property. Id. at 7 ¶ 12. "Hours later, [C.O. Mailloux] came to [plaintiff's] cell and gave [him] portions of [his] property . . . , which did not include [his] legal, political, business[,] and personal documents/book. All of these materials were kept in storage for [plaintiff's] entire three[-]year stay at Clinton." Id. at 7. Plaintiff filed a grievance against Sgt. Orzech and C.O. Mailloux on April 25, 2014, concerning the foregoing events and his missing property. See Dkt. No. 14-4 at 5. He filed two additional grievances on May 16 and May 20, 2014, regarding his missing property. See id. at 6-8. In addition, plaintiff requested, pursuant to the Freedom of Information Law ("FOIL"), video and audio recordings of his conversations with Clinton correctional staff regarding his property. See Dkt. No. 14-1 at 4 at 10-18. Plaintiff paid for the recordings, which were copied onto a compact disk, but before the disk was "mailed to [plaintiff's] paralegal assistant," Sgt. Orzech "destroyed" the disk by "put[ting] a stable in the bottom of [it]." Dkt. No. 14-1 at 5.

**2. Transfer to 13 Cell**

On April 27, 2014, plaintiff spoke to Sgt. Randall about his missing property.  See Dkt. No. 14-1 at 8 ¶ 14.  Sgt. Randall stated, "[o]h now you wanna [sic] talk to me[?]  You have stopped every [c]aptain, [d]eputy[,] and [s]uperintendent about your property, but you have not said anything to me about it.  This is my . . . unit and you must come to me first."  Id. at 9 ¶ 14 (parenthesis omitted).  Plaintiff replied that he "had not come to [Sgt. Randall] because he told [plaintiff] that [plaintiff] was a 'needy inmate' and that [plaintiff] should not 'stop him every[]day.'"  Id.  Approximately one hour after speaking to Sgt. Randall, plaintiff was taken to the property area and given "two more bags of [his] property."  Id.  After plaintiff obtained his property bags, he was "transferred to the infamous 13 Cell."  Id. (internal quotation marks and parenthesis omitted).  Plaintiff describes 13 Cell as "a dirty, filthy cell that is never cleaned by porters, feces stuck to the base of the toilet, urine soaked mattress, thick sheets of dust on the floor, no broom or cleaning supplies, no desk, no light, no music-tv outlet, etc. . . . ."  Id. at ¶ 15 (parenthesis omitted).  Plaintiff states that 13 Cell is only used for inmates who "file litigation or utilize mental health services."  Id. at ¶ 15.  Plaintiff filed a grievance against Sgt. Randall alleging that his transfer to 13 Cell was done "in retaliation for [plaintiff] exercising [his] rights."  See Dkt. No. 14-4 at 21.

The Inmate Grievance Program ("IGP") denied plaintiff's grievance against Sgt. Randall and clarified that plaintiff had "received a total of six bags of

property.  Four bags were received on 4/23/14 and two bags were received on

4/26/14.  During the processing of the property [plaintiff] became agitated with an

aggressive demeanor and it was determined that [plaintiff] was to be removed

and returned back to his cell."  Id. at 22.  Further, the IGP noted that plaintiff

> "was housed in accordance with facility and DOCCS
> policy and directives, as well as space availability.  [13
> C]ell was and is in normal use in unit #14.  Plaintiff is
> afforded the opportunity for cleaning and supplies []on
> Tuesdays, Thursdays[,] and Saturdays weekly.  The cell
> is equipped with an ear jack and [plaintiff] did sign for
> and has an ear headphone."  Id.

The Central Office Review Committee ("CORC") unanimously denied plaintiff's

appeal of the IGP determination, as without merit.  See id. at 23.  CORC

explained that "four bags of [plaintiff's] property were received on 4/23/14 and

two additional bags were received on 4/26/14.  It appears that one bag was

inadvertently misplaced."  Id. at 23.  CORC further noted that C.O. Mailloux

stated that plaintiff "became uncooperative while viewing his property on 4/25/14,

and that he was escorted back to the housing unit" and that he issued plaintiff "all

legal materials and 20 letters[] in accordance with [DOCCS] Directive #4933."  Id.

Moreover, CORC observed that plaintiff was "moved [to 13 Cell] due to his

behavior," which "was in normal use, has an ear jack, that headphones were

issued to [plaintiff,]" and that plaintiff was afforded cleaning supplies on

Tuesdays, Thursdays[,] and Saturdays."  Id.

### 3. Cell Searches

7

Plaintiff states that, on April 30, 2014, C.O. Gadway "ramsacked [sic] [his] cell, stole-confiscated-and destroyed [his] legal-personal and business documents and wrote two misbehavior reports charging [plaintiff] with violating" several DOCCS rules, including using his correspondence to solicit funds and conduct a business while in custody.  Dkt. No. 14-1 at 12 ¶ 19.  In his April 30, 2014 misbehavior report,[7] C.O. Gadway "claimed to have searched [plaintiff's] cell and confiscated documents that show[ed plaintiff] was running a business."  Id. at ¶ 20.  However, plaintiff states, he "was not in possession of any business documents" on April 30, 2014, as his property "bag #7 . . . which contained [his] business documents was allegedly lost or in the possession of the I.G."  Id. (internal quotation marks and parenthesis omitted).  Rather, to acquire plaintiff's business documents, plaintiff states that C.O. Gadway "went into [plaintiff's] alleged lost bags of property, grabbed a bunch of documents[,] and issued the [misbehavior] report" for the "sole purpose" of "rid[ding plaintiff] of [his] important business and legal documents" and "stop [plaintiff] from exercising [his] [F]irst [A]mendment rights."  Id. at 13 ¶ 20.

On July 18, 2014, C.O. Gadway again "ramsack[ed]" plaintiff's cell, confiscated documents, and issued a misbehavior report, which stated that "upon inspection of [plaintiff's] cell and . . . personal property[, C.O. Gadway] found [plaintiff] to be in possession of several documents [and] letters, providing

---

[7]  Although plaintiff refers to the misbehavior report issued by Gadway on April 30, 2014 as "Exhibit E," no such document is contained in plaintiff's list of exhibits.  See Amen. Compl. at 12 ¶ 20.

evidence that [plaintiff wa]s running Madison Ave. Entertainment Group[] while incarcerated" and using his correspondence privileges to solicit funds in violation of DOCCS rules.  Id. at 14; Dkt. No. 14-4 at 24.  "This time around [plaintiff] did have business documents in [his] cell, but Clinton's mailroom and Media Review Committee had reviewed them and allowed [him] to possess them."  Dkt. No. 14-1 at 14 ¶ 21.  "[A]ll documents [C.O. Gadway] confiscated and ultimately destroyed were adverse to [DOCCS'] public image."  Id.  Plaintiff states that C.O. Gadway "threw thousands of pages of doc[uments] all around [his] cell, ripping some pages," "ripped up photos, threw some documents on [plaintiff's] toilet, poured grape juice on [plaintiff's] sheets, put dirty books on [plaintiff's] clean clothes, and took [plaintiff's] pen so [he] couldn't write."  Id. at 17 ¶ 23.  Moreover, plaintiff states that, as "the A-man for the SHU, [C.O. Gadway] would have access to all complaints filed by SHU prisoners," and that his misbehavior reports were written in retaliation for plaintiff exercising his constitutional rights.  Id. at 17 ¶ 24.  Plaintiff filed a grievance against C.O. Gadway based on the July 18, 2014 cell search, which Supt. Racette denied.  See Dkt. No. 14-1 at 25-26, 34.

In May 2015, C.O. Lee conducted a search of plaintiff's cell and confiscated and threw away two of three copies of plaintiff's issue of Entrepreneur Magazine, allowing plaintiff to retain one copy.  See Dkt. No. 14-1 at 31 ¶ 42.  Plaintiff filed a grievance regarding C.O. Lee's actions, see Dkt. No. 14-4 at 36, which Supt. Kirkpatrick denied.  See id. at 40.  On June 19 and July 12, 2015, C.O. Lee searched plaintiff's cell and "threw away a neatly stacked

folder of magazine articles that [plaintiff had] been collecting to use as exhibits in [his] civil action to support [his] argument that prisoners have a First Amendment [r]ight to run a business." Dkt. No. 14-1 at 32 ¶ 42. C.O. Lee issued plaintiff contraband receipts for the documents he threw away, which he labeled as "excess garbage" and characterized as a "fire hazard" and "possibl[y] gang related." Dkt. No. 14-4 at 41, 42; see Dkt. No. 14-1 at 32 ¶ 43. With respect to the July 12, 2015 cell search, C.O. Lee confiscated 49 magazines and 11 books, and advised plaintiff that he "had to send them home because [he] was over the property limits." Dkt. No. 14-1 at 35 ¶ 47. Accordingly, plaintiff "filled out form 2068 and chose to send [the magazines] home through [a] visitor." Id. When plaintiff next went to the visiting room, he was informed that no bags were available for pickup. See id. Plaintiff "became extremely irate" and "decid[ed] that it was time to harass[,] bully[,and] mental[ly] tortur[e]" C.O. Lee. Dkt. No. 14-1 at 33 ¶ 45. In October 2015, plaintiff filed a grievance and letter concerning his "missing magazines." See id. at ¶ 48; Dkt. No. 14-5 at 14. Supt. Kirkpatrick denied plaintiff's grievance and informed him that the magazines were destroyed pursuant to DOCCS Directive # 4911 when the visitor plaintiff listed "never showed up for the visit." Dkt. No. 14-5 at 16. CORC upheld Supt. Kirkpatrick's determination. See id. at 17.

With respect to the July 12, 2015 cell search, C.O. Lee issued plaintiff three misbehavior reports. See id. at 43, 44, 45. One misbehavior report stated that, during the July 12, 2015 cell search, plaintiff began screaming at C.O. Lee

that he was "gonna [sic] violate [C.O. Lee] every chance [he] got."  Id. at 43.

C.O. Lee's misbehavior report states that he informed his area supervisor of

plaintiff's threat, and that plaintiff was removed from his cell and placed in a cell

with a plexiglass shield on the door.  See id.  The "shield order" was reevaluated

three times, once upon review by Sgt. Delisle and twice upon review by Sgt.

Orzech, and authorized by a higher ranking DOCCS official.  See Dkt. No. 14-4

at 46, 47, 48.  Another misbehavior report stated that, during the July 12, 2015

cell search, C.O. Lee discovered typed documents demonstrating that plaintiff

was attempting to solicit money through a pen pal program in violation of DOCCS

Rules 103.20 (soliciting) and 180.11 (facility correspondence).  See id. at 45.  In

a third misbehavior report, C.O. Lee stated that plaintiff harassed him by calling

him a "cracker ass bitch whenever he would make a round" and that plaintiff

sounded a false alarm.  Id. at 44 (internal quotation marks omitted).  Plaintiff

states that C.O. Lee "requested that a cell plexi-glass shield be placed on

[plaintiff's] cell door (which prevents all air circulation) because of the 'I'm gonna

violate you' statement."  Dkt. No. 14-1 at 33 ¶ 45.  He contends, however, that his

statement was mischaracterized because he told C.O. Lee only that he was

going to "verbally violate him."  Dkt. No. 14-1 at 34 ¶ 46.  Following a disciplinary

hearing, plaintiff was found guilty of creating a disturbance, harassment, and

threats in violation of DOCCS Rules 104.13, 107.11, and 102.10, respectively.

See Dkt. No. 14-4 at 53.  However, plaintiff was found not guilty of solicitation,

11

violating correspondence policies, possessing flammable materials, interference with an employee, or sounding a false alarm.  See id. at 53, 54.

In October 2015, plaintiff "started a non-violent, progressive, litigious, writing campaign labeled 'The Clean Up The Clinton SHU Campaign.'"  Dkt. No. 14-1 at 50 ¶ 68.  "The actions of the campaign was [sic] to file grievances, write to reporters-legislators-legal organizations, etc., post petitions on line, pass out flyers in the streets and ultimately, if all else failed, file a massive Class-Action lawsuit."  Id.  In November 2015, Clinton SHU inmates "started filing grievances." Id.  In retaliation for the Clean Up The Clinton SHU Campaign, "Sgt. Delisle and his SHU staff started to retaliate against [SHU inmates] by performing an increase in the destructive cell searches, denying [them] hot showers, hot food, mail, etc."  Id. at 50-51 ¶ 70.

On November 24, 2015, C.O. Beaudette instructed nonparty C.O. Myers to deny plaintiff a shower in retaliation for plaintiff's grievances.  See Dkt. No. 14-1 at 45 ¶ 63; Dkt. No. 14-6 at 39.  Plaintiff knew C.O. Beaudette was responsible for the denial of his shower when he found out that C.O. Beaudette was operating the mechanism that opens inmates' cell doors and, two or three days after the incident, C.O. Beaudette told plaintiff "I hear you was [sic] whining and bitching about your shower the other day.  More grievances equal less showers." Dkt. No. 14-1 at 45 ¶ 63.  On March 5, 2016, C.O. Beaudette took all of the food out of plaintiff's cell and placed dirty books on plaintiff's bed in retaliation for plaintiff's "Clean Up The Clinton SHU Campaign."  Dkt. No. 14-6 at 38.  On April

12

13, 2016, C.O. Beaudette searched plaintiff's cell, confiscated plaintiff's stamps, and issued plaintiff a misbehavior report for possessing "excessive stamps" in retaliation for plaintiff's filing of grievances.  Dkt. No. 14-1 at 46 ¶ 65.  C.O. Beaudette's misbehavior report charged plaintiff with violating DOCCS Directive #4422 and DOCCS Rule 113.16, which allow an inmate to have a maximum of $22.50 worth of stamps in his cell.  Dkt. No. 14-6 at 48.  C.O. Beaudette specified that, upon searching plaintiff's cell, he discovered an "envelope with 132 stamps in it," left plaintiff with 50 stamps, and confiscated the additional 82 stamps.  See id.  Plaintiff states that C.O. Beaudette "did[ not] realize at the time" that plaintiff was allowed to have $24.50 worth of stamps, "not the $22.50 as stated in the ticket," and that because the stamps C.O. Beaudette confiscated "were .20¢ and .01¢ stamps," the amount of stamps in plaintiff's possession was "well below the $24.50 limit."  Dkt. No. 14-1 at 46 ¶ 65 (parenthesis omitted).  Plaintiff states that C.O. Beaudette engaged in the foregoing conduct in "retaliation for [plaintiff] exercising [his] [First] Amendment rights."  Id.

"On April 25, 2016[,] Sgt. Delisle and C.O. Stickney searched [plaintiff's] cell and confiscated all of [his] personal, business and legal documents."  Id. at 51 ¶ 71.  Sgt. Delisle and C.O. Stickney each issued plaintiff two misbehavior reports.  See Dkt. No. 14-6 at 21-24.  C.O. Stickney's first misbehavior report cited plaintiff for solicitation and correspondence violations based on the discovery of documents indicating that plaintiff was attempting to solicit "individuals/businesses for funds to assist him in the operation of multiple

businesses," including "Black Entrepreneur Media Group, Brand Ambassador for Madison Avenue Entertainment Group ("MAEG"), Families Oppressed [b]y [t]he Criminal Justice System ("FOCIS"), and The FOCIS Movement Paralegal Services." Id. at 21 (internal quotation marks omitted). C.O. Stickney noted that plaintiff "represented [that he was] running these businesses and requesting funds for the services he is stating he will provide once paid." Id. C.O. Stickney also issued plaintiff a misbehavior report for possessing a list of names and identification numbers for inmates who were known gang members, which plaintiff had "concealed in [his] legal paperwork." Id. at 22. Sgt. Delisle issued plaintiff two misbehavior reports, which explained that plaintiff had composed duplicative grievances which he was "distributing to other [SHU] inmates" "that he had solicited or offered his services to[] sign" in violation of DOCCS Directive Nos. 4040 and 701.7, which require that inmate grievances be personal and prohibit SHU inmates as serving as advisors with respect to grievances. Id. at 23, 24. In particular, Sgt. Delisle noted that one document recovered from plaintiff's cell on April 25, 2016, stated that plaintiff was "the executive director of . . . FOCIS Paralegal & Advocacy Group" and that he was "collecting an initial fee of $20.00 that is applied to [a] $350.00 filing fee" and that plaintiff "offered these services to file the . . . grievances he manufactured for several other inmates." Id. Plaintiff filed a grievance concerning the April 25, 2016 cell search, which Supt. Kirkpatrick denied. See Dkt. No. 14-6 at 26.

14

**4. Library Services**

In March 2015, plaintiff "submitted requests for internet research [directly] to the Clinton-Essex-Franklin County Library." Dkt. No. 14-1 at 50 ¶ 58. His request was forwarded to Clinton Librarian Delisle. See id. On March 27, 2015, Librarian Delisle informed plaintiff that his requests "must be sent to the Facility General Library" and that "[f]rom there, the request will be forwarded to the correct location." Dkt. No. 14-5 at 23. In April 2015, plaintiff sent Librarian Delisle two letters inquiring about certain e-books. See id. at 24, 25. In response, Librarian Delisle informed plaintiff that, "[o]n the book cart in SHU, there is a list of available books. E[-]books are not permitted in a correctional facility." Id. at 27. Plaintiff filed a grievance claiming that he was being denied library services by Librarian Delisle, including, among other things, denying him access to books and research. See id. at 31. Supt. Racette denied plaintiff's grievance. See id. at 30. Plaintiff then sent a letter to Deputy Commissioner for Program Services at Clinton, Jeff McKoy ("McKoy"), who directed plaintiff that his "complaints [we]re being address through the [IGP]," that his grievance was "currently in process," and "recommended that [plaintiff] allow the grievance procedure to continue to await the decision." Id. at 32.

**5. Mail Watch Order**

In February 2017, Clinton engaged Clemons to perform an investigation into plaintiff's business activities. See Dkt. No. 14-1 at 60 ¶ 86. On February 16,

2017, plaintiff received a misbehavior report authored by Clemons charging him with 10 counts of solicitation in violation of DOCCS Rule 103.20.  See id.; Dkt. No. 14-7 at 40.  The charges were based on a series of 10 pieces of outgoing mail plaintiff sent between December 22 and December 29, 2016, for the purpose of, among other things, promoting plaintiff's website and businesses, including MAEG; advertising salaries to prospective employees of MAEG; creating a blog, crowd-funding website, and social media pages; and obtaining promotional material for his businesses.  See Dkt. No. 14-7 at 40-41.  Plaintiff states that Clemons read his outgoing mail without first obtaining a "mail[]watch order."  Dkt. No. 14-1 at 61 ¶ 86.

### 6. Medical Care
### a. Dr. Adams

"Within a few weeks of arriving at Clinton," plaintiff met Dr. Adams for "an initial medical interview."  Dkt. No. 14-1 at 22 ¶ 32.  When plaintiff requested medical boots, lotion, and a permit for clippers, Dr. Adams told plaintiff that his "time [wa]s up" and led him out of the room.  Id.  After his initial visit to Dr. Adams, plaintiff wrote a letter to Deputy Supt. Keysor requesting Magic Shave Cream because he gets "terrible razor bumps."  Dkt. No. 14-4 at 60.  Plaintiff also sent a letter addressed to Supt. Racette and Simpson on July 21, 2014 requesting medical boots.  See id. at 24 ¶ 33; Dkt. No. 14-4 at 61.  In a July 24, 2014 letter, Simpson informed plaintiff that his "concerns regarding foot[]ware

may be addressed at [his] next provider callout which ha[d] been scheduled." Id. at 62.  On July 29, 2014, plaintiff "was called to the hospital to see [Dr.] Adams, apparently for the medical boots."  Dkt. No. 14-1 at 24 ¶ 33.  When Dr. Adams asked plaintiff what he could do for him, plaintiff responded "I don't know[, d]id someone place me on a callout?"  Dkt. No. 14-4 at 63.  In response, Dr. Adams "started yelling and screaming [at plaintiff]" and "kicked [him] out of the office because [plaintiff] did[n't] know why [he] was there."  Dkt. No. 14-1 at 24 ¶ 33. Following his July 29, 2014 visit, plaintiff filed a grievance against Dr. Adams alleging medical malpractice.  See Dkt. No. 14-4 at 63-64.  On August 8, 2014, plaintiff received a letter from Dr. Adams that stated, "[d]ue to the fact that I do not and did not know of your alleged foot problem, we will arrange for you to come to the hospital for the same.  Should you require any special foot[wear] we will do our best to accommodate you."  Id. at 65.  Plaintiff then filed a grievance concerning the availability of Magic Shave Cream to SHU inmates.  See id. at 69.

In September 2014, Supt. Racette denied plaintiff's grievance concerning medical footwear, stating that "[t]he investigation . . . revealed that[ plaintiff] was reviewed by his provider for medical foot ware and provider determined that the medical boot requested was not justified at this time and that he will be glad to discuss this issue with [plaintiff] on the next callout to provider."  Id. at 67.  CORC upheld Supt. Racette's determination.  See id. at 68.  Supt. Racette also denied plaintiff's grievance concerning the availability of Magic Shave Cream to SHU inmates.  See id. at 71-72.

17

In October 2014, Dr. Adams prescribed plaintiff Fluocinonide for plaintiff's skin and determined that there was no medical need for a facial clipper permit. See Dkt. No. 14-1 at 24, 29; Dkt. No. 14-4 at 68. In March 2016, plaintiff again visited Dr. Adams and requested that Dr. Adams take photos of his skin and x-rays of his feet, which Dr. Adams declined to do. See Dkt. No. 14-1 at 26 ¶ 35. Plaintiff then filed a grievance against Dr. Adams alleging "harassment, retaliation, bias, discrimination, cruel and unusual punishment[,] and unfair treatment." Dkt. No. 14-5 at 4 (emphasis added). Plaintiff also complained that Dr. Adams would not "issue [him] a medical permit to purchase a pair of facial electronic clippers or Magic Shave Shaving Cr[eam]." Id. at 5. Plaintiff stated that Dr. Adams refused his requests "based largely (or probably solely) on [his] refusal to discuss [his case concerning Sing Sing] with him." Dkt. No. 14-1 at 26 ¶ 36. Supt. Kirkpatrick denied plaintiff's grievance. See Dkt. No. 14-5 at 8. CORC upheld Supt. Kirkpatrick's determination, explaining that, following his March 2016 visit, plaintiff saw Dr. Adams in June 2016 for his skin and that plaintiff had been "issued Hydrocortisone, Fluocinonide[,] and Clindamyacin since early 2015." Id. at 9. Moreover, CORC observed that Dr. Adams "determined that an electric shaver and Magic Shave [we]re not medically indicated." Id. CORC also noted that Dr. Adams "denie[d] making inappropriate comments[] and state[d] that [plaintiff] did not raise concerns regarding razor bumps during [his March 2016 visit]." Id.

18

### b. Dr. Gillani

In April 2014, due to "everything that was happening to [his] property, [plaintiff] became suicidal and was transferred [from 13 Cell] to the mental health unit ["MHU"] under Dr. Gillani's care" from April 27, 2014, until May 1, 2014. Dkt. No. 14-1 at 10 ¶ 17. Plaintiff told Dr. Gillani "[e]very[]day . . . throughout [his] stay" in the MHU that he "would commit suicide if [he] was forced to go back to 13 Cell." Id. On May 1, 2014, Dr. Gillani released plaintiff from the MHU and plaintiff was sent back to 13 Cell. See id. "On [May 5, 2014,] an officer found [plaintiff] fixing a noose around [his] neck and sent [him] back to the [MHU]." Id. at 10-11 ¶ 17. Plaintiff was again discharged from the MHU and sent back to 13 Cell on May 7, 2014. See id. Plaintiff states that Dr. Gillani "purposely ignored [his] plans for suicide and twice sent [him] back to 13 Cell to kill [him]self." Id. at 11 ¶ 17. At deposition, plaintiff testified that he attempted suicide on two separate occasions after being examined by Dr. Gillani, but could not recall the dates of those alleged incidents. See Dkt. No. 68-13 at 30, 37-42.

### B. Plaintiff's Arguments

Liberally construing the Amended Complaint, plaintiff asserts numerous First Amendment claims. Plaintiff alleges that C.O. Mailloux violated his First Amendment rights by denying him his property in retaliation for threatening to file grievances against him. See Dkt. No. 14-1 at 7 ¶ 12, 65 ¶ 93. Plaintiff also alleges that Sgt. Randall violated his First Amendment rights by transferring him

to 13 Cell in retaliation for plaintiff filing grievances concerning his missing property.  See id. at 8 ¶ 14 ("Sgt. Randall retaliate[ed] against [plaintiff] for exercising his right to inform the Clinton administration about [his] missing property."); id. at 65 ¶ 94.  Plaintiff contends that Sgt. Orzech is liable for C.O. Mailloux's and Sgt. Randall's allegedly retaliatory actions because he "failed to remedy," "allowed," "directed[,] and encouraged" C.O. Mailloux to deny plaintiff his property and Sgt. Randall to transfer plaintiff to 13 Cell.  Id. at 64 ¶ 92, 65 ¶ 93, 66 ¶ 94.

Further, plaintiff alleges that C.O. Gadway violated his First Amendment rights by filing a false misbehavior report, ransacking his cell, and confiscating and destroying his property in retaliation for plaintiff filing grievances.  Dkt. No. 14-1 at 17 ¶ 24, 66-67 ¶ 96.  Plaintiff also alleges that C.O. Lee violated his First Amendment rights by destroying his property, issuing him a false misbehavior report, and placing a shield order on plaintiff's cell in retaliation for plaintiff stating that he was going to "violate" C.O. Lee and filing grievances against him.  Id. at 33 ¶ 45; see id. 68-69 ¶ 100.  He contends that Sgt. Orzech is liable for Lee's conduct because he "failed to remedy the problem when learning about it."  Id. at 69 ¶ 100.

Plaintiff argues that C.O. Beaudette denied him a shower, took food from plaintiff's cell, placed dirty books on plaintiff's bed sheets, and confiscated his stamps in retaliation for plaintiff filing grievances and the Clean Up The Clinton SHU Campaign.  See id. at 45 ¶ 63, 46 ¶ 65, 70 ¶ 103; Dkt. No. 14-6 at 38-39.

Plaintiff also contends that Sgt. Delisle and C.O. Stickney retaliated against him for his Clean Up The Clinton SHU Campaign by conducting destructive cell searches, confiscating his property, and issuing him misbehavior reports. See Dkt. No. 14-1 at 51 ¶ 71, 71 ¶ 105 ; Dkt. No. 14-6 at 21-24. Moreover, plaintiff avers that Librarian Delisle violated his rights "to access information [and] freedom of speech . . . by denying [him] the research and books [he] requested." Dkt. No. 14-1 at 69 ¶ 101. Finally, plaintiff alleges that Dr. Adams violated his First Amendment rights by denying him adequate medical care in retaliation for filing grievances against him and for refusing to discuss his prior lawsuit concerning Sing Sing. See Dkt. No. 14-1 at 23 ¶ 32, 67-68 ¶ 98.

Plaintiff also asserts a First Amendment mail tampering claim against Clemons, alleging that she viewed 10 pieces of his outgoing mail without first obtaining a valid mail watch order. See Dkt. No. 14-1 at 61 ¶ 86. Moreover, plaintiff argues that Dr. Gillani violated his Eighth Amendment rights by exhibiting deliberate indifference to his serious medical needs when he twice released plaintiff back to 13 Cell from the MHU, despite plaintiff informing him of his "plans for suicide." Id. at 11 ¶ 17, 66 ¶ 95.

### C. Defendants' Motion for Partial Summary Judgment[8]

---

[8] As stated supra at 4 n.6, defendants seek dismissal of only: plaintiff's (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams; (2) First Amendment mail tampering claim against Clemons; and (3) Eighth Amendment medical indifference claim against Dr. Gillani. See Dkt. No. 68-3 at 6-12. The Court denied defendants' request to submit supplemental briefing—made nearly five months after expiration of the dispositive motion deadline—in which they sought to include arguments in support of dismissal of plaintiff's additional causes of action. See Dkt. Nos. 76-78. Notwithstanding the

**1. Plaintiff's First Amendment Claims**

**a. Sgt. Orzech and C.O. Mailloux**

Defendants first argue that plaintiff's First Amendment retaliation claims against Sgt. Orzech and C.O. Mailloux fail because "the withholding of plaintiff's property was an administrative error, rather than based on any improper motive." Dkt. No. 68-3 at 10. Defendants support their argument with Sgt. Orzech's declaration and two interdepartmental communications between Sgt. Orzech and Lt. Reif, dated May 12, 2014, and May 19, 2014. See Dkt. No. 68-31 at 1, 2. In his declaration, Sgt. Orzech denies withholding plaintiff's property or destroying the C.D. in retaliation for plaintiff's grievances. See Dkt. No. 68-30 at 2 ¶ 3, 4 ¶¶ 15-16. Sgt. Orzech explains that, on April 17, 2014, four of plaintiff's property bags were received from Attica and that the bags were "tagged with two inconsistent sets of tags, one set indicating that [p]laintiff had a total of seven bags, the other set indicating that he had a total of five bags." Id. at 2 ¶ 5; see Dkt. No. 68-31 at 1 ("The tags were numbered as I recall[:] 1 of 7, 2 of 7, and 5 of 7 [and] also tagged with a second set of plain tags that were numbered 1, 2, 3, and 4 of 5. No additional paperwork was delivered with these four bags.").

---

Court's order, defendants filed a reply to plaintiff's opposition that includes arguments in support of dismissal of plaintiff's additional causes of action. See Dkt. No. 79. Although the Second Circuit has clarified that a district court has discretion to consider a belatedly-asserted argument, see Ruggiero v. Warner–Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005), the Court declines to exercise that discretion here "in light of [p]laintiff's pro se status and the fact that [he] did not have an opportunity to respond" to the arguments advanced in defendants' reply brief. Byrd v. New York State Fingerlakes Developmental Disabilities Servs. O.P.W.D.D., No. 6:14-CV-06470 (MAT), 2018 WL 3305423, at *2 (W.D.N.Y. July 5, 2018).

Plaintiff informed Sgt. Orzech that "he believed [he had] about seven bags."  Dkt. No. 68-31 at 1; see Dkt. No. 68-30 at 2 ¶ 5; Dkt. No. 14-4 at 5.

Sgt. Orzech declares that, after another Clinton staff member contacted "Attica . . . by telephone, [he] was informed that the [I.G.]'s staff at Attica had detained some of [p]laintiff's property."  Dkt. No. 68-30 at 2 ¶ 6; see Dkt. No. 68-31 at 1.  He states that, on April 25, 2014, while plaintiff was present in the property processing area, he instructed C.O. "Mailloux to advise [p]laintiff that watching his property being processed was a privilege and subject to revocation." Id. at 3 ¶ 7; see Dkt. No. 68-31 at 1.  When Sgt. Orzech informed plaintiff that Clinton had received only four bags of his property and that the remainder were being detained by the IG at Attica, plaintiff "became agitated and aggressive."  Id. at ¶ 9; see Dkt. No. 68-31 at 1.  Sgt. Orzech determined that plaintiff's "continued presence could pose a threat to the safety and security of the facility," so he "had him removed to his cell in accordance with [DOCCS] Directive # 4933."  Id. at ¶ 9; see Dkt. No. 68-31 at 1.

Sgt. Orzech declares that, on April 26, 2014, Clinton received two more of plaintiff's property bags, which were "processed and returned to [p]laintiff on April 27, 2014."  Id. at ¶ 10; see Dkt. No. 68-31 at 1.  Thereafter, Clinton staff emailed Attica to inquire about any remaining property, in response to which "Attica . . . reported that [it] had sent seven bags to Clinton."  Id. at ¶ 11; see Dkt. No. 68-31 at 2.  Sgt. Orzech informed Lt. Reif that he was unable "to make further progress locating the seventh bag during [his] investigation."  Dkt. No. 68-31 at 2; see Dkt.

23

No. 68-30 at 3 ¶ 11.  Sgt. Orzech states that Brown made "another phone call to Attica . . . on [his] behalf," and that Brown "informed [Sgt. Orzech] that no investigation by IG was ongoing at [that] time."  Dkt. No. 68-31 at 2; see Dkt. No. 68-30 at 3 ¶ 12.  Sgt. Orzech informed Lt. Reif that he was "unaware as to why the original information received indicated IG involvement."  Id.; see Dkt. No. 68-30 at 3 ¶ 12.

Defendants also offer C.O. Mailloux's declaration in support of their motion for summary judgment.  See Dkt. No. 68-29.  C.O. Mailloux declares that, on April 25, 2014, "at the direction of Sgt. Orzech, [he] escorted [p]laintiff from his cell to the holding area where [plaintiff's] property was to be processed [and] advised [p]laintiff that watching his property being processed was a privilege . . . subject to revocation."  Id. at 2 ¶ 4.  C.O. Mailloux states that he "did not confiscate any letters or any other documents from [p]laintiff's property."  Id. at ¶ 6.  Further, he states that Sgt. Orzech "directed [him] to escort [plaintiff] back to his cell" after plaintiff "became aggressive during the processing of his property."  Id. at ¶ 7.

### b. Sgt. Randall

Defendants next contend that "plaintiff has failed to establish . . . that any of his complaints had any bearing upon [Sgt.] Randall's actions[] and, as such, has failed to make out a claim against him."  Dkt. No. 68-3 at 10.  In his declaration in support of defendants' motion for partial summary judgment, Sgt. Randall denies retaliating against plaintiff by placing him in 13 Cell on April 27,

24

2014, and states that his "actions in dealing with [p]laintiff . . . were not motivated by [plaintiff's] informing Clinton administration about his missing property." Dkt. No. 68-32 at 2 ¶ 8. He states that "[p]laintiff was housed in . . . 13-[C]ell in accordance with DOCCS and facility policy and directives and . . . availab[ility]." Dkt. No. 68-32 at 2 ¶ 4. He states that "[p]laintiff was . . . placed in . . . SHU based upon his behavior, and was held in that location until his behavior dictated a change and another cell became available." Id. at ¶ 5. Sgt. Randall declares that, "[c]ontrary to [p]laintiff's allegations concerning the cleanliness of [13 C]ell, it is a cell in normal use in Unit-14 SHU and is regularly maintained." Id. at ¶ 6. He explains that "[i]f a[ SHU] inmate is not satisfied with the condition of his cell, he is afforded the opportunity for additional cleaning supplies Tuesdays, Thursdays, and Saturdays weekly." Id. at ¶ 6.

### c. Sgt. Delisle, C.O. Stickney, C.O. Gadway, C.O. Lee, C.O. Beaudette, and Clemons

Defendants argue that plaintiff's admission to running a business and possessing business documents in knowing violation of DOCCS policy—the subject of the misbehavior reports issued by C.O. Gadway, C.O. Stickney, Sgt. Delisle, and Clemons—entitles those defendants to summary judgment as to plaintiff's First Amendment retaliation claims insofar as asserted against them. See Dkt. No. 68-3 at 9. Similarly, defendants contend that plaintiff's First Amendment retaliation claims against C.O. Beaudette should be dismissed, as

he "confiscated plaintiff's stamps, which were over the limit allowed to plaintiff and, . . . plaintiff admits [that the stamps] were being used for a business purpose." Id.[9]  Thus, defendants argue, C.O. Gadway, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, C.O. Lee, and Clemons are entitled to summary judgment as to plaintiff's First Amendment retaliation claims insofar as asserted against them because plaintiff "admit[s] to engaging in the conduct that formed the basis of the misbehavior report[s]."  See Dkt. No. 68-3 at 10 (quoting Brooks v. Rock, 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *24 (N.D.N.Y. Mar. 28, 2014) (internal quotation marks and citation omitted)).

Defendants submitted the declaration of C.O. Gadway, who states that, on April 30, 2014, and July 18, 2014, he conducted "authorized cell frisk[s] of plaintiff's cell."  Dkt. No. 68-23 at 2 ¶¶ 4, 5.  On both occasions, C.O. Gadway discovered documents and letters in plaintiff's cell, which "provid[ed] evidence that [plaintiff] was running a business named [MAEG]."  Id. at ¶ 4; see id. at ¶ 5.  C.O. Gadway explains that he confiscated these materials and placed them in a contraband locker.  See id. at ¶ 4.  "Because it is prohibited for an inmate to run a business while incarcerated, or to use correspondence privileges to solicit

---

[9]  Defendants' motion for partial summary judgment states that C.O.s "Lee and Beaudette confiscated plaintiff's stamps," and asserts that plaintiff's admission to possessing an unauthorized amount of stamps relieves both of these defendants from liability as to plaintiff's First Amendment retaliation claims.  Dkt. No. 68-3 at 7.  However, upon review of the pleadings, plaintiff does not base his First Amendment retaliation claim against C.O. Lee on C.O. Beaudette's confiscation of stamps.  See Dkt. No. 14-1 at 31-33 ¶¶ 42-45.  Therefore, defendants appear to have erroneously included C.O. Lee in their analysis of plaintiff's claims asserted against C.O. Beaudette.  Accordingly, the Court will construe defendants' argument insofar as it pertains to C.O. Lee as arguing, generally, that plaintiff's First Amendment retaliation claim against him fails because plaintiff admits to engaging in the conduct for which C.O. Lee issued him misbehavior reports.  See Dkt. No. 68-3 at 7.

money, [he] issued [p]laintiff . . . misbehavior reports charging him with violating Rules 103.20 (Soliciting) and 180.11 (Facility Correspondence)" on both occasions.  Id. at ¶ 4; see id. at ¶ 5.

Similarly, Sgt. Delisle declares that, on April 25, 2016, while plaintiff was confined in SHU, he and C.O. Stickney conducted a search of plaintiff's cell to search for and remove any contraband.  See Dkt. No. 68-17 at 2 ¶¶ 4-5.  "The order to search [p]laintiff's cell came from the CIU (Crisis Intervention Unit) in Albany, which tracks high-profile inmates."  Id. at ¶ 6.  Upon searching plaintiff's cell, Sgt. Delisle and C.O. Stickney confiscated papers, "including gang-related material being used by [p]laintiff in writing a book about his life on the street[,] which was not authorized without permission."  Id. at ¶ 7.  Sgt. Delisle and C.O. Stickney also confiscated "documents connected with the running of several businesses."  Id.  "All . . . contraband material was placed in the contraband locker[] and [p]laintiff was given a contraband receipt."  Id. at ¶ 8.  C.O. Stickney submitted a declaration, which contains a materially identical account of the April 25, 2016 search of plaintiff's cell, and specifies that possession of gang material is a violation of DOCCS Rule 105.13 and possession of documents related to running a business is a violation of DOCCS Rule 103.20.  See Dkt. No. 68-33 at 3.  Sgt. Delisle and C.O. Stickney both deny taking any action against plaintiff motivated by retaliation.  See id.; see Dkt. No. 68-17 at 3 ¶ 9.  Moreover, C.O. Stickney submitted a contraband receipt dated April 25, 2016, which states, "multiple pieces of paper, hand written and typed[ c]ontaining business material,

legal material, gang material, and other documentation" was confiscated and that "no property [was] damaged during search."  Dkt. No. 68-34.

Moreover, C.O. Beaudette declares that, upon conducting a "daily cell frisk on [p]laintiff's cell" on April 13, 2016, "as ordered by the Deputy Superintendent for Security," he "found an envelope with 132 stamps in it, and other excess property and food stores in [plaintiff's] cell."  Dkt. No. 68-15 at 2 ¶ 5.  C.O. Beaudette states that he "left 50 stamps in [p]laintiff's cell[,] secured 82 stamps in a contraband locker," and issued plaintiff a misbehavior report for, among other infractions, violating 7 N.Y.C.R.R § 113.16 and DOCCS Directive No. 4422, which prohibit inmates from possessing greater than $22.50 worth of stamps. See id. at ¶¶ 7, 8.  C.O. Lee declares that he "conducted several authorized random searches of [p]laintiff's cell" while plaintiff was housed in SHU, and discovered that plaintiff had magazines and books in excess of that allowed pursuant to DOCCS Directive 4933 section 302.2(e)(2)(xvii), which "permits an inmate to have a maximum of 5 books, magazines[,] and newspapers in his cell." Dkt. No. 68-27 at 2 ¶¶ 5, 6.  Concerning plaintiff's possession of multiple copies of the same magazine, C.O. Lee states that "there is no provision for an inmate to receive multiple copies of identical books, magazines[,] or periodicals."  Id. at ¶ 8.  Therefore, C.O. Lee states, he "returned the duplicate magazines to the mail room and issued [p]laintiff a contraband receipt."  Id. at 3 ¶ 9.  C.O. Lee explains that, "[o]n August 14, 2015, [he] . . . recorded that [p]laintiff had 49 magazines and 5 books beyond the prescribed limit," and notes that plaintiff chose to have

28

the excess magazines and [three] books sent out via a visitor [and] to have [two] of the books destroyed." Id. at ¶¶ 11, 12, 13.  However, because the visitor plaintiff listed to pick up his excess property never arrived on the scheduled date, his excess property was destroyed on September 3, 2015.  See id. at ¶¶ 14-15. C.O. Lee denies acting with any retaliatory motive for plaintiff filing grievances against him or other Clinton staff.  See id. at ¶ 16.

In addition, Clemons declares that, "[b]etween December 7, 2016[,] and January 17, 2017, [she] conducted an official investigation of [p]laintiff's correspondence."  Dkt. No. 68-16 at 2 ¶ 5.  She further states that "[c]ontrary to [p]laintiff's claim, on December 7, 2016, [she] submitted to [Supt.] Kirkpatrick a request for a 60-day MAIL WATCH of all incoming and outgoing non-privileged correspondence be initiated on [plaintiff's] mail[, which Supt. Kirkpatrick] approved . . . on December 9, 2016."  Id. at 2 ¶ 7 (internal quotation marks omitted).  Supt. Kirkpatrick "also approved [her] notice to [c]orrespondence staff, dated December 8, 2016, . . . that ALL mail for [plaintiff], except legal and privileged mail, be delivered to the [s]ecurity [o]ffice for a period of 60 days."  Id. at ¶ 8 (internal quotation marks omitted).

### d. Librarian Delisle

With respect to Librarian Delisle, defendants contend that plaintiff's deposition testimony "effectively nullified any" First Amendment retaliation claim asserted against her."  Dkt. No. 68-3 at 9.  Defendants point out that plaintiff

29

made clear at deposition that his claim against Librarian Delisle was premised on her denial of access to library searches and research materials "because Clinton did not want [him] to have any more information related to running a business." See id. at 10 (quoting Dkt. No. 68-13 at 78).  However, "[w]hen asked whether [Librarian] Delisle retaliated against him because he had filed grievances against her husband, [Sgt. Delisle,] plaintiff stated 'I can't say that because I don't know.'" Id. (quoting Dkt. No. 68-13 at 79).  Librarian Delisle declares that she denied plaintiff's requests for internet research based on DOCCS Directive # 4470, which explicitly provides that, "[f]or security reasons, DOCCS prohibits offender access to the Internet, and access for Librarians and other library staff in the library."  Dkt. No. 68-18 at 2-3 ¶ 7 (quoting Dkt. No. 68-22 at 6).

### e. Dr. Adams

Defendants argue that the record does not support plaintiff's contention that Dr. Adams denied him medical care in retaliation for plaintiff's filing of grievances against him; rather, defendants posit, the record establishes that plaintiff "was not in need of the medical treatment he alleges Dr. Adams denied him" and, therefore, that plaintiff's claim amounts only to a "disagreement over the proper treatment," which "[does] not create a constitutional claim."  Dkt. No. 68-3 at 11 (quoting Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)).  Dr. Adams submitted a sworn declaration in support of defendants' partial motion for summary judgment in which he states that his "denial of plaintiff's requests for

medical boots, lotion, blood pressure and other medications was based on [his] professional evaluation of [p]laintiff's medical needs," that "[i]n [his] estimation, the boots and medications requested were unnecessary," and that he "never . . . withh[e]ld medications as a means of retaliation for [plaintiff's] filing of grievances."  Dkt. No. 68-14 at 2 ¶¶ 6, 8.

### 2. Eighth Amendment Deliberate Medical Indifference Claims Against Dr. Gillani

Defendants argue that "[p]laintiff's deliberate indifference claim against [Dr.] Gillani must be dismissed because plaintiff cannot establish that [Dr. Gillani] acted with deliberate indifference toward any objectively serious medical need."  Dkt. No. 68-3 at 12.  Defendants rely on Dr. Gillani's declaration in which he explains that, "[o]n May 1, 2014, [he] examined plaintiff at the Residential Treatment Program Center ("RCTP") at Clinton" after "[p]laintiff was admitted to the RCTP [for] having expressed threats of self-harm."  Dkt. No. 68-25 at 2 ¶ 12, 2 ¶ 13.  Dr. Gillani states that he "was informed by staff that plaintiff had not engaged in any self-harming gestures."  Id. at 3 ¶ 15.  Further, Dr. Gillani declares that plaintiff "expressed to [him] that he did not want to return to [SHU]." Id. at ¶ 16.  "[S]taff informed [Dr. Gillani] that[,] while in the RCTP, plaintiff had been eating and sleeping well without any problems."  Id. at ¶ 17.  Dr. Gillani notes that "[p]laintiff informed [him] that he would be happy if he could be released into [g]eneral [p]opulation so that he could move freely in the prison and

visit the law library whenever he wanted"; "denied [feeling] any mood, psychotic, or anxiety symptoms"; and "denied any suicidal or homicidal ideas."  Id. at ¶¶ 18-20.

Moreover, Dr. Gillani states that, "[u]pon review of plaintiff's risk factors, [plaintiff] had a history of substance abuse and engaging in self-harming gestures only; plaintiff had no history of in-patient psychiatric treatment."  Dkt. No. 68-25 at ¶ 21.  In addition, "[p]laintiff was noted as facing sanctions in the SHU, but presented with no hopelessness, helplessness, feelings of being trapped, or other indications of a state of mind that would lead to suicidal behavior."  Id. at ¶ 22.  "After reviewing . . . plaintiff," Dr. Gillani concluded "that there was no evidence that plaintiff had evidence of any psychiatric illness"; "appeared to be presenting with environment-related agenda[,] specifically, seeking to be released from the SHU"; and "that plaintiff's complaints did not stem from mental illness, but rather, were calculated toward an effort to be released from his confinement in the SHU."  Id. at ¶¶ 23-25.  "Based on the foregoing, [Dr. Gillani] released plaintiff on May 1, 2014."  Id. at ¶ 26.  Attached to Dr. Gillani's declaration are his psychiatric progress notes for plaintiff dated May 1, 2014, which corroborate the statements and conclusions contained in his declaration. See Dkt. No. 68-26 at 1-2.

**D. Plaintiff's Opposition**

In opposition to defendants' motion for partial summary judgment, plaintiff "disagree[s]" with the factual recitation and arguments set forth by defendants. See Dkt. Nos. 75-1 at 1-2, Dkt. No. 75-2 at 1-3.  Concerning his Eighth Amendment medical indifference claim, plaintiff argues that, contrary to Dr. Gillani's assessment, his "mood was not normal" and that he "was clearly depressed and suicidal."  Dkt. No. 75-2 at 2 ¶ 10.  He also contends that his "immediate problem was not that [he] wanted to get out of the SHU, it was that [he] wanted out of 13 Cell."  Id.  Further, plaintiff "disagree[s]" that his claims against Librarian Delisle should be dismissed on the basis that he testified at deposition that "'[he] [didn't] know' if [Librarian] Delisle denied [him] law library resources as retaliation for [his] litigation" because "what [he] feel[s] is irrelevant." Dkt. No. 75-1 at 2 ¶ 2.  Plaintiff also "disagree[s]" that his claims concerning the destructive cell searches and withholding of property should be dismissed on the basis that he "admitted to running a business."  Id.  Moreover, plaintiff disagrees that he "had stamps in [his] cell to run [his] business" and states that "[his] stamps were to send out legal, personal, [and] political mail as well."  Id. at 1 ¶ 2.

### E. Defendant's Reply[10]

In reply to plaintiff's opposition, defendants reassert their argument that plaintiff's First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux,

---

[10]  As discussed supra at 17 n.8, the Court will not address defendants' arguments—raised for the first time in reply to plaintiff's opposition—concerning plaintiff's additional claims.

Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams should be dismissed. See Dkt. No. 79 at 9-11. Defendants contend that plaintiff has failed to establish that he was retaliated against for engaging in protected activity. See id. at 9. In particular, defendants argue that plaintiff, in fact, alleges that all of defendants' retaliatory acts were committed based on plaintiff engaging in the operation of a business— which is not protected activity—and not based on the filing of grievances. See id. 9-10. Further, defendants posit that the declarations of Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams establish "a non-retaliatory basis for the actions alleged against them." Id. at 10. Moreover, defendants posit that plaintiff's opposition, in which he "identified . . . things he 'disagreed' with, . . . fail[s] to . . . creat[e] an issue of material fact." Id. (quoting Dkt. No. 75-1 at 1, 2).

Defendants also reassert their argument that plaintiff's Eighth Amendment medical indifference claim against Dr. Gillani should be dismissed because the record evidence establishes "that Dr. Gillani's assessment (that [p]laintiff was motivated by an 'environmental-related agenda') was accurate" and that plaintiff's indications that he was suicidal were "calculated toward an effort to be released from his confinement in the SHU." Id. at 7 (quoting Dkt. No. 68-25 at 3 ¶ 24, 25). Defendants note that plaintiff expressly stated in his opposition that his "immediate problem" when he was in the Clinton M.H.U. was that he "wanted out of 13 Cell." Id. at 7 (quoting Dkt. No. 68-25 at 3 ¶ 24, 25; Dkt. No. 75-2 at 2 ¶

34

10). Finally, defendants contend that plaintiff's First Amendment claim against Clemons should be dismissed because, contrary to plaintiff's contention, Clemons' sworn declaration establishes that she obtained a mail watch order from Supt. Kirkpatrick prior to investigating his outgoing mail. See id. at 9. Defendants argue that plaintiff's "disagree[ment]" with the foregoing is insufficient to establish an issue of material fact. Id. at 9, 10.

## II. Discussion[11]
### A. Legal Standard

Summary judgment may be granted only if the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could

---

[11] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

return a verdict for the nonmoving party." Id. (internal quotation marks omitted). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 273. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (internal quotation marks and citation omitted); see also Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("[A]ffidavtis must be based upon concrete particulars, not conclusory allegations." (internal quotation marks and citation omitted)). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). "'The

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

**B. First Amendment Retaliation**

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) . . . the speech or conduct at issue was protected, (2) . . . the defendant took adverse action against the plaintiff, and (3) . . . there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context . . . adverse action" is "defined . . . *objectively*[] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although "'[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

"Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks, 2014 WL 1292232, at *18 (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant

may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See Green, 2006 WL 846272, at *3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in

the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

### 1. Sgt. Orzech and C.O. Mailloux

As an initial matter, it appears that plaintiff's April 25, 2014 grievance concerning his missing property was the first grievance he filed at Clinton in connection with the present lawsuit. See Dkt. No. 14-4 at 5. Consequently, it is impossible that Clinton personnel retaliated against plaintiff for filing grievances prior to that date. To the extent the Amended Complaint may be read as alleging that Sgt. Orzech and C.O. Mailloux retaliated against plaintiff for filing the April 25, 2014 grievance and subsequent grievances concerning his property by withholding plaintiff's property bags, his claim fails, as defendants have established through admissible evidence that the receipt of plaintiff's property was delayed due to administrative error, not out of retaliation, see Dkt. No. 30 at 2 ¶¶ 3, 4, 15-16; Dkt. No. 68-31 at 1-2, and plaintiff's conclusory allegations to the contrary fail to raise a triable issue of fact.

"To prevail on a [First Amendment] retaliation claim [based on lost or destroyed property, an inmate] must show both (1) that [the defendants] intentionally or deliberately lost or destroyed his property, and (2) that they were personally involved in doing so." Key v. Toussaint, 660 F. Supp. 2d 518, 526 (S.D.N.Y. 2009) (internal quotation marks and citations omitted). For example, in

Key, the court awarded summary judgment in favor of the defendant correction officers and dismissed the plaintiff's First Amendment retaliation claim alleging intentional loss or destruction of his property where "[t]here [wa]s no evidence that [the defendants] were the exclusive custodians of the property after they took possession of it" prior to the plaintiff's transfer to another correctional facility and "[t]he mechanism for storing [the plaintiff's] property and its chain of custody [wa]s simply unknown." Id. Further, observing that the defendants returned three of the plaintiff's four property bags, the court reasoned that "[t]he return of a portion of his property further suggest[ed] that there was no intentional act on any particular person's part to lose or destroy his property." Id.

Here, Sgt. Orzech's sworn declaration and accompanying interdepartmental communications with Lt. Reif establish that Clinton received four of plaintiff's property bags on April 23, 2014, which were labeled with inconsistent sets of numbering tags, indicating that plaintiff had either a total of five or seven property bags. See Dkt. No. 68-30 at 2 ¶ 5; Dkt. No. 68-31 at 1. The first four of plaintiff's bags to arrive at Clinton were issued to him on April 25, 2014. See Dkt. No. 68-31 at 1. Further, it is undisputed that Clinton received two more of plaintiff's property bags on April 26, 2014, which were issued to plaintiff on April 27, 2014; thus, as of April 27, 2014, plaintiff was in possession of six of his seven property bags. See Dkt. No. 68-31 at 2; Dkt. No. 14-4 at 2. Therefore, the fact that Clinton personnel issued plaintiff six of his property bags as they arrived at the facility from Attica within a two-day period, the evidence

"suggests that there was no intentional act on any particular person's part to lose . . . his property." <u>Key</u>, 660 F. Supp. 2d at 526.  In fact, the evidence demonstrates the opposite, as defendants have established that Clinton personnel, including Sgt. Mailloux, made efforts to locate plaintiff's missing property including making numerous phone calls and emailing Attica.  <u>See</u> Dkt. No. 68-30 at 2 ¶ 6, 3 ¶¶ 11-12.  Moreover, there is no evidence that either Sgt. Orzech or C.O. Mailloux were the exclusive custodians of any of plaintiff's property bags, and the precise chain of custody between Attica and Clinton is simply unknown.  <u>See</u> Dkt. No. 68-31; <u>see also</u> <u>Key</u>, 660 F. Supp. 2d at 526. Indeed, all of plaintiff's property transfer forms indicate that C.O. Lee or C.O. Comya—not Sgt. Orzech or C.O. Mailloux—packed his incoming property.  <u>See</u> Dkt. No. 14-4 at 1-4.  In addition, it is undisputed that Attica was the entity which had custody over plaintiff's property bags prior to his transfer to Clinton—and his conclusory assertions that Clinton personnel received his bags but intentionally lost or withheld them are factually unsupported by the record evidence.

Plaintiff's reliance on the fact that personnel at Attica initially informed Clinton personnel that plaintiff's property was being held pending an IG investigation, but later stated that "no investigation by IG was ongoing at th[at] time," fails to raise any issue of material fact as to whether Sgt. Orzech or C.O. Mailloux were ever in exclusive custody of plaintiff's property and/or intentionally withheld it.  Dkt. No. 68-31 at 2.  At most, this establishes only that Attica personnel provided incorrect or outdated information to Clinton personnel

regarding the status of the remaining three property bags—two of which were received at Clinton only four days after the receipt of the initial four bags.  See id. at 1.  In any event, plaintiff's own documentary evidence appears to establish that Clinton received the seventh bag in July 2014, for which plaintiff signed the property transfer sheet.  See Dkt. No. 14-4 at 4 (personal property transfer sheet of one property bag dated July 2014 and containing plaintiff's signature).  Finally, Sgt. Orzech has sworn that he has "never damaged a CD by putting a staple through it," and plaintiff offers only speculative allegations to the contrary.  Id. at 3 ¶ 14.  Thus, plaintiff's allegations concerning Sgt. Orzech's and C.O. Mailloux's alleged retaliatory loss or withholding of his property bags or damage to his property are conclusory as they are "unsubstantiated by any other direct evidence" in the record, and his general disagreements fail to raise an issue of material fact.  Smith, 2006 WL 1133247, at *3.  Accordingly, plaintiff's First Amendment retaliation claim, insofar as asserted against Sgt. Orzech and C.O. Mailloux based on the alleged intentional loss or withholding of his property bags, must be dismissed.

Plaintiff's claim that C.O. Mailloux violated his First Amendment rights by removing him from the property area in retaliation for threatening to file a grievance must also be dismissed.  Courts in this Circuit have held that an inmate's threat to file a grievance against a correction officer can constitute protected activity for purposes of a First Amendment retaliation claim.  See Smith, 2006 WL 1133247, at *10 ("I acknowledge that the First Amendment

protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers."), aff'd, 219 F. App'x 110 (2d Cir. 2007) (summary order); see also Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint against a prison guard sufficient to establish protected activity).  However, defendants have established that plaintiff would have been removed from the property area regardless of any retaliatory motivation by C.O. Mailloux, because Sgt. Orzech determined that plaintiff had become aggressive and agitated when he was informed that only four of his property bags had arrived at the facility, and that plaintiff's "continued presence could pose a threat to the safety and security of the facility."  Dkt. No. 68-30 at 3 ¶ 9; see Dkt. No. 68-29 at 2 ¶ 7.  Therefore, even assuming plaintiff could demonstrate retaliatory motive, defendants have established that C.O. Mailloux's action of removing plaintiff from the property holding area at the direction of Sgt. Orzech "would have occurred" "even without the improper motivation" and were done for the purpose of maintaining safety and order at the facility.  Scott, 344 F.3d at 287; see Brooks, 2014 WL 1292232, at *18.  Moreover, to the extent that plaintiff states that he will controvert defendants' assertion that he became aggressive by "submitting a DVD to prove otherwise," no such evidence has been submitted to the Court as of the filing of plaintiff's opposition on July 22, 2019; the deadline for filing opposition papers has expired; and plaintiff's general disagreement with defendants' documentary evidence fails to raise a genuine issue of material fact.  Dkt. No. 75-1 at 1.

Accordingly, it is recommended that defendants' motion for partial summary judgment be granted and plaintiff's First Amendment retaliation claims against Sgt. Orzech and C.O. Mailloux be dismissed insofar as they arise out of plaintiff's alleged retaliatory removal from the property holding area on April 25, 2014.

### 2. Sgt. Randall

Plaintiff's First Amendment retaliation claim against Sgt. Randall fails. It is undisputed that plaintiff has established that he engaged in protected activity by filing grievances against Sgt. Orzech and C.O. Mailloux concerning his missing property on April 25, 2014. See Dkt. No. 14-4 at 5; see, e.g., Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity"). However, plaintiff's transfer to 13 Cell did not constitute adverse action. Contrary to plaintiff's allegations, defendants have established, though admissible evidence that, 13 Cell is "a cell in normal use in Unit-14 SHU and is regularly maintained." Dkt. No. 68-32 at ¶ 6. In addition, the documentary evidence establishes that plaintiff was "afforded the opportunity for additional cleaning supplies Tuesdays, Thursdays, and Saturdays weekly" if he was unhappy with the cleanliness of his cell. Id. In any event, even assuming that plaintiff established that Sgt. Randall's act of transferring him to 13 Cell was done with a retaliatory motive and constituted adverse action, defendants have established that plaintiff would have been transferred to SHU regardless of any personal animus Sgt. Randall harbored against him "based upon his behavior,"

and that plaintiff was placed in 13 Cell based on "availab[ility]."  Dkt. No. 68-32 at 2 ¶ 5; see Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18.

Alternatively, plaintiff cannot demonstrate any causal connection between the filing of his April 25, 2014 grievance against Sgt. Orzech and C.O. Mailloux and his cell transfer.  To plausibly allege causation, a plaintiff "must allege facts suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against him."  Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citations omitted).  It is well settled that "[a]llegations of adverse actions alone . . . are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct."  Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).  Factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.  See id. (citing Colon, 58 F.3d at 872-73).  With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

46

> [P]risoner retaliation claims are easily fabricated, and
> . . . pose a substantial risk of unwarranted judicial
> intrusion into matters of general prison administration.
> Accordingly, while we have held that temporal proximity
> between protected conduct and an adverse action
> constitutes circumstantial evidence of retaliation, we
> have consistently required some further evidence of
> retaliatory animus before permitting a prisoner to
> proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal

citations and quotation marks omitted).

Here, although the alleged adverse action of plaintiff's transfer to 13 Cell

occurred within close temporal proximity to the filing of his April 25, 2014

grievance, it is well-settled that "temporal proximity without more is insufficient to

survive summary judgment."  Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018

WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and

citation omitted).  Further, the record is devoid of facts establishing that plaintiff's

filing his April 25, 2014 grievance against Sgt. Orzech and C.O. Mailloux was "a

substantial or motivating factor" in Sgt. Randall's decision to transfer plaintiff to

13 Cell.  Burton, 664 F. Supp. 2d at 367.  In support of his claim, plaintiff alleges

only that Sgt. Randall stated, "[o]h now you wanna [sic] talk to me[?]  You have

stopped every [c]aptain, [d]eputy[,] and [s]uperintendent about your property, but

you have not said anything to me about it.  This is my . . . unit and you must

come to me first."  Id. at 9 ¶ 14 (parenthesis omitted).  In response, plaintiff

allegedly informed Sgt. Randall that he "had not come to [Sgt. Randall] because

[Sgt. Randall] told [plaintiff] that [he] was a 'needy inmate' and that [plaintiff]

47

should not 'stop him every[]day.'" Id.  Even assessing these statements in the light most favorable to plaintiff as the non-moving party, they are insufficient to support "an inference of a causal connection between" plaintiff's April 25, 2014 grievance and Sgt. Randall's act of transferring plaintiff to 13 Cell, as they do not make any mention of plaintiff filing complaints against other Clinton correctional staff.  Baskerville, 224 F. Supp. 2d at 732.

Indeed, plaintiff does not allege—let alone provided factual support—to suggest that Sgt. Randall was even aware of plaintiff's April 25, 2014 grievance such that his act of transferring plaintiff to 13 Cell on April 27, 2014, was retaliatory.  See Baskerville, 224 F. Supp. 2d at 732.  Rather, it is undisputed that plaintiff did not file a grievance against Sgt. Randall prior to April 27, 2019, and the record is devoid of facts that would allow the Court to draw the "legitimate inference" that Sgt. Randall retaliated against plaintiff based on his grievance filed against other correctional personnel.  Espinal, 558 F.3d at 130; see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer); see also Burroughs v. Mitchell, 325 F. Supp. 3d 249, 282 (N.D.N.Y. 2018) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." (internal quotation marks and citation omitted)).  In fact, plaintiff's own documentary evidence establishes that his grievance against Sgt. Orzech and C.O. Mailloux, dated April 25, 2014, was not received by the inmate grievance supervisor until

May 6, 2014—after the alleged adverse action of plaintiff's transfer to 13 Cell on April 27, 2014.  See Dkt. No. 14-4 at 5.  Thus, the alleged adverse action of transferring plaintiff to 13 Cell preceded plaintiff's constitutionally-protected conduct and, therefore, does not establish the requisite causal nexus to support his retaliation claim against Sgt. Randall.  See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney).  In opposition, plaintiff's general disagreement with defendants' arguments and documentary evidence is conclusory and "insufficient to defeat [defendant's] properly supported motion for summary judgment.  See Bickerstaff, 196 F.3d at 452.

Finally, to the extent that plaintiff contends that Sgt. Orzech is liable for Sgt. Randall's conduct, his claim fails because the record is bereft of facts from which the Court could infer that Sgt. Orzech was in any way in a position of authority over Sgt. Randall such that he could have controlled Sgt. Randall's actions or remedied any alleged wrongs committed with respect to the transfer. See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").  In any event, as defendants have established that Sgt. Randall did not violate plaintiff's constitutional rights by transferring him to 13 Cell, plaintiff cannot establish

liability pursuant to Section 1983 against Sgt. Randall's superiors based thereon. See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003) (holding that, absent an underlying constitutional violation, a supervisor cannot be held liable for the actions or omissions of a subordinate under Section 1983).  Accordingly, plaintiff's First Amendment retaliation claim against Sgt. Randall and Sgt. Orzech based on his transfer to 13 Cell must be dismissed.

### 3. C.O. Gadway

Plaintiff's claim that C.O. Gadway violated his First Amendment rights by conducting a "destructive" cell search and issuing a false misbehavior report on April 30, 2014, in retaliation for plaintiff filing grievances against other correctional staff fails because, as with his claim against Sgt. Randall, the record lacks facts that would allow the Court to draw the "legitimate inference" that C.O. Gadway retaliated against plaintiff based grievances he filed against other Clinton correctional personnel.  Espinal, 558 F.3d at 130; see Wright, 554 F.3d at 274; see Burroughs, 325 F. Supp. 3d at 282.  Aside from plaintiff's conclusory allegations that, as "the A-man for the SHU, [Gadway] would have access to all complaints filed by SHU prisoners," Dkt. No. 14-1 at 17 ¶ 24, there are no facts to support "an inference of a causal connection between" plaintiff's filing of grievances and C.O. Gadway conducting destructive cell searches and issuing false misbehavior reports.  Baskerville, 224 F. Supp. 2d at 732.  Further, defendants have established, through admissible evidence, that C.O. Gadway

conducted an authorized search of plaintiff's cell on April 30, 2014, and

discovered documents indicating that plaintiff was running MAEG from his cell

and using his prison correspondence to solicit funds—both violations of DOCCS

rules.  See Dkt. No. 68-23 at 3 ¶ 4.  Thus, defendants have established that C.O.

Gadway would have taken the action complained of regardless of any personal

animus he held against plaintiff.  See Scott, 344 F.3d at 287-88; Brooks, 2014

WL 1292232, at *18.

In opposition, plaintiff offers only his conclusory and self-serving

allegations that, because he was not in possession of his seventh property bag

as of the April 30, 2014 cell search, he was not in possession of any business

documents.  See Dkt. No. 14-1 at 12 ¶ 20.  Plaintiff would have the Court believe

that the only bag containing documents relating to MAEG or his other businesses

was being intentionally withheld by Clinton staff and that, to retaliate against

plaintiff for filing grievances, C.O. Gadway went to wherever his seventh property

bag was purportedly being hidden, found incriminating documents, and issued a

misbehavior report based thereon.  See id. at 12-13 ¶ 20.  Plaintiff's contentions

in this regard are "unsubstantiated by any other direct evidence and . . . so

replete with inconsistencies and improbabilities that no reasonable juror would

undertake the suspension of disbelief necessary to credit the allegations."  Smith,

2006 WL 1133247, at *3 (internal quotation marks and citation omitted).

Moreover, concerning C.O. Gadway's July 18, 2014 cell search and

misbehavior report, which was also issued for his possession of documents

indicating that plaintiff was running MAEG from his cell and using his prison correspondence to solicit funds, plaintiff admits to possessing such documents and engaging in such activities.  See Dkt. No. 14-1 at 14 ¶ 21.  Therefore, as defendants aver, as plaintiff "admit[s] to engaging in the conduct that formed the basis of the misbehavior report," defendants have established that the July 18, 2014 misbehavior report would have been issued regardless of any retaliatory animus on the part of C.O. Gadway.  Brooks, 2014 WL 1293343, at * 25; see Scott, 344 F.3d at 287-88.[12]  Consequently, it is recommended that plaintiff's claims against C.O. Gadway be dismissed.


### 4. C.O. Lee

Defendants are entitled to summary judgment as to plaintiff's First Amendment retaliation claims against C.O. Lee.  Plaintiff engaged in constitutionally-protected conduct by filing his May 19, 2015 misbehavior report against C.O. Lee based on C.O. Lee's May 2015 cell search.  See Dkt. No. 14-4 at 36; Davis, 320 F.3d at 352-53.  Further, courts in this Circuit have held that "[t]he retaliatory destruction of an inmate's personal property can constitute an adverse action."  Roseboro, 791 F. Supp. 2d at 374; see Smith v. City of New

---

[12]  Plaintiff also appears to allege that C.O. Gadway violated his constitutional rights by confiscating certain items of his property because "the mailroom and Media Review Committee allowed [him] to possess them," and by failing to submit the confiscated items to the Media Review Committee.  Dkt. No. 14-1 at 13 ¶ 20.  His claims in this regard are conclusory in that they are unsupported by any record evidence and, therefore, do not defeat defendants' motion for partial summary judgment.  See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).  To the extent plaintiff alleges that C.O. Gadway violated DOCCS media review procedures, such claims were previously dismissed by the Court's November 2017 Order on initial review.  See Dkt. No. 17 at 55-56, 60.

York, 03-CV-7576 (NRB), 2005 WL 1026551 at *3 (S.D.N.Y. May 3, 2005) (stating that the "retaliatory destruction of a prisoner's personal property has . . . been found substantial enough to qualify as an adverse action.").  Here, however, defendants have established that the property C.O. Lee confiscated from plaintiff's cell during the June and July 2015 cell searches was destroyed in September 2015 pursuant to DOCCS Directive #4911 because the visitor plaintiff selected to receive that property never visited the facility within the specified time-frame—not out of retaliation for plaintiff filing his May 2015 grievance.  See Dkt. No. 14-5 at 16, 17.  Indeed, plaintiff signed the Authorization for Disposal of Personal Property form on August 14, 2015, which explicitly provided that "[t]he items [would] be held a maximum of 14 days pending arrival of a visitor," and plaintiff did not select an alternative choice for disposition of his property in the event the visitor did not accept his property.  Dkt. No. 68-28 at 1.  Therefore, defendants have established that plaintiff's excess magazines and books would have been destroyed regardless of any retaliatory motive.  See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted).[13]

Further, insofar as plaintiff suggests that the cell shield order violated his First Amendment rights, defendants have established that the shield order was a direct result of plaintiff screaming at and threatening C.O. Lee that that he would

---

[13]  To the extent plaintiff argues that his property was destroyed as a result of C.O. Lee neglecting to follow DOCCS "Directive [No.] 4913, Section III(D)(1)(C)" by failing to instruct him to select a second disposition option, such claim was previously dismissed by the Court's November 2017 Order on initial review because the alleged violation of a DOCCS Directive does not give rise to a constitutional claim actionable under Section 1983.  See Dkt. No. 17 at 55-56.

"violate" him, and not in retaliation for plaintiff engaging in protected conduct. See Dkt. No. 14-1 at 43. In any event, nothing in the record indicates that C.O. Lee was responsible for the shield order. See Farrell, 449 F.3d at 484 ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Rather, the record evidence establishes only that (1) plaintiff was placed in a cell with a shield after C.O. Lee informed his area supervisor of plaintiff's threatening statements; (2) Sgt. Delisle and Sgt. Orzech recommended renewing the shield order on three separate occasions because "monitoring indicate[d] that the threat to staff . . . ha[d] not lessened" and "continuation of th[e shield] order for staff protection [wa]s warranted at th[ose] time[s]"; and (3) the shield order was authorized by higher ranking Clinton personnel. Dkt. No. 14-4 at 46, 47, 48. In addition, to the extent plaintiff attempts to argue that C.O. Lee retaliated against him by filing a false misbehavior report for plaintiff threatening to "violate" him, plaintiff admits to making this threat, although now attempts, unpersuasively, to argue that he qualified his threat by stating that he would "verbally violate" Lee. Dkt. No. 14-1 at 34 ¶ 46. Therefore, as defendants contend, plaintiff "admit[s] to engaging in the conduct that formed the basis of the misbehavior report," and defendants have established that the July 2015 misbehavior report concerning plaintiff's threatening statement would have been issued regardless of any retaliatory animus on the part of C.O. Lee. Brooks, 2014 WL 1293343, at *25; see Scott, 344 F.3d at 287-88. Moreover, plaintiff's blanket allegation that Sgt.

Orzech is liable for C.O. Lee's actions fails, as plaintiff proffers no factual support to establish Sgt. Orzech was in a position of authority over C.O. Lee or personally involved in any of C.O. Lee's conduct.  See Farrell, 449 F.3d at 484. In any event, as discussed, C.O. Lee did not violate plaintiff's constitutional rights.  See Hernandez, 341 F.3d at 145.  Accordingly, plaintiff's First Amendment retaliation claim against C.O. Lee and Sgt. Orzech based on C.O. Lee's alleged filing of false misbehavior report based on plaintiff's threat to "violate" him and the implementation of a shield order, must be dismissed.

To the extent plaintiff asserts that C.O. Lee retaliated against him for filing his May 2015 grievance by issuing a false misbehavior report in July 2015, which charged plaintiff with possessing materials indicating that he was soliciting funds and violating facility correspondence rules, defendants are entitled to partial summary judgment.  See Dkt. No. 14-1 at 32.  As addressed above, plaintiff's filing of the May 2015 grievance constitutes constitutionally-protected activity. See Davis, 320 F.3d at 352-53.  Further, a sufficient causal connection appears to exist, as C.O. Lee's alleged retaliatory action of filing a false misbehavior report occurred in close temporal proximity—approximately two months—after plaintiff filed his May 2015 grievance, and plaintiff was ultimately vindicated at the disciplinary hearing insofar as he was found not guilty of solicitation or violating facility correspondence rules.  See Baskerville, 224 F. Supp. 2d at 732.

Notwithstanding the foregoing, the evidence does not support a finding of adverse action; therefore, plaintiff's claim fails to satisfy the second element of a

First Amendment retaliation claim.  See Espinal, 558 F.3d at 128.  To constitute

adverse action, the "retaliatory conduct" must be such that it "would deter a

similarly situated individual of ordinary firmness form exercising . . . constitutional

rights." Gill, 389 F.3d at 381 (internal quotation marks and citation omitted).

"Conduct that is *de minimis* does not provide this deterrent effect and does not

give rise to actionable retaliation."  Lunney v. Brureton, No. 04-CV-2438

(LAK/GWG), 2007 WL 1544629, at *20 (S.D.N.Y. May 29, 2007) (citation

omitted).  Although it is well settled that prison inmates do not have a general

constitutional protection from being falsely accused in a prison misbehavior

report, see Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (citing

Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)), the Second Circuit has

held that the filing of a false misbehavior report may constitute an adverse action

for purposes of an inmate's First Amendment retaliation claim.  See Gill, 389

F.3d at 384.

However, in Freeman, the Second Circuit held that the Constitution merely

guarantees inmates "the right not to be deprived of a protected liberty interest

without due process of law."  Freeman, 808 F.2d at 951.  In Franco v. Kelly, the

Second Circuit made clear that, "[a]s long as prison officials grant the inmate a

hearing and an opportunity to be heard, the 'filing of unfounded charges d[oes]

not give rise to a *per se* constitutional violation actionable under section 1983.'"

Franco v. Kelly, 854 F.2d 584, 587 (2d Cir. 1988) (quoting Freeman, 808 F.2d at

953).  Furthermore, courts within this Circuit have held that "[t]he filing of

misbehavior reports that result in a temporary loss of various privileges such as permission to visit the commissary do not constitute adverse action because they are *de minimis*." Gantt v. Lape, No. 9:10-CV-0083 (GTS/TWD), 2012 WL 4033729, at *8 (N.D.N.Y. July 31, 2012) (internal quotation marks and citation omitted); see also Bartley v. Collins, No. 95-CV-10161(RJH), 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary . . . do not constitute adverse action because they were *de minimis*; they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights.").

Here, plaintiff was not found guilty of solicitation and violating facility correspondence rules, as charged C.O. Lee's July 12, 2015 misbehavior reports. See Dkt. No. 14-4 at 45, 54; Dkt. No. 14-1 at 34 ¶ 46.  Consequently, no penalty was imposed upon him based on those charges; therefore, even if C.O. Lee issued a false misbehavior report in retaliation for plaintiff filing grievances, the conduct was *de minimis*, as plaintiff suffered no harm as a result.  See Lunney, 2007 WL 1544629, at *20; cf. Gantt, 2012 WL 4033729, at *8; Bartley, 2006 WL 1289256, *7.  Based on the foregoing, defendants' motion for partial summary judgment dismissing plaintiff's claims against C.O. Lee must be granted.

**5. C.O. Beaudette**

Plaintiff's First Amendment retaliation claims against C.O. Beaudette must be dismissed.  Insofar as plaintiff claims that C.O. Beaudette retaliated against him for filing grievances and spearheading the Clean Up The Clinton SHU Campaign by denying plaintiff a shower on one occasion in November 2015, and taking food out of plaintiff's cell and placing dirty books on plaintiff's sheets during a cell search in March 2016, these isolated acts constitute *de minimis* conduct and do not amount to adverse action.  See Lunney, 2007 WL 1544629, at *21 ("Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation."); Snyder v. McGinnis, No. 03-CV-0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); see also Smith, 2017 WL 2172318, at *4 ("That [the defendant correction officer] allegedly threw out the [p]laintiff's food and bed linen is not a substantial enough [injury] to deter legitimate grievances against prison officers." (internal quotation marks and citation omitted)); Phillips v. LaValley, No. 9:12-CV-609 (NAM/CFH), 2014 WL 1202693, at *9 (N.D.N.Y. Mar. 24, 2014) ("the adverse action of removing photos off of a cell wall is so *de minimis*, that it falls outside the ambit of constitutional protection") (internal quotation marks and citations omitted)).

Insofar as plaintiff contends that C.O. Beaudette retaliated against him in violation of his First Amendment rights by confiscating 82 of his 132 stamps, defendants have established through admissible evidence that C.O. Beaudette

would have taken this action regardless of any retaliatory animus because plaintiff was in violation of DOCCS Rule 113.16, which prohibits inmates from "be[ing] in possession of stamps in excess of $22.50 in value."  7 N.Y.C.R.R. § 270.2; see Dkt. No. 68-15 at ¶¶ 7, 8; see also Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted).  In any event, aside from plaintiff's conclusory assertions, nothing suggests that leaving plaintiff with 50 stamps, as opposed to 132 stamps, deterred or prevented him from exercising his constitutional rights.  See generally Gill, 389 F.3d 379, at 381.  Thus, the conduct complained of is "*de minimis* and therefore "outside the ambit of constitutional protection."  Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001) (citations omitted), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).  Moreover, plaintiff's entire argument in this regard is based on his erroneous belief that inmates are entitled to possess stamps in value up to $24.50—which is clearly belied by the plain language of 7 N.Y.C.R.R. § 113.16.  See Dkt. No. 14-1 at 46 ¶ 65.  Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Beaudette be dismissed.

### 6. Sgt. Delisle and C.O. Stickney

As defendants correctly argue, plaintiff's First Amendment retaliation claims against Sgt. Delisle and C.O. Stickley must be dismissed because plaintiff has "admitted to engaging in the conduct that formed the basis of the misbehavior reports."  See Dkt. No. 68-3 at 9 (quoting Brooks, 2014 WL

1292232, at *24).  Defendants have established that Sgt. Delisle's and C.O. Stickney's allegedly retaliatory actions would have occurred regardless of whether they acted with an improper retaliatory motive.  See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18.  In issuing plaintiff misbehavior reports for possessing documents indicating that plaintiff was operating a business from his cell, including using his facility correspondence to solicit funds from other inmates in order to draft grievances on their behalf, and possessing identification numbers of inmates who were known gang members, Sgt. Delisle and C.O. Stickney charged plaintiff with violations of numerous DOCCS Rules, including Rules 103.20 (solicitation), 180.11 (correspondence), 105.13 (Gangs), 103.10 (Extortion), 103.20 (Extortion/Soliciting).  See Dkt. No. 14-6 at 21-24. Indeed, as defendants contend, plaintiff admitted at his deposition to engaging in the unauthorized operation of several businesses while incarcerated.  See Dkt. No. 68-13 at 19-20.  Moreover, to the extent that plaintiff contends that Sgt. Delisle and C.O. Stickney retaliated against him by denying him showers and meals, his allegations are unsupported by any specific facts and, therefore, do not survive summary judgment.  See generally Kerzer, 156 F.3d at 400; Smith, 2006 WL 1133247, at *3.  Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against Sgt. Delisle and C.O. Stickney be dismissed.

### 7. Librarian Delisle

Defendants are entitled to summary judgment dismissing plaintiff's First Amendment claims against Librarian Delisle.  Plaintiff conceded at deposition that he has no factual basis to allege that Librarian Delisle retaliated against him in violation of his First Amendment rights by denying his library requests because he filed grievances against her husband, Sgt. Delisle.  See Dkt. No. 68-3 at 9-10. Indeed, in response to defense counsel's question whether plaintiff was "alleging that [Librarian Delisle's] actions had anything to do with the fact that [plaintiff] had filed grievance against her husband," plaintiff replied "I can't say that because I don't know."  Dkt. No. 68-13 at 79.  Further, in response to defense counsel's inquiry as to whether it was "fair to say that [plaintiff's] allegation against [Librarian] Delisle is not that she retaliated against [plaintiff] because [he had] fil[ed] grievances against her husband[, but] generally because people at Clinton didn't want [plaintiff] to have the information that could help [him] build a case or . . . run a business," plaintiff stated "that is my allegation."  Id. at 80 (emphasis added). Moreover, the Amended Complaint is devoid of any facts or allegations in support of a retaliation claim against Librarian Delisle.  See Dkt. No. 14-1 at 40-44 ¶¶ 58-61.  Thus, as plaintiff made clear that he did not intend to allege a First Amendment retaliation claim against Librarian Delisle and, in fact, stated that he had no factual basis to do so, defendants are entitled to summary judgment dismissing any purported First Amendment retaliation claim against Librarian Delisle.  See Salahuddin, 657 F. Supp. at 377 ("One of the prime purposes of the summary judgment rule 'is to isolate and dispose of factually

61

unsupported claims or defenses.'" (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986))).  In opposition, plaintiff fails to raise any genuine issue of material fact through his conclusory statement that his claims against Librarian Delisle should not be dismissed on the basis that he testified at deposition that "[he] [didn't] know' if [Librarian] Delisle denied [him] law library resources as retaliation for [his] litigation" because "what [he] feel[s] is irrelevant."  Dkt. No. 75-1 at 2 ¶ 2; <u>see</u> <u>Kerzer</u>, 156 F.3d at 400.

In any event, to the extent that plaintiff contends that Librarian Delisle wrongfully denied him access to requested internet-based research materials, including e-books, his claim lacks merit and is belied by the record, including Librarian Delisle's declaration in which she makes clear that she followed DOCCS directives in denying plaintiff's requests for internet related materials. <u>See</u> Dkt. No. 68-18 at 2-3 ¶ 7.  Indeed, defendants have established that, pursuant to DOCCS Directive No. 4470, Librarian Delisle was not authorized to provide plaintiff with such materials.  <u>See</u> <u>id.</u>  Accordingly, it is recommended that plaintiff's claims against Librarian Delisle be dismissed.


**8. Dr. Adams**

Defendants are entitled to summary judgment as to plaintiff's claim that Dr. Adams retaliated against him in violation of his First Amendment rights for filing grievances against him by providing plaintiff with inadequate medical treatment. <u>See</u> Dkt. No. 68-3 at 11.  As an initial matter, it is unclear whether plaintiff even

bases his First Amendment retaliation claim against Dr. Adams on his filing of grievances against Dr. Adams, as he explicitly argues that Dr. Adams refused him medical treatment "based largely (or probably solely) on [his] refusal to discuss [his] case [concerning Sing Sing with him." Dkt. No. 14-1 at 26 ¶ 36. However, even assuming plaintiff does premise his retaliation claim against Dr. Adams on his constitutionally-protected conduct of filing grievances against him, see Davis, 320 F.3d at 352-53, defendants are still entitled to summary judgment.

Plaintiff's own documentary evidence establishes that, contrary to his contention, Dr. Adams did, in fact, examine plaintiff and proscribe various medications to treat his skin condition, including "Hydrocortisone, Fluocinonide[,] and Clindamyacin." Dkt. No. 14-5 at 9; Dkt. No. 14-4 at 68. In addition, plaintiff's documentary evidence establishes that Dr. Adams "determined that an electric shaver and Magic Shave [we]re not medically indicated" and that there was "no medical indication for medical boots." Dkt. No. 14-5 at 8; Dkt. No. 14-4 at 68. Dr. Adams' declaration, in which he states that his "denial of plaintiff's requests for medical boots, lotion, blood pressure and other medications was based on [his] professional evaluation of [p]laintiff's medical needs"; that "[i]n [his] estimation, the boots and medications requested were unnecessary"; and that he "never . . . with[e]ld medications as a means of retaliation for [plaintiff's] filing of grievances," corroborates plaintiff's documentary evidence. Dkt. No. 68-14 at 2 ¶¶ 6, 8. Plaintiff's conclusory allegations to the contrary, including that the skin

prescriptions do not work, see Dkt. No. 14-1 at 29 ¶ 38, fail to raise a genuine

issue of material fact, are unsupported by the record, and amount only to a

personal disagreement with Dr. Adams' treatment based on his professional

medical judgment—which fails to support a constitutional claim.  See Chance,

143 F.3d at 703 ("It is well-established that mere disagreement over the proper

treatment does not create a constitutional claim.").  Consequently, it is

recommended that plaintiff's First Amendment retaliation claim against Dr.

Adams be dismissed.


### C. First Amendment Mail Interference Claim Against Clemons

Plaintiff's claim against Clemons, properly characterized as a First

Amendment mail interference claim, should be dismissed.

"The First Amendment protects an inmate's right to send and receive both

legal and nonlegal mail, although prison officials may regulate that right if the

restrictions they employ are 'reasonably related to legitimate penological

interests.'" Abreu v. Travers, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 6127510,

at *10 (N.D.N.Y. Oct. 20, 2016) (quoting Thornburgh v. Abbott, 490 U.S. 401, 409

(1989) (additional quotation marks and citation omitted); see Johnson v. Goord,

445 F.3d 532, 534 (2d Cir. 2006) (per curiam).  Legal mail is entitled to greater

protection from interference than nonlegal mail.  See Johnson, 445 F.3d at 534

(citing Davis, 320 F.3d at 351).  "A single instance of mail tampering that does

not result in the plaintiff suffering any damage is generally insufficient to support

a constitutional challenge." Burroughs, 138 F. Supp. 3d at 210 (citation omitted). "Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'" Davis, 320 F.3d at 351 (quoting Cancel v. Goord, No. 00-CV-2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001)).

Here, plaintiff premises his claim against Clemons on his conclusory and self-serving allegation that she issued her misbehavior report based on a review of his outgoing mail without first obtaining a valid mail watch order. See Dkt. No. 14-1 at 61 ¶ 86. However, as defendants establish through admissible evidence, Clemons did obtain a 60-day mail watch order for all of plaintiff's incoming and outgoing non-privileged correspondence, which Supt. Kirkpatrick approved on December 9, 2016. See Dkt. No. 68-16 at 2 ¶ 7. Moreover, as discussed above, plaintiff does not deny that he engaged in the unauthorized use of his correspondence to operate business ventures while incarcerated—the very source of the solicitation charges of Clemons misbehavior report. See Dkt. No. 68-13 at 51-52; Dkt. No. 14-7 at 40-41. In opposition, plaintiff asserts only that he "disagree[s] that Clemons had a properly authorized mail watch order supported by probable cause," Dkt. No. 75-1 at 2, which is belied by the record and fails to raise a genuine issue of material fact. See Kerzer, 156 F.3d at 400. Accordingly, it is recommended that plaintiff's First Amendment mail interference claim against Clemons be dismissed.

**D.  Eighth Amendment Medical Indifference Claim Against Dr. Gillani**

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

The objective component of an Eighth Amendment medical indifference claim "requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'"  Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).  "[I]n the context of suicide, jailers are not required to safeguard every inmate; only those presenting a strong likelihood of suicide are entitled to protection."  Allah v. Kemp, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 5860290, at *7 (N.D.N.Y. Nov. 9, 2010) (internal quotation marks and citation omitted), report and recommendation adopted, No. 9:08-CV-1008 (NAM/GHL), 2011 WL 705210 (N.D.N.Y. Feb. 22, 2011); see Helijas v. Corr. Med. Care, Inc., No. 115-CV-1049 (GTS/DJS), 2016 WL 5374124, at *13 (N.D.N.Y. Sept. 26, 2016) ("With respect to the objective prong of an Eighth Amendment claim, courts have found that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." (internal quotation marks and citation omitted)).  "[T]o establish a strong likelihood of suicide, a[n inmate] must have made a previous threat of or an earlier attempt at suicide."  Allah, 2010 WL 5860290, at *7 (internal quotation marks and citation omitted).

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" Chance, 143 F.3d at 703 (quoting Hathaway, 99 F.3d at 553). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). "[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." Chance, 143 F.3d at 703 (citation omitted). A prison official acts with deliberate indifference when he "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Chance, 143 F.3d at 702 (quoting Farmer, 511 U.S. at 137).

"In an inmate suicide context, there are two scenarios where deliberate indifference may exist." Allah, 2010 WL 5860290, at *8. "First, officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies." Id. (internal quotation marks and citation omitted). "Second, officials could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." Id. (internal quotation marks and citation omitted). "The second scenario focuses on the adequacy of preventive

67

measures." Id. (internal quotation marks and citation omitted).  Concerning the adequacy of preventative measures, even if a medical defendant's "treatment decision was erroneous, deliberate indifference cannot be inferred [where] the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Sims v. Gorman, No. 09-CV-6643 (MAT), 2012 WL 566875, at *6 (W.D.N.Y. Feb. 21, 2012) (internal quotation marks and citation omitted).

Upon careful review of the evidence, the undersigned concludes that no reasonable juror could conclude that Dr. Gillani acted with deliberate indifference to plaintiff's serious medical needs.  It is undisputed that plaintiff was placed in the MHU on April 27, 2014, where he stayed until May 1, 2015, because he expressed threats of self-harm.  See Dkt. No. 14-1 at 10 ¶ 17; Dkt. No. 68-25 at 3 ¶ 13.  Plaintiff told Dr. Gillani "[e]very[]day . . . throughout [his] stay" in [MHU] that he "would commit suicide if [he] was forced to go back to 13 Cell and live under such inhumane conditions."  Dkt. No. 14-1 at 10 ¶ 17; see Dkt. No. 68-13 at 39. Thus, plaintiff's stated intention to commit suicide establishes the objective element of the deliberate medical indifference test.  See Allah, 2010 WL 5860290, at *8.

As defendants argue, however, the record establishes that Dr. Gillani did not act with deliberate indifference.  See Dkt. No. 68-3 at 13-14.  Dr. Gillani's sworn declaration and treatment notes establish that he conducted an evaluation

68

of plaintiff on May 1, 2014, and concluded that plaintiff was not suffering from any

psychiatric illness, but rather, exhibiting an "environment-related agenda"

designed at being "released from the SHU" and "that plaintiff's complaints did not

stem from mental illness, but rather, were calculated toward an effort to be

released from his confinement in the SHU." Dkt. No. 68-25 at 3 ¶¶ 23-25. Dr.

Gillani based his conclusion on numerous factors, including that he had been

informed that plaintiff had not engaged in self-harming behavior prior to his April

2014 transfer to MHU, his statements to Dr. Gillani that he did not wish to return

to SHU and that he would prefer to return to general population to use the law

library, and his denial of having suicidal ideas. See id. at 3 ¶¶ 15-16, 19. Dr.

Gillani also observed that plaintiff had been eating and sleeping normally, denied

having psychotic or anxiety symptoms, and had a history of engaging in "self-

harming gestures" but no history of in-patient psychiatric treatment. Id. at ¶ 21;

see id. at ¶¶ 17, 19. Dr. Gillani's May 1, 2014 conclusions are bolstered by

plaintiff's deposition testimony in which he stated that, "[a]t one point, [he]

couldn't take the smell [of 13 Cell] so [he] attempted suicide to get out of the cell

so that they going to move [him] to [MHU] so that [he] didn't . . . have to take the

smell inside of [13 C]ell." Dkt. No. 68-13 at 23. Moreover, consistent with Dr.

Gillani's analysis, following his release back to SHU, on May 5, 2014, plaintiff

alleges only that he engaged in the self-harming gesture of "fixing a noose

around [his] neck," but does not allege in his Amended Complaint that he

engaged in any actual suicide attempt on that date. See Dkt. No. 14-1 at 10 ¶

17.  Based on the foregoing, "deliberate indifference cannot be inferred" from Dr. Gillani's decision to discharge plaintiff back to SHU on May 1, 2015, as the evidence before the Court does not establish that his decision "was . . . such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [Dr. Gillani] did not base [his] decision on such a judgment."  Sims, 2012 WL 566875, at *6.

Moreover, plaintiff's allegations, made for the first time at deposition, that he made two suicide attempts shortly after being examined by Dr. Gillani on two unspecified occasions, are uncorroborated by the record and do not defeat defendants' properly supported motion for partial summary judgment as to his Eighth Amendment medical indifference claim.  See Dkt. No. 68-13 at 30, 37-42. Plaintiff's deposition testimony that he actually attempted suicide by hanging on two occasions is wholly self-serving and directly contradicts the allegations made in the Amended Complaint, which state only that he "became suicidal," expressed "suicidal plans and ideations" prior to being admitted to MHU in April 2014; "fix[ed] a noose to his neck" after being released on March 5, 2014; and that he "told [Dr.] Gillani of [his] suicidal plans if [he] returned to 13 Cell."  Dkt. No. 14-1 at 10 ¶ 17, 66 ¶ 95 (internal quotation marks omitted).  Indeed, when asked whether he "kn[e]w the dates" of his two suicide attempts, plaintiff responded "I don't.  They're listed in the complaint."  Dkt. No. 68-13 at 30. However, no such dates or events are mentioned in the Amended Complaint, and the record is devoid of any evidence corroborating these belated and self-

serving allegations.  See Dkt. No. 14-1 at 10-11 ¶ 17, 66 ¶ 95.  Thus, although plaintiff's pro se submissions are to be construed to raise the strongest arguments they suggest, a party opposing summary judgment "may not rely merely on allegations . . . in its own pleading; rather, it[] must . . . set out specific facts showing a genuine issue for trial."  Green v. Gunn, No. 06-CV-6248 (CJS), 2009 WL 1809932, at *5 (W.D.N.Y. June 24, 2009) (internal quotation marks and citation omitted).  Plaintiff has failed to make such a specific factual showing to raise a genuine issue for trial concerning Dr. Gillani's conduct.  Accordingly, it is recommended that plaintiff's Eighth Amendment deliberate medical indifference claim against Dr. Gillani be dismissed.

## III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 68) be **GRANTED IN ITS ENTIRETY** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Beaudette, Sgt. Delisle, C.O. Stickney, and Dr. Adams;

(2) First Amendment claim against Librarian Delisle;

(3) First Amendment mail tampering claim against Clemons; and

(4) Eighth Amendment medical indifference claim against Dr. Gillani; and it is further,

**RECOMMENDED**, that the action be **TERMINATED** as to Dr. Gillani, Dr. Adams, Librarian Delisle, C.O. Mailloux, C.O. Beaudette, C.O. Gadway, C.O. Stickney, and Clemons; and it is further,

**ORDERED**, that the Clerk of the Court revise the docket to reflect the correct spelling of C.O. Mailloux's and Dr. Gillani's names; and it is further,

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.[14]

Dated: January 24, 2020
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[14] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).