

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

Writer Direct: (518) 776-2511

September 26, 2023

The Honorable Christian F. Hummel
United States Magistrate Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway - 4th Floor
Albany, New York 12207

Re:   *Zimmerman v. Racette et al. (BKS/CFH)*
      Docket No.:  17-cv-375

Dear Judge Hummel:

Please accept this supplemental letter-brief on the issue of damages, as raised in Defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. Rule 50.

## A.  Physical Injury Component of the PLRA

The Prison Litigation Reform Act ("PLRA") provides, in relevant part, that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of **physical injury** or the commission of a sexual act (as defined in section 2246 of title 18, United States Code[1]). 42 USCS § 1997e (e) **Emphasis Added**. The PLRA's limitation on recovery "is generally

---

[1] Defendants note a matter of statutory construction: in 2013 Congress passed the Violence Against Women Reauthorization Act of 2013, wherein language was added to 42 USC 1997e (e) as follows: "or the commission of a sexual act (as defined in section 2246 of title 18, United States Code)." P. L. 113-4, Title XI, § 1101(a), 127 Stat. 134. It is clear from the legislative history that it was intended that the reference to 18 USC 2246 was in relation to "Sexual Act" and was not intended to elevate the burden on prisoners to "Serious Bodily Injury," which is also defined by 18 USC 2246. Insofar as the Court included the 18 USCA § 2246 language relative to "Serious Bodily Injury" in its statutory authorities, delivered to all parties in Court on September 26, 2023,

Zimmerman v. Racette et al
September 26, 2023
Page 2 of 6

interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages." Walker v. Schult, 45 F.4th 598, 612 (2d Cir. 2022).

"[T]here is no statutory definition of 'physical injury' as used in section 1997e(e)," however, the physical injury required under § 1997e(e) must be more than *de minimis*. Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999); see Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997). "Physical afflictions that courts have found *de minimis* include contracting a fungal infection from exposure to sewage and waste, skin rashes, and itching, soreness and cracked skin." Hong v. Liburd[2], 18-cv-7201, 2020 U.S. Dist. LEXIS 139145, at *30 (S.D.N.Y. Aug. 3, 2020). Even where a Plaintiff alleged physical injury due to a fifty-pound weight loss, headaches, fatigue, hunger, and mental distress, Courts have found no basis for an award based upon physical, mental, or emotional injury. Brandon v. Kinter, No. 9:13-cv-00939 (BKS/ATB), 2023 U.S. Dist. LEXIS 36403, at *81-82 (N.D.N.Y. Mar. 6, 2023). Additionally, conditions such as "insomnia, nightmares, fear, depression, and 'psychological trauma' are not a cognizable 'physical injury' under the PLRA." Hosannah v. Officer Ameed Saeed, No. 15-CV-03773 (GRB/LGD), 2022 U.S. Dist. LEXIS 232789, at *25 (E.D.N.Y. Dec. 28, 2022).

Thus, New York Courts have held that physical manifestations of emotional injuries are not "Physical Injuries" for the purposes of the Prisoner Litigation Reform Act. *See* McCloud v. Tureglio, No. 9:07-CV-0650 (NAM/GHL), 2008 U.S. Dist. LEXIS 124388, at *21-31 (N.D.N.Y. Mar. 17, 2008); *report and recommendation adopted* 2008 U.S. Dist. LEXIS 30984, at *1 (N.D.N.Y. Apr. 15, 2008).

---

it bears clarifying that Defendants are not arguing that Plaintiff should be held to the standard of Serious Bodily Injury; and instead submit that Plaintiff has failed to clear even a minimal threshold of *de minimis* physical injury.

[2] Unreported Case Law is being served upon Plaintiff herewith.

Zimmerman v. Racette et al
September 26, 2023
Page 3 of 6

This interpretation, as applied to attempts at suicide, follows Courts in other circuits, where even a more egregious example of attempted suicide was determined not to be a physical injury. *See* Dipietro v. Barron, 2019 U.S. Dist. LEXIS 237254, *53-55 (M.D. Ga. Nov. 14, 2019) , report and recommendation adopted as modified, 2020 U.S. Dist. LEXIS 252346, (M.D. Ga. Jan. 3, 2020); see Morrill v. Holmes Cty. Jail, 2018 U.S. Dist. LEXIS 219853, 2018 WL 7082149, at *9 (N.D. Fla. Jan. 30, 2018) ("[T]he Court concludes that self-inflicted injuries do not, and cannot, rise to the level of a physical injury under the PLRA."); Corbin v. Adams, 2020 U.S. Dist. LEXIS 103380, 2020 WL 3105954, at *2 n.3 (S.D. Ga. May 21, 2020) ("Plaintiff's act of cutting himself after [another inmate] was placed in his cell ... does not satisfy this physical injury requirement.").; *see also* Al-Amin v. Williams, 2022 U.S. Dist. LEXIS 165595, *16-17 (US Dist Ct South Carolina 2022); *see also* Barnes v. Harris, No. 5:21-cv-112 (MTT), 2022 U.S. Dist. LEXIS 155391, at *2-3 (M.D. Ga. Aug. 29, 2022) (Barnes's objection makes clear that he seeks compensatory damages because the defendants "did not appropriately treat or medicate any of [his] health conditions, which led to [his] suicide attempts"). The rationale for these decisions stems from the legislative intent of the statute, permitting Plaintiffs to bring claims for damages based upon their self-injury (or attempt of the same) would "[undermine] the PLRA's purpose of curtailing frivolous and abusive prisoner litigation". Dipietro, *supra*; *See also* Morrill v. Holmes Cnty. Jail, *supra*.  Self-harm, by whatever means, is simply not the type of "physical injury" required to recover compensatory damages under the PLRA.  Barnes v. Harris, *supra.*

Willey v. Kirkpatrick, upon which Plaintiff strongly relies, is extremely distinguishable: in Willey, the Second Circuit remanded, for consideration, a motion for summary judgment pursuant to Fed. R. Civ. P. 56. In doing so, the Circuit noted that the Trial Court had only considered "threadbare" analysis of the conditions of confinement claim, *non sequitur* arguments regarding theft, and generally provided defendants more than their motion sought, reaching such other

grounds without notice to the plaintiff. Willey v. Kirkpatrick, 801 F.3d 51, 62 (2d Cir. 2015). The

Second Circuit then provided extensive *dicta* on the merits of the underlying claims, including a

rejection of a requirement that the plaintiff show "serious injury." Willey v. Kirkpatrick, 801 F.3d

at 68; *see* Hudson v. McMillian, 503 U.S. 1, 4 (1992). In light of these distinguishing factors, the

Court should not substitute Willey's interpretation for the PLRA's clear requirement that Plaintiff

establish a physical injury.

Here, Plaintiff has failed to establish not just "serious injury", but *any* physical injury.

Plaintiff's statements in oral arguments alluding to back injuries and reliance on ibuprofen have

not been born out by the record. Critically, Plaintiff did not testify to the same, nor did he enter

medical records as an exhibit to substantiate his claims. The only injuries that Plaintiff has alleged

are that he testified to communicating a desire to commit suicide and/or making an attempt to

commit suicide in order to escape SHU Cell 13, and that he now alleges that he participated in an

approximately twenty-day hunger strike. He does not allege that the purported attempt at suicide

caused any injuries (*c.f.* Dipietro, *supra*), or was even sincere (Plaintiff testified that he did not

want to die). In fact, Mental Health records entered as Exhibit D-4 indicate that Plaintiff was

admitted on threats of self-harm, but had not engaged in any actual self-harm, which is consistent

with Plaintiff's testimony.  In other words, Plaintiff's claimed suicidal ideations resulted in no

physical injury at all.

Additionally, as set forth above, weight loss as a symptom of mental distress does not

qualify as a physical injury. *See* Brandon, *supra*; McCloud, *supra*. Even were the Court to take

Willey as binding, the Plaintiff's insincere and self-serving allegations are not the meritorious case

contemplated by Willey.

As such, Defendants submit that based upon Plaintiff's failure to demonstrate a physical

injury, he should be prevented from requesting the Jury to consider mental or emotional injury.

**Zimmerman v. Racette et al**
September 26, 2023
Page 5 of 6

## B.  Jury Instruction

In the alternative, if the Court does not dismiss Plaintiff's claims on the Rule 50 motion,

Defendants respectfully request that the Jury should be instructed on the PLRA, and propose the

following Jury Instruction:

## PRISON LITIGATION REFORM ACT

The purpose of the law of damages is to award just and fair compensation for the loss, if any, that resulted from Defendants' alleged violation of Plaintiffs constitutional rights. Generally, if you find that a defendant is liable with respect to a plaintiffs claim, then you must award the plaintiff sufficient damages to compensate him for any injury proximately caused by the conduct of the defendant. This is what we call "compensatory damages" or "actual damages." An injury is proximately caused by an act or a failure to act whenever it appears from the evidence that the act or failure to act played a substantial part in bringing about or actually causing the injury, and that injury was either a direct result or reasonably probable consequence of the act or omission.

However, because of a federal statute called the Prison Litigation Reform Act, for Plaintiff to recover for any pain and suffering caused by Defendants, Plaintiff must prove by a preponderance of the evidence that he also suffered a physical injury. What this means is that, if Plaintiff has not proved by a preponderance of the evidence that he suffered a physical injury, then you may not award him damages to compensate him for any claimed pain and suffering. Generally, physical manifestations of mental or emotional injuries (such as anxiety, depression, stress, nausea, hyperventilation, headaches, insomnia, dizziness, appetite loss and weight loss) are not "physical injuries" for purposes of the Prison Litigation Reform Act.[3]

## Conclusion

Defendants respectfully submit that, because Plaintiff has failed to put forth evidence to

support any claim of "physical injury" under the PLRA, that the Court grant Defendant's motion

---

[3] See, Poulous v. Miller, 18-cv-01279 (February 20, 2022 at Dkt. No. 111 (jury charge included language from the PLRA)

**Zimmerman v. Racette et al**
September 26, 2023
Page 6 of 6

for judgment as a matter of law under Fed. R. Civ. P. Rule 50 and/or preclude Plaintiff from

collecting compensatory damages under a theory of emotional or mental injury.In the alternative,

Defendants request that the Court instruct the jury as to the provisions of the Prison Litigation

Reform Act; together with such other and further relief as the Court determines to be just and

proper.

Respectfully submitted,

By: Nicholas W. Dorando
Assistant Attorney General, of counsel
Bar Roll No. 7101029
Tel.: (518) 776-2511
Email: Nicholas.Dorando@ag.ny.gov

cc:     Nicholas Zimmerman (DIN 02-A-1663) *Hand-Delivered*

        Stephen J. Rehfuss, *via ECF*

# *Barnes v. Harris*

United States District Court for the Middle District of Georgia, Macon Division

August 29, 2022, Decided; August 29, 2022, Filed

CIVIL ACTION NO. 5:21-cv-112 (MTT)

**Reporter**

2022 U.S. Dist. LEXIS 155391 *; 2022 WL 3718505

OTIS L. BARNES, Plaintiff, v. Major HARRIS, et al., Defendants.

**Prior History:** *Barnes v. Harris, 2022 U.S. Dist. LEXIS 155443 (M.D. Ga., June 30, 2022)*

**Counsel:** **[\*1]** OTIS L BARNES, Plaintiff, Pro se, WRIGHTSVILLE, GA.

For Major HARRIS, Head of Mental Health at Baldwin State Prison, RAMSEY, Nurse and Mental health Counselor at Baldwin State Prison, RENO, Mental Health Director at Georgia State Prison, WESTFIELD, Mental Health Counselor at Georgia State Prison, Defendants: JOSCELYN HUGHES, LEAD ATTORNEY, ATLANTA, GA; ANGIE DOAN, ATLANTA, GA.

**Judges:** MARC T. TREADWELL, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** MARC T. TREADWELL

# Opinion

### ORDER

United States Magistrate Judge Charles H. Weigle recommends granting in part and denying in part the defendants' motion to dismiss (Doc. 23) in this *42 U.S.C. § 1983* action. Doc. 27. Plaintiff Otis Barnes timely objected, so pursuant to *28 U.S.C. § 636(b)(1)*, the Court reviews *de novo* the portions of the Recommendation to which Barnes objects.

The defendants' objection (Doc. 31)—filed twenty-eight days after the Magistrate Judge's Recommendation—is untimely and will not be considered by the Court.[1] *See 28 U.S.C. § 636(b)(1)*.

Barnes's problems began when he was assaulted by a group of unknown offenders while incarcerated, resulting in an injury to his eye that required stitches and multiple operations. Doc. 1-1 at 5. But Barnes does not seek to recover under a failure-to-protect theory, rather, **[\*2]** Barnes's *Eighth Amendment* claim seeks to impose liability on the defendants for failing to treat a variety of mental health conditions that Barnes developed in the aftermath of the assault. *See* Docs. 1; 1-1. Specifically, Barnes contends the defendants' deliberate indifference to his mental health conditions led to suicide attempts and other forms of self-harm. Doc. 1 at 5. Barnes requests nominal, compensatory, and punitive damages. Doc. 1-1 at 7.

The Magistrate Judge reasoned compensatory damages were barred because Barnes has not

---

[1] Even if the Court reviewed *de novo* the portions of the Recommendation to which the defendants object, the result would be the same. As the Magistrate Judge noted, the defendants "did not file a reply to [Barnes's] response or oppose the suggestion that GSP Grievance No. 311468 relates to or exhausted Plaintiff's claims." Doc. 27 at 8. The exhaustion of administrative remedies is an affirmative defense to which the defendants carry the burden of persuasion and production. *Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008)*. The defendants have not carried that burden, and thus are not entitled to dismissal on exhaustion grounds.

2022 U.S. Dist. LEXIS 155391, *2

alleged a physical injury of the nature required by the Prison Litigation Reform Act ("PLRA").[2] Doc. 27 at 10-11 (citing *42 U.S.C. § 1997e(e)*). To recover compensatory damages under the PLRA, the physical injury must be more than *de minimis* and must be connected to the alleged unconstitutional act. *Brooks v. Warden, 800 F.3d 1295, 1307 (11th Cir. 2015)*. Attempted suicide, alone, does not constitute a physical injury under the PLRA because allowing recovery for "physical manifestations of purely mental or emotional injury" undermines the PLRA's purpose of curtailing frivolous and abusive prisoner litigation. *Dipietro v. Barron, 2019 U.S. Dist. LEXIS 237254, 2019 WL 11879042, at *17-18 (M.D. Ga. Nov. 14, 2019)*, *report and recommendation adopted as modified*, *2020 U.S. Dist. LEXIS 252346, 2020 WL 8969969 (M.D. Ga. Jan. 3, 2020)*; *see Morrill v. Holmes Cty. Jail, 2018 U.S. Dist. LEXIS 219853, 2018 WL 7082149, at *9 (N.D. Fla. Jan. 30, 2018)* ("[T]he Court concludes that self-inflicted injuries do not, and cannot, rise to the **[*3]** level of a physical injury under the PLRA."); *Corbin v. Adams, 2020 U.S. Dist. LEXIS 103380, 2020 WL 3105954, at *2 n.3 (S.D. Ga. May 21, 2020)* ("Plaintiff's act of cutting himself after [another inmate] was placed in his cell ... does not satisfy this physical injury requirement."). The same holds true here. Barnes's objection makes clear that he seeks compensatory damages because the defendants "did not appropriately treat or medicate any of [his] health conditions, which led to [his] suicide attempts." Docs. 29 at 1; 30 at 1. And while Barnes submitted medical records to show he has attempted suicide "by hanging and cutting his wrists," that doesn't help him. Docs. 29 at 2; 30 at 2; 29-1; 30-1.

Self-harm, by whatever means, is simply not the type of "physical injury" required to recover compensatory damages under the PLRA.

After review, the Court accepts and adopts the findings, conclusions, and recommendations of the Magistrate Judge. The Recommendation (Doc. 27) is **ADOPTED** and made the order of the Court. The defendants' motion to dismiss (Doc. 23) is **GRANTED in part** as to Barnes's claims for compensatory damages and **DENIED in part** as to all remaining grounds.

**SO ORDERED**, this 29th day of August, 2022.

/s/ Marc T. Treadwell

MARC T. TREADWELL, CHIEF JUDGE

UNITED STATES DISTRICT **[*4]** COURT

---

**End of Document**

---

[2] Specifically, the PLRA states "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act[.]" *42 U.S.C. § 1997e(e)*.

# *Brandon v. Kinter*

United States District Court for the Northern District of New York

March 6, 2023, Decided; March 6, 2023, Filed

9:13-cv-00939 (BKS/ATB)

### Reporter

2023 U.S. Dist. LEXIS 36403 *; 2023 WL 2382637

CHAMMA K. BRANDON, Plaintiff, v. SUZANNE KINTER, LAWRENCE BEDARD, ROBERT WEBB, THOMAS PERRY, ERIC BLAISE, KEVIN LAURIN, and MARGARET CLANCY, Defendants.

**Prior History:** *Brandon v. Schroyer, 2016 U.S. Dist. LEXIS 25003 (N.D.N.Y., Feb. 26, 2016)*

**Counsel:** [*1] For Plaintiff: William S. Nolan, Gabriella R. Levine, Jennifer M. Thomas, Whiteman Osterman & Hanna LLP, One Commerce Plaza, Albany, New York.

For Defendants: April J. Laws, Johnson & Laws, LLC, Clifton Park, New York.

**Judges:** Brenda K. Sannes, Chief United States District Judge.

**Opinion by:** Brenda K. Sannes

## Opinion

**Hon. Brenda K. Sannes, Chief United States District Judge**:

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Chamma K. Brandon brings this action against the above-named Defendants, employees of Clinton County Jail ("CCJ"), under *42 U.S.C. § 1983*, alleging that during his 2012 incarceration, he was served meals containing pork in violation of his Muslim diet and retaliated against for filing grievances regarding his religious and medical diets. (Dkt. No. 17). Plaintiff pressed two claims at trial: (1) that Defendants Corrections Lieutenant Kevin Laurin, Registered Nurse and Healthcare Coordinator Suzanne Kinter, Corrections Sergeant Margaret Clancy, Food Service Manager Lawrence Bedard, and Corrections Officers Robert Webb and Thomas Perry violated Plaintiff's right to the free exercise of religion under the *First Amendment*; and (2) that Defendants Lt. Laurin, Nurse Kinter, Sgt. Clancy, Bedard, and Corrections Officer Eric Blaise [*2] retaliated against Plaintiff for filing meal-related grievances in violation of the *First Amendment*. (*Id.*). The Court held a three-day bench trial at which Plaintiff and all Defendants, except Margaret Clancy,[1] testified.

After carefully considering the trial record, the credibility of the witnesses, and the submissions of the parties,[2] the Court finds Plaintiff proved by a preponderance of the evidence that: (1) Lt. Laurin violated Plaintiff's *First Amendment* right to the free exercise of

---

[1] Prior to trial, the Court appointed Samantha Clancy, Margaret Clancy's daughter, as guardian ad litem for Margaret Clancy due to medical issues. (Dkt. No. 241).

[2] In his Proposed Findings of Fact and Conclusions of Law, Plaintiff seeks an award of sanctions in connection with the Special Diet Notification form, one version of which is contained in Defendants' Exhibit 21,(Dkt. No. 247, at 72-75), and a second version is contained in Plaintiff's Exhibit 8, *see infra* Figure 1. The Court addresses this request in an Order to Show Cause that will be issued separately.

religion; (2) Officers Webb and Perry are entitled to qualified immunity; (3) Lt. Laurin and Nurse Kinter retaliated against Plaintiff for engaging in conduct protected by the _First Amendment_; and (4) Plaintiff is entitled to compensatory damages, and punitive damages are warranted. The Court further finds that Plaintiff failed to prove by a preponderance of the evidence: (1) his free exercise claims against Nurse Kinter, Sgt. Clancy, and Bedard; and (2) his retaliation claims against Sgt. Clancy, Officer Blaise, and Bedard. The following constitutes the Court's findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. The Individual Defendants

Lt. Laurin was a "Corrections Lieutenant at CCJ whose duties included supervising corrections **[*3]** sergeants and the day-to-day activities throughout CCJ, as well as overseeing the grievance program at CCJ." (Joint Pre-Trial Stipulation, ¶ 3(a)(vi)). Nurse Kinter, a registered nurse, "was the Jail Healthcare Coordinator whose duties included supervising Registered Nurses at CCJ and overseeing the medical treatment of inmates detained at CCJ." (_Id._ ¶ 3(a)(viii)). Sgt. Clancy "was a Corrections Sergeant at CCJ whose duties included supervising Corrections Officers [and] documenting reports," and assisting Lt. Laurin in overseeing the grievance program. (_Id._ ¶ 3(a)(vii); Trial Transcript, at 70 ("T. 70")). Bedard "was the Food Service Manager at CCJ whose duties included supervising the cooks in the kitchen to make sure food was provided in compliance with the menu, recipes, and special diets that the inmates have on file with the kitchen." (Joint Pre-Trial Stipulation, ¶ 3(a)(v)). Officers Webb, Perry, and Blaise were "Corrections Officer[s] whose duties included providing for

the safety, security and order of the facility." (_Id._ ¶¶ 3(a)(ix-xi)).

### B. Religious and Medical Diets

CCJ is a 300-bed facility that housed approximately 210 inmates in 2012, the time period relevant to this action. **[*4]** (T. 284). During the booking and intake process, the booking officer documented each inmate's religion, if any, for the purpose of ascertaining whether the inmate required a religious diet. (T. 293). If so, the booking officer would fill out a "Special Diet Notification" form for a religious diet and "physically bring that [form] to the kitchen." (Dkt. No. 250, ¶ 12; T. 293-94, 446). A CCJ lieutenant, sergeant, and grievance coordinator were also authorized to fill out a Special Diet Notification form documenting an inmate's need for a religious diet. (Pl.'s Ex. 8; Defs.' Ex. 21; T. 343).[3] CCJ medical staff and facility nurses were responsible for approving medical diets and for notifying the kitchen of an inmate's need for a medical diet by sending a Diet Notification form specifying the medical diet to the kitchen. (T. 448).[4]

### C. CCJ Kitchen and Meal Service

Inmates at CCJ received all their meals on

---

[3] The CCJ 2012 "Inmate Handbook Rules/Regulations" stated: "There will be NO special diets unless ordered by the facility nurse or doctor, and ONLY for a legitimate medical or religious reason." (Defs.' Ex. 24). However, there was no evidence at trial showing that a facility nurse could order or remove a religious diet. Nurse Kinter testified that the nurses "were always told that the healthcare office, any of us nurses, were not allowed to do religious diets" and that she had never filled out a religious diet slip in the four years she had worked at CCJ. (T. 389; _see also_ T. 468 (Bedard testifying that "I would only allow the booking officer to give me the religious diet or a nurse a medical diet")). At most, a facility nurse could check an inmate's kitchen file to ascertain whether that inmate had a religious diet on file. (Defs.' Ex. 20).

[4] Information about an inmate's special diet was also contained in a file in the inmate's housing unit, or "pod." (T. 488).

trays that the kitchen staff delivered to them in their housing units, or "pods." (T. 296-97). Unless the kitchen had been notified of a medical or religious diet, each inmate received a "regular" or "general population" meal. (T. 455). In addition to the general population diet, [*5] the CCJ kitchen prepared "approximately ten" special diets, including diabetic, lactose free, low fat/low cholesterol, low sodium, gluten-free, and "nopork" or religious diets. (*Id*.). Each day, to ensure each inmate received "the proper meal in [the] right area," Bedard, as food service manager, reviewed the menu and the inmate housing report and prepared a list with each inmate's name, special diet, if any, and the inmate's pod. (T. 441-42). Bedard maintained inmate files and would place all special diet slips— religious or medical—in the inmate's file. (T. 293, 461).

Bedard, several cooks, and up to seven inmates worked in the kitchen. (T. 449). The cooks were responsible for making the meal designated by the menu that day—"whatever soup it is for the day, whatever sandwiches for that day," for example. (T. 443). There was a "food line" in the kitchen, which Bedard described as "a conveyer-type line where the trays are placed on the conveyer from one end to the other end as the food is being served." (T. 443). The cooks were responsible for placing the "main course" and other food items on the trays. (T. 444, 451). Bedard was "not always on [the] food line," but he would, at times, [*6] work on the food line serving small items such as condiments, fruit, or a package of cookies. (T. 451). The inmate workers also served on the food line, and one inmate worker was "at the very end to put the trays into the cart" for delivery to the designated pod. (T. 443). Prior to each meal, "sticky note tabs" were prepared for each inmate receiving a special diet. (T. 444). The sticky notes listed the inmate's name and type of diet and were first placed above the food line and then onto

the meal tray before the tray was placed onto the cart for delivery. (T. 444 (Bedard testifying that if the inmate had a religious diet, for example, that inmate's name and "no pork" would be on the tray's label)).

Once the trays were placed onto the cart, a corrections officer and inmate worker would escort the cart to "particular pods." (T. 43). The corrections officer in the pod would alert the inmates that meals had arrived and divide the inmates into two lines—"regular gen pop" and "special diet persons"—to receive their trays. (T. 44). If an inmate complained that his meal did not comply with a special diet, the pod corrections officer could check the inmate's file, a copy of which was contained [*7] "at the podium" in the inmate's pod, to verify the diet. (T. 487-88). The corrections officer could also call the kitchen, or send the tray back to the kitchen where Bedard or a cook would inspect the tray and, if the tray was not right, replace the incorrect item or the entire meal. (T. 451, 487-88).

### D. Plaintiff

#### 1. Religious Background

Plaintiff, a born Muslim, grew up attending religious services with his father. (T. 35). The *Quran* prohibits Muslims from eating pork. (T. 38). Eating pork is "haram," "a sin," for which "you can be placed in hellfire." (T. 39); *see Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019)* ("For Muslims who follow Islamic dietary laws, consuming pork is a sin at any time, regardless of whether the consumption occurs during a holiday or not" and "[t]he Quran expressly commands against it." (citing *Quran* 2:173)). The practice of Islam also prohibits the eating of pork products, or "anything associated" with pork. (T. 39). For this reason, not only is the handling of pork prohibited, but a plate of food containing pork and non-pork

products is considered contaminated and inedible. (T. 39).

## 2. Plaintiff Booked at CCJ - January 2012 and March 2012

Plaintiff was booked into CCJ twice during 2012. During all time periods **[\*8]** relevant to this action, Plaintiff was a pretrial detainee. Plaintiff's first stay at CCJ was from January 14, 2012 until March 2, 2012. (Pl.'s Ex. 5; Defs.' Ex. 2; T. 42, 191). No religion is noted on Plaintiff's January 12 booking sheet. (Pl.'s Ex. 5; Defs.' Ex. 2). "On January 14, 2012, Plaintiff was issued a 'no shellfish diet' at CCJ." (Joint Pre-trial Stipulation, ¶ 3(a)(xii)). Plaintiff did not request religious, no-pork meals during this stay. (T. 41-42). If Plaintiff received a meal with pork in it, he did not complain but he would not eat the meal, either. (T. 41-42). Some form of pork, i.e., sausage, ribs, salami, bologna, was featured on the menu for the general population diet two to four times each week. (T. 48-49, 72-73; Pl.'s Exs. 1, 2).

On March 2, 2012, Plaintiff was "released," though, for reasons that are not relevant here, he was never "physically" "released" from the facility, and he was, instead, arrested and booked into CCJ a second time. (T. 42, 191). Plaintiff's March 2 booking sheet lists his religion as Muslim. (Defs.' Ex. 3). However, the booking officer, who is a not a defendant in this case, did not bring a religious "no-pork" diet slip to the kitchen **[\*9]** after Plaintiff's booking, or at any time thereafter. (T. 344, 371). Because Plaintiff identified as Muslim when he was rebooked on March 2, 2012, he should have had a religious diet slip forwarded to the kitchen as of March 2, 2012. (T. 370-71).

## 3. Plaintiff's Requests for Muslim Diet — March to August 2012

"On March 23, 2012, Plaintiff was issued a 'no tomato or tomato product diet,'" because he has severe acid reflux. (Joint Pre-Trial Stipulation, ¶ 3(a)(xiii); T. 46). "On May 21, 2012, Plaintiff was issued a 'low fat, low cholesterol' diet" because he had high cholesterol. (Joint Pre-Trial Stipulation, ¶ 3(a)(xiv); T. 46).

In March, April, and May 2012, Plaintiff received meals with pork two to four times each week. (T. 49, 76-77). If Plaintiff received a meal tray with pork, he did not eat it; he would either give it away, throw it away, or trade with another inmate. (T. 75). If Plaintiff could not consume a food tray because it contained pork, and if he had "commissary," he "would "eat commissary" though it "had nothing to really substitute" for a meal and "[i]t was just junk." (T. 75, 79). If he did not have commissary food, he "just wouldn't eat anything." (T. 75). As a result **[\*10]** of missing meals, Plaintiff had headaches, fatigue, dizziness, and confusion, and was frustrated. (T. 79). Plaintiff experienced the "angst of knowing" that he was not going to eat. (*Id.*).

In May 2012, Plaintiff began complaining to shift corrections officers, who knew he was Muslim and that he was "not supposed to get pork." (T. 78). One officer responded by suggesting that Plaintiff "write a medical," (*id.*), and told him that the medical ward "would address" his religious dietary needs. (T. 80). On May 28, Plaintiff filed a grievance stating:

> I was denied my meal. I'm on a special diet and the cooks [sic] refused to make the proper accommodations to my diet. The housing unit officer told the trustee to obtain the proper special diet meal and that was to no avail. The housing unit officer called the kitchen in a further attempt to obtain my special diet me[al] and resulted in the cook's absolute refusal.

(Pl.'s Ex. 10).[5] Although it is not referenced in the grievance, Defendants acknowledge that on May 28, Plaintiff stated in writing to CCJ that he was Muslim. (Dkt. No. 250, ¶ 77; T. 202-03).

On June 21, Plaintiff submitted a "Sick Call Request" inquiring about a knee brace and requesting **[*11]** that a "no pork order" be sent to the kitchen and placed in his folder, explaining that he did "not eat pork yet [was] still being served pork during meals." (Pl.'s Ex. 11). Medical staff responded: "given knee brace." (Id.). Plaintiff received no response regarding his request for a no-pork diet and continued to receive meals with pork. (T. 82).

On or about July 4, Plaintiff sent another Sick Call Request. (Pl.'s Ex. 12). In it, Plaintiff stated that his inmate folder reflects that he is to have "no fish or shellfish" due to "allergy" and requests that the "kitchen" be notified. (Id.). Although the remainder of the request is largely illegible, it appears to seek a no-pork product diet. (Id.). The response, from a nurse who is a not a defendant in this case, stated: "Done—for no fish/shellfish. Need to ask security staff to submit diet slip for pork. Medical does not do religious diets." (Id.). When Plaintiff received this response, he showed it to a security officer who said: "we don't do that. We don't do religious diets, that's a medical thing." (T. 83).

On July 6, Plaintiff submitted a third Sick Call Request. (Pl.'s Ex. 13). He wrote: "I've made several attempts to have my meals **[*12]** altered to a no pork or pork products diet. I'm a Muslim and do not consume anything associated with pork. I told the 'Security Staff' [illegible] they directed me to consult medical about this matter. Please make the proper

adjustment to my diet." (Id.). On July 9, Nurse Kinter responded: "You will have to speak with jail Sgt. or Lt." (Id.). Nurse Kinter explained at trial that she referred Plaintiff to the jail sergeant or lieutenant because she always been told by "security . . . all the way up to the major," that "nurses were not allowed to do religious diets." (T. 389). Plaintiff continued to receive meals with pork in July, August, and September 2012. (T. 86-87).[6]

### 4. Plaintiff's Muslim Diet Grievances and Lt. Laurin's Involvement — September 2012

On September 15, 2012, Plaintiff filed a grievance complaining that he was being given trays with food he could not eat due to his medical conditions and that were inconsistent with his "various restrictive diets." (Pl.'s Ex. 14). He further stated that "this is one of several grievances I've made but to no avail." (Id.). Plaintiff sought a:

> complete overhaul of the kitchen staff. This is one of many complaints which seems to go unresponded. **[*13]** I've been here for more than 9 mths [sic] and at least 1 time per week there has been a problem with my meals. I've filed several grievances, made countless complaints to shift officers. Still this problem still reoccurs.

(Id.). The grievance's "Summary of facility staff attempts to resolve" stated: "Sent tray back to

---

[5] Plaintiff did not pursue the grievance after filing; under "Summary of facility staff attempts to resolve," Plaintiff placed a check-mark next to "I accept this resolution." (Pl.'s Ex. 10). The "resolution" is not stated on the grievance form.

[6] In 2012, the holy month of Ramadan was between July and August. (T. 87). During Ramadan, Plaintiff was required "to abstain from consuming food or beverage" from sunrise to sundown. (T. 88). In July, Plaintiff told a corrections officer that "Ramadan is coming up" and he was "supposed to fast" and asked who he should "speak to about getting the accommodation of fasting, of receiving a meal prior to the beginning of fast and then a meal after fast" (T. 88-89). Plaintiff testified that he was told that CCJ would not accommodate the fast. (T. 89). Plaintiff also testified that he filed "grievances" related to meals he received with pork during Ramadan. (Id.). However, none of this testimony is corroborated.

kitchen. Talked with kitchen staff." (*Id.*) The staff individual, who is not a defendant here "stated that everything on inmate Brandon's tray coinsided [sic] with inmate Brandon's diet. The tray was sent back down to D-Pod and Inmate Brandon took the tray and asked for a grievance." (*Id.*).

On September 24, Plaintiff filed a grievance stating that he "can not/do[es] not eat pork or any pork products nor tomatoes" but that he was served a BLT for lunch and that when he "instructed the server to produce another tray," the server later "returned with the same tray stating the kitchen will not accommodate." (Pl.'s Ex. 15). As to the "[a]ction requested," Plaintiff wrote that "stating some sort of action to be conducted seems useless" because he had been in CCJ "for 250+ days and continuously receive[d] food" he could not eat. (*Id.*). The grievance's "Summary of facility staff **[*14]** attempts to resolve" stated: "called the nurse to see what the inmate 'Brandon' couldn't eat and she stated he is on a low fat low sodium diet and that the inmate is allergic to tomatos [sic]." (*Id.*). Plaintiff did not receive a replacement for the September 24 lunch. (T. 93). Later that day, Plaintiff filed a second grievance: "Again, I'm being denied a dinner (meal). I do not/can not eat pork or pork products or tomatoes. For dinner I was served a salad which had tomatoes & bacon strips . . . . The officer instructed the server to make accommodations & the server returned with the same tray after picking out the tomatoes." (Pl.'s Ex. 16). Under "Action requested by the grievant," Plaintiff wrote: "I've made countless grievances to what seems to be a useless process. I've went many times without having a meal because of the kitchen's seemingly inability to make simple food accommodations." (Pl.'s Ex. 16). The grievance's "Summary of facility staff attempts to resolve" stated: "I called the nurse to see what the inmate can't have and she stated no tomatoes or low fat low salt items." (*Id.*).

On or about September 26, 2012, Sgt. Clancy, who had been handling Plaintiff's grievances, went **[*15]** to Lt. Laurin with a concern about the number of grievances Plaintiff had submitted about meals. (T. 302, 306-07 (Lt. Laurin testifying that he received Plaintiff's grievance on September 26 and that he began to investigate on September 26 or 27)). Sgt. Clancy "had tried to explain [to Plaintiff] that the meals that [Plaintiff] was receiving were his meals." (T. 302). When Lt. Laurin and Sgt. Clancy investigated, they found Plaintiff had a medical diet in place—low fat, low sodium, no fish, no shellfish, no tomatoes, and no tomato products. (*Id.*). Sgt. Clancy also told Lt. Laurin that Plaintiff was stating that he "wasn't getting his Muslim no pork, no pork products diet." (T. 303). Lt. Laurin "dismissed Sergeant Clancy from doing the grievances" and took them over himself because there was "a problem and [he] needed to find out where the problem was" and see if he "could cure it." (T. 304). On either September 26 or 27, 2012, Lt. Laurin "went down physically" to the kitchen and he and Bedard went through Plaintiff's file together. (T. 305-06). Lt. Laurin explained that "[t]he paper that normally has religious diets that are generated by security staff is a little bit smaller" and **[*16]** he "wanted to make sure that it wasn't being missed." (*Id.*). They "did not find a religious slip" in Plaintiff's file. (*Id.*).

Lt. Laurin testified that on either September 9 or 27, he *verbally* notified the kitchen that Plaintiff was to be on a "no pork or no products" diet. (T. 307, 333-34). The Court does not credit this testimony. Lt. Laurin could not recall who he told about Plaintiff's diet. (T. 307 (Lt. Laurin testifying that he "would have to go to Bedard" but that he did not "know exactly" who he talked to, only that he "talked to somebody down in the kitchen")). Nor could Lt. Laurin accurately state on what date he told the kitchen of Plaintiff's no pork diet, (*compare id.* (Lt. Laurin testifying that he notified the kitchen on September 26 or 27); *with* T. 333-

34 (Lt. Laurin testifying that he verbally notified the kitchen on September 9)).[7] Indeed, Lt. Laurin's representations regarding when the kitchen was notified—verbally or in writing—of Plaintiff's religious diet have varied greatly in this case. For example, at trial, Lt. Laurin acknowledged that he previously filed an affidavit in this matter, in support of Defendants' motion for summary judgment, that stated: "due to **[*17]** plaintiff's March 2012 declaration that he was a Muslim, plaintiff did have a notification placed in his file that provided him a diet with no pork or no pork products." (T. 372 (citing Pl.'s Ex. 67 (marked for identification)); *see infra* Section II.D.6. Lt. Laurin further acknowledged that, in that affidavit, he referred to "Exhibit A," a copy of the Special Diet Notification form that the Court has found was not actually given to the kitchen until October 5, 2012. *See infra* Section II.D.6. The Special Diet Notification form that Lt. Laurin cited in his affidavit is in all respects identical to the Special Diet Notification form that was given to the kitchen

on October 5, 2012 except that the date ("10/5/12") is missing.[8] (T. 374-75). Moreover, not only was Lt. Laurin's testimony regarding a verbal notification to the kitchen not credible, but Bedard[9] testified that no one at CCJ *told* him that Plaintiff should not be served pork or pork products, (T. 469), stated that it was *not* the general practice for anyone at CCJ to tell him orally about an inmate's medical or religious restrictions, (T. 468), and that he received Plaintiff's religious diet notification on a *form*, (T. 470).

On or around September 27, Lt. Laurin went to Plaintiff's housing unit to discuss what was "going on, in terms of" Plaintiff's "religious diet." (T. 91, 97, 304). Lt. Laurin told Plaintiff he was aware Plaintiff is Muslim and that Plaintiff was receiving pork meals and

---

[7] The September 9 date is repeated in a response Lt. Laurin provided to a Prisoner Request Form Plaintiff submitted on October 11 complaining that he was still being served pork and had not received a response to his grievances, (Pl.'s Ex. 21; Defs.' Ex. 16 (Lt. Laurin responding: "You have not received pork or pork products since 9/9/12")), and again in an October 15 response to Plaintiff's October 10 grievance regarding a chef salad with ham, (Pl.'s Ex. 19 (Lt. Laurin responding: "You have not received pork or pork products from the kitchen for a meal since 9/9/2012")). However, given Lt. Laurin's testimony that he did not become aware of Plaintiff's entitlement to Muslim meals until September 26, (T. 302, 306-07), Lt. Laurin's statements to Plaintiff in October that Plaintiff had not received pork since September 9 were false. Had this date appeared once, it might be explained as a typographical error, but Lt. Laurin used it in two separate documents, and again at trial, without explanation. However, as Plaintiff has not argued that Lt. Laurin had personal knowledge of Plaintiff's deprivation of a Muslim diet before September 26, the Court concludes Plaintiff implicitly acknowledges the September 9 date is inaccurate. (*See generally* **[*18]** Dkt. No. 247; *see also id.* at 64-65 (discussing Lt. Laurin's personal involvement and September 26 discovery "that Plaintiff had no religious diet slip on file with the kitchen")).

---

[8] It was undisputed at trial that the *dated* form contained in Defendants' Exhibit 21 was the authentic form. (*See* Figure 1 *infra* Section II.D.6.). At trial, the Court took judicial notice (T. 375-76) that United States Magistrate Judge David E. Peebles issued a Report and Recommendation recommending granting Defendants' motion for summary judgment as to Plaintiff's *First Amendment* free exercise of religion and retaliation claims in which he noted that the "date of '10/5/12'" appeared to be written in "defendant Laurin's handwriting," and found "it plausible, that the version of this notice produced by defendants in support of their motion has been 'falsified . . . by removing the date written on the notification.'" *Brandon v. Schroyer, 13-cv-939, 2016 U.S. Dist. LEXIS 25003, at *10-11, 2016 WL 1638242, at *4 (N.D.N.Y. Feb. 26, 2016)*, adopted by, *2016 WL 1639904, 2016 U.S. Dist. LEXIS 54634 (N.D.N.Y. Apr. 25, 2016)*, affirmed in part and reversed and remanded in part, sub nom., *Brandon v. Kinter, 938 F.3d 21 (2d Cir. 2019)*. The submission of the undated form to the Court is the subject of an Order to Show Cause that will be issued separately.

[9] Bedard acknowledged at trial that he was asked in an interrogatory during discovery: "When was Bedard or anyone with the kitchen staff notified that plaintiff was issued a religious diet?" and that he provided the following sworn response: "the kitchen staff was notified of plaintiff's religious diet from the booking officer on or about March 2, 2012." (T. 464). At trial, Plaintiff argued that "[p]er Defendant Bedard's interrogatory response" the kitchen staff was notified about his religious diet on March 2. (T. 514). However, there was no credible evidence presented at trial that Bedard or anyone in the kitchen knew of Plaintiff's religious diet before October 5.

acknowledged "it's wrong, but he said he's going to help." (T. 91). Lt. Laurin told Plaintiff he was "going to look into it and to address these matters." (T. 91-92).

On September 27, Lt. Laurin, as grievance coordinator, issued decisions regarding Plaintiff's September 15 and two September 24 grievances. (Pl.'s Exs. 14, 15, 16). As to the September 15 grievance, Lt. Laurin wrote: "Kitchen has been informed as of 9/27/2012 that you are low fat, low cholesterol, no tomatoes or tomatoe [sic] products, no fish or shellfish. They did not have that you were Muslim. You will get no pork or pork products." (Pl.'s Ex. 14). As to the first September 24 grievance, Lt. Laurin wrote: "As of 9/27/12 the kitchen was reviewed [sic] of your diet. Lowfat/low cholesterol, no tomatoes or tomatoe [sic] products, no shellfish or fish and that you **[*19]** are Muslim. Kitchen stated that the bacon is veggie bacon. We will furnish you with a copy of the ingredients." (Pl.'s Ex. 15). As to the second September 24 grievance, Lt. Laurin wrote: "Kitchen is aware of your diet. Bacon is veggie bacon. A copy of the ingredients will be provided to you. I have advised the kitchen that if you get a wrong meal that the whole meal will be redone." (Pl.'s Ex. 16). Plaintiff never received a copy of ingredients listing "veggie bacon" and did not recall ever seeing "veggie bacon" on the menu at CCJ. (T. 94).

On September 29, after issuing the above-referenced decisions, Lt. Laurin further investigated Plaintiff's September 15 and 24 grievances. (Pl.'s Exs. 14, 15, 16 ("Grievance Investigation Form")). Lt. Laurin interviewed Plaintiff, Nurse Kinter, and Bedard. (Pl.'s Exs. 14, 15, 16). In his "Summary of findings," Lt. Laurin wrote: "Inmate Brandon's diets have been documented by medical and a copy of Brandon's special deit [sic] was given to the kitchen staff. Kitchen had not been notified he was Muslim. Kitchen staff has been advised to

correct the diet." (Pl.'s Exs. 14, 15, 16). Under "List other relevant information/documentation," Lt. Laurin wrote: **[*20]** "A copy of special diets. Has been buying items in the commissary that he should not have with his diet." (Pl.'s Exs. 14, 15, 16).

## 5. Plaintiff's Medical Diet Grievances — October 1-3, 2012

Plaintiff filed two grievances on October 1, 2012. In the first, Plaintiff wrote that he was "served a sandwich which had tomatoes in it." (Pl.'s Ex. 26). He explained that because of his "medical conditions, he cannot consume any tomatoes/tomatoes products." (Id.). In the second October 1 grievance, Plaintiff complained that he was "being denied a lunch tray" that complied with his medical special diet. (Pl.'s Ex. 27). Under "Summary of facility staff attempts to resolve" an officer wrote: "called kitchen — spoke with kitchen boss Bedard — new sandwich was being made . . . brought down to inmate." (Id.). Lt. Laurin subsequently wrote: "Had a meeting with the kitchen cook manager and explained no more mistakes if there are mistakes they are to be corrected." (Id.).

On October 3, Plaintiff filed a grievance stating that he "cannot eat/consume tomato or tomato products due to my medical conditions which was cleared by medical staff. I was served tomato soup in my lunch tray. Having been served tomato **[*21]** soup denies me a meal." (Pl.'s Ex. 28). The grievance's "Summary of facility staff attempts to resolve" stated that: "the tomato alternative soup was the 3 bean salad in a separate bowl on the meal tray. According to the kitchen all contents of tray was compliant to the diets prescribed to inmate Brandon by medical." (Id.).[10]

---

[10] In addition, on October 3, Plaintiff also filed two Prisoner

### 6. Special Diet Notification Form for Religious Diet Filed with Kitchen - October 5, 2012

On October 5, 2012, Lt. Laurin "went down to booking, filled out the [religious meal] slip [him]self, put the date on it, brought it down to the kitchen and had them put it right directly in [Plaintiff's] file and mark him as a Muslim, no pork/no pork products." (T. 306; Pl.'s Ex. 8) Lt. Laurin circled the section of the form for a "Religious" diet and wrote "Muslim no pork or pork products"; he signed the from and dated it "10/5/12." (Pl.'s Ex. 8); *see* Figure 1.

Figure 1: Defendants' Exhibit 21 — Dated Special Diet Notification Form



Lt. Laurin testified that he did not know why he did not provide the "religious slip" earlier and instead waited until October 5. (T. 306). The Court finds that the kitchen was first notified

_____

Request Forms, both seeking "a copy of all past food grievances." (Pl.'s Exs. 29, 30). To the first, Lt. Laurin responded: "Copies are 25 cents per page. You will be issued a copy of grievance if accepted or appealed to the CPCRC at no charge." (Pl.'s Ex. 29). To the second, Lt. Laurin responded: "Previously answered." (Pl.'s Ex. 30). Further, on October 5, Plaintiff filed two Prisoner Request Forms. (Pl.'s Exs. 31, 32). One seeks the address for "Prisoner Legal Services," the "Attorney General Office of New York," and the "closest Legal Aid Society." (Pl.'s Ex. 31). The other seeks copies of "all" his food grievances. (Pl.'s Ex. 32). On October 9, Lt. Laurin responded with three addresses. (Pl.'s Ex. 31). Lt. Laurin's undated response to Plaintiff's request for all food grievances stated "[p]reviously answered." (Pl.'s Ex. 32).

about Plaintiff's religious diet on October 5, 2012, in **[*22]** this Special Diet Notification form. The Court further finds that from September 26 to October 5, Plaintiff continued to be served pork meals and received approximately six pork meals during that week-and-a-half time period. (Pl.'s Exs. 1, 2 (CCJ menus showing pork served two to four times weekly)).

### 7. Meal-Related Grievances — October 9-15, 2012

On October 9, 2012, Plaintiff filed a grievance regarding a meal he received in September:

> I've been served & have consume[d] food items I'm not suppose to consume due to religious beliefs. Through discussion on today's lunch tray [sic] with the shift officer "Coocher" about it containing a ham sandwich. The officer stated it is not ham it is turkey & continued to state, the only pork product served to inmates is the ham steak. He was told it contains pork from the kitchen staff. On September 9th, I was served ham steak for dinner. When I presented it to the shift officer he told me it was made of turkey and no pork/pork [products] . . . were included in the ham steak. He continued to state the kitchen doesn't use any pork products specifically because of the variety of inmates having religious constraints against pork/pork products.
>
> I need someone **[*23]** to get to the bottom of this. 2 different officers making 2 contrary statements.

(Pl.'s Ex. 18). Under "Summary of facility staff attempts to resolve" is written:

> I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that inmate Brandon was a no pork diet. So it is very likely that inmate Brandon recieved [sic] pork on Sept. 9. She also

stated that inmate Brandon will no longer receive [sic] pork due to the fact that they now have documentation.

(*Id.*).

On October 10, at approximately 4:30 p.m., Plaintiff filed a grievance stating that he was "served a chef salad with strips of ham." (Pl.'s Ex. 20; Defs.' Ex. 9). The grievance's "Summary of facility staff attempts to resolve" states the corrections officer had the tray returned to the kitchen for replacement. (Pl.'s Ex. 20; Defs.' Ex. 9). Fifteen minutes later, at approximately 4:35 p.m., Plaintiff filed a second grievance stating that instead of replacing the tray in its entirety, the kitchen removed the strips of ham and sent back the same tray. (Pl.'s Ex. 19; Defs.' Ex. 8; Pl.'s Ex. 20; Defs.' Ex. 9). The second grievance's "Summary of facility staff attempts to resolve" states that "Sgt. Gregory" **[*24]** "went [to] the kitchen staff to discuss the tray and that no pork products were to be placed on or near the meal. The cook informed Sgt. Gregory the meat was turkey ham and a replacement tray would not be made." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin investigated these grievances and falsely responded: "You have not received pork or pork products from the kitchen for a meal since 9/9/2012." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin further stated that "the ham you receive is turkey ham sliced or cubed. Your Muslim diet is being served correct. I have included the ingredient label to you." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin made a copy of the turkey ham label to show Plaintiff "that it wasn't a pork product, even though it looks like pork." (T. 318; Defs.' Ex. 1).

On October 11, Plaintiff filed a grievance seeking copies of his food grievances.[11] (Pl.'s

---

[11] On October 11, Plaintiff also filed a Prisoner Request Form stating that he was "still being served pork" and that he "need[ed] these issues addressed." (Pl.'s Ex. 21). Lt. Laurin again falsely responded: "You have not received pork or pork

Ex. 34). Lt. Laurin's response stated: "The foil request I have given you should give you the information you are requesting." (*Id.*). In a decision dated October 25, Lt. Laurin stated that it "has always been the practice of the facility to charge 25 cents for any requested copies" and that Plaintiff would receive a copy of his grievances **[*25]** "at no charge when the grievance is accepted or is appealed." (*Id.*).

On October 14, Plaintiff submitted a second grievance seeking copies of past food grievances. (Pl.'s Ex. 35). On October 15, Plaintiff filed two grievances.[12] (Pl.'s Exs. 36, 38). One of the grievances sought copies of past food grievances[13] and the other complained that the peanut butter that was served with his breakfast was "high on cholesterol" and asserted that he needed his "restrictive diets to be followed." (Pl.'s Exs. 36, 38).

## 8. Medical Diets Revoked — October 15-16, 2012

Lt. Laurin had noted during his September 29 investigation into Plaintiff's grievances that Plaintiff had "been buying items in commissary

---

products since 9/9/12." (*Id.*). Because Plaintiff provided no testimony regarding the factual circumstances underlying this complaint, and the parties do not advance any arguments regarding this complaint, and given that Plaintiff submitted it the day after he filed his October 10 grievances, (Pl.'s Exs. 19, 20), to which Lt. Laurin had yet to respond, the Court concludes that Plaintiff was complaining about the meals he received on October 10 (rather than an additional pork meal).

[12] On October 15, Plaintiff also filed a Prisoner Request Form seeking the address for the State Commission of Corrections. (Pl.'s Ex. 37).

[13] In a decision dated October 25, regarding the October 14 grievance regarding the lack of response to his prior food grievances, Lt. Laurin stated that three of Plaintiff's grievances had been "mailed" for further appeal, that four were with "the Jail Administrator," and there "were 13 others not counting this one" and that none of Plaintiff's grievances were "being ignored." (Pl.'s Ex. 35). The same day, Lt. Laurin issued a decision regarding the October 15 grievance seeking copies. (Pl.'s Ex. 36 (referring to Pl.'s Ex. 34))

that he should not have with his diet." (Pl.'s Exs. 14, 15, 16). "[E]arly in October," after receiving "an awful lot of grievances from [Plaintiff] that just wouldn't even slow down," Lt. Laurin requested Plaintiff's commissary receipts. (T. 326-27 (explaining that the grievances "were just one right after another, so we have an issue"); *see also* Defs.' Ex. 22 (commissary receipts "reprinted on 10/02/2012")). Lt. Laurin testified that his purpose in requesting the receipts was "to look over the items [Plaintiff] **[*26]** was purchasing and to see if it was complying with his diet." (T. 327). Upon reviewing Plaintiff's commissary slips, Lt. Laurin noted that "[t]here was some items that [he] felt were contradictory to [Plaintiff's] low sodium/low fat diet," (*id.*), including "[r]amen [chili] soup," which contained tomato products; "squeeze cheese;" "mac and cheese;" and "nutty buddy bars." (T. 211, 327).

On October 15, Lt. Laurin went to Plaintiff's pod to speak with Plaintiff about his "various grievances" and commissary purchases. (T. 113-14, 328). Lt. Laurin "started . . . yelling" and asked Plaintiff "to explain" his commissary purchases—Lt. Laurin asked Plaintiff what the "sense" was of Lt. Laurin and other CCJ officials "putting in all this effort" to respond to "all [Plaintiff's] grievances" if Plaintiff was "turning around and purchasing" "oatmeal cream pies and nutty bars in commissary?" (T. 113-14, 328-29). Plaintiff responded that "sometimes I don't eat anything since I'm not fed anything, so I have to eat something." (T. 115). Lt. Laurin testified that he understood from their discussion of the commissary receipts that Plaintiff had "traded or bartered" commissary items; although Lt. Laurin **[*27]** acknowledged that Plaintiff did not expressly say so. (T. 328-29). Lt. Laurin testified that if Plaintiff had admitted this he would have been "written up" for violating CCJ rules. (*Id.*). Plaintiff had never been questioned about his commissary purchases before. (T. 115).

After speaking with Plaintiff, Lt. Laurin went to Nurse Kinter to show her the commissary receipts. (T. 329). Lt. Laurin wanted Nurse Kinter "to be aware that [Plaintiff] was purchasing these items and they weren't compliant with his low fat/low sodium diet." (*Id.*). Lt. Laurin explained that his job was "just to make" Nurse Kinter "aware" of the items Plaintiff had been purchasing, and that he had "done this before in the past" with other inmates. (*Id.*). When asked for examples, Lt. Laurin responded: diabetics, individuals who they had "to put . . . on a low sodium diet because they start retaining fluids," and "pregnant females," in an effort "to keep them on a good healthy diet." (T. 330). However, Lt. Laurin acknowledged on cross-examination that CCJ would not revoke a diabetic or pregnant inmate's medical diet based on a review of commissary purchases. (T. 357-58).

The following morning, October 16, Plaintiff "was **[*28]** called to go to sick call." (T. 115).[14] Plaintiff was escorted to the medical ward, where he was seen by Nurse Kinter and Dr. Glen Schroyer, who is not a defendant in this case. (T. 116-17). Nurse Kinter told Plaintiff that they were "taking [Plaintiff's] . . . medical — - the dietary restrictions away" because Plaintiff was "not being compliant with [his] diet." (T. 118). Plaintiff "immediately" objected and began asking Dr. Schroyer why Nurse Kinter was "making these statements" and "how" he was "allowing this?" (*Id.*). Dr. Shroyer "didn't say anything" and "shrugged his shoulders." (*Id.*). Regarding the commissary purchases, Plaintiff told Nurse Kinter that "due to the past instances and continuous neglect of my dietary restrictions from the kitchen I never know whether or not I'll receive a meal let alone a meal I can eat." (Pl.'s Ex. 40). Plaintiff then said that if they removed his

---

[14] Plaintiff was "confused about" being called to go to sick call because typically, inmates were required to "fill out a form to go"—"they don't just call you." (T. 115-16).

medical diets he was "not going to just eat anything" and that he could not eat a regular diet and that he was "going to write grievances." (T. 118-19).

Nurse Kinter testified that there were no medical concerns about removing Plaintiff's low fat/low cholesterol diet because "his labs had improved at the **[*29]** time when he was here at the jail" and as it "look[ed] like he wasn't being compliant with his meals . . . we had no concern with Mr. Brandon's diet at that time." (T. 437). The "coronary risk evaluation" labs in the record, however, do not support this testimony. (Pl.'s Ex. 66). For example, Plaintiff's cholesterol was 255 (high) in May 2012, 259 (high) in August 2012, and 249 (high) on October 3, 2012. (Id.). The other lab results—HDL, LDL, and triglycerides—showed similarly minor fluctuations and all remained flagged as high or low. (Id.). Nurse Kinter was aware that patients with high levels of cholesterol are at increased risk of heart disease and that patients with acid reflux can become ill if they eat foods with high acidity, like tomatoes, but had "[n]o concerns" about that. (T. 419-20, 440). After reviewing Plaintiff's commissary purchases, and finding that he "was buying everything that was against his medical diet," Nurse Kinter "did a new diet slip to start the regular diet, no fish, no shellfish diet," and she "sent it back down to the kitchen, and then that notification went into the doctor's folder." (T. 393). The "Diet Notification" Nurse Kinter sent to the kitchen **[*30]** is dated October 16, and directed the kitchen to "Cancel all previous slips" and place Plaintiff on the "Reg Diet" but "No Shellfish." (Pl.'s Ex. 41).

The same day, October 16, Plaintiff filed a grievance regarding Nurse Kinter's removal of his medical diet. (Pl.'s Exs. 39, 40). Lt. Laurin denied the grievance. (Pl.'s Ex. 40).

On October 17, 2012, Plaintiff submitted two Sick Call Requests. (Pl.'s Ex. 42; Defs.' Ex. 20). The first stated: "I do not eat tomatoes. Tomatoes causes me extreme acid reflux . . . yet I was served a dinner of pasta & tomato sauce. The restriction was taken out of my file." (Pl.'s Ex. 42). Plaintiff requested that the restriction be reinstated. (Id.). On October 18, Nurse Kinter responded: "This was discussed at visit with M.D. You decided not to follow doctor's recommendations!" (Id.). The second Sick Call Request stated that Plaintiff does not eat pork, he is Muslim, he has raised this issue on several occasions, and that his diet was "recently" changed under Nurse Kinter's "directive" and he "need[s] his religious diet reinstated." (Defs.' Ex. 20). Nurse Kinter investigated Plaintiff's request and on October 18, responded: "Your religious diet is still in **[*31]** effect. I checked with kitchen. I don't do anything with religion." (Id.; T. 414).

## 9. Served Pork Meal — October 17, 2012

On October 17, Plaintiff received a pasta salad. (T. 136). It was labeled "meatless" or "vegetarian" but when Plaintiff "began to . . . dig in," he discovered the salad had pork in it. (Id.). When Plaintiff compared his tray to that of another Muslim inmate he found his salad was different. (T. 137). When Plaintiff compared his tray to "the general population" trays, he found they were identical. (Id.). Plaintiff reported the tray to the officer on duty. (Id.). Plaintiff submitted a grievance on October 17 reporting that he had been served a "ham salad" despite having a Special Diet Notification in his inmate file. (Pl.'s Ex. 22). On the grievance, Sgt. Clancy wrote: "I replaced the meal and was given a non-pork meal. And as for the meal slip a new one was placed in file and kitchen was notified."[15] (Id.). Plaintiff checked the line next to "I do not accept this

---

[15] There was no evidence of a "new" "meal slip" presented at trial.

resolution and wish to file a formal grievance." (*Id.*). Under "Decision of the Grievance Coordinator," Sgt. Clancy wrote: "Spoke with kitchen @ 1835 [6:35 p.m.]. Was shown file that shows inmate Brandon no shellfish; **[*32]** No pork. Returned and spoke with inmate. Inmate Brandon refuses to accept @ 1844 [6:44 p.m.]." (*Id.*). The next day, Sgt. Clancy told Plaintiff she had investigated the matter and that "the staff chef had made a mistake," and had "put the pork meal on [Plaintiff's] tray instead of the non-pork meal." (T. 141-42; Pl.'s Ex. 22). When Plaintiff asked Sgt. Clancy if she would document that, Sgt. Clancy said "no," and that she was "going to leave it as she had it." (T. 143). Plaintiff testified that as Sgt. Clancy walked away from him, she said to Officer Blaise: "if he grieves another tray, she's going to lock" Plaintiff up. (*Id.*).[16] Lt. Laurin ultimately denied the grievance by attaching, without explanation, his October 12 investigation, which occurred five days before the incident at issue in the October 17 grievance. (Pl.'s Ex. 22).

### 10. Medical Diet Grievances — October 19-27, 2012

On October 19, 2012, Plaintiff submitted three grievances: the first stated that he had received a tray with "hot cereal & buttery toast," which did not comply with his "restrictive diet" for his "high cholesterol condition," (Pl.'s Ex. 43), the second stated that he was served tomato soup for lunch, which **[*33]** causes him "severe . . . acid reflux," (Pl.'s Ex. 44), and the third stated that he had been served a salad with tomatoes for dinner, which causes him "severe . . . acid reflux," (Pl.'s Ex. 45). Plaintiff filed similar grievances on October 20, 22, 24, 25, 27, 28, 29, 30, 31, and November 1. (Pl.'s Exs. 45-55). On November 2, after investigating, Lt. Laurin issued a decision denying Plaintiff's grievances, noting that "[t]he jails [sic] Health Coordinator and the Jail Physician has [sic] eliminated your diets consisting of low fat, low cholesterol, no fish and no tomatoes or tomato products" because the commissary items Plaintiff had purchased were not compliant "with the Physicians [sic] recommendations." (Pl.'s Ex. 56). Lt. Laurin noted that the "no shell fish" and "religious restrictions for Muslims" were intact. (*Id.*). Plaintiff filed additional grievances regarding his medical diet on November 2, 4, and 9. (Pl.'s Exs. 57, 58, 59).

By October 26, Lt. Laurin had received "several grievances" from Plaintiff, and he spoke with "medical and asked them if there was something we could do." (T. 335-36). Lt. Laurin's "focus was totally on answering his grievances and seeing if we couldn't **[*34]** get some kind of resolution." (T. 336). Lt. Laurin explained that resolving Plaintiff's grievances had "turned into a full-time job" and "was a little overwhelming." (*Id.*). Lt. Laurin estimated that Plaintiff had filed eighteen grievances. (*Id.*). Lt. Laurin also discussed with Nurse Kinter whether there was "something we could do to get [Plaintiff] back on his diet because we needed to come to a conclusion of all this"—meaning that they "needed to make all parties happy." (T. 336-37).[17]

### 11. Served Pork Meal — Late October 2012

---

[16] Plaintiff testified that he thought he received a second pork meal later on that day but unlike his testimony about other pork meals, which detailed the type of pork and surrounding circumstances, his testimony was nonspecific and he seemed uncertain. (*See* T. 144 ("I think I received it later on that day - - or like, later on that day I believe I received another meal with pork")). The Court therefore declines to credit this testimony.

---

[17] On October 27, 2012, Plaintiff filed a "Prisoner Request Form." (Pl.'s Ex. 24). The top portion of the form is unreadable. (*Id.*). The response states: "Medical does not do religious diet. See security." (*Id.*). The form is signed by Nurse Kinter and dated October 29. (*Id.*).

The following week, in late October, Plaintiff received a meal with "a label of vegetarian bean soup" that appeared to be "compliant." (T. 152). However, as Plaintiff started to eat, he noticed "small bits of ham chunks swimming in" the soup. (*Id.*). Plaintiff looked around and noticed that the others who received "non-pork meal[s]," had different meals than Plaintiff but that his was the same as "the general population meals." (T. 152). Plaintiff reported the meal to the officer on duty. (*Id.*). The officer "did his own investigation" by comparing Plaintiff's meal to the meals of the other inmates and concluded, like Plaintiff, that although Plaintiff's soup **[*35]** was labeled "vegetarian soup" it was ham soup. (T. 153). The officer "contacted the kitchen." (*Id.*). The officer reported that "Chef Bedard said that he mistakenly used the same ladle spoon to serve [his] tray with another tray," so he "mixed" up the soup on Plaintiff's tray. (T. 153-54). Plaintiff received a replacement meal. (*Id.*). As a result, Plaintiff "started combing through" his meals. (*Id.*).

### 12. Served Pork Meal — November 2012

In November 2012, Plaintiff received a meal with a pasta salad labeled "meatless salad" that contained pepperoni. (T. 155). Plaintiff "immediately" brought the pepperoni to the attention of Officer Webb, who was the corrections officer on duty. (T. 156). Plaintiff told Officer Webb that he did not eat pork and about "the last two instances when [he] received a meal that appeared to have a label that was compliant with [his] religious diet, but the meal itself wasn't," and said, "this happened again and this is pepperoni." (*Id.*). Officer Webb, without looking at the tray, immediately said "oh, that's turkey pepperoni." (*Id.*). Plaintiff explained that it was "pork pepperoni" and "went on to say" that even if it was "turkey," not only would everyone have **[*36]** received it, but it was not

"meatless" and the salad was labeled "meatless salad." (T. 155, 157). Plaintiff asked Officer Webb to "[c]ontact the kitchen and just confirm," "[i]f it's turkey, then its turkey. If it's not, then . . . [he] would like a replacement of some sort." (T. 157). Officer Webb said he would call. (*Id.*).

After twenty minutes "went by," Plaintiff approached Officer Webb, who was on the phone." (*Id.*). Officer Webb said "oh, so its turkey—turkey pepperoni." (*Id.*). "And then he told [Plaintiff] that he spoke to somebody in the kitchen and he confirmed that it was turkey pepperoni." (*Id.*). When Plaintiff asked who Officer Webb spoke to, Officer Webb said something to the effect that he was not going to tell Plaintiff who it was. (T. 158). Plaintiff stated that he wanted a name because he wanted to submit a grievance. (*Id.*). Officer Webb replied that if Plaintiff grieved the meal, he would not get a replacement meal. (*Id.*). Plaintiff did not receive a replacement meal and there is no evidence that Plaintiff filed a grievance. (T. 159). Defendants did not present any evidence that the kitchen served turkey pepperoni. The Court finds that the pepperoni served to Plaintiff **[*37]** that day contained pork and, crediting Plaintiff's testimony, finds that Officer Webb did not call the kitchen to check whether the pepperoni in the salad was turkey pepperoni.

### 13. Medical Diet Reinstated — November 15-21, 2012

On November 15, Plaintiff submitted a "Sick Call Request" seeking to speak with Nurse Kinter about the removal of his restrictive diets "because of a non-compliance of my diet she said I committed through my commissary purchases." (Pl.'s Ex. 60). Plaintiff requested guidance regarding appropriate commissary purchases "that won't be deemed as non-compliant so" that his restrictive diets can be

"reinstated." (*Id.*). Plaintiff asked if Nurse Kinter "could talk to him about his commissary purchases," and she did. (T. 394). Together, they "went through the commissary options to see what would be better options of what to buy." (T. 394-95). Nurse Kinter crossed off items from the commissary list "that were not recommended for him to purchase." (T. 401). On November 21, Nurse Kinter restored Plaintiff's diets and noted that Plaintiff could "purchase items from commissary that are highlighted." (Pl.'s Ex. 60).

### 14. Assaulted by Another Inmate — November 17-18, 2012

On or **[\*38]**  about November 17, Plaintiff saw Sgt. Clancy and Officer Blaise in an observation housing unit where Plaintiff was confined. (T. 145). They were "escorting" another inmate, "Tiny," "into the cell next to" Plaintiff. (*Id.*). Plaintiff knew Tiny "had a reputation . . . for attacking other inmates," for throwing things at other inmates, including feces and urine, and for spitting. (T. 145-46). As Sgt. Clancy and Officer Blaise were moving Tiny into his cell, Plaintiff heard Tiny and Sgt. Clancy arguing and then heard Sgt. Clancy say, "let's see if he tries this shit on Brandon." (T. 146). Plaintiff testified that after Sgt. Clancy and Officer Blaise left, Tiny began making "racial remarks" to Plaintiff, and that the two of them argued during the night. (T. 147). When Officer Blaise returned the next day during mealtime, Officer Blaise asked Plaintiff to assist in carrying food trays. (T. 148). Plaintiff agreed and began carrying trays. (T. 149). As Plaintiff stood up from his work in front of Tiny's cell, Tiny spit in his face. (*Id.*). Officer Blaise issued an incident report regarding Tiny's conduct. (Defs.' Ex. 23).

### 15. Served Pork Meal — December 25, 2012

On December 25, there were two **[\*39]**  issues

with Plaintiff's meals. (T. 494). At breakfast, Plaintiff told Officer Perry, the corrections officer on duty, that there was butter on his toast. (*Id.*). Officer Perry checked his file, which reflected a "low cal/low fat diet," and "called the kitchen and had his toast replaced." (*Id.*). At lunch, Plaintiff received a meal of barbeque ribs, which he immediately brought to Officer Perry's attention. (T. 161-62). Officer Perry "smirk[ed] and said, come on Brandon . . . where's your holiday spirit." (T. 162). They "started arguing immediately." (*Id.*). Plaintiff "cursed at him" and "was combative" and "upset." (*Id.*). Plaintiff voiced his frustration of "an entire year of this nonstop" "like I'm a joke to these people." (T. 162-63). Plaintiff filed a grievance stating again that he is Muslim and that he was yet again served a meal with pork. (Pl.'s Ex. 25). Under "[s]ummary of facility staff attempts to resolve," the grievance states: "your meal was addressed and changed to address your needs." (*Id.*). On the grievance, Plaintiff checked the line next to "I do not accept this resolution and wish to file a formal grievance." (*Id.*). The grievance was never forwarded to the grievance **[\*40]**  coordinator and there is nothing in the record that suggests it proceeded beyond Officer Perry. Defendants provide no explanation for this.[18] Plaintiff testified that despite the statement on the grievance, his meal was not replaced. (T. 164). Having observed the testimony of Plaintiff and Officer Perry, and the credibility and demeanor of each witness on this issue, the Court credits Plaintiff's testimony that his meal was not replaced.

Plaintiff lost fifty pounds during the twelve months he was in the jail. (T. 166).

_____

[18] If an inmate checked the line next to "I do not accept this resolution and wish to file a formal grievance," it was deemed an appeal and sent to the grievance coordinator, who was required to respond to the grievance within five days. (T. 295). Once the grievance coordinator responded, the grievance was returned to the inmate, who then had two days to accept or appeal the response. (T. 295-96).

## III. CONCLUSIONS OF LAW

### A. Legal Standard

"The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante, 94 F.3d 53, 55 (2d Cir. 1996)*; *see Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 731 (2d Cir. 2001)*.

### B. *First Amendment* Free Exercise of Religion

Like prisoners, pretrial detainees "have 'long been understood to retain some measure of' their rights under the *Free Exercise Clause*." *Brandon, 938 F.3d at 32* (quoting *Ford v. McGinnis (Ford II), 352 F.3d 582, 588 (2d Cir. 2003)*). "These rights, however, must be balanced against the 'interests of prison officials charged with complex duties arising from administration of the penal system.'" *Id.* (quoting *Ford II, 352 F.3d at 588*). Thus, courts must "judge prisoners' free exercise claims 'under a "reasonableness" test less restrictive than that ordinarily applied **[*41]** to alleged infringements of fundamental constitutional rights.'" *Id.* (quoting *Ford II, 352 F.3d at 588*). This test requires a prisoner or pretrial detainee to "show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* (quoting *Holland v. Goord, 758 F.3d 215, 220 (2d Cir. 2014)*). If the prisoner or pretrial detainee "satisfies these threshold requirements, a defendant can still avoid liability by showing that his or her conduct is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Holland, 758 F.3d at 222*).

At trial, Plaintiff established by a preponderance of the evidence that he was entitled to receive a Muslim, no-pork, no pork products diet starting on March 2, 2012, the date he was rebooked into CCJ and listed his religion as Muslim. The importance of avoiding pork and pork products to the practice of Islam was undisputed at trial; the *Quran* prohibits the eating of pork and the eating of pork is considered "a high sin." (T. 38-39). It was also undisputed that Plaintiff's beliefs were sincerely held. (T. 55). Notwithstanding Plaintiff's entitlement to a religious diet, he was served pork meals two to four times weekly—between 62 and 124 pork meals—during the 31-week period from March 2, 2012 to October **[*42]** 5, 2012, the day a Special Diet Notification form directing the kitchen to provide a religious diet was placed in his inmate file. (T. 59-81; Pl.'s Ex. 1). Even after Lt. Laurin gave the kitchen written notice of Plaintiff's entitlement to a Muslim, no-pork, no pork products diet on October 5, Plaintiff was served pork meals at least four times thereafter: on October 17, (Pl.'s Ex. 22); in late October, (T. 152-54); once in November, (T. 155); and on December 25, (Pl.'s Ex. 25). The October meals were replaced, (*see* Pl.'s Ex. 22 T. 154), but the November meal with pepperoni, and the December 25 BBQ pork ribs meal were not replaced.

Thus, Plaintiff has established that he was denied a religiously compliant diet from March 2 to October 5, 2012 and served a total of *at least* 66 pork meals from March 2 to December 25, 2012. The Court has no difficulty concluding that the denial of a religious diet for seven months and the service of at least 66 pork meals substantially burdened Plaintiff's sincerely held religious beliefs. *See Brandon, 938 F.3d at 35-36* (observing that the Circuit previously found the denial "of a single [religious] feast constituted a substantial burden" and concluding that the denial of ten Muslim, **[*43]** no-pork meals "may constitute a substantial burden" (citing *Ford II, 352 F.3d at 593*)). Defendants

2023 U.S. Dist. LEXIS 36403, *43

presented no evidence at trial that the service of pork meals to Plaintiff was reasonably related to a legitimate penological interest. Accordingly, the Court finds Plaintiff's right to the free exercise of religion was violated.

### 1. Personal Involvement[19] and Deliberate Indifference

The Second Circuit has instructed:

[A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *[Ashcroft v.] Iqbal, 556 U.S. [662,] 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 [(2009)]*. "The factors necessary to establish a [*§ 1983*] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020)*. "The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Id.* (quoting *Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010)* (Gorsuch, J.)).

In this case, to prove the individual Defendants liable under the *First Amendment* for **[*44]** the violation of his right to free exercise of religion, Plaintiff must also establish that they acted with deliberate indifference.[20] "The 'deliberate indifference standard embodies both an objective and a subjective prong.'" *Morgan v. Dzurenda, 956 F.3d 84, 89 (2d Cir. 2020)* (quoting *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)*). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Id.* (quoting *Hathaway, 37 F.3d at 66*). "Second, the charged official must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway, 37 F.3d at 66*). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* (quoting *Hathaway, 37 F.3d at 66*). As to the second prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk" to the right to free exercise. *Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017)* (explaining deliberate indifference in pretrial detainee context); *see also id.* (explaining that "[i]n other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively"). **[*45]**

---

[19] Plaintiff argues that because Defendants did not argue personal involvement on summary judgment, the mandate rule bars "its consideration here." (Dkt. No. 247, at 68). The Court disagrees. "[T]he so-called mandate rule bars relitigation of issues already decided on direct appeal" and also "prevents re-litigation in the district court" of matters expressly decided or impliedly resolved by the appellate court. *Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010)*. In reversing the district court's entry of summary judgment, the Second Circuit did not expressly or impliedly resolve the issue of personal involvement. Moreover, "[t]he role of the appellee is to defend the decision of the lower court. This Court has not held that an appellee is required, upon pain of subsequent waiver, to raise every possible alternate ground upon which the lower court could have decided an issue." *Brown v. City of New York, 862 F.3d 182, 188 (2d Cir. 2017)*.

[20] The Second "Circuit has not stated whether a *First Amendment* free exercise claim requires more than negligence." *Brandon, 938 F.3d at 38*. The parties here assume that it does and advance arguments concerning whether Defendants acted with deliberate indifference in serving Plaintiff pork. (Dkt. No. 247, at 63-67; Dkt. No. 250, at 30-41).

2023 U.S. Dist. LEXIS 36403, *45

### a. Lt. Laurin

To establish a constitutional violation against Lt. Laurin, Plaintiff must show that Lt. Laurin, "through [his] own individual actions, has violated the Constitution." *Tangreti, 983 F.3d at 618*. Lt. Laurin was responsible for supervising the corrections sergeants and the day-to-day activities throughout CCJ, and for overseeing the grievance program at CCJ. (Joint Pre-Trial Stipulation, ¶ 3(a)(vi)). However, there is no evidence in the record indicating that Lt. Laurin had any knowledge regarding, or involvement with, Plaintiff's requests for a Muslim diet before September 26. And because Lt. Laurin's supervisory responsibilities alone are insufficient to subject him to liability, *see Tangreti, 983 F.3d at 619* (explaining that a supervisor cannot be found liable alone "by reason of . . . [his] supervision of others who committed the violation"), the Court finds Plaintiff has failed to prove Lt. Laurin's liability for the service of pork meals, in violation of Plaintiff's free exercise rights, from March 2 to September 26. However, this does not end the inquiry as to Lt. Laurin's liability for it is undisputed that Lt. Laurin became involved on September 26.

When Lt. Laurin began handling Plaintiff's grievances on September **[*46]** 26, he learned that Plaintiff was Muslim, (T. 91 (Plaintiff testifying that Lt. Laurin told him that he was aware Plaintiff was Muslim)), and that he had been receiving noncompliant meals for many months, (*see, e.g.*, Pl.'s Ex. 15 (Plaintiff stating in grievance "I've been here for 250+ days and continuously receive food . . . which I can't eat")). When Lt. Laurin searched the kitchen's files, he found the kitchen did not have a religious diet form in Plaintiff's file. (T. 303, 306-07, 341). Lt. Laurin then went to Plaintiff and said he knew Plaintiff was Muslim, that Plaintiff was receiving pork meals, that it was "wrong" and that "he's going to help." (T. 91,

304). On September 29, when Lt. Laurin issued a decision on Plaintiff's grievances, he noted that the "kitchen had not been notified he was Muslim" but that "kitchen staff has been advised to correct the diet." (Pl.'s Ex. 15). This, of course, was untrue because Lt. Laurin had not yet filed a Special Diet Notification form for Plaintiff. Despite personally assuring Plaintiff on September 27 that he would no longer receive pork meals and representing that he had already "advised" the kitchen "to correct the diet," Lt. Laurin did **[*47]** not complete a Special Diet Notification form until October 5—ten days, and thirty meals, later. (Pl.'s Ex. 8). Lt. Laurin had no explanation for not filing the Special Diet Notification form until October 5, (T. 306, 351 (Lt. Laurin testifying that he did not "know offhand" and speculating that he "probably got tied up in something")), and understood such forms were to be filed the same day as booking, or shortly thereafter. (T. 293-94 (Lt. Laurin testifying that "[o]nce that inmate was booked in," the booking officer "was supposed" to physically bring the religious diet notification slip "down to the kitchen")). Based on this evidence, the Court concludes that as of September 26, Lt. Laurin knew that Plaintiff was entitled to a Muslim diet, and that without a Special Diet Notification form in his kitchen inmate file, there was an excessive risk that Plaintiff would continue to receive pork meals in violation of his religion. And yet, Lt. Laurin inexplicably waited ten days to file the Special Diet Notification form. Therefore, the Court finds that Plaintiff has proven by a preponderance of the evidence that Lt. Laurin recklessly failed to act with reasonable care to mitigate the **[*48]** risk that remaining on a regular diet at CCJ posed to Plaintiff's right to free exercise of religion. *Darnell, 849 F.3d at 35*. Accordingly, Lt. Laurin is liable for the September 26 to October 5 violation of Plaintiff's right to the free

exercise of religion.[21]

Despite Lt. Laurin's filing of the Special Diet Notification form, Plaintiff was served four pork meals between October 5 and December 25. However, Plaintiff has not shown Lt. Laurin's "individual actions" with respect to these meals led to the violation of Plaintiff's *First Amendment* rights. Moreover, as the two pork meals Plaintiff was served in October were both replaced immediately, (Pl.'s Exs. 22; T. 154), the burden on Plaintiff's free exercise of religion may have been de minimis. *See Rutherford v. Westchester Cty., No. 18-cv-4872, 2020 U.S. Dist. LEXIS 14113, at *19, 2020 WL 433841, at *7 (S.D.N.Y. Jan. 28, 2020)* ("As Plaintiff alleges only a single incident of ham in his halal meal, and as he acknowledges that Defendants attempted to rectify (or at least ameliorate) the situation immediately, he has not alleged a constitutional violation."). But even assuming the service of two pork meals in October constituted a substantial burden, in both instances, the only evidence before the Court as to why Plaintiff was served pork meals suggests that it was due to a mistake in the kitchen. **[*49]** (T. 142, 153-54). While Lt. Laurin was responsible for the day-to-day supervision of the CCJ, and reviewed the grievance regarding the October 17 pork meal, (Pl.'s Ex. 22), there is no evidence connecting him to either meal. *See Tangreti, 983 F.3d at 619* (explaining that a supervisor cannot be found liable alone "by reason of . . . [his] supervision of others who committed the violation").

Plaintiff was also served a pasta salad with pepperoni in November, and barbeque pork ribs on December 25. (T. 155; Pl.'s Ex. 25). Neither meal was replaced. There is no evidence in the record indicating why Plaintiff received pork meals on these dates. The Court therefore has no basis for finding the service of pork on either date was an intentional act. Moreover, Plaintiff failed to present evidence showing that Lt. Laurin was personally involved in either meal. Therefore, the Court finds Plaintiff has not shown Lt. Laurin's liability for the four pork meals served to Plaintiff between October 17 and December 25.

Accordingly, the Court finds Lt. Laurin is liable for violating Plaintiff's *First Amendment* right to the free exercise of religion by failing to provide a Muslim diet from September 26 to October 5.

### b. Nurse Kinter

There is evidence **[*50]** that Nurse Kinter knew of Plaintiff's efforts to obtain a religious diet as early as May 28. (*See, e.g.*, Pl.'s Exs. 9, 13). There is also evidence that Nurse Kinter directed Plaintiff to speak to a sergeant or lieutenant at CCJ and that she did not help Plaintiff obtain a religious diet. (Pl.'s Ex. 13). However, Plaintiff failed to prove by a preponderance of the evidence that Nurse Kinter had any authority to do more than direct Plaintiff's inquiries to those with authority to assist him and check to see what diets were on file with the kitchen. Nurse Kinter testified that the nurses at CCJ "were always told that the healthcare office, any of us nurses, were not allowed to do religious diets" and that she had never filled out a religious diet slip in the four years she had worked at CCJ. (T. 389; T. 468 (Bedard testifying that he did not recall a nurse or anyone from the medical facility ever providing him with a religious diet restriction)). The evidence showed that only a booking officer, sergeant or lieutenant, or grievance coordinator could authorize a religious diet. (T.

---

[21] Defendants do not dispute that that this ten-day deprivation of a religious diet constituted a substantial burden. *See Brandon, 938 F.3d at 36* (observing that "when Muslim inmates are served meals containing pork, they are faced with the choice of disobeying the commands of their faith or not eating").

293, 468; Pl.'s Ex. 8'; Pl.'s Ex. 13). In *Tangreti*, for example, the Second Circuit noted that where the defendant **[*51]** prison official "was not responsible for procuring cameras or for [the correctional facility's] camera policy[,] [t]he district court correctly concluded that apart from discussing this problem with other officials, [the defendant] had no further responsibility to resolve it." *983 F.3d at 619 n.7*. Thus, the Court finds that apart from directing Plaintiff to the individuals at CCJ who could authorize religious diets, Nurse Kinter had no additional authority or responsibility to assist Plaintiff in obtaining a religious diet. *Jackson v. Sheehan, No. 16-cv-6710, 2021 U.S. Dist. LEXIS 38947, at *19, 2021 WL 795313, at *7 (W.D.N.Y. Mar. 2, 2021)* ("Jansen and Haimes, having performed their functions with respect to Plaintiff's complaint to the limits of their authority, 'had no further responsibility to resolve it.'" (quoting *Tangreti, 983 F.3d at 619 n.7*)). Accordingly, the Court finds Plaintiff failed to prove by a preponderance of the evidence Nurse Kinter's personal involvement in the violation of his right to the free exercise of religion.

### c. Bedard

Plaintiff also failed to prove Bedard acted with deliberate indifference or was personally involved in the deprivation of his right to the free exercise of religion. Plaintiff established that Bedard was responsible for ensuring that meals were prepared in compliance with religious diets, and was aware, **[*52]** as of October 5, of Plaintiff's religious diet. (T. 459-60, 469-70; Pl.'s Ex. 8). To the extent Plaintiff seeks to hold Bedard liable for the period before the Special Diet Notification was placed in his inmate folder—March 2 to October 5—Plaintiff has presented no evidence that Bedard knew he was entitled to a no-pork diet during that time period. The Court therefore finds Plaintiff has failed to establish Bedard's

liability for the noncompliant meals served from March 2 to October 5. However, as the kitchen served pork meals to Plaintiff four times *after* being notified in writing on October 5 of Plaintiff's no-pork diet, the Court must consider whether Plaintiff has proven Bedard's deliberate indifference and personal involvement in connection with these meals. (See Pl.'s Ex. 22 (served pasta salad with ham on October 17); T. 152-54 (served vegetarian bean soup "with small bits of ham chunks" in late October); T. 155 (served pasta salad with pepperoni in November); Pl.'s Ex. 25 (served barbeque pork rib sandwich on December 25)).

The evidence at trial showed that Bedard acted in a supervisory role with respect to meal service, and although there is some evidence that Bedard was aware **[*53]** Plaintiff was claiming that mistakes were being made with respect to his religious meals, *see* Dkt. No. 22 ("Grievance Investigation Form" dated October 15 indicating that Lt. Laurin interviewed Bedard with respect to serving Plaintiff pork), there was little evidence connecting Bedard to the four pork meals Plaintiff received after the Special Diet Notification was filed with the kitchen. There was no evidence presented at trial that suggested Bedard was involved in preparing or serving Plaintiff's meal tray on October 17. Indeed, the evidence in record shows that Sgt. Clancy spoke with the "kitchen" about this incident and learned that a "staff chef had a made a mistake." (T. 141-42). The Court therefore finds no basis for holding Bedard liable for this incident. With respect to the soup with ham that Plaintiff was served in late October, Plaintiff testified that he was told that Bedard "mistakenly used the same ladle spoon to serve [Plaintiff's] tray with another tray" which resulted in Plaintiff receiving ham in his soup. (T. 153-54). However, even assuming Bedard mistakenly served Plaintiff ham soup

instead of vegetarian bean soup,[22] the Court finds no basis for concluding Bedard [*54] acted with deliberate indifference. Indeed, the evidence that each time the kitchen was made aware of a mistake (on October 17 and again in late October), a replacement meal was sent undermines any suggestion of deliberate indifference to the violation of Plaintiff's right to the free exercise of religion. *See, e.g., Rangolan v. County of Nassau, 217 F.3d 77, 79 (2d Cir. 2000)* (finding no deliberate indifference when "the County took steps to protect" a vulnerable inmate "but mistakenly failed to implement them"); *Vail v. City of New York, 68 F. Supp. 3d 412, 425-26 (S.D.N.Y. 2014)* (finding that the plaintiff failed to adequately allege the defendant acted with deliberate indifference because even if the defendant administered the incorrect medication, they "acted quickly after Plaintiff became symptomatic, and therefore they were not reckless"); *Ivey v. City of New York, Nos. 12-cv-3580, 2013 U.S. Dist. LEXIS 175884, at *8-9, 2013 WL 6838954, at *3 (S.D.N.Y. Dec. 12, 2013)* (granting a motion to dismiss where it was "[im]plausible that [the] defendants [had] acted with 'deliberate indifference'" because "they appeared to have taken immediate steps to provide treatment" "almost immediately" after the plaintiff "was diagnosed with a serious . . . condition"). Finally, there is no evidence connecting Bedard, other than in a supervisory role as food service manager, to the third or fourth pork meals Plaintiff was served—pasta salad with [*55] pepperoni in November or the barbeque pork ribs on December 25. Accordingly, the Court finds Plaintiff has failed to prove, by a preponderance of the evidence, his free exercise of religion claim against

---

[22] There was no corroboration of the report that Bedard mistakenly gave Plaintiff ham soup. Indeed, Bedard testified that it was the "cook's duty" on the food line to serve the main course, including the soup, (T. 444), that he was "not always on th[e] food line," but that when he was, he helped in small ways, such as placing condiments, crackers, or cookies on meal trays. (T. 451).

Bedard.

### d. Sgt. Clancy

Plaintiff asserts Sgt. Clancy was "personally involved and deliberately indifferent to Plaintiff's Free Exercise rights" because she refused to "record" her finding that Plaintiff had been served pork on Plaintiff's October 17 religious dietary grievance and threatened to "lock" Plaintiff up if he filed another grievance. (Dkt. No. 247 (citing Pl.'s Ex. 22; T. 142-45)). Although Sgt. Clancy did not explicitly state that Plaintiff received a pork meal on Plaintiff's October 17 grievance, Sgt. Clancy stated that she "replaced the meal" and that Plaintiff "was given a non-pork meal." (Pl.'s Ex. 22). Sgt. Clancy's statement implies that Plaintiff's original meal contained pork, and her efforts to have it replaced reflect Sgt. Clancy's acknowledgement that the original meal was improper and that Plaintiff was entitled to a no-pork meal. (*Id.*). The Court finds no deliberate indifference or personal involvement under these circumstances.

### e. Officers Webb and Perry

Plaintiff's [*56] free exercise claim against Officer Perry arises from the pasta salad with pepperoni Plaintiff was served in November 2012. Plaintiff's free exercise claim against Officer Perry stems from Plaintiff's receipt of a meal of barbeque pork ribs on December 25. (T. 161-62). However, for the reasons discussed below, *see supra* Section III.B.2, because it was not "clearly established" in 2012 that the failure to replace a single meal would substantially burden a Muslim inmate's *First Amendment* rights, *Francis v. Fiacco, 942 F.3d 126, 139 (2d Cir. 2019)* (quoting *Ricciuti v. Gyzenis, 834 F.3d 162, 167 (2d Cir. 2016)*), the Court finds Officer Webb and Officer Perry are entitled to qualified immunity, and does not

address the merits of Plaintiff's constitutional claims against them, *see* id. at 140 (observing that courts, in their discretion, may "proceed directly to step two of the [qualified immunity] analysis and, if they find that qualified immunity applies, avoid the '[u]nnecessary litigation of constitutional issues' at step one" (quoting *Pearson v. Callahan, 555 U.S. 223, 237, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*).

## 2. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged **[*57]** conduct." *Francis 942 F.3d at 139* (quoting *Ricciuti, 834 F.3d at 167*). Thus, even after a prison officer has been found liable for a constitutional violation, "the doctrine of qualified immunity will shield that officer from liability for damages if his [or her] 'conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Outlaw v. City of Hartford, 884 F.3d 351, 366 (2d Cir. 2018)* (quoting *Mullenix v. Luna, 577 U.S. 7, 11, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)*). A court may grant qualified immunity after a finding of liability "if an officer has made a reasonable mistake of law, i.e., if the constitutional violation he [or she] has committed was not a 'clearly established' violation." *Jackson v. Tellado, 236 F. Supp. 3d 636, 662 (E.D.N.Y. 2017)*. "The qualified immunity standard is an objective standard, asking not whether the defendant officer acted in good faith or what he himself [or she herself] knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw, 884 F.3d at 367*. Qualified immunity is an affirmative defense

that a defendant bears the burden of proving. *Id.* "To the extent that a particular finding of fact [i]s essential to an affirmative defense, . . . it [i]s incumbent on [the defendant] to request that the [factfinder] be asked the pertinent question." *Id.* (quoting *Kerman v. City of New York, 374 F.3d 93, 120 (2d Cir. 2004)*) (markings in original). **[*58]**

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes, 575 U.S. 822, 825, 135 S. Ct. 2042, 192 L. Ed. 2d 78 (2015)* (quoting *Reichle v. Howards, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)*). "In making this determination, [courts] consider Supreme Court and Second Circuit precedent as it existed at the time of the challenged conduct." *McGowan v. United States, 825 F.3d 118, 124 (2d Cir. 2016)* (citing *Garcia v. Doe, 779 F.3d 84, 92 (2d Cir. 2014)*). However, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (quoting *Garcia, 779 F.3d at 92* (internal quotation marks, alterations, and citations omitted)).

### a. Lt. Laurin

"We . . . have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford II, 352 F.3d at 597* (citing *Kahane v. Carlson, 527 F.2d 492 (2d Cir. 1975)*). Lt. Laurin knew, as of September 26, that Plaintiff was entitled to a Muslim diet, that Plaintiff should have been receiving a Muslim diet since March 2, and that Plaintiff had been wrongfully denied a Muslim diet for approximately seven months. And yet, Lt. Laurin, inexplicably, left Plaintiff on

a regular prison diet for ten more days before placing in Plaintiff's kitchen file **[*59]** a Special Diet Notification form advising the kitchen to provide Plaintiff a non-pork diet. Even assuming, as discussed below, that the "law was not clearly established as to how many religiously compliant meals must be denied before the prisoner' religious beliefs are substantially burdened," *Brandon, 938 F.3d at 39*, the Court finds that no reasonable officer, who had no legitimate penological reason for withholding a religious diet, would have believed that allowing an inmate to remain on a regular diet for an additional ten days, during which time the inmate regularly received pork meals he could not eat,[23] was not a substantial burden. *See, e.g., McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004)* (explaining that the principle that denying "prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights" was "established in our circuit at least as early as 1975" and that the district court improperly dismissed the plaintiff's claim that "the seven-day restrictive diet imposed upon him . . . impinged upon his observance of Ramadan" (citing *Ford II, 352 F.3d at 597*)). Notably, Lt. Laurin does not argue otherwise. Accordingly, Lt. Laurin is not entitled to qualified immunity.

**b. Officers Webb and Perry**

Officers **[*60]** Webb and Perry were each only involved in one incident. The Court finds that, even crediting Plaintiff's allegations, Officers Webb and Perry are entitled to qualified immunity for these isolated incidents. A reasonable officer would not necessarily have known that the failure to replace a single noncompliant meal imposed a substantial burden under existing precedent. Though

---

[23] Plaintiff estimated, based on the menu, that he received two to four pork meals per week while on a regular diet. (T. 49).

there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor, 575 U.S. at 825* (internal quotation marks and citations omitted). It was not clearly established in 2012 that the denial of a single religious meal would substantially burden a plaintiff's *First Amendment* rights. *Compare Brandon, 938 F.3d at 36 n.11* ("We express no opinion as to whether a single meal or a smaller number of meals spread out over a longer period of time might perhaps be considered isolated incidents, such that the burden they impose is de minimis."); *with Williams v. Doe, 639 Fed. Appx. 55, 57 (2d Cir. 2016)* ("The district court relied on non-binding case law when it determined that Williams's burden was *de minimis* because only a few of his meals were delivered prematurely; its reasoning is inconsistent with this Court's case law, which cautions against 'the danger that **[*61]** courts will make conclusory judgments about the unimportance of the religious practice to the adherent.'" (quoting *Ford II, 352 F.3d at 593*)); *see also Wiley v. Baker, No. 20-cv-154, 2022 U.S. Dist. LEXIS 138684, at *15, 2022 WL 3045042, at *6 (D. Vt. June 10, 2022)* (declining to dismiss at the pleading stage because, "given that the case law is not clear on precisely how many missed or untimely meals during Ramadan would constitute a 'substantial burden' to a Muslim inmate, dismissal on 'substantial burden' grounds is inappropriate at this stage of the case"), *report and recommendation adopted, 2022 WL 3042140, 2022 U.S. Dist. LEXIS 136972 (D. Vt. Aug. 2, 2022)*; *Brown v. Graham, No. 07-cv-1353, 2010 U.S. Dist. LEXIS 144188, at *56, 2010 WL 6428251, at *15 (N.D.N.Y. Mar. 30, 2010)* (holding that even assuming that the "plaintiff was approved to receive a kosher meal throughout his confinement . . . the withholding of a single noon meal constituted, at most, a de minimis burden on plaintiff's religious expression"),

*report and recommendation adopted*, *2011 WL 1213482, 2011 U.S. Dist. LEXIS 34345 (N.D.N.Y. Mar. 31, 2011)*, *aff'd*, *470 F. App'x 11 (2d Cir. 2012)* ("[T]here is nothing in this record that could support a reasonable jury conclusion that [the defendant's] failure to provide [Plaintiff] a kosher meal on a single occasion rose to the level of a substantial burden on [Plaintiff's] religious freedom."). Thus, Officers Webb and Perry are entitled to qualified immunity.

## C. *First Amendment* Retaliation

Plaintiff brings three *First Amendment* retaliation claims: (1) that Lt. Laurin and Nurse Kinter retaliated against him for filing **[*62]** grievances by removing his medical diets; (2) that Sgt. Clancy and Officer Blaise retaliated against him for filing a grievance on October 17 by exposing him to assault by another inmate; and (3) that Bedard retaliated against him for filing grievances by intentionally placing pork in his meals. Defendants argue that Plaintiff has failed to prove his claims by a preponderance of the evidence.

To prove *First Amendment* retaliation, Plaintiff must establish by a preponderance of the evidence: "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action.'" *Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020)* (alteration in original) (quoting *Holland, 758 F.3d at 225*).

## 1. Removal of Medical Diets

Plaintiff filed his first meal-related grievance on May 28, (Pl.'s Ex. 10), and thirteen additional grievances from September 15 to October

15.[24] It is well settled that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the *First* and *Fourteenth Amendments* and is actionable under *§ 1983*." *Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996)* (citing *Franco v. Kelly, 854 F.2d 584 (2d Cir. 1988)*); *see also Brandon, 938 F.3d at 40* ("The filing of prison grievances is a protected activity." (citing **[*63]** *Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003)*)). Thus, Plaintiff has proven the first element of his retaliation claims.

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Id.* (quoting *Davis, 320 F.3d at 353*). "The test is objective, and the plaintiff is not required to show that he was actually deterred." *Id.* (citing *Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004)*). Thus, a retaliation claim may proceed "even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances." *Gill, 389 F.3d at 381.* Such a plaintiff may satisfy the adverse

---

[24] (Pl.'s Ex. 14 (medical diet not followed, filed September 15); Pl.'s Ex. 15 (served pork and tomatoes in violation of religious and medical diets, filed September 24); Pl.'s Ex. 16 (served pork and tomatoes in violation of religious and medical diets, filed September 24); Pl.'s Ex. 26 (served tomatoes in violation of medical diet, filed October 1); Pl.'s Ex. 27 (served sandwich with tomatoes in violation of medical diet, filed October 1); Pl.'s Ex. 28 (served tomato soup in violation of medical diet and requests copies of food grievances, filed October 2); Pl.'s Ex. 18 (served ham or turkey ham for lunch on October 9 in violation of religious diet and received conflicting information about whether ham steak served on September 9 was turkey or ham, filed October 9); Pl.'s Ex. 19 (served chef salad with ham in violation of religious diet, filed October 10); Pl.'s Ex. 20 (served chef salad with ham in violation of religious diet, filed October 10); Pl.'s Ex. 34 (requests copies of food grievances, filed October 11); Pl.'s Ex. 35 (requests response to grievances about medical and religious diets, filed October 14); Pl.'s Ex. 36 (requests copies of food grievances and objects to charge for copies, filed October 15); Pl.'s Ex. 38 (served peanut butter in violation of medical diet, filed October 15)).

action element by showing that the conduct "would have deterred a similarly situated individual of ordinary firmness." *Brandon, 938 F.3d at 40* (quoting *Gill, 389 F.3d at 381*).

Next, the plaintiff must "establish a causal connection between the defendants' actions and the adverse action." *Id. at 40*. To do so, a plaintiff must show "that the speech played a substantial part in the adverse action," *id.* (quoting *Davis, 320 F.3d at 354*), "in response to which the defendant official can then show that the [adverse] action would have occurred regardless," *Hayes, 976 F.3d at 272* (citing *Holland, 758 F.3d at 226*). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time **[*64]** to the adverse action." *Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)*.

On October 16, Nurse Kinter issued a "Diet Notification" form to the CCJ kitchen regarding Plaintiff's "Medical" diet. (Pl.'s Ex. 41). The form, which is signed by Nurse Kinter, directed the "cancel[ation of] all previous slips" and placement of Plaintiff on a "Reg Diet"—"No Shellfish." (*Id.*). It canceled Plaintiff's low fat/low cholesterol, no tomato, no fish medical diet. The cancelation of Plaintiff's medical diet did not deter him from filing further grievances: he filed one the day his medical diet was canceled, (Pl.'s Exs. 39, 40), and seventeen grievances between October 17 and November 21, the day his medical diet was reinstated, (Pl.'s Exs. 22, 43, 44, 45, 45, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59). However, applying the objective test, the Court finds Plaintiff has proved by a preponderance of the evidence that he suffered an adverse action. Dr. Schroyer issued a medical diet, including a "no shellfish diet" on January 14 to address Plaintiff's shellfish allergies, a "no tomato or tomato products diet" on March 23 to address Plaintiff's severe acid reflux, and a "low fat/low cholesterol diet" on May 21 to

address Plaintiff's high cholesterol. **[*65]** (Joint Pre-Trial Stipulation, ¶ 3(a)(xii)-(xiv); T. 45-46). At the time Dr. Shroyer ordered Plaintiff's low fat/low cholesterol diet, Plaintiff's labs reflected high cholesterol levels, which, Plaintiff understood, placed his health at risk. (T. 129). Plaintiff also understood that the dietary restriction was important to reduce the risks to his health. (T. 129).[25] Because tomatoes caused Plaintiff severe acid reflux, their removal from his diet was necessary to avoid acid reflux. In this case, Plaintiff established that the removal of these diets had the impact of depriving Plaintiff of portions of many of his meals. (*See, e.g.*, Pl.'s Ex. 46 (Plaintiff grieving the removal of "restrictive status" and explaining that it directly exposed him "to foods I can't consume")). Indeed, the grievances Plaintiff filed show that as a result of the revocation of his medial diet, he was deprived of a full or partial meal at least fourteen times during a 21-day period (Pl.'s Exs. 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 55, 57, 58, 59 (Grievances filed between October 19 and November 9)). Thus, Plaintiff has established that the removal of his "low fat/low cholesterol" and "no tomato" diet was an adverse **[*66]** action. *See, e.g.*, *Quezada v. Roy, No. 14-cv-4056, 2017 U.S. Dist. LEXIS 210539, at *29, 2017 WL 6887793, at *10 (S.D.N.Y. Dec. 14, 2017)* (finding, at summary judgment, that "removing Plaintiff from his therapeutic diet plan constitutes an adverse action for purposes of a *First Amendment* retaliation claim"); *Davis, 320 F.3d at 353* (finding, at pleading stage, that the plaintiff adequately alleged adverse action based on deprivation of "high fiber diet").

In addition, Plaintiff has proven by a preponderance of the evidence that his filing of grievances "played a substantial part" in the

_____

[25] Nurse Kinter explained at trial that "cholesterol can cause a lot of different problems in your body," including a stroke, a heart attack, and blocked arteries. (T. 396).

adverse action. Lt. Laurin investigated "what [Plaintiff was] doing with commissary" as part of his investigation into Plaintiff's grievances about his medical and religious diets. (T. 326). On September 29, Lt. Laurin noted, in investigating Plaintiff's September 15 and 24 grievances, that Plaintiff was "buying items in the commissary that he should not be with his diet." (Pl.'s Exs. 14, 15, 16). On or about October 2, Lt. Laurin had Plaintiff's commissary receipts printed. (Defs.' Ex. 22 (commissary receipts "reprinted on 10/02/2012")). Although he had that information on October 2, Lt. Laurin did nothing with it until October 15, when he angrily confronted Plaintiff, asking "[i]f we're getting all these grievances and you're turning around and purchasing [*67] these items," what is the "sense of us . . . putting in all this effort." (T. 328). Between October 2 and October 15, Plaintiff had filed seven grievances, five of which concerned the food he was being served. (Pl.'s Exs. 18, 19, 20, 34, 35, 36, 38). Although Lt. Laurin understood that Plaintiff was not eating all of what he was buying and that Plaintiff had been regularly receiving pork meals, no part of which he could eat during a significant part of the time period reflected in the commissary receipts, (see Defs.' Ex. 22 (receipts from purchases for July, August, and September 2012)), after speaking with Plaintiff, he went directly to Nurse Kinter to inform her about the commissary receipts, (T. 329). Nurse Kinter removed Plaintiff's medical diet the next day. Given the temporal proximity between Plaintiff's grievances and Lt. Laurin's conduct, Lt. Laurin's direct reference to Plaintiff's grievances, and his angry tone, Plaintiff has established his filing of grievances played a substantial role in the removal of his medical diets. Lt. Laurin's comments to Plaintiff on October 15 directly implicated not only the fact that Plaintiff had engaged in protected speech—filing grievances—but [*68] also the

content of that speech—seeking help ensuring he received meals consistent with his medical diet.

"The defendant official then bears the burden of establishing that the [adverse] action would have occurred 'even absent the retaliatory motivation.'" *Holland v. Goord, 758 F.3d 215, 226 (2d Cir. 2014)* (quoting *Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002)*). In *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)*, the Second Circuit held that a retaliation defendant satisfies this burden when it is "undisputed that [plaintiff] had in fact committed the prohibited conduct."

Defendants have failed to prove that Plaintiff's medical diets would have been revoked absent the retaliatory motivation. There is no dispute that Plaintiff made the commissary purchases at issue. However, as Lt. Laurin knew, Plaintiff did not eat all the commissary purchases himself. In addition, Plaintiff testified that with respect to the chili ramen, about which Lt. Laurin and Nurse Kinter were purportedly concerned because it contained tomato powder, although he did eat the "noodles several times," that he "couldn't handle" and did not "[u]tilize the [seasoning] packet." (T. 211-12). Moreover, the evidence at trial established that the practice at the jail, in the case of an inmate making unhealthy commissary purchases, was to procure the medical staff's [*69] help in *placing them on* a medical or healthier diet; the practice was never to remove a medical diet of an inmate whose health depended on it. Indeed, Lt. Laurin asserted at trial that "[w]e've done this before in the past" and that it was his "job . . . to make" medical "aware" of the inmate's commissary purchases. (T. 329). He stated, for example he had "done this for" diabetics who were not paying "attention" and they have had "to put them on a low sodium diet because they start retaining fluids" and for "pregnant females," and explained that "we try to keep

them on a good healthy diet." (T. 330). This testimony might support the unilateral placement of an inmate on a medial diet as it would *benefit* the diabetic or pregnant inmate's health, but it in no way supports the *removal* of a medical diet necessary to an inmate's health, which could only be harmful. Moreover, to the extent it was Lt. Laurin's job to make medical aware, the only inference from the above testimony is that he had a duty to make medical aware that the inmate was eating products harmful to his health—and procure intervention that would help, not harm, the inmate. Lt. Laurin has identified no other reason for the **[*70]** removal of Plaintiff's medical diet other than Plaintiff's purchase of commissary items that did not comply with the "low fat/low sodium" diet, a reason he reaffirmed in personally denying Plaintiff's fifteen subsequent grievances, most of which complained that he was served spaghetti sauce, tomato soup, and tomato slices, which caused him acid reflux, and buttered toast, which was bad for his cholesterol. (Pl.'s Ex. 56). Therefore, Lt. Laurin has not met his burden of establishing as a matter of law that Plaintiff's medical diet would have been removed in the absence of a retaliatory motive.

Finally, to the extent Lt. Laurin argues he was not personally involved in this retaliatory act, because only medical staff could decide to remove a medical diet, the Court rejects that argument. (Dkt. No. 250, at 46). Lt. Laurin himself testified that he worked together with Nurse Kinter with respect to medical diets, (T. 329-30 (Lt. Laurin testifying that "[w]e've done this before in the past" and that "we have to put [diabetics] on a low sodium diet because they start retaining fluids" and "we try to keep [pregnant inmates] on a good healthy diet")), and that he brought the commissary receipts **[*71]** directly to Nurse Kinter for the purpose of showing Plaintiff's noncompliance with his medical diets, (T. 329 ("I wanted her to be aware that he was purchasing these items

and they weren't compliant with his low fat/low sodium diet.")). In light of these facts, the Court finds it of little consequence that Lt. Laurin could not sign the form removing the medical diet himself. Thus, for all these reasons, the Court finds that Lt. Laurin's "own individual actions," constitute *First Amendment* retaliation. *Tangreti, 983 F.3d at 612* (quoting *Iqbal, 556 U.S. at 676*).

Plaintiff likewise established Nurse Kinter's liability and personal involvement. Nurse Kinter was aware of Plaintiff's grievances because Lt. Laurin interviewed her on September 29 as part of his investigations into Plaintiff's complaints that he was not receiving meals that complied with his medical diets, (*see* Pl.'s Ex. 14 (September 15 grievance: "My food trays are constantly either missing something or stocked with items I'm not supposed to consume due to medical conditions."); Pl.'s Ex. 15 (September 24 grievance: "I cannot eat . . . tomatoes."); Pl.'s Ex. 16 (September 24 grievance: "I was served a salad which had tomatoes."); *see also* Pl.'s Ex. 16 ("Grievance Investigation Form" **[*72]** for September 15 and 24 grievances noting that Nurse Kinter was interviewed as part of the investigation); T. 421 (Nurse Kinter testifying that she knew Plaintiff was grieving his meals)). On September 15, Lt. Laurin notified Nurse Kinter about Plaintiff's noncompliant commissary purchases. On September 16, Nurse Kinter summoned Plaintiff to the medical ward and informed him that his medical restrictions were being revoked due to his noncompliant commissary purchase. That same day, Nurse Kinter signed the "Diet Notification" form revoking Plaintiff's medical diets. (Pl.'s Ex. 41).

Nurse Kinter removed Plaintiff's medical diet less than three weeks after she was interviewed in connection with Plaintiff's medical diet related grievances. The close temporal proximity between Plaintiff's grievances and the revocation of Plaintiff's

medical diets is circumstantial evidence of retaliatory intent and causal connection. *See Gayle v. Gonyea, 313 F.3d 677, 683 (2d Cir. 2002)* ("We have held that the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation."). In addition, there is a direct correlation between the subject matter of the protected conduct, the grievances **[*73]** complaining that Plaintiff's medical diet was not being followed and the adverse action, the removal of the medical diet. Finally, Nurse Kinter's inexplicable placement of Plaintiff on a regular diet that would do nothing to help, and could only, as she knew, further harm his cholesterol level and cause Plaintiff severe acid reflux, is evidence of retaliatory intent. (*See* T. 419-20 (Nurse Kinter testifying that she was aware that patients with high levels of cholesterol are at increased risk of heart disease and that patients with acid reflux can get sick if they eat foods with high acidity)); *Burton v. Lynch, 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009)* (finding that, while the doctor's refusal to examine the plaintiff's elbow and comments that it "look[ed] fine" and that the plaintiff's "allergy to Motrin was Plaintiff's 'problem'" did not "explicitly state an intent to retaliate," they were "consistent with and imply a retaliatory motive," explaining that "[t]he facts corroborating the existence of Plaintiff's injuries and the failings of Dr. Supple's diagnosis and treatment, when taken in conjunction with Plaintiff's allegations of the brusque treatment he received from Dr. Supple, sufficiently allege a 'causal connection' between the filing **[*74]** of the grievance and the adverse action").

Further, Nurse Kinter has failed to show that she would have taken the same action in the absence of Plaintiff's grievances. Nurse Kinter testified that Plaintiff had a history of problematic cholesterol and triglyceride levels, (T. 396 (Nurse Kinter testifying that Plaintiff's "ADL's, HDLs, LDLs were a little bit out of

whack and we wanted to get them better" and "we needed to . . . decrease his triglycerides and . . . cholesterol")), that cholesterol can cause, among other health problems, a stroke, heart attack, and blocked artery, and "if somebody has a history of that, we kind of want to get that under control." (T. 396). Nurse Kinter testified that had she felt that removing the medical diet would "make that prisoner in worse condition, I would not have removed that diet" and that she had no concerns about removing Plaintiff medical diet because "his labs had improved." (T. 437). If true, this evidence might support a finding that Nurse Kinter would have removed the medical diets regardless of Plaintiff's grievance, but the evidence before the Court shows that Plaintiff's "labs" were largely the same at the time; they do not show improvement. **[*75]** In addition, as discussed above, there is no evidence that removal of a medical diet was ever used as a tactic for improving an inmate's health at CCJ. Accordingly, the Court finds Plaintiff has proven by a preponderance of the evidence that Nurse Kinter retaliated against him for engaging in conduct protected by the *First Amendment*.

**2. Exposing Plaintiff to Assault by Another Inmate**

Plaintiff claims that Sgt. Clancy and Officer Blaise retaliated against Plaintiff for filing his October 17 grievance regarding a pork meal, (Pl.'s Ex. 22), by "exposing him to assault by another inmate" on November 18.

Even crediting Plaintiff's testimony that on October 17, Sgt. Clancy commented to Officer Blaise that she would lock Plaintiff up if he filed another grievance and that on November 17, as she was bringing Tiny into Plaintiff's housing unit, she wondered if Tiny would "tr[y] this shit on Brandon," Plaintiff's retaliation claim against Sgt. Clancy and Officer Blaise

fails. By Plaintiff's own admission, he argued with, yelled at, cursed, and called Tiny names, and made racially prejudicial remarks to Tiny "*all night*," the night before the November 18 assault. (T. 147). The Court therefore finds that it was **[*76]** more likely than not Plaintiff's own conduct toward Tiny—not any actions Sgt. Clancy or Officer Blaise may have taken in placing Plaintiff near Tiny—that exposed Plaintiff to Tiny's assault. Accordingly, as Plaintiff failed to prove by a preponderance of the evidence a causal connection between Plaintiff's October 17 protected conduct of filing a grievance, and Tiny's November 18 assault, his retaliation claims against Sgt. Clancy and Officer Blaise are dismissed.

### 3. Intentional Introduction of Pork Into Meals

Plaintiff claims CCJ Food Service Manager Bedard retaliated against Plaintiff for filing meal-related grievances "by introducing pork into meals otherwise labeled meatless." (Dkt. No. 247, at 61-62). Plaintiff filed twenty-nine grievances from May 28 to October 31, the majority of which were food-related. (Pl.'s Exs. 10, 14, 15, 16, 18, 19, 20, 22, 26, 27, 28, 34, 35, 36, 38, 39, 40, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54). Bedard was only aware of Plaintiff's no-pork diet as of October 5, 2012. In his post-trial briefing regarding his retaliation claim against Bedard, Plaintiff specifically refers to the "meals otherwise labeled meatless" he received on October 17, (*see* **[*77]** Pl.'s Ex. 22 (ham salad)), "and on other *dates* in October 2012," (Dkt. No. 247, at 61 (emphasis added)). However, the evidence showed that Plaintiff was served a pork meal on only *one* other occasion in late October—a vegetarian or "meatless" soup containing ham in late October. (T. 152-54).

Even assuming Bedard was aware of Plaintiff's grievances, because there is no evidence that

Bedard had any part in the preparation of Plaintiff's tray on October 17, the Court finds Plaintiff's claim of retaliation as to that incident fails for lack of personal involvement. *See supra*, Section III.B.1.c. Bedard was responsible for supervising the cooks in the kitchen to make sure food was provided in compliance with an inmate's special diet, but his supervisory role, without more, is insufficient. *Tangreti, 983 F.3d at 618*. Plaintiff has introduced some evidence that Bedard was responsible for placing the soup that contained pork on Plaintiff's tray in late October. Although temporal proximity between Plaintiff's filing of grievances in September and October 2012 and the late October service of soup with pork may be circumstantial evidence of retaliatory intent, there is no evidence that shows that the placement of the soup **[*78]** with pork on Plaintiff's tray was anything more than a mistake and the Court notes that this meal was immediately replaced. (T. 153-54). On this record, the Court finds that Plaintiff has failed to establish retaliatory intent. *See Lakram v. Coughlin, 99 F.3d 402 (2d Cir. 1995)* ("Although correctional officials now concede that Lakram's transfer was a mistake, a mistake is insufficient to support a claim of retaliation."). Thus, Plaintiff's *First Amendment* retaliation claim against Bedard is dismissed.

### 4. Qualified Immunity

Lt. Laurin argues that he is entitled to qualified immunity on Plaintiff's *First Amendment* retaliation claim because he had no authority to rescind medical diets, Plaintiff's claim of retaliation is unfounded, and Lt. Laurin spent time and effort following the removal of Plaintiff's medical diet addressing Plaintiff's grievances on that issue. (Dkt. No. 250, at 55). Nurse Kinter argues that she is entitled to qualified immunity because it was "the jail physician—and not Defendant Kinter who had the final decision as to which medical special

diets would be . . . removed" and, in any event, one month later she recommended the reinstatement of Plaintiff's medical diet. (Dkt. No. 250, at 56).

These arguments principally concern the merits of Plaintiff's **[*79]** retaliation claim, which the Court has addressed above. The Court has found not only that Lt. Laurin had the authority to procure the revocation (or approval of) a medical diet, but that he procured the revocation of Plaintiff's medical diet in retaliation for Plaintiff's filing of multiple grievances complaining that his medical and religious diets were not being followed. The Court has also found that Nurse Kinter had the express authority to revoke a medical diet and that she revoked Plaintiff's medical diet with retaliatory intent. Nurse Kinter correctly notes that Plaintiff's medical diets were reinstated eventually—after Plaintiff asked for guidance on medically appropriate commissary purchases. But the eventual reinstatement of the medical diet does not undermine the Court's determination that the revocation of that diet was retaliatory. It appears that the medical diet was reinstated to quell the increase in Plaintiff's grievances. (T. 336-37 (Lt. Laurin testifying that he discussed with Nurse Kinter whether there was "something we could to do get [Plaintiff] back on this diet because we needed to come to a conclusion of all this")). Although Defendants have not advanced any **[*80]** other arguments regarding their entitlement to qualified immunity, as the following analysis shows, qualified immunity is, in any event, inapplicable here.

First, the filing of grievances was clearly established as a constitutionally protected activity in 2012. *See* *Gill, 389 F.3d at 384* (the "use of the prison grievance system" is a protected activity); *Franco, 854 F.2d at 589* (holding that prisoner had constitutional right to petition government for redress of grievances,

which included cooperating with state investigation of inmate abuse); *Graham, 89 F.3d at 80* (filing of a grievance and attempt to find inmates to represent the grievants is constitutionally protected). Second, no reasonable prison official could have reasonably believed that it was not an adverse action to remove Plaintiff's medical diet which was in place to help get his cholesterol "under control" in order to reduce his risk of, among other things, heart attack and stroke, and without which he would experience "severe acid reflux." *See* *Davidson v. Chestnut, 193 F.3d 144, 149 (2d Cir. 1999)* (observing that denial of kosher diet is an adverse action that may support retaliation claim); *Davis, 320 F.3d at 352-54* (holding inmate's claim that prison officials denied plaintiff his high fiber diet days after filing inmate grievances sufficiently alleged *First Amendment* retaliation **[*81]** claim); *Quezada, 2017 U.S. Dist. LEXIS 210539, at *30, 2017 WL 6887793, at *10* ("[D]enial of a therapeutic diet is an adverse action sufficient to form the basis of a retaliation claim."). Finally, the Court has found that both Lt. Laurin and Nurse Kinter acted with retaliatory intent. "[W]here a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir, 264 F.3d 154, 169 (2d Cir. 2001).*[26]

Accordingly, the Court finds that Lt. Laurin and Nurse Kinter are not entitled to qualified immunity.

## D. Compensatory Damages

The Prison Litigation Reform Act ("PLRA"), *42 U.S.C. § 1997e(e)*, provides, in relevant part:

---

[26] Defendants make no arguments and cite no case law to the contrary.

(e) Limitation on recovery

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). The PLRA's limitation on recovery "is generally interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages." Walker v. Schult, 45 F.4th 598, 612 (2d Cir. 2022).[27] Here, Plaintiff alleges physical injury due to a fifty-pound weight loss, headaches, fatigue, hunger, and mental [*82] distress. (Dkt. No. 247, at 76). "[T]here is no statutory definition of 'physical injury' as used in section 1997e(e)." Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999). However, the physical injury required under § 1997e(e) must be more than de minimis. Id. (citing Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)). "Physical afflictions that courts have found de minimis include contracting a fungal infection from exposure to sewage and waste, skin rashes, and itching, soreness and cracked skin." Hong v. Liburd, 18-cv-7201, 2020 U.S. Dist. LEXIS 139145, at *30 (S.D.N.Y. Aug. 3, 2020) (internal citations omitted) (citing cases).[28] Even assuming Plaintiff established physical injury, because Defendants are liable for only limited time periods, September 26 to October

5, and October 15 to November 21, and Plaintiff has not presented specific evidence concerning his physical condition during these time period, the Court finds no basis for awarding compensatory damages based on physical, mental, or emotional injury.

Nonetheless, Plaintiff is entitled to compensatory damages for the injury resulting from Defendants' violation of his First Amendment rights. Toliver v. City of New York, 530 F. App'x 90, 93 n.2 (2d Cir. 2013) ("[E]ven if Toliver is unable to establish that any of the injuries complained of in this action stemmed from an incident in which he suffered physical injuries, Toliver may still recover damages for [*83] injuries to his First Amendment rights, as well as nominal and punitive damages for any other constitutional violations." (citing Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002)); see also Ford v. McGinnis (Ford I), 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001) (explaining that the PLRA "does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself."). Where, as here, a plaintiff is "entitled to recover for the loss of intangible rights," although a jury, or, in this case, the Court, may "not . . . award 'speculative damages,'" the amount of monetary damages awarded is "necessarily arbitrary and unprovable." Kerman v. City of New York , 374 F.3d 93, 125 (2d Cir. 2004) (emphasis in original) (quoting Raysor v. Port Auth. of New York & New Jersey, 768 F.2d 34, 39 (2d Cir. 1985)). In Kerman, the plaintiff prevailed on his Fourth Amendment unlawful seizure claim. 374 F.3d at 121. The Second Circuit held that the jury should have been instructed that the plaintiff was entitled to compensatory damages for his loss of liberty, and explained that: "The damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional

---

[27] Because Plaintiff was incarcerated at the time he commenced this action, (see Dkt. No. 1), this provision continues to apply. Cf. Cano v. City of New York, 44 F. Supp. 3d 324, 331 (E.D.N.Y. 2014) (explaining that "§ 1997e(e) does not bar Plaintiffs, who were not incarcerated at the time they filed this action, from seeking any category of damages"); In re Nassau County Strip Search Cases, No. 99-cv-2844, 2010 U.S. Dist. LEXIS 99783, at *13, 2010 WL 3781563, at *5 (E.D.N.Y. Sept. 22, 2010) ("PLRA's recovery limitation . . . does not apply to plaintiffs not incarcerated at the time the action is brought").

[28] No Westlaw cite available.

suffering; even absent such other injuries, an award of several thousand dollars may be appropriate simply for several hours' loss of liberty." *374 F.3d 93, 125-26 (2d Cir. 2004)*; *see also Ford I, 198 F. Supp. 2d at 366* (holding that the "plaintiff may be awarded an amount **[\*84]** to compensate him for the denial of his religious meal").

In this case, Plaintiff has proven that he was wrongfully served six meals containing pork from September 26 to October 5, 2012, as a result of Lt. Laurin's failure to place a Special Diet Notification in Plaintiff's inmate folder. Thus, not only was he deprived of six meals in a ten-day period, but the service of each meal violated his *First Amendment* right to the free exercise of religion. The Court awards Plaintiff $500 per meal for the violation of his *First Amendment* right to the free exercises of religion, for a total of $3,000. *Cf., Drayton v. City of New York, No. 17-cv-7091, 2022 U.S. Dist. LEXIS 207165, at \*12-15, 2022 WL 16948769, at \*4-5 (E.D.N.Y. Nov. 15, 2022)* (offering the plaintiff choice of new trial or accepting reduced compensatory damages award of $10,000 for his loss of liberty during the "3 and 30 minutes" he was in wrongful custody, observing that New York cases uphold awards of up to $10,000, in loss of liberty cases, "even without proof of actual damages" (citing inter alia *Hallenbeck v. City of Albany, 99 A.D.2d 639, 472 N.Y.S.2d 187 (3d Dep't 1984)* ($10,000 for three hours); *Woodard v. City of Albany, 81 A.D.2d 947, 439 N.Y.S.2d 701 (3d Dep't 1981)* ($7,500 for five hours)); *King v. Zamiara, 788 F.3d 207, 215-16 (6th Cir. 2015)* (affirming award of compensatory damages in the amount of $1,475, equally $5 per day for *First Amendment* retaliatory transfer to "more restrictive facility").

Plaintiff has also proven that Lt. Laurin and Nurse Kinter retaliated against him for filing grievances **[\*85]** by revoking his medical diets

from October 16, 2012 to November 21, 2012. During that thirty-seven-day period, Plaintiff regularly received meals, parts of which he could not eat because they were harmful to his cholesterol levels or would cause severe acid reflux. Accordingly, the Court awards Plaintiff $200 per day for each day his medical diets were revoked, for a total of $7,400. *Cf., King, 788 F.3d at 215-16*.

## E. Punitive Damages

"Punitive damages are available in a *§ 1983* action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996)* (quoting *Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)*). "The terms 'malice' or 'reckless indifference' pertain to the [defendant's] knowledge that [he or she] may be acting in violation of federal law." *Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)*. "To be entitled to an award of punitive damages, a claimant must show a "positive element of conscious wrongdoing." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 121 (2d Cir. 2006)* (quoting *Kolstad, 527 U.S. at 538*). Further, punitive damages are appropriate when the defendant's actions call for "deterrence and punishment over and above that provided by compensatory awards." *Wade, 461 U.S. at 54*.

Here, Lt. Laurin acted recklessly and with callous indifference to Plaintiff's *First Amendment* right to the free exercise of **[\*86]** religion when he waited ten days to implement a religious diet that he knew Plaintiff was entitled to and had been wrongfully denied for the past seven months. Lt. Laurin knew religious diet notification forms were to be filed

with the kitchen on the same day as booking, but gave no explanation for waiting ten days after learning one had not been filed on Plaintiff's behalf to do so, speculating only that he may have gotten "tied up" in something. The Court further finds that an award of punitive damages will serve the purposes of deterrence and punishment.

The Court further finds that Lt. Laurin and Nurse Kinter acted recklessly and with an evil motive and intent toward Plaintiff when they removed his medical diets—a particularly vicious action given that they were well aware how concerned Plaintiff was about his health and diet and that he had used commissary purchases, to eat or barter, in order to help make up for the many meals he could not eat because they contained pork. Indeed, they removed his medical meals less than two weeks after Plaintiff began receiving proper religious meals, placing him back in the position of regularly receiving meals he could not eat. The Court further **[*87]** finds that an award of punitive damages will serve the purposes of deterrence and punishment.

Accordingly, Plaintiff is entitled to punitive damages and the Court will hold a hearing to permit evidence regarding the financial conditions of Defendants Laurin and Kinter, and argument concerning an appropriate punitive damages award.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff is entitled to judgment in his favor against Kevin Laurin on his *First Amendment* free exercise claim; and it is further

**ORDERED** that Plaintiff is entitled to judgment in his favor against Kevin Laurin and Suzanne Kinter on his *First Amendment* retaliation claim; and it is further

**ORDERED** that Suzanne Kinter, Lawrence Bedard, Margaret Clancy, Robert Webb, and Thomas Perry are entitled to judgment in their favor on Plaintiff's *First Amendment* free exercise claim; and it is further

**ORDERED** that Lawrence Bedard, Margaret Clancy, and Eric Blaise are entitled to judgment in their favor on Plaintiff's *First Amendment* retaliation claim; and it is further

**ORDERED** that Plaintiff is entitled to compensatory damages in the amount of $3,000 on his *First Amendment* free exercise claim; and it is further

**ORDERED** that Plaintiff is entitled to compensatory damages in the amount of $7,400 **[*88]** on his *First Amendment* retaliation claim; and it is further

**ORDERED** that Plaintiff is entitled to an award of punitive damages against Kevin Laurin and Suzanne Kinter in an amount to be determined following a hearing on April 18, 2023, at 10:00 a.m.

**IT IS SO ORDERED**.

Dated: March 6, 2023

Syracuse, New York

/s/ Brenda K. Sannes

Brenda K. Sannes

Chief U.S. District Judge

---

**End of Document**

# *Hong v. Liburd*

United States District Court for the Southern District of New York

August 3, 2020, Decided; August 3, 2020, Filed

18 Civ. 7201 (GBD) (RWL)

**Reporter**

2020 U.S. Dist. LEXIS 139145 *

BRANDON HONG, Plaintiff, - against - CAPTAIN LIBURD, #1157; C.O. TROCCHIA, #10734; C.O. PARKER; CAPTAIN DESIR; CAPTAIN PICHARDO; and ASSISTANT DEPUTY WARDEN MITCHELL, Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Dismissed by, Objection overruled by *Hong v. Liburd, 2021 U.S. Dist. LEXIS 51339 (S.D.N.Y., Mar. 18, 2021)*

**Counsel:** [*1] Brandon Hong, Plaintiff, Pro se, Collins, NY.

For Captain Liburd, Shield No. 1157, C.O. Trocchia, Shield No. 10734, Captain Desir, Captain Pichardo, Mitchell, Assistant Deputy Warden, Defendants: Stefano Perez, LEAD ATTORNEY, New York City Law Department, New York, NY.

For C.O. Parker, Defendant: Stefano Perez, LEAD ATTORNEY, New York City Law Department, New York, NY.

**Judges:** ROBERT W. LEHRBURGER, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** ROBERT W. LEHRBURGER

# Opinion

## REPORT AND RECOMMENDATION TO HON. GEORGE B. DANIELS: SUMMARY JUDGMENT

**ROBERT W. LEHRBURGER, United States**

**Magistrate Judge**.

Plaintiff Brandon Hong ("Hong" or "Plaintiff") filed this lawsuit against corrections officers and officials, pursuant to *42 U.S.C. § 1983*, claiming his *Eighth Amendment* rights against cruel and unusual punishment were violated when guards stood by as Hong and other inmates were assaulted with feces thrown by another prisoner. Hong claims he suffered a skin rash resulting in open wounds and seeks $ 300,000 in damages. Defendants now move for summary judgment pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* on several grounds, including that Hong's claimed injury is not sufficiently serious to state a claim; Defendants are entitled to qualified immunity; two of the Defendants had no personal involvement [*2] in the events at issue; and the Prison Litigation Reform Act bars Hong's claim for damages. For the following reasons, I recommend that Defendants' motion be GRANTED and that judgment be entered in favor of Defendants and against Plaintiff.

## Facts[1]

_____

[1] Unless otherwise noted, the alleged facts are taken from Defendants' Statement of Material Facts Pursuant to *Local Civil Rule 56.1* ("SOF") (Dkt. 59), to which Hong provided no counterstatement as required by *Rule 56.1*; Defendants' supporting affidavits; and Hong's notarized Opposition to Defendants' Motion for Summary Judgment (Dkt. 64) to the extent it asserts facts and not legal argument. Mindful of the duty to extend special solicitude to pro se litigants, the Court has conducted a thorough review of the available record and considered Hong's admissible evidence. Further, the Court draws all reasonable inferences and resolves all ambiguities in

2020 U.S. Dist. LEXIS 139145, *2

At all relevant times, Hong was a pre-trial detainee incarcerated at the Manhattan Detention Complex ("MDC") operated by the New York City Department of Correction ("DOC"). (SOF ¶ 3.) As an enhanced restraint inmate, Hong was housed in segregated Housing Area 9 South. (*Id.* ¶ 4.) An enhanced restraint inmate presents a significant threat to the safety and security of the facility if housed in a housing area other than a segregated housing area. (*Id.* ¶ 5.) Inmates assigned to Housing Area 9 South are generally required to be confined to their cells when necessary for the safety and security of the facility, and are required by DOC rules to be locked into their cells at night, beginning at 9 p.m. (*Id.* ¶¶ 6-7.)

At approximately 11:00 p.m. on July 18, 2018, Defendant Correction Captain Verna Liburd ("Captain Liburd") was directed by Defendant Assistant Deputy Warden Lee Mitchell ("ADW Mitchell") to conduct a tour of Housing Area 9 North and South. **[\*3]** (*Id.* ¶ 8.) While conducting the tour, Captain Liburd ensured that correction staff were on post and instructed inmates to lock in. (*Id.*)

At approximately 11:20 p.m., Correction Officer Nicholas Trocchia ("Officer Trocchia") arrived at his post in Housing Area 9 South. (*Id.* ¶ 9.) Upon Officer Trocchia's arrival, inmate Rashaun Bullock ("Bullock") threatened to throw feces and unknown liquid substances at Officer Trocchia and proceeded to do so. (*Id.*)

Officer Trocchia immediately contacted the Area Captain, Mallory Desir ("Captain Desir"). (*Id.* ¶ 10; Affidavit of Correction Officer Nicholas Trocchia ("Trocchia Aff."), Dkt. 56, ¶ 11.) About ten minutes later, Captain Desir relieved Officer Trocchia from his duties and

assigned Officer James Parker ("Officer Parker") as his replacement. (SOF ¶ 10.) At that point, approximately 11:30 p.m., Officer Trocchia left Housing Area 9 South and went directly to his newly assigned post on the second floor of the facility. (*Id.*) Officer Parker arrived at Housing Area 9 South and assumed the post of floor officer. (*Id.* ¶ 11.) A floor officer is responsible for maintaining order within the housing area, keeping an accurate count of the inmates, and ensuring **[\*4]** the safety and security of the inmates. (*Id.* ¶ 11.)

At approximately 11:45 p.m., while conducting a tour of the housing area, Officer Parker noticed that four inmates were not locked into their cells, including Hong and Bullock. (*Id.* ¶ 12.) Officer Parker ordered Hong, Bullock, and the other two inmates to lock into their cells, but they did not comply.[2] (*Id.*) Instead, when Officer Parker ordered Bullock to lock into his cell, Bullock threatened to throw feces and unknown liquid substances at him. (*Id.*) At about 12:00 a.m., Bullock began throwing feces and unknown liquid substances, including at Officer Parker. (*Id.* ¶¶ 12-13.) When Officer Parker saw what was happening, he contacted the Area Supervisor by radio to alert them of the situation and positioned himself nearby, but outside of the housing area. (*Id.* ¶ 14; Parker Aff. ¶ 6.)

At approximately 1:30 a.m., another officer, Officer Evans, relieved Officer Parker of his post at Housing Area 9 South. (*Id.* ¶ 15.) Officer Evans also called the Area Supervisor

---

[2] Officer Parker attests that he twice ordered the inmates to lock into their cells. (Affidavit of Correction Officer James Parker ("Parker Aff."), Dkt. 54, ¶¶ 4, 7.) Hong testified at deposition that the first time he was told to lock into his cell was at the end of the incident. (Deposition of the Plaintiff ("Hong Dep."), Dkt. 58-2, at 115.) The Court therefore deems this a disputed fact. However, it is not material as Hong does not dispute that DOC rules required him to be locked into his cell by 9:00 p.m., and even in the absence of any such rules, he could have voluntarily retreated to his cell to avoid being hit by any feces or other substance.

---

favor of Hong, the nonmoving party. The consequences of Hong's failure to file a *Rule 56.1* statement are discussed further below.

to alert them of the continued feces throwing. (*Id.*) At approximately 2:30 a.m., Captain Desir arrived at Housing Area 9 South. (*Id.* ¶ 16.) She observed multiple inmates throwing **[*5]** feces and unknown liquid substances at each other from their cell areas. (*Id.*) Hong and other inmates were still not locked into their cells as required by DOC rules. (*Id.*) Captain Desir repeatedly ordered the inmates to stop throwing feces and tried to de-escalate the incident. (*Id.* ¶ 18.)

At approximately 3:10 a.m., Captain Desir radioed ADW Mitchell advising that a Probe Team was needed to quell the situation. (*Id.*) ADW Mitchell activated the alarm alerting DOC staff of an emergency situation and called for a Probe Team. (*Id.* ¶¶ 19-20.) As a general matter, the alarm alerts all available staff to report to the staging area for purposes of forming a Probe Team. (*Id.* ¶ 20.) A Probe Team responds to emergencies within the correctional facility and usually consists of a captain and five corrections officers equipped with protective gear, such as shields, gas masks, helmets, and protective vests. (*Id.*) When responding to a situation that poses a biological hazard or one that involves chemical substances, as here, the members of the Probe Team also don specialized hazardous material ("hazmat") gear, which increases the time it takes to respond to the incident location. (*Id.* ¶¶ 20-21.)

 **[*6]** After ADW Mitchell activated the alarm, the Probe Team assembled in the designated staging area, suited up in hazmat gear, and headed to Housing Area 9 South. (*Id.* ¶ 21.) Officer Trocchia joined the Probe Team, which was led by Correction Captain Jose Pichardo ("Captain Pichardo"). (*Id.*) On arriving at Housing Area 9 South at 3:30 a.m., the Probe Team directed all inmates to lock into their cells. (*Id.* ¶ 22; Affidavit of Correction Captain Mallory Desir ("Desir Aff."), Dkt. 55, ¶ 11.) This time, the inmates complied, putting an end to

the incident. (SOF ¶ 22.) Later that morning, the sanitation crew cleaned and sanitized the area. (*Id.* ¶ 23.)

Shortly thereafter, Hong complained of having rashes that developed into open wounds. (*Id.* ¶ 24.) On July 22, 2018, Hong was seen at the MDC medical clinic for a rash on his back and right forearm, and was prescribed Hydrocortisone Cream, 1%. (*Id.* ¶ 25.)

During the feces-throwing incident, Hong was hit "a couple of times" with feces and unknown liquid substances in his chest area, head, eyes, mouth, ears, nose, right side of his body, and on his clothes. (*Id.* ¶ 17.) Had Hong retreated into his cell, he would have been completely insulated from the exposure to the feces and unknown liquid substances that were being thrown by certain other inmates. (*Id.*) Hong's cell, like that of all inmates in Housing Area 9 South, was completely enclosed and would have acted as a barrier to feces and unknown liquid substances. (*Id.*)

## Procedural History

Hong filed his Complaint ("Compl.") on August 9, 2018. (Dkt. 2.) The Complaint alleges that Defendants violated his *Eighth Amendment* right to be free from cruel and unusual punishment when they **[*7]** "did nothing to stop the inmate from throwing feces and unknown substances at me and other inmates." (Compl. at 4.) Hong claims he suffered rashes that developed into open wounds for which a doctor prescribed hydrocortisone. (*Id.*) He also claims that he cannot sleep and "constantly think[s] an inmate or officer will assault me." (*Id.*) Hong seeks "compensatory relief" in the amount of $ 300,000. (*Id.* at 5.)

On September 5, 2018, the Honorable George B. Daniels, U.S.D.J., referred the case to the undersigned for general pretrial purposes and

for reports and recommendations on dispositive motions. (Dkt. 9.) All Defendants answered the Complaint. (Dkt. 17, 18, 27.) The initial scheduling order, entered on January 29, 2019, called for fact discovery to end on June 30, 2019. (Dkt. 22.) Following two extensions, fact discovery closed on September 30, 2019. (Dkt. 29, 38.) During discovery, Defendants deposed Hong and produced materials to Hong, including camera footage of a sanitation crew cleaning the area where the incident occurred. (*See* Dkt. 58 ¶ 4 (declaration attaching Hong deposition excerpts); Dkt. 37 (letter motion requesting further extension of time for discovery so that Defendants can produce **[*8]** video); *see also* Reply Memorandum of Law in Support ("Def. Reply"), Dkt. 68, at 2 (asserting that the video footage was produced on August 29, 2019).)

## Defendants' Motion for Summary Judgment

Defendants filed their motion for summary judgment on March 5, 2020. (Dkt. 51.) Each Defendant except Captain Pichardo filed a supporting affidavit. (Dkt. 53-57.) Defendants also filed a memorandum in support of their motion (Dkt. 52) as well as a statement of undisputed material facts pursuant to the *Southern District of New York's Local Civil Rule 56.1* (Dkt. 59). As required by *Local Civil Rule 56.2*, Defendants also served Hong with a "Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment" containing the full texts of *Fed. R. Civ. P. 56* and *Local Civil Rule 56.1*. (Dkt. 60).

Defendants advance four principal arguments as to why they are entitled to summary judgment. First, they argue that Hong's claim is a claim for deliberate indifference, which fails because Hong's skin rash was not "sufficiently serious" as required, and because the undisputed evidence shows that Defendants did not act with the requisite intent. Second,

Defendants Mitchell and Pichardo argue that Hong has no claim against them because there is no basis on which to find that they were personally **[*9]** involved in the controversy. Third, all Defendants argue that they are entitled to qualified immunity. Fourth, and finally, Defendants contend that the Prison Litigation Reform Act bars Hong's claim for damages because he did not suffer a cognizable physical injury.

On July 8, 2020, Hong filed his opposition to the motion, consisting of a single notarized, but unsworn, document asserting his arguments. (Dkt. 64.) He did not file a counterstatement of material facts as required by *Local Civil Rule 56.1*. Hong's opposition quotes from his Complaint but also claims that his case "relies solely on camera footage" of the incident, which he believed to be in DOC's possession. (Dkt. 64 at 3-4.) Hong believes the camera footage "will reveal the discrepancies in the log book" as well as "the disgusting, revolting, animalistic standards of sanitation and serving of food while feces were still on every surface." (Dkt. 64 at 3.) Defendants filed their reply on July 28, 2020. (Dkt. 68.)

## Legal Standards

## A. Summary Judgment

The standard for summary judgment is well settled. Pursuant to *Rule 56(a) of the Federal Rules of Civil Procedure*, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled **[*10]** to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The moving party bears the initial burden of proving that there is no genuine issue of material fact. *Anderson v. Liberty*

*Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002)* (internal quotation marks and citation omitted). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The nonmoving party must produce admissible evidence that supports its pleadings. In this regard, the "mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat summary judgment. *Anderson, 477 U.S. at 252*. If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Id. at 249-50* (citations omitted).

In ruling on a motion for summary judgment, the court must resolve any ambiguity in favor of the nonmoving party. *Amnesty America v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004)*. The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility **[*11]** assessments . . . ." *Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)*. As a result, summary judgment will not issue where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita, 475 U.S. at 587* (internal quotation marks and citation omitted).

Where, as here, a plaintiff is pro se, district courts must read his or her pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)* (internal quotation marks and citations omitted). Courts "are less demanding of [pro se] litigants generally, particularly where motions for summary judgment are concerned." *Jackson v. Federal Express, 766 F.3d 189, 195 (2d Cir. 2014)*. A pro se litigant thus is given "special solicitude" in responding to a motion for summary judgment. *Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010)*; *see also Knowles v. New York City Department of Corrections, 904 F. Supp. 217, 220 (S.D.N.Y. 1995)* (same). This solicitude, however, "does not relieve [the pro se litigant] of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen, 351 F.3d at 50* (internal quotation marks and citation omitted).

## B. Consequences of Hong's Failure to Provide a *Rule 56.1* Statement

Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure*, a party asserting that a fact cannot be, or is, genuinely disputed "must support **[*12]** the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Fed. R. Civ. P. 56(c)(1)*. The court need only consider the cited materials, although it may consider other materials in the record. *Fed. R. Civ. P. 56(c)(3)*. The Southern District of New York's local rules require the parties to submit enumerated statements of undisputed and disputed material facts. *Local Civil Rule 56.1(a)-(b)*. Consistent with *Rule 56(c) of the Federal Rules of Civil Procedure*, "[e]ach statement by the movant or opponent .

. . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible." *Local Civil Rule 56.1(d)*.

"Pro se litigants . . . are not excused from meeting the requirements of *Local Civil Rule 56.1*" when a party moving for summary judgment provides notice to a pro se party consistent with *Local Civil Rule 56.2*. *Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)*; *see also Berry v. Marchinkowski, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015)* ("A pro se litigant is not excused from [*Local Civil Rule 56.1*]") (quoting *Brandever v. Port Imperial Ferry Corp., No. 13 Civ. 2813, 2014 U.S. Dist. LEXIS 36844, 2014 WL 1053774, at *3 (S.D.N.Y. March 13, 2014))*. If the pro se party fails to file a *Rule 56.1* statement, a court may deem all factual allegations of the moving party as true or, in the alternative, may "opt to conduct an assiduous review of the record." *Battle v. Day Care Council, Local 205, DC 1707 Welfare Fund, No. 11 Civ. 4043, 2012 U.S. Dist. LEXIS 104560, 2012 WL 3055574, at *1 n.1 (S.D.N.Y. July 26, 2012)* [*13] (internal quotation marks and citation omitted); *see Brandever, 2014 U.S. Dist. LEXIS 36844, 2014 WL 1053774, at *3* (concluding that because the pro se plaintiff did not submit a *Rule 56.1* statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *see also Anand v. New York State Division of Housing and Community Renewal, No. 11 Civ. 9616, 2013 U.S. Dist. LEXIS 126925, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013)* (same).

While Defendants filed a *Rule 56.1* statement, Hong did not. Nor did Hong directly object to Defendants' *Rule 56.1* statement in whole or in part, despite the fact that Defendants served Hong with the requisite Notice To Pro Se Litigants. Instead, Hong submitted only an unsworn notarized opposition to Defendants'

motion containing argument and a few factual contentions. (Dkt. 64.) The Court therefore accepts as true Defendants' factual assertions in its *Rule 56.1* statement, but also credits, for purposes of this motion, Hong's factual assertions to the extent they are based on personal knowledge and not unduly speculative. And mindful of the "special solicitude" afforded pro se litigants, the Court also has conducted its own "assiduous review" of the record in setting forth the facts.

**C. *Section 1983* Claims for Deliberate Indifference to Safety**

To state a cause of action under 28 U.S.C. § 1983, "a plaintiff must allege that some person acting under color of state law deprived him of a federal right." *Ahlers v. Rabinowitz, 684 F.3d 53, 60-61 (2d Cir. 2012)* (quoting [*14] *Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986))*. Because § 1983 does not provide its own substantive right, plaintiffs must identify the federally protected right which was allegedly violated. *See Gonzaga University v. Doe, 536 U.S. 273, 285, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002)* (plaintiffs cannot simply claim a violation of § 1983, because § 1983 "by itself does not protect anyone against anything") (quoting *Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 617, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979))*. Accordingly, the plaintiff must show that (1) the defendant acted under color of state law and that (2) as a result of the defendant's actions, the plaintiff suffered a denial of federal statutory rights, or constitutional rights or privileges. *Fierro v. New York City Department of Education, 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014)*.

Hong's Complaint, read liberally, asserts a claim for deliberate indifference to safety and unconstitutional conditions of confinement. Although Hong invokes the *Eighth Amendment*

prohibition on cruel and unusual punishment, his claim arises under the *Fourteenth Amendment* because he was a pre-trial detainee, not a convict, at the time of the events at issue. *See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)* ("A pretrial detainee's claims are evaluated under the *Due Process Clause* because[ ] [p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner — neither cruelly and unusually nor otherwise") (internal quotation marks and citations omitted); *Barnes v. Harling, 368 F. Supp. 3d 573, 596 (W.D.N.Y. 2019)* ("Under current Second Circuit law, when a pretrial detainee plaintiff brings § 1983 claims alleging **[*15]** deliberate indifference, including claims alleging failure to protect or intervene," a district court analyzes these claims under the *Fourteenth Amendment* using the standard set forth in *Darnell, 849 F.3d at 30, 35*).

A claim of deliberate indifference under the *Due Process Clause of the Fourteenth Amendment* requires a plaintiff to prove conditions that objectively pose an unreasonable risk of serious harm and that the "defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Vega v. Semple, 963 F.3d 259, 273-74 (2d Cir. 2020)* (citation omitted). Additionally, "in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." *Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998)*; *see also White v. City of New York, No. 16 Civ. 6183, 2017 U.S. Dist. LEXIS 131614, 2017 WL 3575700, at *5 (S.D.N.Y. Aug. 17, 2017)* (same).

## Discussion

## I. Hong Cannot Establish All Elements of a Deliberate Indifference Claim

Hong's deliberate indifference claim requires him to demonstrate a substantial risk of serious harm, deliberate indifference by prison officials, and causation. The undisputed facts demonstrate that he cannot establish any of those.

## A. No Substantial Risk of Serious Harm

Exposure to human waste, whether **[*16]** thrown by other inmates or as a feature of an inmate's living environment, may give rise to a substantial risk of serious harm. Indeed, several courts have denied dispositive motions, finding actionable claims or questions of fact in just such situations. For example, in *Willey v. Kirkpatrick, 801 F.3d 51 (2d Cir. 2015)*, an inmate alleged that corrections officers subjected him to a retaliatory "campaign of harassment" exposing him to unsanitary conditions of confinement. *Id. at 55*. The campaign consisted of three periods: being placed in solitary confinement with a Plexiglas cell shield that restricted airflow, incapacitated the toilet, and exposed plaintiff "to breathing a miasma of his own accumulating waste"; a second period when plaintiff was left naked for two weeks in an observation cell where the walls and mattress of which were smeared with feces and stained with urine; and a third period of almost four weeks when plaintiff was placed in another observation cell with similar conditions. *Id. at 55, 66*. The court reviewed earlier cases in which it addressed the issue, as well as cases from other Circuits, and determined that there is no bright-line rule governing the length of time of exposure to unsanitary conditions that determines whether or **[*17]** not constitutional rights are transgressed. Rather, "whether exposure to human waste is cruel and unusual

2020 U.S. Dist. LEXIS 139145, *17

depends on both the duration and the severity of the exposure." *Id. at 68*. Finding that the district court erred in granting summary judgment by failing to consider both duration and severity (in addition to making other errors), the Second Circuit reversed and remanded.

Other scenarios in which the Second Circuit and district courts have found exposure to human waste may be sufficiently serious include the following: plaintiff alleged that on several days the area directly in front of his cell was filled with human feces, urine, and sewage water, *Gaston v. Coughlin, 249 F.3d 156, 165-66 (2d Cir. 2001)*; inmate spent five days in a cell whose toilet was a grate-covered hole in the floor which could be flushed only from outside the cell, causing the inmate "to live, eat and perhaps sleep in close confines with his own human waste," *LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972)*; officers confined inmate to his cell, allowed another inmate to assault him with feces, and thereafter refused to let plaintiff shower for 18 days, *Ruggiero v. Prack, 168 F. Supp. 3d 495, 521-22 (W.D.N.Y. 2016)*; for three days plaintiff had diarrhea but was denied basic toiletries and the ability to wash his hands after defecating into a bucket, such that he could not remove **[*18]** fecal material from his hands and fingers, causing him to ingest fecal matter and to become ill, *Williams v. Artus, No. 13-CV-00680A(F), 2016 U.S. Dist. LEXIS 71661, 2016 WL 3919726, at *5 (W.D.N.Y. May 31, 2016)*; officers allowed another inmate to kick plaintiff in his stomach and chest and later allowed other inmates to throw food, urine, and feces at plaintiff's cell door, including when the trap door for food was opened, *Medina v. Allen, No. 3:15-cv-1411, 2015 U.S. Dist. LEXIS 135989, 2015 WL 5842461, at *1-3 (D. Conn. Oct. 6, 2015)*; after an inmate — with a documented history of committing unhygienic and violent acts — threw, from his cell, a combination of feces and bodily fluid at plaintiff

while officers escorted him through the hallway, the same officers returned with plaintiff along the same route, resulting in a repeat of the same incident, with the in-cell inmate again throwing and hitting plaintiff with fecal substances, *Ramsey v. Busch, 19 F. Supp. 2d 73, 77, 79 (W.D.N.Y. 1998)*; prison officials placed plaintiff in a cell by inmates known to throw feces and then had inmates throw feces into his cell, directly at him, *Porter v. Coughlin, 964 F. Supp. 97, 104 (W.D.N.Y. 1997)*.

As these cases illustrate, subjecting an inmate to human waste, whether through accumulation in the inmate's cell, or thrown at him by other inmates, can be sufficiently serious to sustain a deliberate indifference claim. But there is a key fact that distinguishes **[*19]** all of those cases from the one before this Court. In all of the cited cases, the plaintiff inmate was confined to his cell or otherwise restrained by officers, thus providing the plaintiff with no means to avoid the exposure to human waste. Here, however, Hong was never forcefully exposed to feces being thrown at him. To the contrary, he had the ability to return to his cell and thereby avoid any potential harm. Instead, he voluntarily remained outside of his cell in violation of prison rules. (SOF ¶¶ 13-14, 16-17.) Given that Hong readily could have removed himself from harm's way, there was no "substantial risk of serious harm" to which the Defendants could be indifferent.[3]

---

[3] Defendants make two additional arguments as to why the first element is not met. First, they argue that Hong "has not alleged that his exposure was prolonged or severe"; rather, the incident lasted approximately four hours, Hong was hit only a "couple of" times with feces and unknown liquids, he received treatment from a doctor, and he was merely prescribed an over-the-counter medication. (Memorandum of Law in Support ("Def. Mem."), Dkt. 52, at 8.) This Court does not agree that those facts alone establish the absence of a risk of serious harm as a matter of law, particularly given the Second Circuit's holding in *Willey*. Second, Defendants argue that Hong's skin rash is not serious enough to sustain a

2020 U.S. Dist. LEXIS 139145, *19

## B. No Deliberate Indifference

For the same, and additional, reasons, Hong cannot establish the second requirement that Defendants were deliberately indifferent.

To assess the deliberate indifference element, the question is whether an official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed **[*20]** an excessive risk to health or safety." *Darnell, 849 F.3d at 35.* "Accordingly, the 'deliberate indifference' prong under the *Fourteenth Amendment* is said to be defined objectively." *Vega, 963 F.3d at 274.*

No reasonable juror could conclude based on the evidentiary record that Defendants acted intentionally or recklessly failed to act in the face of an excessive risk to Hong's health or safety. The undisputed evidence is that Officer Parker attempted to put a stop to Bullock's misconduct but was deterred when Bullock threw feces at him, after which Officer Parker radioed his supervisor to alert them of the situation. (Parker Aff. ¶¶ 5-6.) Later, Captain Desir attempted to de-escalate the incident and advised of the need for a Probe Team. (Desir Aff. ¶ 10.) ADW Mitchell activated the institutional alarm and called for the Probe Team. (SOF ¶ 19.) Captain Pichardo led the Probe Team, of which Officer Trocchia was a member, successfully bringing the incident to a close and restoring order. (*Id.* ¶ 21-22.)

In other words, Defendants acted to quell the fracas. Hong asserts that Defendants

"neglected their post" leaving him and other inmates "helpless." (Compl. at 4.) It is undisputed that the Defendants present at Housing Area 9 South where the incident **[*21]** occurred were first Officer Trocchia and then Officer Parker (and as noted earlier, Officer Parker was replaced by non-defendant Officer Evans). It also is undisputed, however, that inmate Bullock threw and hit Officer Trocchia with feces (SOF ¶ 9), that Bullock then threatened and threw feces at his replacement, Officer Parker (SOF ¶ 12), and that Officer Parker, after alerting his supervisor of the situation, took himself out of the line of fire but remained standing nearby (Parker Aff. ¶ 6). No reasonable juror could find Defendants deliberately indifferent for taking evasive action to protect themselves, particularly when Hong and other inmates were able, but chose not, to do the same. *See Rosen v. City of New York, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009)* ("an officer displays deliberate indifference when he has . . . a fair opportunity to protect the inmate *without risk to himself*, yet fails to intervene") (emphasis added) (internal quotation marks and citation omitted); *Williams v. Russo, No. 01-CV-6401, 2009 U.S. Dist. LEXIS 5086, 2009 WL 185758, at *4 (W.D.N.Y. Jan. 26, 2009)* (in circumstances where a corrections officer reasonably concludes that further intervention would threaten the health and safety of all concerned, including correctional staff, his failure to intervene is not a constitutional violation)*; Ramsey, 19 F. Supp. 2d at 82* ("no reasonable prison guard could **[*22]** be expected to act with deliberate indifference to his own health and safety by so exposing himself to such gross conduct"). And Hong certainly was not "helpless" as he could have simply returned to his cell where he would have been fully protected.

At best, Hong conceivably has an argument that Defendants did not act quickly enough. After all, a Probe Team was not called for and

---

deliberate indifference claim. (Def. Mem. at 8.) In *Willey*, however, the Second Circuit clearly stated that while a slight harm "may shed light on the severity of an exposure, serious injury [as opposed to risk of serious harm] is unequivocally not a necessary element of an *Eighth Amendment* claim." *801 F.3d at 68.*

activated until 3:20 a.m., more than three hours after Bullock began throwing feces. But even then, there is no evidence that acting any quicker would have prevented Hong from getting hit with feces the "couple of times" that he did. Any such conclusion would be pure speculation and therefore insufficient to defeat summary judgment. *See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)* (a party cannot rely on "conclusory allegations or unsubstantiated speculation" at the summary judgment stage of the case) (citation omitted); *see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* (same). And, again, no reasonable juror could find Defendants were reckless when Hong had the freedom, and even the obligation pursuant to prison rules, to return to his cell but did not do so.

## C. No Causation

"The Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil **[*23]** rights actions brought under section 1983." *Warner v. Orange County Department of Probation, 115 F.3d 1068, 1071 (2d Cir. 1996)* (internal quotation marks and citations omitted); *see also Higazy v. Templeton, 505 F.3d 161, 175 (2d Cir. 2007)* (reciting principle that an action to vindicate a constitutional right, such as a § 1983 action, employs the tort principle of proximate causation). Accordingly, "in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability." *Warner, 115 F.3d at 1071; see also Deskovic v. City of Peekskill, 673 F. Supp. 2d 154, 161 (S.D.N.Y. 2009)* ("Even if a Section 1983 defendant's initial act is the 'but for' cause of some ultimate harm . . . . [the defendant] is not legally liable for the harm if an intervening act is a 'superseding cause' that breaks the legal chain of proximate cause.") (quoting *Higazy, 505 F.3d at 181*) (internal quotation marks

omitted).

"An intervening exercise of independent judgment breaks the chain of causation . . . ." *Hernandez v. Wells, No. 01 Civ. 4376, 2003 U.S. Dist. LEXIS 21146, 2003 WL 22771982, at *10 (S.D.N.Y. Nov. 24, 2003)* (citing *Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999)); accord Deskovic, 673 F. Supp. 2d at 161*. Thus, for example, plaintiff's own conduct will constitute intervening cause when it "demonstrate[s] a lack of reasonable regard for his own safety." *Henry-Lee v. City of New York, 746 F. Supp. 2d 546, 571 (S.D.N.Y. 2010)* (internal quotation marks and citations omitted); *see, e.g., Caraballo v. United States, 830 F.2d 19, 23 (2d Cir. 1987)* (Government's failure to warn or patrol for safety was not proximate cause where adult, as superseding cause, dove head first into clearly visible shallow water).

Once again, Hong's claim fails **[*24]** because of his undisputed failure to return to his cell where he would have been protected. In failing to return to his cell, with or without orders, Hong exercised his independent judgment to remain where he would be exposed to the offending conduct. In other words, Hong disregarded his own safety and was the superseding cause of his exposure to the unsanitary substances thrown by another inmate.[4]

In sum, Defendants have demonstrated the absence of disputed material fact with respect to whether they exposed Hong to risk of serious harm, whether they did so with deliberate indifference, and whether their

_____

[4] In arguing lack of causation, Defendants describe Hong's skin rash as a preexisting condition based on his having seen prison medical personnel for a skin rash two years earlier. (Def. Mem. at 9.) Whether the two incidents are related and to what extent is a question of fact. And, at best, this argument would go to damages, not liability. Accordingly, the Court rejects the argument as a basis for summary judgment.

actions (or inaction) were the proximate cause of Hong's being hit by feces. Any and all of these deficiencies in Hong's claim merit summary judgment.

## II. Defendants Are Entitled to Qualified Immunity

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages under federal claims insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. _White v. Pauly, ___ U.S. ___, ___, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017)_; _see also Ayers v. Ryan, 152 F.3d 77, 82 (2d Cir. 1998)_ (same). In practice, this means that "[o]fficials are not liable for bad guesses in [*25] gray areas; they are liable for transgressing bright lines." _Coollick v. Hughes, 699 F.3d 211, 221 (2d Cir. 2012)_ (internal quotation marks and citation omitted).

A government official is entitled to qualified immunity when "(1) Plaintiff fails to allege a violation of a federal right; (2) the right alleged was not clearly established at the time of the alleged violation; or (3) the defendant's actions were objectively reasonable in light of the legal rules that were clearly established at the time it was taken." _Burns v. Citarella, 443 F. Supp. 2d 464, 469 (S.D.N.Y. 2006)_ (citing _Harhay v. Town of Ellington Board of Education, 323 F.3d 206, 211-12 (2d Cir. 2003))_; _see also X-Men Security, Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999)_ (same). Where the plaintiff alleges a violation of a clearly established federal right, "defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." _Varrone v. Bilotti, 123 F.3d 75, 78 (2d Cir.1997)_ (citing _Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))_.

For purposes of analyzing qualified immunity, the Court accepts that inmates have a constitutional right to be protected from other inmates and to not be exposed to unsanitary conditions, including exposure to human feces. The Court also recognizes that that right was clearly established at the time of events at issue. _See Willey, 801 F.3d at 66-67_. Accordingly, to establish that they are entitled to qualified immunity, Defendants must show that it was objectively reasonable for them to believe that they [*26] were not acting with the requisite deliberately indifferent state of mind.

As demonstrated above, the undisputed facts establish exactly that. Bullock threatened officers that he would throw feces at them if they continued to advance toward him. Bullock carried through on that threat. Meanwhile, Hong and other inmates could have avoided being hit with feces simply by seeking refuge in their cells. No reasonable officer in that situation would risk placing himself in the "zone of danger," particularly when other inmates could easily protect themselves by retreating to their cells. _Ramsey, 19 F. Supp. 2d at 82_; _see also Rosen, 667 F. Supp. 2d at 360_ (officer's failure to intervene is deliberately indifferent if the officer had a fair opportunity to protect the inmate "without risk to himself"); _Williams, 2009 U.S. Dist. LEXIS 5086, 2009 WL 185758, at *4_ (no constitutional violation where a corrections officer reasonably concludes that further intervention would threaten his and other corrections officers' health and safety). Defendants are thus at the very least protected by qualified immunity.

## III. Lack of Personal Involvement by Defendants Mitchell and Pichardo

Defendants contend that ADW Mitchell and Captain Pichardo also should be dismissed from the action under the "well settled [principle] in this [*27] Circuit that personal

involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010)* (internal quotation marks and citation omitted).

A defendant may be personally involved in a constitutional deprivation through a variety of means. A supervisory official, for instance, "is personally involved if (1) [he or she] participated directly in the alleged constitutional violation, (2) [he or she], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) [he or she] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) [he or she] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) [he or she] exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Brandon v. Kinter, 938 F.3d 21, 36-37 (2d Cir. 2019)* (quoting *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995))* (internal quotation marks omitted).

The Complaint makes no express allegations of specific involvement or wrongdoing by any of the six Defendants. At deposition, Hong testified that Defendants "left the area" after they were threatened by **[*28]** inmate Bullock with feces and other substances, and that "nothing immediate [happened] between the beginning and end of this incident" until the Probe Team arrived. (SOF ¶ 27.) The undisputed facts, however, are that ADW Mitchell and Captain Pichardo were involved only in bringing the incident to an end and were not presented with any earlier opportunity to intervene.

The only facts in the record as to ADW Mitchell's role are that (1) he dispatched Captain Liburd to conduct a tour of Housing Area 9 North and South at 11:00 p.m. on July 18, 2018, when the feces throwing had not yet started (Affidavit of Correction Captain Verna Liburd ("Liburd Aff."), Dkt. 57, ¶¶ 4, 8); (2) upon being alerted to the disturbance by Captain Desir, ADW Mitchell activated the institutional alarm and called for a Probe Team (Affidavit of Assistant Deputy Warden Lee Mitchell ("Mitchell Aff."), Dkt. 53, ¶ 4); and (3) ADW Mitchell came to the incident area with the Probe Team (SOF ¶ 28; Hong Dep. at 114). There is no evidence in the record that ADW Mitchell delayed or failed to act when notified, created a policy or custom of ignoring feces throwing by inmates, or was grossly negligent in supervising any of **[*29]** the other Defendants involved. Summary judgment therefore should be granted in favor of ADW Mitchell for lack of personal involvement.

The same goes for Captain Pichardo. Captain Pichardo led the Probe Team. (SOF ¶ 21.) There is no evidence that Captain Pichardo had any role in the events at issue prior to when the Probe Team was activated. And as with ADW Mitchell, there is no evidence that Captain Pichardo delayed or failed to act when notified, created a policy or custom of any kind, or was grossly negligent in supervising any of the other Defendants involved. Summary judgment thus should be granted in favor of Captain Pichardo for lack of personal involvement.

## IV. Hong's Claim for Compensatory Damages Is Barred by the PLRA

Defendants argue that even if there were facts supporting Hong's claim that his constitutional rights were violated, he would not be entitled to any compensatory damages under the *Prison Litigation Reform Act ("PLRA")*. In relevant part, the PLRA prohibits prisoners from bringing any federal civil action for mental or emotional injury "without a prior showing of

physical injury." *42 U.S.C. § 1997e(e)*. *Section 1997e(e)* "bars prisoner civil rights suits seeking damages for constitutional violations where **[*30]** the inmate-plaintiff suffers only emotional and mental injury." *Cox v. Malone, 199 F. Supp. 2d 135, 139 (S.D.N.Y. 2002), aff'd, 56 F. App'x 43 (2d Cir. 2003)*. The purpose of the physical injury requirement is "to weed out frivolous claims where only emotional injuries are alleged." *Cox, 199 F. Supp. 2d at 140*. "Courts have strictly construed this requirement, barring claims by prisoners who demonstrate solely emotional or mental injury . . . ." *Petty v. Goord, No. 00 Civ. 803, 2008 U.S. Dist. LEXIS 38975, 2008 WL 2604809, at *6 (S.D.N.Y. June 25, 2008)* (internal quotation marks and citation omitted).

Moreover, the physical injury complained of must be more than *de minimis*. *See Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999)* (citing Fifth Circuit case for proposition that physical injury required by *§ 1997e(e)* "must simply be more than *de minimis*" and recognizing sexual assault as more than *de minimis* injury) (quoting *Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)*; *Edwards v. Horn, No. 10 Civ. 6194, 2012 U.S. Dist. LEXIS 30968, 2012 WL 760172, at *22 (S.D.N.Y. March 8, 2012)* ("the [physical] injury complained of must be more than *de minimis* to meet the requirements of *§ 1997e(e)*"). Physical afflictions that courts have found *de minimis* include contracting a fungal infection from exposure to sewage and waste, *Florio v. Canty, 954 F. Supp. 2d 227, 236 (S.D.N.Y. 2013)*; skin rashes, *Purdie v. City of New York, No. 10 Civ. 5802, 2011 U.S. Dist. LEXIS 27866, 2011 WL 1044133, at *3 (S.D.N.Y. March 15, 2011)*; and itching, soreness and cracked skin, *Swindell v. Supple, No. 02 Civ. 3182, 2005 U.S. Dist. LEXIS 1517, 2005 WL 267725, at *7 (S.D.N.Y. Feb. 3, 2005)*. Indeed, "district courts in this Circuit have found repeated punching that results in 'superficial and temporary irritations or abrasions' do not

constitute physical injuries under the PLRA." *Johnson v. Lynn-Caron, No. 9:11-cv-386, 2013 U.S. Dist. LEXIS 142050, 2013 WL 5465594, at *4 (N.D.N.Y. Sept. 30, 2013)* (citing *McCloud v. Tureglio, No. 9:07-CV-0650, 2008 U.S. Dist. LEXIS 124388, 2008 WL 1772305, at *8 (N.D.N.Y. April 15, 2008)* **[*31]** (collecting cases)).

Here, the only physical injury asserted by Hong is a temporary skin rash that developed into open wounds for which he was given over-the-counter hydrocortisone.[5] Those conditions are the same as or similar to skin rashes, soreness, cracked-skin, and abrasions that have been deemed *de minimis*. While "open wounds" could be more than *de minimis*, the record indicates otherwise in this case. For instance, there is no evidence indicating that Hong ever sought or required treatment for wounds. The clinic provided hydrocortisone cream for his rash, but the medical record from his visit does not reflect any observation, complaint, or treatment of wounds. (*See* Declaration of Stefano Perez ("Perez Aff."), Dkt. 58, Ex. C.) Nor is there any evidence (or allegation) that Hong ever returned to the medical clinic for treatment of any such wounds. There is no evidence (or allegation) that the wounds became infected, that the wounds were painful, or that Hong sought any pain medication. And there is no evidence (or allegation) that the wounds were anything other than "superficial and temporary irritations or abrasions." *Johnson, 2013 U.S. Dist. LEXIS 142050, 2013 WL 5465594, at *4*. On this record, no reasonable juror could **[*32]** conclude that Hong's physical injury was any

---

[5] The Court takes judicial notice that hydrocortisone cream, 1% is an over-the-counter medication. *See* Hydrocortisone; Marketing Status as an *External Analgesic Drug Product for Over-the-Counter Human Use; Notice of Enforcement Policy, 56 Fed. Reg. 43,025 (Aug. 30, 1991)* (United States Food and Drug Administration recognition that hydrocortisone is safe and effective as an over-the-counter antipruritic active ingredient at a concentration up to 1.0 percent).

more than *de minimis*.

Accordingly, the PLRA bars Hong from obtaining compensatory damages. That alone, however, would not be sufficient to dismiss the entire case. Were he able to establish a constitutional violation, Hong could still seek other forms of relief, such as "nominal or punitive, but not compensatory, damages irrespective of any physical injury if he proves that violation." *Lipton v. County of Orange, New York, 315 F. Supp. 2d 434, 457 (S.D.N.Y. April 14, 2004)* (citing *Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002)*); *see also Herring v. Tabor, No. 9:12-cv-1739, 2014 U.S. Dist. LEXIS 89506, 2013 WL 6173775, at *10 (N.D.N.Y. Nov. 20, 2013)* ("*section 1997e(e)* does not preclude claims for nominal damages, punitive damages, or declaratory, or injunctive relief"). But as determined above, Defendants have demonstrated that Hong cannot prove a violation of his constitutional rights.

## V. Hong's Request for Camera Footage

In opposition, Hong claims that his "defense" relies "solely" on camera footage that "will contradict all the evidence presented against my claim, especially allegations of a sanitation crew arriving the next day" and will show "animalistic standards of sanitation and serving of food while feces were still on every surface." (Dkt. 64 at 3.) He describes various locations of cameras, expresses his belief that DOC has relevant footage, and asks **[*33]** that the footage be produced so it can be shown to the Court. (*Id.*) These assertions do not advance the ball for Hong for several reasons.

First, Hong's complaint makes no allegation about failure to timely clean after the incident or any lasting unsanitary conditions. While pleadings may be conformed to the evidence for later proceedings, *see Fed. R. Civ. P.*

*15(b)*, Hong never sought to do so for purposes of summary judgment and never raised the issue of post-incident conditions with the Court.[6] Indeed, there is nothing in the record before the Court, other than Hong's single, unsworn, conclusory statement in his opposition, to support a claim for deliberate indifference to unsanitary conditions following the incident at issue.

Second, Defendants already produced camera footage of a sanitation crew cleaning the area where the incident occurred. (*See* Dkt. 37 (letter motion requesting further extension of time for discovery so that Defendants can produce video); Def. Reply at 2-3 (referring to production of camera footage on August 29, 2019).) Hong's unsubstantiated assertions regarding possible additional footage is merely speculative.

Third, discovery closed on September 30, 2019. Any additional discovery **[*34]** or concerns about sufficiency of discovery should have been raised before then. Hong made no mention of any such alleged deficiency until more than eight months after the close of discovery, in his opposition to the instant motion. Now that the discovery deadline has passed (long ago) and Defendants have moved for summary judgment, further discovery is not warranted. *See Morgan v. County of Nassau, No. 13-CV-06524, 2017 U.S. Dist. LEXIS 22992, 2017 WL 664027, at *6 (E.D.N.Y. Feb. 17, 2017)* (denying bid to reopen discovery after discovery deadline had

---

[6] Although *Rule 15(b) of the Federal Rules of Civil Procedure* explicitly refers to amendment "during and after trial," "some courts have applied *Rule 15(b)* to conform pleadings to the proof offered at summary judgment." *Rockland Exposition, Inc. v. Alliance of Automotive Service Providers of New Jersey, 894 F. Supp. 2d 288, 336 n.44 (S.D.N.Y. 2012)* (collecting cases); *see also Clomon v. Jackson, 988 F.2d 1314, 1323 (2d Cir. 1993)* ("the undisputed facts as presented on the summary judgment motion served as a basis to deem the complaint amended to conform with the proof pursuant to *Fed. R. Civ. P. 15(b)*").

closed and defendants had moved for summary judgment); *Espada v. Schneider, 522 F. Supp. 2d 544, 549 (S.D.N.Y. 2007)* ("The relief that may be afforded under *Rule 56(f)* [for additional discovery to oppose summary judgment] is not available when summary judgment motions are made after the close of discovery, as in the instant case").

## Conclusion

For the foregoing reasons, I recommend that Defendants' motion for summary judgment be GRANTED in its entirety. Pursuant to *28 U.S.C. § 636(b)(1)* and *Rules 72*, *6(a)*, and *6(d) of the Federal Rules of Civil Procedure*, the parties have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable George B. Daniels, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, **[*35]** 500 Pearl Street, New York, New York 10007. **Failure to file timely objections will result in a waiver of$ objections and will preclude appellate review**.

Respectfully submitted,

/s/ Robert W. Lehrburger

ROBERT W. LEHRBURGER

UNITED STATES MAGISTRATE JUDGE

Dated: August 3, 2020

New York, New York

---

**End of Document**

## *Hosannah v. Officer Ameed Saeed*

United States District Court for the Eastern District of New York

December 28, 2022, Decided; December 28, 2022, Filed

15-CV-03773 (GRB) (LGD)

**Reporter**

2022 U.S. Dist. LEXIS 232789 *

DAVID HOSANNAH, Plaintiff, v. OFFICER AMEED SAEED and NASSAU COUNTY CORRECTIONAL CENTER SHERIFF DEPARTMENT, Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, in part, Summary judgment denied by, in part *Hosannah v. Ameed Saeed, 2023 U.S. Dist. LEXIS 13144 (E.D.N.Y., Jan. 24, 2023)*

**Prior History:** *Hosannah v. Saeed, 2015 U.S. Dist. LEXIS 156457 (E.D.N.Y., Nov. 18, 2015)*

**Counsel:** [*1] David Hosannah, Plaintiff, Pro se, Ossining, NY.

For Nassau County Correctional Center Sheriff Department, Officer Ameed Saeed, #2544, Defendants: Liora M. Ben-Sorek, Nassau County Attorney's Office, Mineola, NY; Robert Philip Macchia, LEAD ATTORNEY, The Law Offices of Robert P. Macchia & Associates, Mineola, NY.

**Judges:** LEE G. DUNST, United States Magistrate Judge.

**Opinion by:** LEE G. DUNST

## Opinion

### *REPORT* **AND RECOMMENDATION**

**LEE G. DUNST**, Magistrate Judge:

*Pro se* plaintiff David Hosannah ("Plaintiff"), an inmate currently in custody of the New York State Department Corrections and Community Supervision, commenced this action pursuant to *42 U.S.C. Section 1983* on June 18, 2015 alleging that he suffered verbal threats, sexual harassment, and sexual abuse while incarcerated at the Nassau County Correctional Center ("NCCC") in 2014 and 2015 in violation of his rights ***under*** the First, Fifth, Eighth, Ninth, and *Fourteenth Amendments*. *See generally* Complaint, Electronic Case File Docket Number ("ECF No.") 1 ("Complaint" or "Compl.").[1] Presently before the Court, pursuant to the January 19, 2022 referral from the Honorable Gary R. Brown for a ***Report*** And Recommendation, is the motion for summary judgment ***under*** *Federal Rule of Civil Procedure 56* by defendants Officer Ameed Saeed ("Saeed") and Nassau County Correctional Center [*2] Sheriff's Department ("Sherriff's Department" and together with Saeed, "Defendants") seeking dismissal of the Complaint with prejudice. *See* ECF No. 69. As set forth below, the undersigned respectfully recommends that the Court GRANT IN PART and DENY IN PART Defendants' motion for summary judgment and that the Court DISMISS certain

---

[1] Unless otherwise noted, ECF No. citations are to this action, *Hosannah v. Saeed et al*, No. 15-CV-03773 ("*Hosannah I*"). ECF citation will reflect when they refer to the docket of the consolidated case, *Hosannah v. Nassau County Sheriff Department Division of Correction et al.*, No. 15-cv-05413 ("*Hosannah II*"). For ease of reference, the Court's citations to ***Plaintiff's*** filings refer to the ECF page numbering stamped at the top of each page therein. *See Parker v. Fantasia, 425 F. Supp. 3d 171, 179 n.6 (S.D.N.Y. 2019)* (using this method).

claims *under* 42 U.S.C. § 1997e(c) and 28 U.S.C. § 1915(e)(2)(B)(ii).

## I. FACTUAL BACKGROUND

The facts, as recited below, are taken from the Complaint, Defendants' Local Civil Rule 56.1 Statement at ECF No. 69-1 ("Def. 56.1 Statement"),[2] *Plaintiff's* opposition to the motion for summary judgment at ECF No. 72, and admissible evidence submitted by the parties.

### A. Admission to the NCCC

Plaintiff was arrested on September 13, 2013 and admitted to the NCCC on September 14, 2013. *See* Def. 56.1 Statement ¶ 1; ECF No. 70-5 ("*Plaintiff's* Dep. Tr.") at 14:7-16. The NCCC is "the County jail facility which is staffed by members of the Nassau County Sheriff's Department, Division of Corrections." Def. 56.1 Statement ¶ 2.

---

[2] The Local Civil Rules require motions for summary judgment to attach "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a). The Local Civil Rules also require the nonmovant, here the Plaintiff, to file a statement with "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party . . . ." Local Civil Rule 56.1(b). Plaintiff failed to file a statement *under* Local Civil Rule 56.1. "While *pro se* litigants are . . . *not* excused from meeting the requirements of Local Rule 56.1 . . . where a *pro se* plaintiff fails to submit a proper Rule 56.1 Statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the *plaintiff's* arguments, where actually supported by evidentiary submissions." *Wiggins v. Griffin, No. 18-CV-07559, 2021 U.S. Dist. LEXIS 32634, 2021 WL 706720, at *1 n.1 (S.D.N.Y. Feb. 22, 2021)* (internal quotations omitted). While *Plaintiff's* opposition to Defendants' motion does *not* specifically address Defendants' Rule 56.1 Statement, the Court exercises its discretion to consider the substance of *Plaintiff's* submission as opposition to Defendants' Rule 56.1 Statement. *See id.; Brown v. Phipps, No. 19-CV-04356, 2021 U.S. Dist. LEXIS 152138, 2021 WL 3604664, at *1 n.3 (S.D.N.Y. Aug. 12, 2021)*.

### B. Allegations Concerning Saeed

#### 1. The First Grievance

On January 30, 2014, Saeed "harassed" **[*3]** Plaintiff by stating Plaintiff looked "big and strong" and "gentley [sic] squeezing" *Plaintiff's* shoulder. *See* Compl. at 7. The next day, on January 31, 2014, Plaintiff filed Grievance Form #014-02-14 (the "First Grievance") with the NCCC, which *reported* the interaction with Saeed and requested "a full investigation . . . ." *Id.* On February 7, 2014, the Grievance Coordinator filled in the "Decision of the Grievance Coordinator" section of the First Grievance by noting that the grievance was "[a]ccepted" because "[a]ny information received alleging staff misconduct must be forwarded to the Sheriff's Bureau of Investigation for investigation." *Id.* On February 10, 2014, Plaintiff signed his name in the "Acceptance/Appeal of Grievance Coordinator's decision" section of the form but did *not* check whether he accepted or appealed the Grievance Coordinator's decision. *See id.*

#### 2. The Second Grievance And First Disciplinary Form

On March 28, 2014, Saeed learned that an investigation found him "*not* to be guilty" of the conduct alleged in the First Grievance, and he then filled out Disciplinary Form 8771 (the "First Disciplinary Form") charging Plaintiff with filing a false *report*. *See id.* at 13. **[*4]** [3] That

---

[3] The copy of the First Disciplinary Form attached to the Complaint is an illegible scan. The First Disciplinary Form's charge, however, was read into the record during *Plaintiff's* deposition:

> On January 30th of 2014, Inmate David Hosannah . . . filed [the First Grievance] against me that subsequently went to the Internal Affairs. Today I was advised by Internal Affairs that I was *not* found to be guilty of any of the false allegations made by Inmate Hosannah. Further corroboration of the above stated can be confirmed by

same day, Saeed threatened to lock Plaintiff in his unit unless he signed the First Disciplinary Form. *See id.* at 9. On April 3, 2014, Saeed confirmed to Plaintiff that he "spoke to internal affairs" about the First Grievance. Compl. at 4.

Later on April 3, 2014, Plaintiff filed Grievance Form #033-04-14 (the "Second Grievance") with the NCCC, which (1) **_reported_** the March 28, 2014 interaction with Saeed, (2) characterized that interaction as "retaliating against [an] inmate for grieving an officer for his misconduct" because it took place after "internal affairs spoke to" Saeed about the First Grievance, (3) stated "I refused the law library and was given [the First Disciplinary Form] from Officer Saeed," and (4) requested that the **[*5]** matter be investigated and that Saeed undergo "a [psych]ological examination" Compl. at 9. On April 9, 2014, the Grievance Coordinator filled in the "Decision of the Grievance Coordinator" section of the form by checking that the grievance was "[a]ccepted" and noting that "[a] copy of this grievance was forwarded to the facility's investigative unit, Internal Affairs (IA)." *Id.* On April 14, 2014, Plaintiff signed his name in the "Acceptance/Appeal of Grievance Coordinator's decision" section of the form but did **_not_** check whether he accepted or appealed the Grievance Coordinator's decision. *See id.* The Second Grievance contains a handwritten "witness" note that Plaintiff "refused to check" whether he accepted or appealed the decision of the Grievance Coordinator. *Id.*

### 3. The Third Grievance

On or before April 18, 2014, an unidentified Corporal gave Plaintiff a copy of the First Disciplinary Form. *See **_Plaintiff's_** Dep. Tr. at

---

the Internal Affairs Unit. Based on the inmate's action, he filed a false **_report_**, a violation noted in the inmate handbook.

**_Plaintiff's_** Dep. Tr. at 111:23-112:20.

112:24-113:14. On April 18, 2014, Saeed went to Plaintiff and threatened to "fuck [Plaintiff] up" if Plaintiff failed to give that copy of the Disciplinary **_Report_** to Saeed.[4] Compl. at 11; *see* Compl. at 4. That same day, Plaintiff filed Follow Up Grievance Form #033-04-14 **[*6]** (the "Third Grievance") with the NCCC, which described the April 18, 2014 interaction with Saeed and requested that the NCCC "investigate this problem."[5] Compl. at 11.

### 4. The Fourth Grievance

On July 1, 2015, Saeed told Plaintiff to "take [his] sexy ass" to the front of the law library line and made a kissing "gesture" towards Plaintiff. *Hosannah II*, ECF No. 1 at 10. On July 2, 2015, Plaintiff filed Grievance Form #023-07-16 (the "Fourth Grievance", and together with the First Grievance, Second Grievance, and Third Grievance, collectively, the "Grievances") with the NCCC, which described the July 1, 2015 interaction with Saeed and requested that the NCCC "look into this ongoing problem." *Id.* On July 10, 2015, the Grievance Coordinator filled in the "Decision of the Grievance Coordinator" section of the form by checking that the grievance was "[a]ccepted" and noting that "[t]his office has investigated the incident . . . and was unable to substantiate" the allegations. *Id.* On July 14, 2015, Plaintiff signed his name in the "Acceptance/Appeal of Grievance Coordinator's decision" section of the form and checked that he "read and accepted the Grievance Coordinator's decision." **[*7]** *Id.*

---

[4] Plaintiff testified that, because an inmate typically receives the disciplinary form at the resulting hearing, Plaintiff believes Saeed was angry that Plaintiff "had gotten a copy earlier." Plaintiff Dep. Tr. at 113:19-114:9.

[5] The Second Grievance and Third Grievance share the same number: 033-04-14. *Compare* Compl. at 9 *with id.* at 11. Defendants describe the Third Grievance as a "follow up" to the Second Grievance. Def. Mem. at 5. Consistent with that characterization, handwriting that apparently states "F. Up" precedes the grievance number on the Third Grievance. *See* Compl. at 11.

5. August 12, 2015 Incident And Second Disciplinary Form

On August 12, 2015, Plaintiff met with internal affairs "after almost 2 years of constantly writing grievance[s] and complaint[s] to every higher personnel at [the NCCC]." ECF No. 72 at 11. Saeed stopped *Plaintiff's* escort back from that meeting and told Plaintiff to put his hands up against the wall adjacent to the dorm entrance. *See id.* As Plaintiff complied with that directive, the officer already escorting Plaintiff asked "What did [Plaintiff] do?" *Id.* Saeed ignored that question and instead told Plaintiff "don't fucking move." *Id.* Plaintiff began to state that he did *not* move and was complying, but "before [Plaintiff] even finish[ed] his sentence" Saeed said "shut the fuck up and face the fucking wall." *Id.* at 12. Plaintiff *reports* that "Saeed then proceeded to pat or frisk me as he reach my lower back area he then squeeze my butt, then from behind he reach between my legs and grab my private part slowly holding it for a few seconds. Then slowly bring his hands back between my legs very slowly holding and squeezing my butt [again]." *Id.; see Hosannah II*, ECF No. 1 at 4, 20 (similar). During that search, the officer who **[*8]** was already escorting Plaintiff asked Saeed "what['s the problem?," asked Saeed "what did he do?," and confirmed to Saeed "we already search[ed] him downstairs." ECF No. 72 at 12; *see Hosannah II*, ECF No. 1 at 4, 20 (similar). Instead of responding to that other officer, Saeed threatened to go to *Plaintiff's* unit if Plaintiff said "anything" about the encounter. ECF No. 72 at 12; *Hosannah II*, ECF No. 1 at 4, 20.

Later on August 12, 2015, Plaintiff wrote a letter to the New York State Inspector General and the New York State Commission of Correction Internal Affairs Unit to *report* that day's incident with Saeed, and Saeed gave Plaintiff Disciplinary Form #99560 ("Second Disciplinary Form"). *See* ECF No. 72 at 11-12;

*Hosannah II*, ECF No. 1 at 4, 20. The copy of the Second Disciplinary Form provided to the Court is illegible, and neither Plaintiff nor Defense counsel were able to read the Second Disciplinary Form at *Plaintiff's* deposition. *Hosannah II*, ECF No. 1 at 13; *Plaintiff's* Dep. Tr. 125:11-126:25. Notably, Defendants' summary judgment filings are silent on the August 12, 2015 incident.

## C. Allegations Concerning Other Corrections Personnel

Plaintiff alleges that Sergeant Morrone ("Morrone"), **[*9]** Sergeant Krueger ("Krueger"), and Captain Rogers ("Rogers") each "assist[ed] [Saeed] in violating [*Plaintiff's*] civil rights." *See Hosannah II*, ECF No. 1 at 5. To that end, Plaintiff alleges that (1) an unspecified person "lock[ed him] in" at an unspecified time after Plaintiff at some point spoke to Morrone about the First Grievance, and (2) Plaintiff received a memo dated August 17, 2015, which was signed by Krueger on behalf of Rogers, that imposed a 30-day law library restriction as a result of the Second Disciplinary Form. *See id.* at 4, 14.

## D. Impact Of These Experiences

As a result of the foregoing experiences, Plaintiff reportedly suffered from "*insomnia*, *nightmares*, and an overall *fear* of Officer Saeed" as well as "psychological injury, *psychological trauma*, and *depression*." ECF No. 72 at 3.

## E. *Plaintiff's* Conviction And Transfer From the NCCC

In connection with his September 13, 2013 arrest, Plaintiff was convicted in October 2015 of a robbery offense, sentenced to 20 years, and transferred from the NCCC to the New

York State Department of Corrections and Community Services on October 11, 2016. *See* Def. 56.1 Statement ¶ 3; *Plaintiff's* Dep. Tr. at 12:14-14:16.

## II. PROCEDURAL HISTORY [*10]

On June 18, 2015, Plaintiff commenced this action (*Hosannah I*) by filing the Complaint, which asserts claims *under* 42 U.S.C. Section 1983 that Defendants violated *Plaintiff's* rights *under* the First, Fifth, Eighth, Ninth, and Fourteenth Amendments. *See generally* Compl. On August 21, 2015, then-presiding District Judge Joseph F. Bianco granted *Plaintiff's* motion to proceed *in forma pauperis* in *Hosannah I. See* ECF No. 9. On September 10, 2015, Plaintiff commenced a second action (*Hosannah II). See Hosannah II*, ECF No. 1. On September 19, 2015, Defendants answered the Complaint in *Hosannah I. See* ECF No. 12. On November 18, 2015, then-District Judge Bianco issued an Order that (1) granted *Plaintiff's* motion to proceed *in forma pauperis* in *Hosannah II* and (2) consolidated the *Hosannah II* complaint into *Hosannah I* and closed the docket for *Hosannah II* because the cases "are largely duplicative." ECF No. 17 at 2-4.

On January 19, 2022, District Judge Gary R. Brown (to whom the case was reassigned on January 31, 2020) ordered that "any dispositive pretrial motions are referred to the assigned Magistrate Judge for a *Report* and Recommendation." January 19, 2022 Order. On April 6, 2022, Magistrate Judge Anne Y. Shields, to whom this case was then assigned, [*11] issued an order that confirmed the parties completed discovery and set a briefing schedule for the parties' anticipated summary judgment motion practice. *See* April 6, 2022 Scheduling Order. On June 10, 2022, this case was reassigned to the undersigned Magistrate Judge. *See* June 10, 2022 Notice

Of Reassignment. Consistent with the schedule set by the Court, Defendants filed the parties' collective motion papers on June 14, 2022. *See* ECF Nos. 69-73.

## III. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "No genuine dispute of material fact exists when the record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party." *McKinney v. City of Middletown, 49 F.4th 730, 737 (2d Cir. 2022)* (internal quotations omitted). "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji, 887 F.3d 111, 114 (2d Cir. 2018)* (internal quotations omitted). With respect to issues for which the burden of proof falls on the nonmoving party, the movant can merely "point[] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Id.* (internal [*12] quotations and alterations omitted). Once the moving party carries its burden, "the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." *McKinney, 49 F.4th at 738* (internal quotations omitted). In this analysis, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *ING Bank N.V. v. M/V Temara, 892 F.3d 511, 518 (2d Cir. 2018)*. Critically, "[t]he role of the district court on summary judgment is '*not* to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *McKinney, 49 F.4th at 738* (quoting *Brod v. Omya, Inc., 653*

*F.3d 156, 164 (2d Cir. 2011)*).

## B. *Plaintiff's* Pro Se Status

A court considering a motion for summary judgment must afford "special solicitude" to a *pro se* litigant. *Berry v. Marchinkowski, 137 F. Supp. 3d 495, 522 (S.D.N.Y. 2015)* (quoting *Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988)*). To that end, the Court must "liberally construe" *Plaintiff's* filings and "read[] such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild For The Blind, 864 F.3d 154, 156 (2d Cir. 2017)* (quoting *Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007)*). The duty to liberally construe those filings "is *not* the equivalent of a duty to re-write [them]." *Williams v. Richardson, 425 F. Supp. 3d 190, 201 (S.D.N.Y. 2019)* (internal quotations omitted). This policy is "driven by the understanding that implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants **[*13]** from inadvertent forfeiture of important rights because of their lack of legal training." *McLeod, 864 F.3d at 156* (quoting *Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007)*). Nonetheless, "pro se status 'does *not* exempt a party from compliance with relevant rules of procedural and substantive law.'" *E.g., Peavey v. A. Rosenblum, Inc., 793 F. Supp. 2d 590, 594 (E.D.N.Y. 2011)* (quoting *Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)*); *see Faretta v. California, 422 U.S. 806, 834 n.46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)* ("The right of self-representation is *not* a license . . . *not* to comply with relevant rules of procedural and substantive law."). At bottom, construing *Plaintiff's* filings liberally, Plaintiff must still satisfy "the usual requirements of summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund, 27 F. Supp. 3d 346, 351 (E.D.N.Y.*

*2014)* (internal quotations omitted).

## C. *Plaintiff's* *Section 1983* Claims

*Section 1983* provides that

> Every person who, *under* color of any statue, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

*42 U.S.C. § 1983.* "It is well-settled that *§ 1983* does *not* create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Bd. of Educ., 423 F.3d 153, 159 (2d Cir. 2005)*; *see Moroughan v. Cnty. of Suffolk, 514 F. Supp. 3d 479, 511 (E.D.N.Y. 2021)* ("*Section 1983* does *not* itself create substantive rights; it offers a method for vindicating federal rights elsewhere conferred." (internal quotations omitted)). **[*14]**

## IV. DISCUSSION

Defendants seek summary judgment in their favor on three grounds: (1) the Prison Litigation Reform Act ("*PLRA*") bars this action, (2) the alleged verbal abuse "does *not* amount to constitutional violations" recoverable *under* *Section 1983* and (3) the Sheriff's Department is a non-suable entity. *See* ECF No. 71 ("Def. Mem.") at 3-7. Those arguments (and other issues) are addressed below.

## A. *Plaintiff's* Facially Deficient Claims

For the reasons detailed below, the Court recommends the Court dismiss the claims against the Sheriff's Department consistent

with Defendants' motion and recommends that the Court *sua sponte* dismiss the claims that rely on the Fifth, Eighth, and *Ninth Amendments*. *See* Def. Mem. at 7 (arguing for dismissal of claims against the Sheriff's Department); *42 U.S.C. § 1997e(c)* (requiring the Court to dismiss a *Section 1983* prisoner action "on its own motion" when "the court is satisfied that the action . . . fails to state a claim upon which relief can be granted"); *28 U.S.C. § 1915(e)(2)(B)(ii)* (requiring the Court to dismiss an action proceeding *in forma pauperis* "at any time" the Court determines it "fails to state a claim on which relief may be granted").

1. Claims Against the Sherriff's Department

"It is well established that Plaintiff cannot maintain claims **[*15]** against the Nassau County Sheriff's Department, because it is an administrative arm of the County that cannot be sued separately." *Gazzola v. Cnty. of Nassau, No. 16-CV-0909, 2022 U.S. Dist. LEXIS 111609, 2022 WL 2274710, at *15 (E.D.N.Y. June 23, 2022)* (collecting cases). To the extent Plaintiff may have intended for the claim against the Sheriff's Department to have been asserted against the NCCC, such a claim would fail for the same reasons. *See id.* (explaining that the NCCC is a non-suable entity); *Gleeson v. Cty. of Nassau, No. 15-CV-6487, 2019 U.S. Dist. LEXIS 170373, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019)* (same).

At the motion to dismiss stage, some courts replace improperly named municipal administrative defendants in *pro se* complaints with the municipalities themselves (provided the latter are ***not*** already defendants) and then construe plaintiffs' claims as pursuing municipal liability. *See, e.g., Haddock v. Nassau Cnty. Ct., No. 21-CV-2923, 2021 U.S. Dist. LEXIS 239785, 2021 WL 5920035, at *2 (E.D.N.Y. Dec. 15, 2021)*. The Court is ***not*** required to do so after the conclusion of

summary judgment briefing and the close of fact discovery. *See Barnes v. Malavi, 412 F. Supp. 3d 140, 141 n.2 (E.D.N.Y. 2019)* (granting summary judgment and dismissing claim against non-suable defendant Suffolk County Correctional Facilities Riverhead without construing the claim against Suffolk County); *Greene v. D.O.C., No. 10-CV-5344, 2012 U.S. Dist. LEXIS 28999, 2012 WL 694031, at *2 (S.D.N.Y. Mar. 5, 2012)* (holding defendant Department of Corrections was a non-suable entity and concluding that was an "independently sufficient" basis to grant summary judgment dismissing the case). Nonetheless, after addressing the **[*16]** claims against Saeed, this ***Report*** And Recommendation explains why Plaintiff has ***not*** alleged a claim for municipal liability.

2. The *Fifth Amendment* Claim

"The *Due Process Clause of the Fifth Amendment* prohibits the United States, as the *Due Process Clause of the Fourteenth Amendment* prohibits the States, from depriving any person of property without due process of law." *Dusenbery v. United States, 534 U.S. 161, 167, 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002)* (internal quotations omitted). ***Plaintiff's*** "citation to the *Fifth Amendment* is inapposite" because Defendants are "***not*** federal[] actors . . . ." *Bussey v. Phillips, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006)* (citing *Dusenbery, 534 U.S. at 167*) (dismissing *Section 1983* claim); *see Meisel v. Westchester Cty., No. 18-CV-7202, 2020 U.S. Dist. LEXIS 111581, 2020 WL 3472500, at *3 (S.D.N.Y. June 25, 2020)* (concluding *Fifth Amendment* violations did ***not*** occur at Westchester County Jail because defendants were "state, ***not*** federal, actors").

3. The *Eighth Amendment* Claim

"[T]he *Eighth Amendment* provides that cruel and unusual punishments shall ***not*** be inflicted

. . . [and] the *Fourteenth Amendment* incorporates the *Cruel and Unusual Punishments Clause* against the States." *Jones v. Mississippi, U.S.    , 141 S. Ct. 1307, 1314, 209 L. Ed. 2d 390 (2021)* (internal quotations omitted). As noted above, Plaintiff was a pretrial detainee at all relevant times. The *Eighth Amendment* does ***not*** apply to pretrial detainees because they "have ***not*** been convicted of a crime and thus may ***not*** be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)* (internal quotations omitted); *see Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)* (similar). Accordingly, Plaintiff cannot maintain a claim for an *Eighth Amendment* violation during the relevant time at the NCCC. *See Martinez v. United States, No. 20-CV-7275, 2021 U.S. Dist. LEXIS 178057, 2021 WL 4224955, at *5 n.4 (S.D.N.Y. Sept. 16, 2021)* (dismissing *Eighth Amendment* claim because plaintiff was a pretrial detainee **[*17]** during the relevant time-period); *Sanders v. Simonovic, No. 19-CV-5525, 2021 U.S. Dist. LEXIS 33677, 2021 WL 707060, at *10 (S.D.N.Y. Feb. 23, 2021)* (same), *appeal dismissed*, *No. 21-600, 2021 U.S. App. LEXIS 27769, 2021 WL 4167369 (2d Cir. July 1, 2021)*;

### 4. The *Ninth Amendment* Claim

The *Ninth Amendment* provides that "[t]he enumeration in the Constitution of certain rights, shall ***not*** be construed to deny or disparage others retained by the people." *U.S. Const. amend. IX*. The *Ninth Amendment* "is ***not*** an independent source of constitutional rights that may be asserted in a civil rights action." *Lloyd v. Lee, 570 F. Supp. 2d 556, 566 (S.D.N.Y. 2008)*. That is, "[t]he *Ninth Amendment* cannot serve as the basis for a *§ 1983* claim because such a claim must be premised on the violation of a right guaranteed by the U.S. Constitution or federal law" *Id.; see*

*Meisel, 2020 U.S. Dist. LEXIS 111581, 2020 WL 3472500, at *3* ("[T]he *Ninth Amendment* cannot serve as the basis for a *§ 1983* claim."); *Diaz v. City of New York, No. 00-CV-2944, 2006 U.S. Dist. LEXIS 93923, 2006 WL 3833164, at *7 (E.D.N.Y. Dec. 29, 2006)* ( "[N]o independent constitutional protection is recognized which derives from the *Ninth Amendment* and which may support a *§ 1983* cause of action" (internal quotations omitted)).

### B. The *PLRA*

Defendants argue that the ***PLRA***'s provisions requiring exhaustion of administrative remedies in this case and the presence of ***physical injury*** bar ***Plaintiff's*** claims. *See* Def. Mem. at 3-6. The Court disagrees.

### 1. Exhaustion

The ***PLRA*** provides that "[n]o action shall be brought with respect to prison conditions ***under*** *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative **[*18]** remedies as are available are exhausted." *42 U.S.C. § 1997e*. This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[6] *Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12, (2002)*. Failure to exhaust administrative remedies is

---

[6] Congress enacted the ***PLRA*** to "address the large number of prisoner complaints filed in federal court," i.e. to "reduce the quantity and improve the quality of prisoner suits" concerning confinement. *Walker v. Schult, 45 F.4th 598, 611-12 (2d Cir. 2022)* (first quoting *Jones v. Bock, 549 U.S. 199, 202, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)*; and then quoting *Porter, 534 U.S. at 524*). The ***PLRA*** was also intended "to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011)* (internal quotations and alterations omitted).

an affirmative defense that may be resolved on a motion for summary judgment. *See Walker, 45 F.4th at 612* (recognizing that failure to exhaust administrative remedies is an affirmative defense); *Ruggiero v. Cnty. of Orange, 467 F.3d 170, 178 (2d Cir. 2006)* (affirming summary judgment dismissal of prisoner's claims for failure to exhaust administrative remedies).

Critically, an inmate "must exhaust available remedies, but need **not** exhaust *unavailable* ones." *Ross v. Blake, 578 U.S. 632, 642, 136 S. Ct. 1850, 195 L. Ed. 2d 117 (2016)* (emphasis added); *see Hayes v. Dahlke, 976 F.3d 259, 268 (2d Cir. 2020)* ("The **PLRA** requires an inmate to exhaust all 'available' administrative remedies before bringing a federal civil rights action" (quoting *42 U.S.C. § 1997e*)). **Under** that principle, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross, 578 U.S. at 642* (quoting *Booth v. Churner, 532 U.S. 731, 738, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)*). With respect to available remedies, the "**PLRA** requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses **[*19]** the issues on the merits).'" *Ruggiero, 467 F.3d at 176* (quoting *Woodford v. Ngo, 548 U.S. 81, 90, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)*). In other words, "[i]t is the prison's requirements, and **not** the **PLRA**, that define the boundaries of proper exhaustion." *Hayes, 976 F.3d at 268* (quoting *Jones, 549 U.S. at 218*). The exhaustion inquiry therefore requires the Court to review the NCCC's available "procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Angulo v. Nassau County, 89 F. Supp. 3d 541, 549 (E.D.N.Y. 2015)* (quoting *Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009)*).

Because failure to exhaust is an affirmative defense, "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015)*. Defendants' exhaustion argument pertains only to the First Grievance, Second Grievance, and Third Grievance. *See* Def. Mem. at 5 (arguing for dismissal of claims based only on "**Plaintiff's** three grievances pertaining to Officer Saeed" attached to the Complaint in *Hosannah I*). Defendants accordingly "cannot meet their burden of establishing the affirmative defense of failure to exhaust in reliance on [the Fourth G]rievance" or **Plaintiff's** allegations concerning August 12, 2015. *Drew v. City of New York, No. 16-CV-0594, 2016 U.S. Dist. LEXIS 115732, 2016 WL 4533660, at *7 n.12 (S.D.N.Y. Aug. 29, 2016)* (addressing defendants' failure to discuss a particular grievance **[*20]** in their exhaustion arguments).

*a) The Grievance Process*

Defendants **report** the NCCC inmate grievance process "is detailed in the NCCC Inmate Handbook" (the "Handbook"). Def. 56.1 Statement ¶ 7; *see also* ECF No. 70 (**reporting** that the Handbook, filed at ECF No. 70-3, is attached as Exhibit C to the Declaration of Liora M. Ben-Sorek). "Upon admission to the Correctional Center, all inmates receive a copy of the . . . Handbook."[7]

---

[7] The Court accepts that contention, notwithstanding Defendants' failure to cite supporting factual authority in the record, because Plaintiff has **not** denied receiving the Handbook and **Plaintiff's** timely filing of the Grievances demonstrates familiarity with the NCCC's grievance procedures. *See Anderson v. Spizziota, No. 11-CV-5663, 2016 U.S. Dist. LEXIS 18600, 2016 WL 11480707, at *3 (E.D.N.Y. Feb. 12, 2016)* (accepting that plaintiffs received

Def. Mem. at 2. The Handbook describes a three-step grievance process.[8] The first step requires the inmate to submit a grievance form for review by the Grievance Coordinator within five days of the subject occurrence. *See* ECF No. 70-3 at 4. The Grievance Coordinator must then issue a "written finding" within five business days of receiving the grievance. *Id.* The second step provides an inmate may, within two business days of receiving it, appeal "a negative finding" from the Grievance Coordinator to the Chief Administrative Officer. *Id.* The Chief Administrative Officer must then issue a "written determination" within five business days of receiving the appeal. *Id.* at 5. The third step provides an inmate may, within three business days of receiving it, appeal the **[*21]** Chief Administrative Officer's decision to "den[y]" the grievance "in whole or in part" to the New York State Commission of Correction.[9] *Id.* That final appeal must be decided within forty-five business days of its receipt. *Id.*

The NCCC's grievance form documents the full grievance process. Section I allows for the grievant to specify the issue grieved, provide supporting documentation, and state the

requested relief. *See* Compl. at 7, 9, 11. Section II provides the decision of the Grievance Coordinator, which is rendered in part by checking one of three boxes: "Grievance Accepted," "Grievance Denied," or "Non-Grievable Issue." *Id.* Section III is entitled "Acceptance/Appeal of Grievance Coordinator's decision," in which the grievant must check one of two boxes—either "I have read and accept the Grievance Coordinator's decision" or "I have read and appeal the Grievance Coordinator's decision"—and sign thereunder. *Id.* Section IV provides for the Chief Administrative Officer to rule on any appeal the grievant took (in Section III) regarding the Grievance Coordinator's decision in Section II. *Id.* at 8, 10, 12. Finally, Section V advises **[*22]** the grievant of his right to appeal the Chief Administrative Officer's decision and provides a box for the grievant to indicate "My grievance was denied, in whole or in part, and I appeal to the Citizen's Policy and Complaint Review Council . . . ." *Id.* Therefore, "appeals at each level are commenced by the inmate by making selections on the original grievance form." *Anderson, 2016 U.S. Dist. LEXIS 44821, 2016 WL 11480707, at *7.*

### b) **Plaintiff's** *Grievances*

Defendants argue that Plaintiff failed to exhaust his administrative remedies because he did ***not*** appeal the Grievance coordinator's decisions to "accept" the First Grievance, Second Grievance, and Third Grievance and refer them for investigation. *See* Def. Mem. at 5. As noted above, the NCCC's grievance policy allows inmates to appeal only a "negative finding" from the Grievance coordinator. ECF No. 70-3 at 4. But the Grievance Coordinator did ***not*** provide a negative finding for any of those grievances. On the contrary, the Grievance coordinator's acceptance of those grievances was "a

---

copies of the Handbook upon admission to the NCCC because plaintiffs did ***not*** deny receiving them), ***report*** and recommendation adopted sub nom. *Anderson v. Sposato, No. 11-CV-5663, 2016 U.S. Dist. LEXIS 14821, 2016 WL 1275044 (E.D.N.Y. Mar. 31, 2016)*; *Pooler v. Nassau Univ. Med. Ctr., 848 F. Supp. 2d 332, 341 (E.D.N.Y. 2012)* (finding ***Plaintiff's*** assertion that he was ***not*** aware of the grievance policy in the Handbook "is undermined by the fact that he previously filed at least two grievances relating to his medical care").

[8] Prior to the first formal step, an inmate may attempt to resolve the issue informally. *See* ECF No. 70-3 at 4. Such informal efforts toll the grievance timetable. *See id.* ("[T]he time utilized in attempting to resolve the complaint informally will ***not*** be calculated into the grievance timetable.").

[9] Within three business days of receiving it, the NCCC Grievance Coordinator must mail that appeal to the New York State Commission of Correction's Citizens Policy and Complaint Review Council and provide proof of mailing to the inmate. *See* ECF No. 70-3 at 5.

favorable ruling." *Anderson, 2016 U.S. Dist. LEXIS 44821, 2016 WL 11480707, at \*7*.

Courts in this district recognize that the NCCC's policy precludes inmates from appealing the Grievance Coordinator' referral of a grievance for investigation, which leaves such grievant inmates **[\*23]** without a further administrative remedy to exhaust. As the court in *Taylor v. Wilde* recently explained:

> A negative decision, such that it would be appealable **_under_** the NCCC's rules would have been a denial of grievance, and there was box to indicate such a determination which was **_not_** checked on the grievance form. Instead, the Grievance Coordinator appears to **_not_** have made a determination, deciding instead to refer the grievance to a different body, Internal Affairs. Because a referral is **_not_** a "negative determination," the NCCC's rules did **_not_** provide a remedy of appeal for a referral decision. Thus, the appeals process was **_not_** "capable of use" to Plaintiff to obtain "some relief for the action complained of." *See Ross 578 U.S. at 642*.

*No. 11-CV-3608, 2022 U.S. Dist. LEXIS 102809, 2022 WL 5429655, at \*8 (E.D.N.Y. June 8, 2022)*, **report** *and recommendation adopted*, *2022 U.S. Dist. LEXIS 176334, 2022 WL 4536243 (E.D.N.Y. Sept. 28, 2022)*. The court in *Guzman v. Sposato* reached the same conclusion where, as here, the NCCC Grievance Coordinator "accepted" the **_plaintiff's_** grievance and stated the grievance was "forwarded to the facility's Internal Affairs Unit." *No. 13-CV-6829, 2018 U.S. Dist. LEXIS 55987, 2018 WL 1597395, at \*4 (E.D.N.Y. Mar. 31, 2018)*. That court held that forwarding the grievance for investigation indicated "that the Grievance Coordinator was powerless to provide plaintiff with any remedy" and concluded "if the officials to whom the grievances **[\*24]** are directed do **_not_** have the

authority to provide any remedy to an inmate when an internal affairs investigation is ongoing, then no administrative remedies are available and exhaustion is **_not_** required." *Id.* (citing *Ross, 578 U.S. at 640-49*).

Given that Plaintiff could **_not_** appeal the Grievance Coordinator's referral of the subject grievances for investigation, "the question is whether Plaintiff was [ultimately] given a negative determination on his grievance[s], such that he had an available remedy of appeal." *Taylor, 2022 U.S. Dist. LEXIS 102809, 2022 WL 5429655, at \*8*. But Defendants "make[] no argument that Plaintiff failed to exhaust his administrative remedies regarding Internal Affairs' determination . . . As such, Plaintiff had no available remedy beyond the initial filing of the grievance . . . ."[10]*Id.*

## 2. **_Physical Injury_**

The **_PLRA_** provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of **_physical injury_** . . . ." *42 U.S.C. § 1997e(e)*. That provision "is substantive. It specifies a fact— **_physical injury_**—that must be shown in order for a prisoner's claim for damages for mental

---

[10] Defendants **_report_** in a footnote, without citing factual authority in the record, that "[a]n Internal Affairs Unit investigation was conducted (I-061-14)" and concluded at an unspecified time that unspecified portions of "**_Plaintiff's_**" claims were unfounded." Def. Mem. at 5 n.2. But an argument that Plaintiff failed to exhaust administrative remedies concerning the conclusion of the investigations into the First Grievance, Second Grievance, and Third Grievance, even if made, would fail because Defendants have **_not_** indicated how Plaintiff could have exercised those remedies. *See Guzman, 2018 U.S. Dist. LEXIS 55987, 2018 WL 1597395, at \*4* ("[D]efendants have **_not_** provided any . . . [evidence] to indicate that administrative remedies are available to an inmate who already has a pending Internal Affairs complaint. As such, defendants have **_not_** shown that they are entitled to summary judgment . . . ."); *see also Hubbs, 788 F.3d at 59 (2d Cir. 2015)* ("[D]efendants bear the initial burden of establishing . . . that a grievance process exists and applies to the underlying dispute.").

or emotional injury to succeed." *Walker, 45 F.4th at 615*. Lack of **[\*25]** *physical injury* to the Plaintiff "is *not* an affirmative defense" that Defendants must prove. *Id.* (emphasis removed). Instead, each plaintiff seeking compensatory damages for mental or emotional injuries bears "the express statutory obligation to show that he had also suffered *physical injury*, evidence of which is presumptively accessible to him." *Id. at 616*.

***Plaintiff's reported insomnia, nightmares, fear, depression, and "psychological trauma" are not a cognizable "physical injury" under the PLRA***. ECF No. 72 at 3; *see, e.g., Roldan v. Kang, No. 13-CV-6889, 2016 U.S. Dist. LEXIS 119877, 2016 WL 4625688, at \*5 (S.D.N.Y. Sept. 6, 2016)* (finding **depression** is *not* a "**physical injury**" *under* the *PLRA*); *Antrobus v. City of New York, No. 11-CV-2524, 2014 U.S. Dist. LEXIS 42468, 2014 WL 1285648, at \*6 (S.D.N.Y. Mar. 27, 2014)* (finding emotional distress, emotional despair, mental anguish, post-traumatic stress disorder, and paranoia disorder are *not* "*physical injury*" *under* the *PLRA*). But that conclusion does *not* compel dismissal of the *Plaintiff's* claims. "*Section 1997e(e)* does *not* limit the availability of nominal damages . . . or of punitive damages." *Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002)*; *see Walker, 45 F.4th at 612-13* (similar). For that reason, courts routinely allow pursuit of nominal and punitive damages after dismissing related prayers for compensatory damages to remedy mental and emotional injuries.[11] *See Ford v. Aramark, No. 18-CV-*

*2696, 2020 U.S. Dist. LEXIS 13174, 2020 WL 377882, at \*15 (S.D.N.Y. Jan. 23, 2020)*; *Walker v. City of N.Y., 367 F. Supp. 3d 39, 65 (S.D.N.Y. 2019)*; *Allen v. Keanen, No. 13-CV-718, 2019 U.S. Dist. LEXIS 58246, 2019 WL 1486679, at \*4 (W.D.N.Y. Apr. 4, 2019)*.

### C. *Plaintiff's* Claim For *First Amendment* Retaliation

To prove his **[\*26]** *First Amendment* retaliation claim, Plaintiff must show three elements: (1) *Plaintiff's* speech at issue was protected, (2) Saeed took adverse action against Plaintiff, and (3) there was a causal connection between *Plaintiff's* protected speech and Saeed's adverse action. *See Hayes, 976 F.3d at 272*; *Espinal, 558 F.3d at 128*. Defendants' argument that Saeed's verbal threats cannot sustain a *Section 1983* cause of action implicates the second element (and by extension, the third element) of the claim.[12]*See* Def. Mem. at 7.

---

*2001)*; *see Toliver v. City of N.Y., 530 F. App'x 90, 93 n.2 (2d Cir. 2013)* (holding that the *PLRA* did *not* preclude recovering "damages for injuries to [*plaintiff's*] *First Amendment* rights" (citing *Thompson, 284 F.3d at 416*)). In other words, *Section 1997e(e)* does *not* affect *Plaintiff's* entitlement to compensatory damages for "intangible deprivations of liberty and personal rights" from *First Amendment* retaliation because such damages "are distinct from claims for pain and suffering, mental anguish, and mental trauma." *Malik v. City of New York, No. 11-CV-6062, 2012 U.S. Dist. LEXIS 118358, 2012 WL 3345317, at \*16 (S.D.N.Y. Aug. 15, 2012)*, *report and recommendation adopted, 2012 U.S. Dist. LEXIS 141305, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012)*; *see Jones v. Annucci, No. 16-CV-3516, 2018 U.S. Dist. LEXIS 24359, 2018 WL 910594, at \*8 (S.D.N.Y. Feb. 14, 2018)* (holding *Section 1997e(e)* did *not* bar a *First Amendment* claim). This point is academic because, as explained below, *Plaintiff's* *First Amendment* claim fails.

[12] Plaintiff satisfies the first element. "[I]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and *Fourteenth Amendments* and is actionable *under § 1983*.'" *Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015)* (quoting *Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996)*).

---

[11] Further, relevant to *Plaintiff's First Amendment* retaliation claim is that the *PLRA* "does *not* restrict a *plaintiff's* ability to recover compensatory damages for actual injury." *Thompson, 284 F.3d at 416*. "[A] *First Amendment* deprivation presents a *cognizable* injury standing alone and the *PLRA* 'does *not* bar a separate award of damages to compensate the plaintiff for the *First Amendment* violation in and of itself.'" *Lipton v. Cnty. of Orange, NY, 315 F. Supp. 2d 434, 457 (S.D.N.Y. 2004)* (quoting *Ford v. McGinnis, 198 F.Supp.2d 363, 366 (S.D.N.*

"To be an 'adverse action,' retaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Hayes, 976 F.3d at 272* (quoting *Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)*). This "objective test applies even where a particular plaintiff was ***not*** himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004)*; see *Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir. 2013)* (holding that prisoner who continued to file grievances nonetheless alleged an adverse action sufficient to sustain a *First Amendment* retaliation claim). The Court must "bear[] in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse. " *Davis, 320 F.3d at 353* (internal citations, quotations, and alterations omitted). In addition, **[*27]** the Court must view the retaliation claim "with skepticism and particular care" given "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)*.

### 1. Retaliatory Verbal Threats

As noted above, Plaintiff alleges that, in response to the First Grievance, Saeed threatened to lock Plaintiff in his unit (unless Plaintiff signed a copy of the First Disciplinary Form) and, in response to the Second Grievance, Saeed threatened to "fuck [Plaintiff] up" (unless Plaintiff returned his copy of the First Disciplinary Form). Compl. at 9, 11. "[S]ome verbal threats, even if ***not*** serious enough to implicate the *Eighth Amendment*, can constitute an adverse action. But ***not*** all do." *Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010)*. To qualify as "adverse actions" in the prison retaliation context, verbal threats must be both (1) statements that would

deter a similarly situated inmate of ordinary firmness from exercising his constitutional rights, see *Hayes, 976 F.3d at 272*, and (2) "sufficiently specific and direct," *George v. Cnty. Of Westchester, No. 20-CV-1723, 2021 U.S. Dist. LEXIS 183336, 2021 WL 4392485, at *7 (S.D.N.Y. Sept. 24, 2021)* (internal quotations omitted). See also *Mateo, 682 F. Supp. 2d at 434* ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his *First Amendment* rights.").

That Saeed **[*28]** reportedly responded to the First Grievance by threatening to lock Plaintiff in his unit "is ***not*** sufficient adverse action for purposes of a *First Amendment* retaliation claim." *Sanchez v. Shanley, No. 20-CV-0648, 2021 U.S. Dist. LEXIS 20370, 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021)* (addressing a threat to place an inmate in "restrictive confinement" for filing a grievance); see *Garcia v. Watts, No. 08-CV-7778, 2009 U.S. Dist. LEXIS 84692, 2009 WL 2777085, at *11-12 (S.D.N.Y. Sept. 1, 2009)* (finding threats to place inmate in the "SHU" for filing grievances was insufficient adverse action). Similarly, Saeed's ***reported*** threat to "fuck up" Plaintiff in response to the Second Grievance is "disgusting, offensive and highly unprofessional conduct [but it] does ***not*** rise to the level of a constitutional tort (which is to say, it is ***not*** sufficiently serious to deter a person of ordinary firmness from continuing to exercise his *First Amendment* rights)." *Quezada v. Roy, No. 14-CV-4056, 2015 U.S. Dist. LEXIS 140653, 2015 WL 5970355, at *22-23 (S.D.N.Y. Oct. 13, 2015)* (addressing threats corrections officers made to plaintiff for filing grievances, including threat of "I am going to fuck you up very bad"); see *Bilal v. N.Y. State Dep't of Corr., No. 09-CV-8433, 2010 U.S. Dist. LEXIS 61357, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010)* (finding threat that correction officers "usually fuck people up for writing a bunch of bullshit grievances" was insufficiently direct or

specific), *aff'd sub nom. Bilal v. White, 494 F. App'x 143 (2d Cir. 2012)*.

## 2. Retaliatory Exclusion From The NCCC Law Library

The Second Grievance could be read to allege that Saeed excluded Plaintiff from the NCCC law library on March 28, 2014 as retaliation **[*29]** for filing the First Grievance. *See* Compl. at 9 ("On 3-28-14 I refused the law library and was given [the First Disciplinary Form] by Officer Saeed . . . Staff are prohibited against retaliating against inmate for grieving an officer for his misconduct."). But Plaintiff clarified at his deposition that, upon seeing Saeed that day, Plaintiff chose to ***not*** go to the law library. *See* Plaintiff Dep. Tr. at 115:8-17 ("This is actually the time when I refused to go to the law library, because . . . I came out the unit and I saw [Saeed] and I was like, 'Oh, I am ***not*** going.' I refused . . . ."). In any event, a claim that Saeed once excluded Plaintiff from the law library could ***not*** sustain a *First Amendment* retaliation claim on this record.[13] *See Corines v. Westchester Cnty. Dep't of Corr., No. 22-CV-5179, 2022 U.S. Dist. LEXIS 169099, 2022 WL 4341999, at *5 (S.D.N.Y. Sept. 19, 2022)* ("Plaintiff makes no allegation, for example, that the timing of his law library access had any consequences for his legal matters. ***Plaintiff's*** allegations thus do ***not*** show that he was subjected to an adverse action.").

## D. The *Fourteenth Amendment* Claim

As explained above, Plaintiff asserted a claim ***under*** the *Eighth Amendment's* prohibition

against cruel and unusual punishment with respect to his time as a pretrial detainee at the NCCC—but "[t]he State does ***not*** acquire the power to punish with which the **[*30]** *Eighth Amendment* is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Revere, 463 U.S. at 244*. The *Due Process Clause of the Fourteenth Amendment*, however, applies to pretrial detainees and generally provides protections that are "at least as great as the *Eighth Amendment* protections available to a convicted prisoner."[14] *Darnell, 849 F.3d at 29* (quoting *Revere, 463 U.S. at 244*). With this in mind, the Court will review the remainder of ***Plaintiff's*** claims ***under*** the *Fourteenth Amendment*.

### 1. Sexual Harassment

As discussed above, Plaintiff has alleged that Hosannah sexually harassed him on at least two occasions. *See* Compl. at 7 (***reporting*** in the First Grievance that on January 30, 2014 Saeed commented that Plaintiff looked "big and strong"); *Hosannah II*, ECF No. 1 at 10 (***reporting*** in the Fourth Grievance that on July 1, 2015 Saeed told Plaintiff to "take [his] sexy ass" to the front of the law library line and made a kissing "gesture" towards Plaintiff). But "allegations that a correction officer threatened sexual assault or harassed an inmate, but did ***not*** initiate physical contact, fail to state a ***cognizable*** claim ***under*** *section 1983*." *Camacho v. Potter, No. 21-CV-6180, 2021 U.S. Dist. LEXIS 149005, 2021 WL 3501161, at *4 (S.D.N.Y. Aug. 9, 2021)* (dismissing claim that corrections officer "grabbed his groin area while telling plaintiff, 'You ain't seen nothing yet;'" collecting cases); *see Burroughs v.*

---

[13] ***Plaintiff's*** assertion in opposition to the instant motion that he "would often be denied law library access" does ***not*** compel a contrary conclusion. ECF No. 72 at 3. That allegation is overly generic. *See Corines, 2022 U.S. Dist. LEXIS 169099, 2022 WL 4341999, at *5* (dismissing claim alleging retaliatory exclusion from the law library as too generic).

[14] The *Fourteenth Amendment* provides, in relevant part, that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." *U.S. Const. amend. XIV*.

*Petrone, 138 F. Supp. 3d 182, 198, 205 (N.D.N.Y. 2015)* (concluding, where a corrections **[\*31]** officer allegedly made "verbal sexual advancements" and "masturbated in **plaintiff's** presence," that "the alleged conduct is certainly distasteful [but] . . . mere allegations of verbal harassment are insufficient to support a *§ 1983* claim"); *Jones v. Rock, No. 12-CV-0447, 2013 U.S. Dist. LEXIS 127218, 2013 WL 4804500, at \*19 (N.D.N.Y. Sept. 6, 2013)* (dismissing claim that corrections officer threatened to "take care of" **plaintiff's** "virginity" because "the law is clear that 'although indefensible and unprofessional, verbal threats or abuse are **not** sufficient to state a constitutional violation **cognizable under** *§ 1983*'" (quoting *Harris v. Lord, 957 F. Supp. 471, 475 (S.D.N.Y. 1997)*).

2. Verbal Threats

The Second Grievance and Third Grievance concern verbal threats of a non-sexual nature. *See* Compl. at 9 (**reporting** Saeed threatened to lock Plaintiff in his cell); *id.* at 11 (**reporting** Saeed threatened to "fuck [Plaintiff] up"). "It is well-settled that pre-trial detainees do **not** have **cognizable** *§ 1983* claims based on allegations of verbal harassment and/or abuse." *Carzoglio v. Abrams, No. 18-CV-4198, 2020 U.S. Dist. LEXIS 32388, 2020 WL 905630, at \*5 (S.D.N.Y. Feb. 25, 2020)* (collecting cases; dismissing allegation that defendant threatened to give plaintiff a "fatal dose" of his medication); s*ee Williams v. Ramos, No. 13-CV-826, 2013 U.S. Dist. LEXIS 183992, 2013 WL 7017674, at \*6 (S.D.N.Y. Dec. 23, 2013)* (dismissing pretrial detainee's claim that corrections officer threatened to "fuck[ him] up"); *see also Henrius v. Cnty. of Nassau, No. 13-CV-1192, 2015 U.S. Dist. LEXIS 125117, 2015 WL 5542464, at \*16 n.7 (E.D.N.Y. Sept. 16, 2015)* (finding pretrial detainee's allegations "even if rising to the level of verbal **[\*32]** harassment, do **not** state a claim for a constitutional violation").

**Plaintiff's** assertions in opposition to the instant motion that he suffered from "**insomnia**, **nightmares**, and an overall **fear** of Officer Saeed" as well as "psychological injury, **psychological trauma**, and **depression**" due to Saeed's threats do **not** make those threats actionable. ECF No. 72 at 3. Taking those assertions as true—without regard to **Plaintiff's** representation in the Compliant that he suffered "no injury," Compl. at 4—"those symptoms were merely the physical manifestations of emotional distress caused by two statements that, as discussed above, were objectively unoffensive to the Constitution."[15]*Byrd v. City of New York, No. 17-CV-2166, 2018 U.S. Dist. LEXIS 392, 2018 WL 259316, at \*6 (S.D.N.Y. Jan. 2, 2018)* (dismissing claim that threats spiked pretrial detainee's blood pressure, escalated his heart rate, and caused dizziness, sweats, and chest pains); *see Holland v. City of N.Y., 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016)* (dismissing pretrial detainee's claim that threat from corrections officer caused him to **fear** for his life); *Barnes v. Cnty. of Monroe, 85 F. Supp. 3d 696, 739 (W.D.N.Y. 2015)* (dismissing pretrial detainee's claim regarding threat from jail personnel even though it reportedly caused him to "violently 'shake uncontrollably'").

3. Sexual Abuse

As noted above, Plaintiff has also alleged two instances of Saeed physically touching Plaintiff while **[\*33]** sexually harassing him. Plaintiff asserts that (1) on January 30, 2014, Saeed "gentley [sic] squeez[ed]" **Plaintiff's** shoulder while commenting on **Plaintiff's** appearance, and (2) on August 12, 2015, Saeed took over an in-progress escort of Plaintiff and undertook a frisk search—over the protests of the already-present officer, who also confirmed

---

[15] The Court explained above that those statements failed to constitute "adverse action" **under** the lower standard applicable to **Plaintiff's** *First Amendment* retaliation claim.

that Plaintiff had just been searched—in which he squeezed **Plaintiff's** buttocks, grabbed **Plaintiff's** genitals, held them "for a few seconds," again squeezed **Plaintiff's** buttocks, and threatened he would come to **Plaintiff's** unit if Plaintiff "said anything." Compl. at 7; ECF No. 72 at 11-12; *Hosannah II*, ECF No. 1 at 4. The nature of that contact and its concurrence with **_reported_** sexual harassment necessitates analysis as sexual abuse. **_Under_** the *Eighth Amendment*, a convicted prisoner must show both a subjective and an objective element: (1) "that the defendant acted with a subjectively 'sufficiently culpable state of mind,'" and (2) "that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015)* (quoting *Hudson v. McMillian, 503 U.S. 1, 8, 20, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)*). **_Under_** the objective prong, the conduct must be "incompatible with evolving standards of decency or involve **[*34]** the unnecessary and wanton infliction of pain."[16] *Id.*

_____

[16] Prior to 2015, *Boddie v. Schnieder, 105 F.3d 857 (2d Cir. 1997)* was the leading Second Circuit case on *Eighth Amendment* sexual abuse claims. *See Crawford, 796 F.3d at 257* ("*Boddie* made clear that 'severe or repetitive sexual abuse of an inmate by a prison officer can be objectively, sufficiently serious enough to constitute an *Eighth Amendment* violation'" (quoting *Boddie, 105 F.3d at 861*)). In *Boddie*, the Court held that the plaintiff failed to state an *Eighth Amendment* claim after a female corrections officer made "a pass" at an him, squeezed his hand, touched his penis, called him a "sexy black devil," and pressed into him "with her whole body vagina against penis" because no single incident was sufficiently serious and the series of incidents were **_not_** "cumulatively egregious" enough to reach constitutional dimensions. *Boddie, 105 F.3d at 859-61*. However, the Second Circuit decided *Crawford* in 2015 and held that "while the standard articulated in *Boddie* remains the same, its applicability must change as the basic mores of society change." *796 F.3d at 260* (internal quotations omitted). Accordingly, the Court in *Crawford* concluded "conduct that might **_not_** have been seen to rise to the severity of an *Eighth Amendment* violation 18 years ago may now violate community standards of decency, and for that reason, we believe that the officers' conduct in *Boddie* would flunk its own test today." *Id.*

*at 256* (internal quotations omitted).

Courts have acknowledged that it "is presently unclear" whether the standard for a pretrial detainee's sexual abuse claim **_under_** the *Fourteenth Amendment* is identical to the standard for a convicted inmate's sexual abuse claim **_under_** the *Eighth Amendment*. *Lewis v. Huebner, No. 17-CV-8101, 2020 U.S. Dist. LEXIS 47200, 2020 WL 1244254, at *9 (S.D.N.Y. Mar. 16, 2020)*; *see Johnson v. Cook, No. 19-CV-1464, 2021 U.S. Dist. LEXIS 123147, 2021 WL 2741723, at *11 (D. Conn. July 1, 2021)* (explaining that the overlap between the standards "is **_not_** yet clear"). In addressing a pretrial detainee's excessive force (**_not_** sexual abuse) claim **_under_** the *Fourteenth Amendment*, the Supreme Court held that a detainee is required to show only that "the force purposely and knowingly used was objectively unreasonable in light of the facts and circumstances at the time." *Kingsley v. Hendrickson, 576 U.S. 389, 397-98, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)*; *see id. at 397* (confirming that test "is solely an objective one"). "Since *Kingsley*, courts in this Circuit have noted that it is **_not_** yet clear whether a pretrial detainee bringing a sexual abuse claim **_under_** the *Fourteenth Amendment*—as opposed to an excessive force claim—must satisfy both prongs" of the *Eighth Amendment* sexual abuse test or only the objective prong. *Johnson, 2021 U.S. Dist. LEXIS 123147, 2021 WL 2741723, at *11* (collecting cases). The Court, however, may address **Plaintiff's** sexual abuse claims in the context of the instant motion for summary judgment without resolving this uncertainty. *See id.* (adopting the same approach).

### a) Saeed's **[*35]** Physical Contact With **Plaintiff's** Shoulder

Saeed's contact with **Plaintiff's** shoulder on January 30, 2014 cannot sustain a sexual

abuse claim because that minimal contact was ___**not**___ objectively harmful or serious enough to violate the constitution. *See Silvagnoli v. Fischer, No. 07-CV-561, 2010 U.S. Dist. LEXIS 27125, 2010 WL 1063849, at *14 (N.D.N.Y. Mar. 1, 2010)* (recommending dismissal of claim that corrections officer massaged ___**plaintiff's**___ shoulders and attempted to grab his groin because that conduct was ___**not**___ objectively harmful or serious enough to constitute sexual abuse), ___**report** and recommendation adopted___, *2010 U.S. Dist. LEXIS 26997, 2010 WL 1063840 (N.D.N.Y. Mar. 22, 2010)*;[17] *Roberts v. Hernandez, No. 11-cv-03308, 2014 U.S. Dist. LEXIS 139783, 2014 WL 4976309, at *12 (E.D. Cal. Sept. 30, 2014)* (dismissing claim that corrections officer placed his hand on ___**plaintiff's**___ shoulder while sexually harassing plaintiff because the "statements to plaintiff and brief touch were ___**not**___ objectively harmful enough to establish a constitutional violation . . . ." (internal quotations omitted)).

*b) Saheed's Physical Squeezing of ___**Plaintiff's**___ Genitals And Buttocks, And Threat To Dissuade ___**Reporting**___ Same*

Summary judgment on the excessive force claim arising from Saeed's August 12, 2015 physical contact with ___**Plaintiff's**___ buttocks and genitals, however, would be inappropriate because Defendants' "submissions in support of summary judgment do ___**not**___ address or discuss this particular claim." **[*36]** *Tatum v.*

*City of New York, No. 06-CV-4290, 2009 U.S. Dist. LEXIS 3512, 2009 WL 124881, at *10 (S.D.N.Y. Jan. 20, 2009)* ("In the absence of any stated basis for dismissal, the Court will ___**not**___ dismiss this claim *sua sponte*."); *see White v. Hess, No. 14-CV-03339, 2020 U.S. Dist. LEXIS 58777, 2020 WL 1536379, at *8 (E.D.N.Y. Mar. 31, 2020)* (declining to dismiss deliberate indifference and excessive force claims because they were ___**not**___ addressed in defendants' motion for summary judgment); *Struthers v. City of New York, No. 12-CV-242, 2013 U.S. Dist. LEXIS 76916, 2013 WL 2390721, at *16 (E.D.N.Y. May 31, 2013)* (declining to dismiss an unlawful search claim because defendants' motion for summary judgment did ___**not**___ address the underlying search).

Nor is the Court required to dismiss those allegations for failure to state a claim. *See 42 U.S.C. § 1997e(c)* (requiring the Court to dismiss a *Section 1983* prisoner action that fails to state a claim); *28 U.S.C. § 1915(e)(2)(B)(ii)* (requiring the Court to dismiss an action proceeding *in forma pauperis* that fails to state a claim). It bears repeating that Plaintiff alleged Saeed—who was already the subject of sexual harassment allegations in the First and Fourth Grievances—overtook an in-progress escort of Plaintiff, did so over the objection of the then-presiding escort, and initiated a frisk search in which he grabbed ___**Plaintiff's**___ buttocks, grabbed ___**Plaintiff's**___ genitals and held them for "a few seconds," returned to grab ___**Plaintiff's**___ buttocks a second time, and threatened to go to ___**Plaintiff's**___ unit if he said "anything" about the encounter. *Hosannah II*, ECF **[*37]** No. 1 at 20. As pled by *pro se* Plaintiff, the nature of Saeed's contact with ___**Plaintiff's**___ genitals and buttocks, its timing (interrupting another officer's escort of Plaintiff), and Saeed's threat apparently intended to dissuade Plaintiff from ___**reporting**___ that contact collectively meet the objective

---

17 The Second Circuit abrogated a portion of *Silvagnoli* concerning the Americans With Disabilities Act, but Courts in this district continue to rely on the *Silvagnoli's* analysis of the *Section 1983* claims. *Compare* **Widomski v. State Univ. of New York (SUNY) at Orange, 748 F.3d 471, 475 (2d Cir. 2014)** (rejecting how *Silvagnoli* and other cases applied the term "disability" ___**under**___ the ADA) *with Casiano v. Cnty. of Nassau, No. 16-CV-1194S, 2017 U.S. Dist. LEXIS 166283, 2017 WL 4484338, at *4 (E.D.N.Y. Sept. 30, 2017)* (citing *Silvagnoli* in dismissing ___**Plaintiff's**___ *Eighth Amendment* claim against a prison superintendent).

2022 U.S. Dist. LEXIS 232789, *37

element of a sexual abuse claim.[18] *See Crawford, 796 F.3d at 258* (finding allegation that officer "squeezed" and "fondled" ***plaintiff's*** penis during a frisk search to determine whether plaintiff had an erection was actionable because "no amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes . . .—is permitted by the Constitution"); *see id.* (explaining that the timing of the search suggested it was a pretext for sexual abuse); *Shepherd v. Fisher, No. 08-CV-9297, 2017 U.S. Dist. LEXIS 22772, 2017 WL 666213, at *18 (S.D.N.Y. Feb. 16, 2017)* (declining to dismiss sexual abuse claim where defendant "squeez[ed] and fondl[ed]" ***plaintiff's*** genitals during a frisk search and threatened to retaliate if plaintiff ***reported*** it). To the extent it applies to a pretrial detainee's claim ***under*** the *Fourteenth Amendment*, the subjective element of the sexual abuse standard is satisfied by Saeed's contemporaneous threat to find plaintiff if he ***reported*** the contact. *See Crawford, 796 F.3d at 259* (finding **[*38]** the defendant's statements after he fondled ***plaintiff's*** penis indicated that he initiated physical contact with a culpable state of mind); *Shepherd, 2017 U.S. Dist. LEXIS 22772, 2017 WL 666213, at *18* (finding defendant's threat to retaliate if plaintiff said "anything" about a frisk search indicated that search was undertaken for "sexual gratification, to humiliate Shepherd, or both."). To be clear, even if Saeed initially had a proper justification to undertake the search, "that justification would ***not*** immunize subsequent conduct that

exceeded constitutional bounds." *Shepherd, 2017 U.S. Dist. LEXIS 22772, 2017 WL 666213, at *18*.

## E. Municipal Liability

A claim for municipal liability ***under*** *Section 1983* must comply with *Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* and its progeny. "*Monell* does ***not*** provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Frost v. New York City Police Dep't, 980 F.3d 231, 257 (2d Cir. 2020)* (quoting *Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)*). Thus, "[t]o establish liability ***under*** *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Id.* (internal quotations omitted). A policy or custom may be established by any **[*39]** of the following:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular constitutional deprivation in question; (3) a practice so consistent and widespread that, although ***not*** expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Alwan v. City of New York, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018)* (internal quotations

---

[18] Saeed's threat is relevant to the objective analysis because "[w]hen evaluating the objective prong, courts holistically consider the nature of a defendant's conduct—they do ***not*** divorce the physical and verbal components of the conduct." *DeJesus v. Malloy, 531 F. Supp. 3d 650, 665 (W.D.N.Y. 2021)* (quoting *Shepherd v. Fischer, No. 08-CV-9297, 2018 U.S. Dist. LEXIS 106682, 2018 WL 3122053, at *4 (S.D.N.Y. June 26, 2018)*), *reconsideration denied*, *582 F. Supp. 3d 82 (W.D.N.Y. 2022)*.

omitted); *see Ying Li v. City of New York, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017)* (similar). ***Plaintiff's*** allegations could be construed to pursue the third and fourth above-listed methods of pursuing a *Monell* claim against Nassau County. *See McLeod, 864 F.3d at 156* (stating that courts must read *pro se* filings "to raise the strongest arguments they suggest" (internal quotations omitted)).

1. Persistent And Widespread Practice

"In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must **[*40]** be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Lucente v. Cnty. of Suffolk, 980 F.3d 284, 297-98 (2d Cir. 2020)* (quoting *Sorlucco v. New York City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992)*). "In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" *Id.* (quoting *Jones v. Town of E. Haven, 691 F.3d 72, 82 (2d Cir. 2012)*). As explained above, the only viable constitutional violation Plaintiff alleges pertains to Saeed's August 12, 2015 contact with Plaintiff. That does ***not*** amount to a persistent and widespread practice or custom. *See, e.g., Giaccio v. City of New York, 308 F. App'x 470, 472 (2d Cir. 2009)* (affirming summary judgment dismissing *Monell* claim where plaintiff "identifie[d], at most, only four examples" of constitutional violations because "[t]his evidence falls far short of establishing a practice that is so 'persistent or widespread' as to justify the imposition of municipal liability" (citation and internal quotations omitted)).

2. Failure To Supervise

A failure to supervise "may constitute an

official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)* (quoting *City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*); *see Montero v. City of Yonkers, New York, 890 F.3d 386, 403 (2d Cir. 2018)* (holding that a failure to supervise claim applies where a "policymaker was aware **[*41]** of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions" (quoting *Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004)*). Put differently, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a [municipal] policy or custom that is actionable ***under*** § 1983.'" *Amnesty Am., 361 F.3d at 126* (quoting *City of Canton, 489 U.S. at 388*).

To establish the requisite "deliberate indifference," Plaintiff must "show[] that 'the need for more or better supervision to protect against constitutional violations was obvious'" and that a policymaker "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct." *Id. at 127* (quoting *Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995)*). Therefore, "[a] plaintiff alleging a municipality's deliberate indifference on a failure to supervise theory must cite violations that occurred before the conduct at issue took place." *Rodriguez v. City of N.Y., No. 21-CV-1649, 607 F. Supp. 3d 285, 2022 U.S. Dist. LEXIS 104160, 2022 WL 17750094, at *9 (E.D.N.Y. June 7, 2022)*; *see Greene v. City of New York, 742 F. App'x 532, 537 (2d Cir. 2018)* (holding that a plaintiff cannot rely on subordinate municipal employees' "contemporaneous or subsequent" constitutional violations as evidence that a

policy maker was aware of the need to modify the municipality's supervisory structure (internal quotations **[*42]** omitted)).

Plaintiff, however, has **_not_** pled that Saeed's potential to commit sexual abuse was "obvious" to anyone, let alone any policymaker, before August 12, 2015 such that a policymaker should have "prevent[ed]" Saeed's interaction with Plaintiff on that date.[19] *Amnesty Am., 361 F.3d at 126* (internal quotations omitted); *see McLennon v. City of New York, 171 F. Supp. 3d 69, 99 (E.D.N.Y. 2016)* (dismissing failure to supervise *Monell* claim concerning the unlawful arrest of one plaintiff because policymakers had no prior reason to know about the relevant alleged unlawful arrest practices); *Lewis v. Meloni, 949 F. Supp. 158, 164 n.5 (W.D.N.Y. 1996)* (dismissing failure to supervise *Monell* claim for failure to show that "Sheriff Meloni had *prior* knowledge of VanThof's alleged propensity to engage in illegal arrests").

---

[19] The First and Fourth Grievances (the only grievances that address sexual conduct) are of no help to Plaintiff in this regard because their allegations fall far from making it "obvious" that Saeed would commit sexual abuse. *See* Compl. at 7 (**_reporting_** in the First Grievance that on January 30, 2014 Saeed gently squeezed **_Plaintiff's_** shoulder and commented that Plaintiff looked "big and strong"); *Hosannah II*, ECF No. 1 at 10 (**_reporting_** in the Fourth Grievance that on July 1, 2015 Saeed told Plaintiff to "take [his] sexy ass" to the front of the law library line and made a kissing "gesture" towards Plaintiff). The affidavits submitted with **_Plaintiff's_** opposition to the instant motion likewise do **_not_** support a conclusion that a policymaker was aware of the potential for Saeed to commit sexual abuse. *See* ECF No. 72 at 6-8 (affidavit from Jerome Harris describing unreported sexual harassment Saeed perpetuated on the affiant on an unspecified date); *id.* at 9 (affidavit from John Hayes describing one incident of sexual harassment Saeed perpetrated on the affiant on an unspecified date, which was **_reported_** to an unidentified "area corporal"); *id.* at 10 (affidavit from Reginald Tucker stating that "[o]n various dates and time[s]" he witnessed Saeed "verbally harass" Plaintiff); *see also Barnes v. Ross, No. 12-CV-1916, 2014 U.S. Dist. LEXIS 46924, 2014 WL 1329128, at *1 (S.D.N.Y. Apr. 3, 2014)* (granting summary judgment where *pro se* plaintiff submitted inmate affidavits "that contain vague or irrelevant assertions").

* * *

Accordingly, Plaintiff does **_not_** allege any unconstitutional policy or custom attributable to Nassau County that would confer municipal liability. *See Haddock, 2021 U.S. Dist. LEXIS 239785, 2021 WL 5920035, at *2* (construing complaint as asserting municipal liability claim and dismissing same).

## V. CONCLUSION

For the reasons set forth above, the undersigned recommends that, pursuant to *42 U.S.C. § 1997e(c)* and *28 U.S.C. § 1915(e)(2)(B)(ii)*, the Court DISMISS **_Plaintiff's_** claims **_under_** the Fifth, Eighth, and *Ninth Amendments* for failure to state a claim. The undersigned further recommends that the Court GRANT IN PART and DENY IN PART Defendants' **[*43]** summary judgment motion by (1) dismissing the Sheriff's Department from this action; (2) dismissing **_Plaintiff's_** claims **_under_** the *First Amendment*, (3) permitting Plaintiff to maintain his claim against Saeed **_under_** the *Fourteenth Amendment* for sexual abuse based on Saeed's alleged August 12, 2015 contact with Plaintiff; and (4) dismissing **_Plaintiff's_** other claims **_under_** the *Fourteenth Amendment*. Finally, the undersigned recommends that the Court limit Plaintiff to seeking only nominal and punitive damages for his surviving sexual abuse claim.

Defense counsel is directed to serve a copy of this **_Report_** And Recommendation upon Plaintiff and file proof of service by December 30, 2022.

## VI. OBJECTIONS TO THIS **_REPORT_** AND RECOMMENDATION

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b)(2) of the Federal Rules of Civil Procedure*, the parties shall have fourteen (14)

2022 U.S. Dist. LEXIS 232789, *43

days from service of this **_Report_** and Recommendation to file written objections. *See also* _Fed. R. Civ. P. 6(a)_ & _(d)_ (addressing computation of days). Any requests for an extension of time for filing objections must be directed to Judge Brown. FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS. *See* _Thomas v. Arn, 474 U.S. 140, 154-55, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)_; _Frydman v. Experian Info. Sols., Inc., 743 F. App'x 486, 487 (2d Cir. 2018)_; _McConnell v. ABC-Amega, Inc., 338 F. App'x 24, 26 (2d Cir. 2009)_; _F.D.I.C. v. Hillcrest Assocs., 66 F.3d 566, 569 (2d Cir. 1995)_.

**SO ORDERED**:

Dated: Central Islip, New York

December 28, 2022

/s/ Lee G. **[*44]** Dunst

**LEE G. DUNST**

United States Magistrate Judge

---

**End of Document**

# *Liner v. Goord*

United States Court of Appeals for the Second Circuit

June 10, 1999, Submitted ; September 22, 1999, Decided

Docket No. 98-2925

**Reporter**

196 F.3d 132 *; 1999 U.S. App. LEXIS 22964 **

JOSHUA LINER, Plaintiff-Appellant, - v. - GLENN GOORD; WALTER KELLY; GILMORE, Sgt.; JOHN DOE # 1; JOHN DOE # 2, Defendants-Appellees.

**Prior History: [**1]** Appeal from the sua sponte dismissal (Michael A. Telesca, Judge) of *Section 1983* complaint for failure to state a claim and failure to exhaust administrative remedies.

**Disposition:** Affirmed in part, reversed in part, and remanded.

**Counsel:** Joshua Liner, pro se, Auburn, New York, for Plaintiff-Appellant.

**Judges:** Before: WINTER, Chief Judge, SACK, Circuit Judge, and SPRIZZO, District Judge. *

**Opinion by:** WINTER

## Opinion

 **[*133]** WINTER, *Chief Judge*:

Joshua Liner appeals from Judge Telesca's *sua sponte* dismissal of his *42 U.S.C. § 1983* complaint for failure to state a claim pursuant to *28 U.S.C. § 1915A* and *42 U.S.C. § 1997e(e)* and for failure to exhaust administrative remedies under *42 U.S.C. § 1997e(a)*. For the reasons set forth below, we

---

* The Hon. John E. Sprizzo, of the United States District Court for the Southern District of New York, sitting by designation.

affirm in part, reverse in part, and remand.

BACKGROUND

Appellant filed a *pro se* complaint in the Western District alleging various violations of his constitutional rights by prison officials when he was incarcerated at the Attica **[**2]** Correctional Facility ("Attica").

Specifically, appellant alleges that on May 13, 1998, while he was being frisked, Sergeant Gilmore and two unnamed corrections officers ("Does 1 & 2") repeatedly slammed appellant's head into a cabinet, struck his face, and taunted him with racial slurs. He claims that he was denied medical treatment following the incident. Also with respect to Gilmore and Does 1 & 2, appellant alleges that they: (i) conspired to give false testimony against him in a disciplinary hearing; (ii) falsely accused him of possessing a weapon; (iii) took his personal belongings without returning them to him; and (iv) sexually assaulted him on three separate occasions in February and May 1998 -- conduct appellant contends is condoned by Glenn Goord, Commissioner of the Department of Correctional Service, and Walter Kelly, Attica's Superintendent.

Appellant also contends that Attica prison officials denied him meals, showers, and access to the law library as well as stole and destroyed legal materials in retaliation for filing lawsuits against them. Although he concedes in his complaint that he did not "present the facts relating to [the] complaint under the prisoner grievance **[**3]** procedure," appellant

196 F.3d 132, *133; 1999 U.S. App. LEXIS 22964, **3

contends that he complained about these conditions to both Goord and Kelly but that they ignored his complaints. Moreover, Kelly is alleged to have enhanced a disciplinary punishment of keeplock to confinement in the Special Housing Unit in retaliation for appellant's complaint and prior lawsuits.

Construing the factual allegations in the complaint broadly, the district court concluded that the complaint asserted the following causes of action: (i) retaliation as to all defendants; (ii) violation of equal protection as to all defendants; (iii) assault, verbal abuse, false testimony, and conspiracy as to Gilmore and Does 1 & 2; and (iv) denial of access to law library, denial of meals and showers, enhancement of disciplinary punishment, and emotional distress caused by the alleged sexual assaults as to Goord and Kelly.

The district court dismissed with prejudice appellant's retaliation, equal protection, verbal abuse, false testimony, conspiracy, access to law library, and enhancement **[*134]** of disciplinary punishment claims for failure to state a claim pursuant to _28 U.S.C. § 1915A_. It dismissed without prejudice the assault and denial of meals **[**4]** and showers claims for failure to exhaust administrative remedies pursuant to _42 U.S.C. § 1997e(a)_. Finally, the district court dismissed without prejudice appellant's emotional distress claim with respect to the alleged sexual assaults for failure to allege a prior showing of physical injury pursuant to _42 U.S.C. § 1997e(e)_. The district court did not separately address whether the sexual assault allegations stated a claim under the _Eighth Amendment_.

DISCUSSION

_Section 1915A_ requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint _sua sponte_ if, among other things, the complaint is "frivolous,

malicious, or fails to states a claim upon which relief may be granted." _28 U.S.C. § 1915A(a)_ & _(b)(1)_. Prior to the enactment of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), dismissals of claims under _28 U.S.C. § 1915_ were discretionary and reviewed for abuse of discretion. _See Polanco v. United States Drug Enforcement Admin., 158 F.3d 647, 650 (2d Cir. 1998)_. **[**5]** The PLRA amended _§ 1915_, however, expanding the grounds for dismissal as well as making dismissals mandatory. [1] _See 28 U.S.C. § 1915(e)(2)_; _see also 42 U.S.C. § 1997e(c)(2)_.

We have not yet decided what standard of review applies to an appeal of a dismissal pursuant to _Section 1915A_ or _42 U.S.C. § 1997e(c)(2)_. At least four circuits, **[**6]** however, have determined that these PLRA dismissals are subject to _de novo_ review. _See Ruiz v. United States, 160 F.3d 273, 275 (5th Cir. 1998)_; _McGore v. Wrigglesworth, 114 F.3d 601, 604 (6th Cir. 1997)_; _Atkinson v. Bohn, 91 F.3d 1127, 1128 (8th Cir. 1996)_; _see also Chappell v. McKune, 1997 U.S. App. LEXIS 36181_, No. 96-3359, 1997 WL 787184, at *1 (10th Cir. Dec. 24, 1997) (unpublished opinion). We agree with those circuits and hold that _28 U.S.C. § 1915A_ and 42 U.S.C. § 1999e(c)(2) dismissals are subject to _de novo_ review.

In addition to the PLRA's provisions concerning _sua sponte_ dismissals for failure to state a claim upon which relief can be granted, the PLRA restricts an inmate's right to file suit

_____

[1] The PLRA amended "a variety of statutory provisions governing federal court litigation by prisoners." _Jenkins v. Haubert, 179 F.3d 19, 23 (2d Cir. 1999)_. In addition to dismissals under _28 U.S.C. § 1915A_, for example, "the PLRA authorizes a court to dismiss a prisoner's action regarding prison conditions . . . if the claim on its face clearly fails to state a claim upon which relief can be granted, is frivolous or malicious, or seeks monetary relief from a defendant who is immune from suit." _Id._ (citing _42 U.S.C. § 1997e(c)(2)_).

in federal court prior to exhausting administrative remedies and, with respect to emotional distress claims, without a prior showing of physical injury. *See 42 U.S.C. §§ 1997e(a)* & *(e)*. As amended by the PLRA, *section 1997e(a)* provides that "no action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal **[**7]** law, by a prisoner . . . until such administrative remedies as are available are exhausted." *42 U.S.C. § 1997e(a)*. *Section 1997e(e)* provides that "no Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury." *42 U.S.C. § 1997e(e)*.

With these standards in mind, we address appellant's claims in turn.

a) *Claims Dismissed under § 1915A*

The district court dismissed appellant's retaliation, equal protection, verbal abuse, false testimony, conspiracy, access to law library, and enhancement of disciplinary punishment claims for failure to state a claim upon which relief can be granted. We affirm the dismissal of these claims for **[*135]** substantially the reasons stated by the district court. *See Liner v. Goord*, No. 98-CV-6343L, slip op. at 7-19 (W.D.N.Y. Oct. 13, 1998).

b) *Claims Dismissed Under § 1997e(a)*

The district court dismissed without prejudice appellant's *Eighth Amendment* excessive force claim and his claim concerning the alleged denial of meals and showers for failure to exhaust administrative remedies as required **[**8]** by *42 U.S.C. § 1997e(a)*. The law concerning the PLRA's exhaustion requirement is in great flux. Several circuits, as well as district courts in this circuit, are split on the following issues, both of which are implicated here: whether cases alleging the use of excessive force are actions "with respect to prison conditions" as that phrase is used in *42 U.S.C. § 1997e(a)*; and whether the administrative exhaustion requirement is inapplicable where the relief requested -- *i.e.*, strictly monetary damages -- is not "available" through the administrative process. *See Rumbles v. Hill, 182 F.3d 1064, 1999 WL 459461*, at *1-*7 (9th Cir. 1999) (outlining issue concerning available remedy; discussing split among the circuits on issue, citing conflicting cases; and holding that inmate was not required to exhaust administrative remedies where remedy sought was not available in prison's administrative remedy program); *Perez v. Wisconsin Dep't of Corrections, 182 F.3d 532, 1999 WL 424311*, at *1-*6 (7th Cir. 1999) (citing and discussing conflicting **[**9]** cases, court holds that neither assertion that exhaustion would be futile nor alleged unavailability of administrative remedy negated exhaustion requirement); *Carter v. Kiernan, 1999 U.S. Dist. LEXIS 178, No. 98 Civ. 2664, 1999 WL 14014*, at *2-*5 (S.D.N.Y. Jan. 14, 1999) (holding that *Eighth Amendment* excessive force claims are not subject to PLRA exhaustion requirement); *Beeson v. Fishkill Correctional Facility, 28 F. Supp. 2d 884, 887-96 (S.D.N.Y. 1998)* (holding that *Eighth Amendment* excessive force claims as well as claims seeking only monetary relief are subject to exhaustion requirement); *Baskerville v. Goord, 1998 U.S. Dist. LEXIS 17603, No. 97 Civ. 6413, 1998 WL 778396*, at *2-*5 (S.D.N.Y. Nov. 5, 1998) (holding that exhaustion requirement does not apply to *Eighth Amendment* excessive force claims).

Considering the split in authority and the fact that the district court *sua sponte* dismissed these claims before the defendants were served or had answered, we reverse the district court's dismissal of these claims and remand for service. We decline to resolve the complex legal issues presented here without the benefit of a more complete record, including an answer from the defendants.

[**10]  c) *Claim Dismissed Under* *§ 1997e(e)*

Appellant contends that Commissioner Goord has a policy or practice that permits corrections officers to conduct intrusive body searches without "therapeutic supervision." The district court dismissed this claim, concluding that it was an emotional distress claim and appellant "alleged no prior showing of physical injury." *Liner*, No. 98-CV-6343L, slip op. at 19 (citing *42 U.S.C. § 1997e(e)*). We disagree, for at least two reasons.

First, there is no statutory definition of "physical injury" as used in *section 1997e(e)*. Nevertheless, accepting the allegations in the complaint, the alleged sexual assaults qualify as physical injuries as a matter of common sense. Certainly, the alleged sexual assaults would constitute more than *de minimis* injury if they occurred. *Cf.* *Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)* (relying on *Eighth Amendment* jurisprudence, court holds that physical injury required by *§ 1997e(e)* must simply be more than *de minimis*). Second, "allegations of sexual abuse may . . . state an *Eighth Amendment* claim under *Section 1983*." *Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997)*. [**11]  The district court failed to consider whether appellant's allegations concerning the alleged  [*136] sexual assaults might state a claim under the *Eighth Amendment* in addition to stating a claim for emotional distress.

Accordingly, *sua sponte* dismissal of the claim concerning the alleged sexual assaults was improper.

We therefore affirm in part, reverse in part, and remand. On remand, appellant may pursue only his *Eighth Amendment* claim with respect to the alleged assault on May 13, 1998 and any *Eighth Amendment* or emotional distress claim concerning the three alleged sexual assaults in February and May 1998. The dismissal of appellant's remaining claims with prejudice is affirmed.

---

**End of Document**

## *McCloud v. Tureglio*

United States District Court for the Northern District of New York

April 15, 2008, Decided; April 15, 2008, Filed

9:07-CV-0650

**Reporter**

2008 U.S. Dist. LEXIS 30984 *; 2008 WL 1772305

CHRISTOPHER McCLOUD, Plaintiff, v. C. TUREGLIO, Correctional Officer, Greene Correctional Facility, Defendant.

**Prior History:** *McCloud v. Tureglio, 2008 U.S. Dist. LEXIS 124388 (N.D.N.Y, Mar. 17, 2008)*

**Counsel:** **[*1]** CHRISTOPHER McCLOUD, Plaintiff , Pro se, Wallkill, NY.

For Defendant: HON. ANDREW M. CUOMO, Attorney General for the State of New York, CHARLES J. QUACKENBUSH, ESQ., Assistant Attorney General, OF COUNSEL, New York, NY.

**Judges:** Norman A. Mordue, Chief United States District Court Judge.

**Opinion by:** Norman A. Mordue

# Opinion

## ORDER

The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 17th day of March 2008. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The Defendant's motion to dismiss for failure to state a claim (Dkt. No. 11) [1] is granted.

3. The Court certifies that any appeal of this order would not be taken in good faith. *See 28 U.S.C. § 1915(a)(3)*.

4. **[*2]** The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

Dated: April 15, 2008

Syracuse, New York

/s/ Norman A. Mordue

Norman A. Mordue

Chief United States District Court Judge

---

**End of Document**

---

[1] The Magistrate Judge's Report-Recommendation inadvertently refers to Defendant's motion to dismiss as Dkt. No. 42 on page 35. The correct Dkt. No. is 11 as referred to throughout the Report-Recommendation.

# *McCloud v. Tureglio*

United States District Court for the Northern District of New York

March 17, 2008, Decided; March 17, 2008, Filed

9:07-CV-0650 (NAM)(GHL)

**Reporter**

2008 U.S. Dist. LEXIS 124388 *

CHRISTOPHER McCLOUD, Plaintiff, -v.- C. TUREGLIO, Correctional Officer, Greene Correctional Facility, Defendant.

**Subsequent History:** Adopted by, Dismissed by *McCloud v. Tureglio, 2008 U.S. Dist. LEXIS 30984 (N.D.N.Y, Apr. 15, 2008)*

**Counsel:** **[*1]** CHRISTOPHER McCLOUD, 06-R-5154, Plaintiff, Pro se, Wallkill, NY.

For Defendants: CHARLES J. QUACKENBUSH, ESQ., Assistant Attorney General, OF COUNSEL, HON. ANDREW M. CUOMO, Attorney General for the State of New York, New York, NY.

**Judges:** George H. Lowe, United States Magistrate Judge.

**Opinion by:** George H. Lowe

# Opinion

### REPORT-RECOMMENDATION

This *pro se* prisoner civil rights action, filed pursuant to *42 U.S.C. § 1983*, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to *28 U.S.C. § 636(b)* and *Local Rule 72.3(c)* of the Local Rules of Practice for this Court. In his Complaint, Christopher McCloud ("Plaintiff") alleges that, on May 31, 2007, at Green Correctional Facility ("Green C.F."), Correctional Officer C. Turriglio ("Defendant")

physically assaulted and threatened Plaintiff in violation of his constitutional rights. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) Currently before the Court is Defendant's motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief might be granted, pursuant to *Fed. R. Civ. P. 12(b)(6)*. (Dkt. No. 11.) For the reasons set forth below, I recommend that the Court grant Defendants' motion **[*2]** to dismiss.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

On June 20, 2007, Plaintiff filed his Complaint in this action. (Dkt. No. 1 [Plf.'s Compl.].) The factual allegations giving rise to Plaintiff's (unspecified) constitutional claim against Defendant Turriglio are as follows:

> On May 31, [20]07 I came to my program late[.] [My program] . . . is Mess [H]all [during the] P.M. and late eve[ning shift]. [F]or coming in late I was placed in the pot room[.] [M]y regular job title is 2 ser[v]er on the C-side line[.] [W]hile I was in the pot room I was making noise and Officer Tureglio [sic] came into the pot room and started banging pots and curs[]ing at me[,] telling me to shut up[.] [A]fter that he told me to stop eye balling him or he'll pull my eyes from my skull[.] [A]t 2:30 P.M. [it] is count time and all inmates must report to the din[]ing are[a] for count[.] [A]fter count he called me to his office and took me to

the back of the Mess [H]all out of plain view and placed me o[n] the wall and started to slap me [o]n the back of the head[.] [A]fter his as[sa]ult he placed his pocket knife to his face and told me he'll cut hi[m]self and say I did it [in order to] let the other inmates **[*3]** know he's not play[ing around].

(Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) As a result of this alleged misconduct, Plaintiff is requesting three forms of relief: (1) a court order "secur[ing] [Plaintiff's] safety and mak[ing] sure there will be []no[] retaliation from coworkers or staff"; (2) a court order directing that a search be performed of Defendant's "file to see if [a]ny complaints or grievances [have] been filed against him in the past concerning brutality"; and (3) "$1,000,000 for mental anguish and distress." (*Id.* at ¶¶ 7, 9.)

It is important to note that, in his form Complaint, Plaintiff provided some information regarding his efforts to exhaust his available administrative remedies before filing this action. Specifically, in response to a question reading "Is there a prisoner grievance procedure at this facility?" Plaintiff checked the box reading "Yes." (*Id.* at ¶ 4[a].) In response to a question reading "If your answer to 4(a) is YES, did you present the facts relating to your complaint in this grievance program?" Plaintiff checked the box reading "No." (*Id.* at ¶ 4[b].) In response to a question reading "If your answer to 4(b) is NO: Why did you choose to not present the facts **[*4]** relating to your complaint in the prison's grievance program?" Plaintiff stated, "Because I fear retaliation from officers and the officer [I]'m fil[]ing against brag[s] about the grievance system not working and he claims his uncle is a superintendent." (*Id.*) Finally, in elaboration on this last assertion, Plaintiff stated later on in the Complaint that "[t]he officer [I]'m fil[]ing [this action] againsts uncle [sic] is a Superintendent here at Green Corr." (*Id.* at ¶ 4[c].)

**B. Plaintiff's Abandoned Efforts to File an Amended Complaint and a Supplemental Complaint**

On June 22, 2007, Plaintiff filed a letter to the Clerk of the Court. (Dkt. No. 6.) The stated purpose of the letter was to serve "as evidence in [Plaintiff's] case." (*Id.*) The letter requested that his Complaint be amended to reflect that the correct spelling of Defendant's name was "C. Turriglio," not "Tureglio." (*Id.*) (The Court subsequently directed that the docket be so amended.) In addition, the letter requested that a claim be "add[ed] to [Plaintiff's] complaint . . . ." (*Id.*) The factual allegation giving rise to this claim was as follows:

> On June 18, 2007 Officer Turriglio made intimidating comments [to] me [and] taunt[ed] **[*5]** me[,] saying [']McCloud knows I doesn't [sic] play[.] Let them know[.'] [By 'them' he was] talking about new Mess [H]all workers. I assumed he was back from vacation time or answering a grievance because he [was] brag[g]in' about laying on the beach when some inmates here at the facility filed a grievance against him.

(*Id.*)

On July 5, 2007, I directed the Clerk to strike Plaintiff's submission from the docket for two reasons: (1) to the extent that Plaintiff was requesting court permission for leave to amend his Complaint, such permission was unnecessary under *Fed. R. Civ. P. 15(a)* since Defendant had not yet filed a responsive pleading; and (2) to the extent that Plaintiff was requesting that his (one-page, single-spaced) letter serve as his amended pleading, such an amendment was prohibited by *Local Rule 7.1(a)*, which required that amended pleadings be complete pleadings that superseded the original pleadings in all respects. (Dkt. No. 7.)

However, Plaintiff did not subsequently file an Amended Complaint. Rather, on August 8, 2007, Plaintiff filed another letter with the Court. (Dkt. No. 12.) The stated purpose of the letter was to again request "the court['s] permission to amend [Plaintiff's] **[*6]** complaint." (*Id.*) Although Plaintiff used the word "amend," it was clear that what he was intending was a "supplemental" complaint. *See Fed. R. Civ. P. 15(d)*. This is because the factual allegations he asserted in the letter arose from incidents occurring *after* the filing of his Complaint on June 20, 2007. (Dkt. No. 12.) In pertinent part, Plaintiff alleged as follows:

> On July 14, [20]07 the very next day [after speaking to a prison psychologist and Iman about the anxiety I was suffering due to my experience with Officer Turriglio] I was approached by [O]fficer Turriglio once I arrived . . . [at my] program. Officer Turriglio told me [']I want to talk to you.['] After program assi[]g[n]ments . . . [were] completed [O]fficer Turriglio pulled me to the side away from other inmate[]mess hall workers on the B side in the din[]ing area; [O]fficer Turriglio['s] exact words . . . [were] 'I spok[e] to the Imam [about] what['s] going on[.] [Y]ou can talk to me man to man. I must admit I was nervous when [O]fficer Turriglio approached me. I started studdering [sic] when I spoke and made up a lie. . . . After that [O]fficer Turriglio walked away.

(*Id.* at 1.) In addition, Plaintiff attempted to **[*7]** assert a claim against various (unidentified) nonparties. In pertinent part, Plaintiff alleged as follows:

> On July 24, [20]07 I was called to the sergeant['s] office[] and forced to write a statement [about what had taken place between Plaintiff and Officer Turriglio] that is false . . . . When I arrived at the sergeant['s] office[,] three sergeants or lieutenants . . . [were] there[.] [O]ne left

and the other two stayed[.] [O]ne of them asked what happen[ed] between me and Turriglio. [The] [I]nspector [G]eneral's [O]ffice [had] informed them of what [had] happen[ed]. One of the sergeant['s] or lieutenants told me what to write. I tried to write what really took place between me and [O]fficer Turriglio. I was told ['T]hat['s] not good enough.['] I informed the sergeant or lieutenants that I [had] filed a federal complaint against [O]fficer Turriglio. I was still told what to write[.] [W]hen I refused that['s] when threats . . . [were] made and I was called a nigger. I was told [I']m not leaving the sergeant['s] office intell [sic] I give them what th[e]y want [sic]. . . . I repeat [that] my statement was false and forced and I took no oath[;] it was given out of fear for my safety. **[*8]** . . . I can[']t identify [the two sergeants or lieutenants] by name because th[e]y were not wearing badges or name tags. . . . I [would] like to add [as defendants in my action] Green Cor. Fac.[,] D.O.C. as a while[,] [and the] New Yo[r]k State employees here at Greene [Correctional Facility] . . . .

(*Id.* at 2.)

On August 13, 2007, I directed the Clerk to strike Plaintiff's submission from the docket for two reasons: (1) to the extent that Plaintiff was requesting court permission for leave to supplement his Complaint, such permission was unnecessary under *Fed. R. Civ. P. 15(a)* since Defendant had not yet filed a responsive pleading; and (2) to the extent that Plaintiff was requesting that his (two-page, single-spaced) letter serve as his supplemental pleading, such a supplemental pleading was not in conformity with *Fed. R. Civ. P. 10(b)*, *Local Rule 10.1*, and *Local Rule 7.1(a)(4)* in that the document was not double spaced, the text was not broken down into paragraphs, and the paragraphs were not numbered consecutively to the paragraphs contained in

the original pleading. (Dkt. No. 14.)

However, Plaintiff did not subsequently file a Supplemental Complaint. Rather, on August 29, 2007, Plaintiff **[*9]** filed another letter with the Court. (Dkt. No. 15.) In the letter, Plaintiff requested "the court[']s permission to make a formal complaint, 'not to amend my complaint.'" (*Id.* at 1.) The claim that Plaintiff wished to assert arose from events occurring on August 21, 2007, at Greene C.F., involving the delayed arrival of a piece of his legal mail. (*Id.* at 1-2.) More specifically, Plaintiff alleged that (1) at approximately 3:30 p.m. in Plaintiff's housing unit, Correctional Officer Forbes handed Plaintiff a piece of legal mail (a time-sensitive court order issued by the U.S. District Court for the Southern District of New York on May 31, 2007) unaccompanied by the addressed envelope in which it had arrived at the prison, and (2) that same day, while signing for legal mail (from the New York State Court of Claims) in front of Officer Turriglio at the law library, Plaintiff was led to "fear [that] Officer Turriglio has tampered with my mail . . . [because he was] the officer who had access to all inmate[']s legal mail." (*Id.*) As a form of relief, Plaintiff requested that the Court "issue a[n] order to have the Defendant Officer Turriglio removed from the law library intell [sic] this **[*10]** matter is resolved." (*Id.* at 2.)

On September 6, 2007, I directed the Clerk to strike Plaintiff's submission from the docket for the exact two reasons given in my Order of August 13, 2007 (i.e., that Plaintiff need not request permission to file a Supplemental Complaint since he had the right to do so without permission under the circumstances, and that his two-page, single-spaced letter could not serve as his supplemental pleading since the document was not double spaced, the text was not broken down into paragraphs, and the paragraphs were not numbered consecutively to the paragraphs contained in the original pleading), as well as for the

additional reason that Plaintiff had failed to indicate that he had served his submission on opposing counsel, as required by *Local Rule 5.1(a)*. (Dkt. No. 16.)

However, again, Plaintiff did not subsequently file a Supplemental Complaint.

## C. Defendant's Motion to Dismiss and Plaintiff's Response

On August 2, 2007, Defendant filed a motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief might be granted, pursuant to *Fed. R. Civ. P. 12(b)(6)*. (Dkt. No. 11.) Defendant's motion is premised on two independent grounds: (1) that **[*11]** Plaintiff's action is barred by the Prison Litigation Reform Act ("PLRA") due to his failure to exhaust his available administrative remedies before filing this action; and (2) that Plaintiff's action is barred by the PLRA since that statute requires that any inmate claiming damages related to mental and emotional distress, as is Plaintiff, must make a prior showing of physical injury, which Plaintiff has not made. (Dkt. No. 11, Part 2, at 4-6 [Def.'s Memo. of Law].)

In response to Defendant's first argument (i.e., regarding Plaintiff's failure to exhaust his available administrative remedies), Plaintiff argues that (1) Defendant's own actions inhibited Plaintiff's exhaustion of administrative remedies so as to estop Defendant from asserting Plaintiff's failure to exhaust as a defense, and/or (2) under the circumstances, special circumstances existed justifying his failure to exhaust his administrative remedies. (Dkt. No. 18, Plf.'s Memo. of Law, "Point I.") In response to Defendant's second argument (i.e., regarding Plaintiff's failure to make a prior showing of physical injury), Plaintiff essentially argues that the "continuous injuries" inflicted on Plaintiff by Defendant constitute **[*12]** the showing of physical injury required by the

2008 U.S. Dist. LEXIS 124388, *12

PLRA. (Dkt. No. 18, Plf.'s Memo. of Law, "Point II.")

## II. RECENTLY CLARIFIED LEGAL STANDARD FOR MOTIONS TO DISMISS

Under *Fed. R. Civ. P. 12(b)(6)*, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under *Rule 8(a)(2)*;[1] or (2) a challenge to the legal cognizability of the claim.[2]

*Rule 8(a)(2)* requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[3] **[*15]** The purpose of this rule is to "facilitate a proper decision on the merits."[4] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[5]

The Supreme Court has long characterized

---

[1] See 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under *Rule 12(b)(6)* goes to the sufficiency of the pleading under *Rule 8(a)(2).*") [citations omitted]; *Princeton Indus., Inc. v. Rem, 39 B.R. 140, 143 (Bankr. S.D.N.Y. 1984)* ("The motion under *F.R.Civ.P. 12(b)(6)* tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to *F.R.Civ.P. 8(a)(2)* which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello, 55 F.R.D. 72, 74 (S.D.N.Y. 1972)* ("This motion under *Fed. R. Civ. P. 12(b)(6)* **[*13]** tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to *Fed. R. Civ. P. 8(a)(2)* which calls for a 'short and plain statement that the pleader is entitled to relief.'").

[2] See *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest. . . . In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004)* ("There is a critical distinction between the notice requirements of *Rule 8(a)* and the requirement, under *Rule 12(b)(6)*, that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas, 308 F.3d 180, 187 (2d Cir. 2002)* ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation . . . fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein, 230 F.3d 531, 541 (2d Cir. 2000)* (distinguishing between a failure to meet *Rule 12(b)(6)*'s requirement of stating a cognizable claim and *Rule 8(a)*'s requirement of disclosing sufficient information to put defendant **[*14]** on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*

*379 F. Supp.2d 348, 370 (S.D.N.Y. 2005)* ("Although *Rule 8* does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under *Rule 12(b)(6)*].") [citation omitted]; *Util. Metal Research & Generac Power Sys., 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004)* (distinguishing between the legal sufficiency of the cause of action under *Rule 12[b]6* and the sufficiency of the complaint under *Rule 8[a]*); *accord, Straker v. Metro Trans. Auth., 333 F. Supp.2d 91, 101-02 (E.D.N.Y. 2004)*; *Tangorre v. Mako's, Inc., 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002)* (identifying two sorts of arguments made on a *Rule 12[b]6* motion--one aimed at the sufficiency of the pleadings under *Rule 8[a]*, and the other aimed at the legal sufficiency of the claims).

[3] *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577 (2005)* (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 [1957]*); *see also Swierkiewicz, 534 U.S. at 512* (quoting *Conley, 355 U.S. at 47*); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)* (quoting *Conley, 355 U.S. at 47*).

[4] See *Swierkiewicz, 534 U.S. at 514* (quoting *Conley, 355 U.S. at 48*).

[5] *Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996)* (McAvoy, J.), *aff'd, 113 F.3d 1229 (2d Cir. 1997)* (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. See, e.g., *Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir. 2003)* **[*16]** (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co., 104 F.3d 355 [2d Cir. 1996]*).

2008 U.S. Dist. LEXIS 124388, *16

this pleading requirement under *Rule 8(a)(2)* as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[6] However, it is well established that even this liberal notice pleading standard "has its limits."[7] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[8]

Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly*, the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*, **[*18]** that "a complaint should not be dismissed for failure to state a claim unless

_____

[6] *See, e.g., Swierkiewicz, 534 U.S. at 513-514* (characterizing *Fed. R. Civ. P. 8[a][2]*'s pleading standard as "simplified").

[7] 2 *Moore's Federal Practice § 12.34[1][b]* at 12-61 (3d ed. 2003).

[8] *See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-74, 167 L. Ed. 2d 929 (2007)* (pleading did not meet *Rule 8[a][2]*'s liberal requirement), *accord, Dura Pharms., 125 S. Ct. at 1634-35, Christopher v. Harbury, 536 U.S. 403, 416-22, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002), Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234-35 (2d Cir. 2004), Gmurzynska v. Hutton, 355 F.3d 206, 208-09 (2d Cir. 2004).* Several unpublished decisions exist from the Second **[*17]** Circuit affirming the *Rule 8(a)(2)* dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y., 35 Fed. Appx. 7, 2002 WL 741835, at *5 (2d Cir. 2002)* (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting *Rule 8[a][2]*). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz*, of certain cases from within the Second Circuit interpreting *Rule 8(a)(2). See Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir. 2003)* (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS, 244 F.3d 81 [2d Cir. 2001]*, after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr, 533 U.S. 289, 121 S. Ct. 2271, 150 L. Ed. 2d 347 [2001]*).

it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *550 U.S. 544, 127 S. Ct. 1955, 1968-69, 167 L. Ed. 2d 929 (2007)*.[9] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the *Rule 8* standard turns on the "plausibility" of an actionable claim. *Id. at 1965-74*. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id. at 1965* [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.; see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)* ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly*] is . . . requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim **[*19]** with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.") [emphasis in original].

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under *Rule 12(b)(6)*, the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."[10] Moreover, it should be noted

_____

[9] The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint. . . . *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly, 127 S. Ct. at 1969.*

[10] *Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994)* (affirming grant of motion to dismiss) [citation omitted];

that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*."[11] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* **[*20]** degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[12] In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[13]

However, when a plaintiff is proceeding **[*21]** *pro se*, "all normal rules of pleading are not absolutely suspended."[14] Moreover, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[15]

Finally, it should be remembered that *Fed. R. Civ. P. 12(b)(6)* motions to dismiss are limited to the facts alleged in the complaint and must be converted into a *Fed. R. Civ. P. 56* motion for summary judgment if the court considers materials outside the pleadings.[16] However, of course, the court may, without converting the motion to dismiss into a motion for summary judgment, consider any documents provided by the plaintiff in opposition to defendants' motion to dismiss, *to the extent those documents are consistent with the allegations in the complaint*.[17]

---

*Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994)*.

[11] *Hernandez, 18 F.3d at 136* [citation omitted]; *see also Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003)* [citations omitted]; *Vital v. Interfaith Med. Ctr., 168 F.3d 615, 619 (2d Cir. 1999)* [citation omitted].

[12] *Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)* (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

[13] *Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)* (internal quotation and citation omitted); *see also Fed. R. Civ. P. 15(a)* (leave to amend "shall be freely given when justice so requires").

[14] *Stinson v. Sheriff's Dep't of Sullivan County, 499 F. Supp. 259, 262 & n.9 (S.D.N.Y. 1980)*; *accord, Standley v. Dennison, 05-CV-1033, 2007 U.S. Dist. LEXIS 61394, 2007 WL 2406909, at *6, n.27 (N.D.N.Y. Aug. 21, 2007)* (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz, 2007 U.S. Dist. LEXIS 50072, 2007 WL 2027912, at *2* (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv., 489 F. Supp.2d 305, 307 (W.D.N.Y. 2007)*; *Cosby v. City of White Plains, 04-CV-5829, 2007 U.S. Dist. LEXIS 23770, 2007 WL 853203, at *3 (S.D.N.Y. Feb. 9, 2007)*; *Lopez v. Wright, 05-CV-1568, 2007 U.S. Dist. LEXIS 6904, 2007 WL 388919, at *3, n.11 (N.D.N.Y. Jan. 31, 2007)* (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord, 04-CV-1433, 2007 U.S. Dist. LEXIS 4734, 2007 WL 201109, at *5 (N.D.N.Y. Jan. 23, 2007)* (Kahn,

J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept., 04-CV-1262, 2007 U.S. Dist. LEXIS 1842, 2007 WL 119453, at *2, n.13 (N.D.N.Y. Jan. 10, 2007)* (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins, 2007 U.S. Dist. LEXIS 482, 2007 WL 37404, at *4* **[*22]** (Kahn, J., adopting report-recommendation of Lowe, M.J.).

[15] *Cuoco, 222 F.3d at 112* (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)* ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

[16] *See Fed. R. Civ. P. 12(b)* ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings **[*23]** are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by *Rule 56*.").

[17] "Generally, a court may not look outside the pleadings when reviewing a *Rule 12(b)(6)* motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord, 96 Civ. 7544, 1997 U.S. Dist. LEXIS 18131, 1997 WL 714878, *1, n. 2 (S.D.N.Y. Nov. 17, 1997)* (citing, *inter alia, Gill v. Mooney, 824 F.2d 192, 195 [2d Cir. 1987]* [considering plaintiff's response affidavit on motion to dismiss]). Stated another way,

## III. ANALYSIS

As stated above in Part I.C. of this Report-Recommendation, Defendant's motion is premised on two independent grounds: (1) that Plaintiff's action is barred by the Prison Litigation Reform Act ("PLRA") due to his failure to exhaust his available administrative remedies before filing this action; and (2) that Plaintiff's action is barred by the PLRA since that statute requires that any inmate claiming damages related to mental and emotional distress, as is Plaintiff, must make a prior showing of physical injury, which Plaintiff has not made. (Dkt. No. 11, Part 2, at 4-6 [Def.'s Memo. of Law].) Because I conclude that Defendant's lack-of-physical-injury argument for dismissal is somewhat stronger than is his failure-to-exhaust argument, I address the lack-of-physical-injury argument first.

## A. Requirement of Physical Injury

The Prison Litigation Reform Act of 1995 ("PLRA") provides, in pertinent part, as follows: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." *42 U.S.C. 1997e(e)*.

Here, **[*25]** Plaintiff alleges that, on May 31, 2007, Defendant (1) "bang[ed] pots" in the prison's "pot room," (2) "curs[ed]" at Plaintiff, (3) told Plaintiff "to shut up," (4) told Plaintiff to stop "eye balling him" or he would "pull

[Plaintiff's] eyes from [his] skull, (5) "placed [Plaintiff] o[n] the wall and started to slap me [o]n the back of the head," and (6) "placed his pocket knife to his [own] face and told [Plaintiff] he'll cut hi[m]self and say I did it [in order to] let the other inmates know he's not play[ing around]." (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) As a result of this misconduct, Plaintiff alleges that he suffered "mental anguish and distress." (*Id.* at ¶¶ 7, 9.)

These factual allegations do not plausibly suggest that Plaintiff suffered any *physical injury* as a result of Defendant's alleged misconduct. Generally, some slaps on the back of the head do not constitute a cognizable *physical injury* under the PLRA. *See Jackson v. Johnson, 04-CV-0110, 2005 U.S. Dist. LEXIS 21720, at *18-19, 32 (M.D. Ga. June 17, 2005)* (no physical injury under PLRA occurred where corrections officer, *inter alia*, "slapp[ed] [prisoner] in the face immediately [after shouting derogatory remark to him]"). **[*26]** This is especially true where, as here, there is no allegation that the slaps resulted in any observable or diagnosable medical condition requiring treatment by a medical care professional. *See Jarriett v. Wilson, 414 F.3d 634, 162 Fed. App'x 394, 400-01 (6th Cir. 2005)* (mild swelling of left toe with some pain but no need for medical treatment was not cognizable physical injury under PLRA); *Dixon v. Toole, 225 Fed. App'x 797, 799 (11th Cir. 2007)* ("mere bruising from the application of restraints [resulting in welts]" was not cognizable physical injury under PLRA); *Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir. 1997)* (prisoner's "sore, bruised ear lasting for three days" was not cognizable physical injury under PLRA); *cf. Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1998)* (citing *Siglar v. Hightower* for the point of law that the physical injury under the PLRA must be more than "de miminis"), *accord, Voorhees v. Goord, 05-CV-1407, 2006 U.S. Dist. LEXIS 48370, 2006 WL 1888638, at *10,*

---

"in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.'" *Donhauser v. Goord, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004)* (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds*, **[*24]** *317 F. Supp.2d 160 (N.D.N.Y. 2004)*.

2008 U.S. Dist. LEXIS 124388, *26

*n.2 (S.D.N.Y. Feb. 24, 2006)* (same), *Leon v. Johnson, 96 F. Supp.2d 244, 248 (W.D.N.Y. 2000)* (same).[18]

I note that *repeated punches* by correctional officials (while, of course, deplorable if unprovoked) have been specifically held by district courts in this Circuit to not constitute *physical injury* under the PLRA, where they resulted in only superficial and temporary irritations or abrasions. *See Espinal v. Goord, 00-CV-2242, 2001 U.S. Dist. LEXIS 5688, 2001 WL 476070, at *3-4, 12-13 (S.D.N.Y. May 7, 2001)* ("red face" suffered by inmate after correctional officer "struck [him] a couple times," "punch[ing] [him] in the head and face," did not constitute physical injury cognizable under PLRA); *Warren v. Westchester County Jail, 106 F. Supp.2d 559, 563, 569 (S.D.N.Y. 2000)* (minor scratches suffered **[*28]** by jail inmate as a result of two to three punches by guard, including two scratches to inmate's face, and very small cut inside mouth, did not constitute physical injury cognizable under PLRA); *cf. Abreu v. Nicholls, 04-CV-7778, 2007 U.S. Dist. LEXIS 52845, 2007 WL 2111086, at *5 (S.D.N.Y. July 24, 2007)* [collecting cases in which minor blows to inmates' faces and heads were not actionable under the *Eighth Amendment*].[19]

Furthermore, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to **[*29]** Defendant's motion, I would reach the same conclusion. None of those documents assert any allegations plausibly suggesting that Plaintiff suffered any physical injury as a result of Defendant's alleged misconduct on May 31, 2007. (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].)

Plaintiff alleges, in his letter to the Court of June 22, 2007, that, on June 18, 2007, Officer Turriglio made "intimidating comments" to Plaintiff, and "taunt[ed]" him, by saying to other Mess Hall workers, "McCloud knows I doesn't [sic] play." (Dkt. No. 6.) He alleges, in his letter to the Court of August 8, 2007, that, on July 14, 2007, during a conversation with Defendant, Plaintiff became "nervous" and "started studdering [sic] when [he] spoke" to Defendant. (Dkt. No. 12, at 1.) He alleges, in his letter to the Court of August 29, 2007, that, on August 21, 2007, he "fear[ed] [that] Officer Turriglio ha[d] tampered with [his] mail . . . [because Officer Turriglio was] the officer who had access to all inmate[']s legal mail." (Dkt. No. 15, at 1-2.) None of these three documents contains **[*30]** any allegation that Plaintiff suffered any physical injury at all. Furthermore, none of the three documents sufficiently connects any of the emotional distress described therein to the incident on May 31, 2007; rather, the documents all allege facts plausibly suggesting that the cause of the

_____

[18] *See also Harris v. Garner, 190 F.3d 1279, 1287 (11th Cir. 1999)* (prisoner's claim that corrections officers forced him to "dry shave" during **[*27]** prison "shakedown," causing him to experience bleeding, irritation, and pain, alleged only *de minimis* injury and not the kind of physical injury cognizable under the PLRA) [citation omitted], *opinion reinstated in part on rehearing, 216 F.3d 970 (11th Cir. 2000)*; *Russell v. Johnson, 07-CV-0008, 2008 U.S. Dist. LEXIS 12105, 2008 WL 480020, at *2 (M.D. Ga. Feb. 19, 2008)* (detainee's claim that, during a traffic stop, his foot was caught in police officer's automotive transmission, which resulted only in pain, was not cognizable physical injury under PLRA).

[19] *See also Borroto v. McDonald, 04-CV-0165, 2006 U.S. Dist. LEXIS 69287, 2006 WL 2789152, at *1 (N.D. Fla. Sept. 26, 2006)* (prisoner's claim that he was "repeatedly punched" by correctional officers, alone, did not allege the kind of *physical injury* that is cognizable under PLRA); *cf. Barker v. Lehrer, 02-*

*CV-0085, 2004 U.S. Dist. LEXIS 1229, 2004 WL 292142, at *4-5 (N.D. Tex. Jan. 30, 2004)* (fact that prisoner was "hit . . . with a closed fist on the left side of his forehead," resulting in "a lump on his forehead after the assault," did not constitute *physical injury* under PLRA).

emotional distress described in the documents was contact between Plaintiff and Defendant occurring more than two weeks after May 31, 2007.

The closest Plaintiff comes to alleging facts plausibly suggesting that he suffered a "physical injury" as a result of the incident on May 31, 2007, is when he alleges, in his letter to the Court of August 8, 2007, that, on July 14, 2007, a prison psychologist diagnosed Plaintiff with "anxiety." (Dkt. No. 12, at 1.) However, this allegation of "anxiety" is insufficient for two reasons. First, Plaintiff does not allege that the diagnosis of "anxiety" on July 14, 2007, was caused by the incident on May 31, 2007—as opposed to being caused by the incident on June 18, 2007 (which is not at issue in this action), or some sort of pre-existing emotional disorder. Second, and much more importantly, numerous courts have held—correctly, I believe—that physical manifestations **[*31]** of emotional injuries (e.g., anxiety, depression, stress, nausea, hyperventilation, headaches, insomnia, dizziness, appetite loss, weight loss, etc.) are not "physical injuries" for purposes of the PLRA.[20] This is especially true where, as here,

the plaintiff does not allege an extensive list of physical manifestations but only one, i.e., "anxiety."

Finally, for reasons similar to those articulated above, I find that the affidavit submitted by Plaintiff in opposition to Defendant's motion alleges no facts plausibly suggesting that he suffered a *physical injury* as a result of the incident on May 31, 2007 (or even any physical injury as a result of subsequent incidents). (Dkt. No. 18, Plf.'s Affid., ¶¶ 4, 5[A]-[H].)

For all of these reasons, I recommend that the Court dismiss Plaintiff's Complaint for failing to allege facts plausibly suggesting that he experienced any *physical injury* as a result of Defendant's alleged misconduct.

## B. Exhaustion of Available Administrative Remedies

In addition, the PLRA requires, in pertinent part, that prisoners who bring suit in federal court must first exhaust their available

---

[20] *See, e.g., Davis v. District of Columbia, 158 F.3d 1342, 1349, 332 U.S. App. D.C. 436 (D.C. Cir. 1998)* (weight loss, appetite loss, and insomnia caused by emotional distress not "physical injury" for purposes of PLRA); *Cooksey v. Hennessey, 07-CV-3829, 2007 U.S. Dist. LEXIS 73708, 2007 WL 2790365, at *1 (N.D. Cal. Sept. 20, 2007)* ("Physical symptoms that are not sufficiently distinct from a plaintiff's allegations of emotional distress do not qualify as a prior showing of physical injury [for purposes of the PLRA].") [internal quotation marks]; *Johnson v. Georgia, 06-CV-0049, 2007 U.S. Dist. LEXIS 66312, 2007 WL 2684985, at *3 (M.D. Ga. Sept. 7, 2007)* (stress and "a mental disorder" not "physical injury" for purposes of PLRA); *Brown v. Porter, 01-CV-20957, 2006 U.S. Dist. LEXIS 55383, 2006 WL 2092032, at *2 (N.D. Cal. July 26, 2006)* (migraines, dry mouth, and loss of appetite caused by mental health problems not "physical injury" for purposes of **[*32]** PLRA); *Watkins v. Trinity Serv. Group, Inc., 05-CV-1142, 2006 U.S. Dist. LEXIS 85592, 2006 WL 3408176, at *4 (M.D. Fla. Nov. 27, 2006)* (diarrhea, vomiting, cramps, nausea, and headaches from eating spoiled

food on one day not "physical injury" for purposes of PLRA); *Hill v. Williams, 03-CV-0192, 2005 U.S. Dist. LEXIS 23677, 2005 WL 5993338, at *4 (N.D. Fla. Oct. 14, 2005)* (thirty-minute episode of hyperventilation, accompanied by shortness of breath, swollen tongue, pounding heart, and headache, not "physical injury" for purposes of PLRA); **Mitchell v. Newryder, 245 F. Supp. 2d 200, 203, 205 (D. Me. 2003)** ("permanent traumatization" not "physical injury" for purposes of PLRA); *Todd v. Graves, 217 F. Supp.2d 958, 960 (S.D. Iowa 2002)* (stress, hypertension, insomnia, dizziness, and loss of appetite not "physical injury" for purposes of PLRA); *Ashann-Ra v. Virginia, 112 F. Supp.2d 559, 566 (W.D. Va. 2000)* (psychosomatic conditions, including sexual dysfunction, caused by emotional distress not "physical injury" for purposes of PLRA); *McGrath v. Johnson, 67 F. Supp.2d 499, 508 (E.D. Pa. 1999)* (inflamation of pre-existing skin condition caused by emotional trauma not "physical injury" for purposes of PLRA); *Cain v. Virginia, 982 F. Supp. 1132, 1135 & n.3 (E.D. Va. 1997)* **[*33]** (depression and painful headaches caused by emotional distress not "physical injury" for purposes of PLRA); *Pinkston-Bey v. DeTella, 96-CV-4823, 1997 U.S. Dist. LEXIS 3969, 1997 WL 158343, at *3 (N.D. Ill. March 31, 1997)* (severe headaches caused by emotional distress not "physical injury" for purposes of PLRA).

administrative remedies: "No action shall be brought with respect to prison conditions under _§1983_ . . . by a prisoner confined in any jail, prison, **[\*34]** or other correctional facility until such administrative remedies as are available are exhausted."[21] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[22] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[23]

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[24] First, an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's **[\*35]** superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. Third, a grievant may

appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal.

It is important to emphasize that any failure by the IGRC or the superintendent to adequately respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[25] It is also important to emphasize that DOCS provides for an expedited procedure for the review of grievances alleging employee harassment.[26] While this procedure provides for review of the grievance directly by the facility superintendent, it still requires the filing of a grievance by the inmate.[27] Furthermore, the superintendent's decision must be appealed to CORC **[\*36]** in order for the inmate to complete the grievance process.[28]

---

[21] _42 U.S.C. § 1997e._

[22] _Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)._

[23] _7 N.Y.C.R.R. § 701.7._

[24] _7 N.Y.C.R.R. § 701.7;_ see also _White v. The State of New York, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002)._

---

[25] _7 N.Y.C.R.R. § 701.6(g)_ ("[M]atters not decided within the time limits may be appealed to the next step."); _Hemphill v. New York, 198 F. Supp.2d 546, 549 (S.D.N.Y. 2002),_ vacated and remanded on other grounds, _380 F.3d 680 (2d Cir. 2004);_ see, e.g., _Croswell v. McCoy, 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, 2003 WL 962534, at \*4 (N.D.N.Y. March 11, 2003)_ (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); _Reyes v. Punzal, 206 F. Supp.2d 431, 433 (W.D.N.Y. 2002)_ ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); _Nimmons v. Silver,_ 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), _adopted by_ Decision and Order (N.D.N.Y. filed **[\*37]** Oct. 17, 2006) (Hurd, J.).

[26] _7 N.Y.C.R.R. § 701.2._

[27] _Id._

[28] _Id._

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies.[29] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[30] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[31] Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[32] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly **[*38]** alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[33]

Before I proceed to an analysis of the above-referenced three-part inquiry established by the Second Circuit, I should briefly discuss the appropriateness (or inappropriateness) of a failure-to-exhaust argument during a motion to dismiss for failure to state a claim upon which

relief might be granted, pursuant to _Fed. R. Civ. P. 12(b)(6)_.

For some years now, it has been the majority rule (followed by the Second Circuit) that a prisoner's fulfillment of his duty to exhaust his available administrative remedies under the Prison Litigation Reform Act ("PLRA") is not a fact that the prisoner had to plead in order to state a claim under _42 U.S.C. § 1983_ but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment **[*39]** pursuant to _Fed. R. Civ. P. 56_, or a motion to dismiss for lack of subject-matter jurisdiction pursuant to _Fed. R. Civ. P. 12[b][1]_) established by the PLRA. _See, e.g., Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999)_ ("Because, under the PLRA, a prisoner must exhaust administrative remedies before filing a _§1983_ suit . . ., a defendant in a prisoner _§ 1983_ suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements."); _Snider v. Melindez, 199 F.3d 108, 114 (2d Cir. 1999)_ ("A court may not dismiss for failure to exhaust administrative remedies unless the court determines that such remedies are available. Snider's answers [on a form complaint] cannot establish that.").

Recently, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in prisoner civil rights case. _See Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 914-915, 918-923, 166 L. Ed. 2d 798 (2007)_. A prisoner has no independent _duty_ to plead facts plausibly suggesting that he exhausted his available administrative remedies, in order to state an actionable claim **[*40]** under _42 U.S.C. § 1983_. _Bock, 127 S. Ct. at 919-21_. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." _Id. at 921_. If a prisoner _chooses_ to plead facts

---

[29] _Rodriguez v. Hahn, 209 F. Supp. 2d 344, 347-48 (S.D.N.Y. 2002)_; _Reyes v. Punzal, 206 F. Supp. 2d 431, 433 (W.D.N.Y. 2002)_.

[30] _See Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir. 2004)_.

[31] _Hemphill, 380 F.3d at 686_ (citation omitted).

[32] _Id._ [citations omitted].

[33] _Id._ [citations and internal quotations omitted].

regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his Complaint may be dismissed for failure to state a claim. *Id. at 920-21*. Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as the saying goes. This is what has happened here, according to Defendants.

### 1. Availability of Administrative Remedies

With regard to the first inquiry (i.e., whether the administrative remedies not pursued by Plaintiff were in fact available to Plaintiff), I answer this question in the affirmative, based on even the most liberal of constructions of Plaintiff's Complaint. More specifically, I find that Plaintiff has not alleged **[*41]** any facts plausibly suggesting that administrative remedies were not available to prisoners at Greene C.F. during the time in question (i.e., between the occurrence of the event in question, on May 31, 2007, and the expiration of the deadline by which to file a grievance 14 days later, on or about June 14, 2007). Indeed, Plaintiff quite expressly alleges that there was a prisoner grievance procedure at Greene C.F. (Dkt. No. 1, ¶ 4[a] [Plf.'s Compl.].)

Furthermore, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to Defendant's motion, I would reach the same conclusion. None of those documents assert any allegations plausibly

suggesting that administrative remedies were not available to prisoners (and Plaintiff in particular) at Greene C.F. during the time in question. (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].)

### 2. Estoppel

With regard to the second inquiry **[*42]** (i.e., whether Defendant's own actions inhibited Plaintiff's exhaustion of remedies so as to estop Defendant from raising Plaintiff's failure to exhaust as a defense), I answer this question in the negative, based on even the most liberal of constructions of Plaintiff's Complaint. In his Complaint, Plaintiff alleges no facts plausibly suggesting that Defendant took any actions whatsoever that inhibited Plaintiff from exhausting his available administrative remedies at Greene C.F. during the time in question (i.e., between the occurrence of the event in question, on May 31, 2007, and the expiration of the deadline by which to file a grievance 14 days later, on or about June 14, 2007). Rather, Plaintiff alleges that he chose to not present the facts relating to his Complaint in the prison's grievance program "[b]ecause I fear retaliation from officers and the officer [I]'m fil[l]ing against brag[s] about the grievance system not working and he claims his uncle is a superintendent [at Greene C.F.]." (*Id.*) Plaintiff's feeling of fear of "retaliation from [unidentified] officers" is completely unexplained and wholly conclusory. Furthermore, Defendant's action of "brag[ing] about the grievance **[*43]** system not working" and claiming that his uncle was a superintendent an Greene C.F. in no way constitutes an *action* by Defendant that inhibited Plaintiff from filing a grievance at Greene C.F. about the events giving rise to his claims in this action. At best, these statements

by Defendant constituted an indication that Plaintiff might be *unsuccessful* in the grievance process before any appeal reached to the final level of review, by DOCS' Central Office Review Committee ("CORC"). Notifying an inmate of the *prospect* of *initial* failure (due to alleged antipathy for inmates or even sympathy for correctional officers, held by various *other* officials, participating in the grievance process) is hardly the sort of adverse *action* that is required to estop a correctional officer from asserting the legal defense of non-exhaustion.

Nor do the other factual allegations of Plaintiff's Complaint plausibly suggest that Defendant took any actions that inhibited Plaintiff from exhausting his available administrative remedies at Greene C.F. so as to estop Defendant from raising Plaintiff's failure to exhaust as a defense. Plaintiff alleges, on May 31, 2007, Defendant (1) told Plaintiff to "stop eye **[*44]** balling him" or he would "pull [Plaintiff's] eyes from [his] skull," (2) "slap[ped] [Plaintiff] on the side of his head," and (3) placed a pocket knife to *his own face* and threatened to cut *his own face* and blame it on Plaintiff in order to let the other inmates know he was not "play[ing]" around. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) The problem with these allegations (at least from Plaintiff's perspective) is that they have absolutely nothing to do with the filing of any grievance, or even the making of any verbal complaint, by Plaintiff. Simply stated, while the alleged conduct is (of course) deplorable, it did not (as alleged) have either the design or effect of preventing Plaintiff from exhausting his administrative remedies.

Morever, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in

opposition to Defendant's motion, I would reach the same conclusion. None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during **[*45]** the time in question. (*See* Dkt. No. 6 [Plf.'s Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].)

In particular, Plaintiff's letter to the Court of June 22, 2007, alleges that, on June 18, 2007, Defendant "intimidat[ed]" and "taunt[ed]" Plaintiff by saying to other inmates, "McCloud knows I [don't] play" around. (Dkt. No. 6.) This allegation fails for the same reason as the allegation about Defendant's earlier comments to Plaintiff fails: it had absolutely nothing to do with the filing of any grievance, or the making of any complaint, by Plaintiff. Moreover, Defendant's utterance of these words occurred on June 22, 2007, more than a *week* after Plaintiff had decided not to exhaust his available administrative remedies. (The deadline by which Plaintiff had to file a grievance regarding the incident on May 31, 2007, expired on or about June 14, 2007.)[34] Thus, it could not have possibly inhibited Plaintiff from exhausting his available administrative remedies.

Plaintiff's **[*46]** letter to the Court of August 8, 2007, alleges that, on July 14, 2007, Defendant said to Plaintiff, "I spok[e] to the Imam [about] what[']s going on[.] [Y]ou can talk to me man to man." (Dkt. No. 12.) An attempt to informally resolve a dispute (which is encouraged in DOCS' grievance process) is not an act inhibiting an inmate from exhausting his available administrative remedies. Plaintiff's letter of August 8, 2007, further

---

[34] As described above, an inmate must file a complaint with the facility's IGP clerk within 14 calendar days of the alleged occurrence.

alleges that on July 24, 2007, persons *other than Defendant* coerced Plaintiff into making a false statement about what had taken place between Plaintiff and Defendant. (*Id.*) Plaintiff alleges no action by *Defendant* on July 24, 2007. Nor does Plaintiff explain how the false statement on *July* 14, 2007--whatever that false statement may have been--in any way caused his decision by *June* 14, 2007, not to exhaust his available administrative remedies.

Plaintiff's letter to the Court of August 29, 2007, alleges that Plaintiff obtained reason to "fear" that Defendant was responsible for the delayed arrival of a piece of his legal mail on August 21, 2007. (Dkt. No. 15.) However, the sole reason for this fear was the (alleged) fact that Defendant "had access to all inmate[']s **[*47]** legal mail." (Dkt. No. 15.) Moreover, this fear occurred on August 21, 2007, which was more than *two months* after Plaintiff had decided to not exhaust his available administrative remedies by June 14, 2007.

In an affidavit submitted in opposition to Defendant's motion, Plaintiff swears that, before the incident on May 31, 2007, a fellow inmate, Saheithe Pigford, filed both a federal court action and a grievance against Officer Turriglio and was "beaten on several occasions, threaten[ed] and had his personal area searched during late evening or at predawn hours." (Dkt. No. 18, Plf.'s Affid., ¶ 4.) Plaintiff also swears that, on May 31, 2007, "Plaintiff was aware of what had happened to . . . [Inmate] Shakeith Pigford as a result of filing his grievance [against Officer Turriglio]" since the "Pigford . . . incident[] occurred prior to that of the plaintiffs' [sic]." (*Id.* at ¶ 5[A].)

For the sake of argument, I will assume that Plaintiff is swearing that Mr. Pigford was beaten *by Officer Turriglio* (since actions *by third-persons* can hardly estop Officer Turriglio from asserting Plaintiff's failure to exhaust as a legal defense). The problem with Plaintiff's sworn assertion is that it is **[*48]** so patently false as to be implausible (if not sanctionable). I take judicial notice of the fact that Inmate Pigford did not file the action to which Plaintiff is referring (which is the only federal court action that has been filed by Shakeith Pigford, according to the Federal Judiciary's PACER service) until nearly *a month after* the incident giving rise to the current action, on May 31, 2007. *See Pigford v. Turriglio*, 07-CV-0687, Complaint (N.D.N.Y. filed June 29, 2007, and dated June 25, 2007). Furthermore, I take judicial notice of the fact that the event giving rise to Inmate Pigford's action against Officer Turriglio did not occur until *three days after* the event giving rise to the current action, on May 31, 2007. *See Pigford v. Turriglio*, 07-CV-0687, Complaint, ¶ 6 (N.D.N.Y.). No mention is made in Inmate Pigford's Complaint as to when he filed his grievance and was assaulted. *Id.* at ¶¶ 4(b), 6. However, given the clear factual inaccuracies of Plaintiff's other sworn statements regarding Inmate Pigford's experience, I find that Plaintiff's allegation that Inmate Pigford's experience dissuaded Plaintiff from filing a grievance in this action (from May 31, 2007, to June 14, 2007) **[*49]** to be wholly *implausible*.

Furthermore, because I find that the absence of this factual allegation (regarding Inmate Pigford's having been assaulted for filing a grievance against Officer Turriglio) from Plaintiff's Complaint (which is otherwise quite specific as to why Plaintiff "fear[ed] retaliation" if he filed a grievance) to be conspicuous, I find that this late-blossoming factual allegation to be *inconsistent* with the factual allegations of Plaintiff's Complaint. Therefore, I find that this portion of Plaintiff's Opposition Affidavit may not serve to effectively amend Plaintiff's Complaint. (*See, supra*, note 17 of this Report-Recommendation [citing cases].)

In his affidavit, Plaintiff also swears that, before the incident on May 31, 2007, a fellow

inmate, Mohammed Montalvo, filed a grievance against Officer Turriglio for "brandish[ing] a knife" and was "threaten[ed] thereafter with bodily harm until he agreed to sign-off [sic] on the grievance . . . ." (Dkt. No. 18, Plf.'s Affid., ¶ 4.) For the sake of brevity, I will set aside the fact that Plaintiff does not assert precisely *when* Inmate Montalvo was so threatened. I will also set aside incredulity with which I view this late-blossoming, **[*50]** self-serving sworn statement, given Plaintiff's other misrepresentations to the Court—discussed above, and below. (*See, infra,* Part III.C. of this Report-Recommendation.) The more important fact is that Plaintiff does not allege that it was *Officer Turriglio* who threatened Inmate Montalvo with bodily harm. Again, actions *by third-persons* cannot estop Officer Turriglio from asserting Plaintiff's failure to exhaust as a legal defense. Moreover, because of the conspicuous absence of this factual allegation (regarding Inmate Montalvo's having been threatened for filing a grievance against Officer Turriglio) from Plaintiff's Complaint (which is otherwise quite specific as to why Plaintiff "fear[ed] retaliation" if he filed a grievance), I find that this factual allegation to be *inconsistent* with the factual allegations of Plaintiff's Complaint. Therefore, I find that this portion of Plaintiff's Opposition Affidavit may not serve to effectively amend Plaintiff's Complaint. (*See, supra,* note 17 of this Report-Recommendation [citing cases].)

Finally, in his affidavit, Plaintiff swears that he experienced several other adverse actions following the incident in question on May 31, 2007. As an **[*51]** initial matter, the vast majority of this asserted misconduct was committed by correctional officers at Greene C.F. other than Defendant. More importantly, all of this misconduct occurred between July 24, 2007, and October 9, 2007--*well after* the expiration of the June 14, 2007, deadline by which he had to file a grievance regarding the incident giving rise to this action. (*See* Dkt. No.

18, Plf.'s Affid., ¶¶ 5[D]-[H].) Thus, it is impossible for this misconduct to have been the reason that Plaintiff chose not to file a grievance against Defendant between May 31, 2007, and June 14, 2007.

## 3. "Special Circumstances" Justifying Failure to Exhaust

With regard to the third inquiry (i.e., whether Plaintiff has plausibly alleged *special circumstances* justifying his failure to comply with the administrative procedural requirements), I answer this question in the negative, also based on even the most liberal of constructions of Plaintiff's Complaint. Plaintiff has not alleged that, during the time in question, he was laboring under any sort of physical infirmity, or reasonable misunderstanding of the law, which impeded his attempts to complain. Indeed, he has not even alleged, in his Complaint, **[*52]** that he *attempted* to complain, for example, by sending a letter of complaint directly to CORC, the DOCS' Commissioner, or a Deputy Commissioner (which prisoners occasionally do in analogous circumstances).

Morever, even if (out of special solicitude to Plaintiff) I were to consider the factual allegations contained in Plaintiff's three aborted efforts at filing an amended or supplemental pleading, and the factual allegations contained in Plaintiff's papers in opposition to Defendant's motion, I would reach the same conclusion. None of those documents allege facts plausibly suggesting the existence of any special circumstances justifying Plaintiff's failure to pursue (and exhaust) his administrative remedies during the time in question (i.e., between the occurrence of the event in question, on May 31, 2007, and the expiration of the deadline by which to file a grievance 14 days later, on or about June 14, 2007). (*See* Dkt. No. 6 [Plf.'s

Letter filed 6/22/07]; Dkt. No. 12 [Plf.'s Letter filed 8/8/07]; Dkt. No. 15 [Plf.'s Letter filed 8/29/07]; Dkt. No. 18 [Plf.'s Opposition Papers].) I note that Plaintiff swears that, between June 3, 2007, and June 5, 2007, he wrote letters of complaint **[*53]** to both the New York State Inspector General's Office, and the Superintendent of Greene C.F., regarding the incident on May 31, 2007. (*See* Dkt. No. 18, Plf.'s Affid., ¶¶ 5[B]-[C].) However, Plaintiff does not explain why the "letter of complaint" that he sent to the superintendent was not in the form of a grievance filed with the Greene C.F. IGRC, as required by *7 N.Y.C.R.R. § 701.2*. Nor does Plaintiff explain why he failed to write to CORC, following whatever action the superintendent did or did not take with respect to the "letter of complaint." Nor does Plaintiff allege that, during the time in question, he was laboring under any sort of physical infirmity, or reasonable misunderstanding of the law, which impeded his attempts to file a formal grievance with the Greene C.F. IGRC, or at least write a letter of complaint to CORC.

For all of these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint for alleging facts plausibly suggesting that he failed to exhaust his available administrative remedies following the incident on May 31, 2007.

## C. Second Alternative Ground for Dismissal: Misrepresentations to Court

As stated above in this Report-Recommendation, **[*54]** Plaintiff has, in a sworn statement, falsely stated to the Court that, when the incident in question occurred on May 31, 2007, Plaintiff was aware that a fellow inmate (Shakeith Pigford) had been retaliated against for having filed a grievance against Officer Turriglio—a temporal impossibility since the event giving rise to Inmate Pigford's

grievance had not even yet occurred as of May 31, 2007. (*See, supra,* Part III.B.2. of this Report-Recommendation.) This is not the only misrepresentation that Plaintiff has made to the Court.

As of the date he filed this action on June 16, 2007, Plaintiff had acquired two "strikes" for purposes of *28 U.S.C. § 1915*'s so-called "three strikes rule." *See McCloud v. D.O.C.,* 06-CV-14278 (S.D.N.Y.) (prisoner civil rights case filed by an inmate bearing New York City Department of Correction Identification Number 141-06-05253, with a date of birth of 9/1/74; dismissed *sua sponte* for failure to state a claim pursuant to *28 U.S.C. § 1915* on 12/8/06); *McCloud v. D.O.C.,* 06-CV-14279 (S.D.N.Y.) (prisoner civil rights case by an inmate bearing New York City Department of Correction Identification Number 141-06-05253, with a date of birth of 9/1/74; dismissed *sua* **[*55]** *sponte* for failure to state a claim pursuant to *28 U.S.C. § 1915* on 12/8/06).

Plaintiff failed to disclose these two cases in Paragraph 5 of his sworn Complaint, where he checked the box labeled "Yes" next to the question "Have you ever filed any other lawsuits in any state or federal court relating to his imprisonment?" but then listed only one such lawsuit (i.e., *McCloud v. Buckhalter,* 07-CV-4576 [S.D.N.Y.]) in response to the form complaint's directive: "If your answer to 5(a) is YES you must describe any and all lawsuits, currently pending or closed, in the space provided on the next page." (Dkt. No. 1, ¶ 5 [Plf.'s Compl.].)

While a plaintiff is under no duty to provide this information in order to state an actionable civil rights claim, here, Plaintiff *chose* to answer a question on a form complaint calling for such information, and *swore* to the truthfulness of his answer. There is simply no excuse for making such a sworn misrepresentation to the Court. District Judges from this Court have

indicated a willingness to sanction *pro se* litigants for making such misrepresentations. *See, e.g., Standley v. Dennison, 05-CV-1033, 2007 U.S. Dist. LEXIS 61394, 2007 WL 2406909, at \*13-14 (N.D.N.Y. Aug. 21, 2007)* (Sharpe, **[\*56]** J., adopting, on *de novo* review, Report-Recommendation by Lowe, M.J., premised on alternative ground that the plaintiff should be sanctioned for making a material misrepresentation to the Court in his complaint); *Muniz v. Goord, 04-CV-0479, 2007 U.S. Dist. LEXIS 50072, 2007 WL 2027912, at \*6 & n.32 (N.D.N.Y. July 11, 2007)* (McAvoy, J., adopting, on plain-error review, Report-Recommendation by Lowe, M.J., premised on alternative ground that the plaintiff should be sanctioned for making a material misrepresentation to the Court in his complaint) [collecting cases]. I have considered less drastic sanctions and have found them to be inadequate to curb this particular intentional and egregious litigation abuse.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint *sua sponte*, under *Fed. R. Civ. P. 11*, as a sanction for making multiple sworn misrepresentations to the Court.

### D. Third Alternative Ground for Dismissal: Unavailability of Relief Requested

As stated above in Part I.A. of this Report-Recommendation, as a result of the misconduct alleged in this action, Plaintiff is requesting three forms of relief: (1) a court order "secur[ing] [Plaintiff's] safety and mak[ing] sure **[\*57]** there will be []no[] retaliation from coworkers or staff"; (2) a court order directing that a search be performed of Defendant's "file to see if [a]ny complaints or grievances [have] been filed against him in the past concerning brutality"; and (3) "$1,000,000 for mental anguish and distress." (Dkt. No. 1,

¶¶ 7, 9 [Plf.'s Compl.].)

I find that the first two forms of relief are able to be, and should be, denied on the alternative ground that Plaintiff has alleged no facts plausibly suggesting his entitlement to either form of relief. The first form of relief, which is essentially an injunction or temporary restraining order, must be supported by documents showing cause for the granting of the requested relief—which Plaintiff's Complaint does not do. *See Fed. R. Civ. P. 65*; *N.D.N.Y. L.R. 65.1*, 65.2, *7.1(f)*, *7.1(b)(2)*, *7.1(e)*. The second form of relief is merely a vehicle by which Plaintiff may embark on a fishing expedition to obtain facts that would enable him to assert an actionable legal claim against Defendant. *Rule 8 of the Federal Rules of Civil Procedure*—which requires that a plaintiff must assert enough facts in his complaint (and thus be in possession of such basic facts *before* **[\*58]** he files the complaint) to give a defendant *fair notice* of the claim against him—does not permit such a "bootstrap" pleading.[35] Nor does Plaintiff even provide cause in support of what is essentially a request for discovery.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's

---

[35] *See Balliett v. Heydt, 95-CV-5184, 1997 U.S. Dist. LEXIS 14913, at \*3-9, 29 (E.D. Pa. Sept. 25, 1997)* (referring to a similar attempt to state a claim--based on information generated in 1997, several years after the filing of the complaint in 1995--as a "means of circular pleading and bootstrapping"); *Hill v. Austin, 957 F. Supp. 604, 1997 U.S. Dist. LEXIS 11737, at \*10 (N.D. Ill. 1990)* ("Hill cannot bootstrap his [untimely and therefore non-actionable] complaints dealing with the years 1976 through 1982 through his timely filing of the complaint on the 1985 involuntary detail."); *cf. City of New York v. Permanent Mission of India to the U.N., 446 F.3d 365, 377 (2d Cir. 2006)* (referring to an analogous attempt to state a claim as a "use [of] creative pleading to 'bootstrap' claims" that were otherwise unavailable to the plaintiff); *Scott v. Johnson, 95-CV-0403, 1995 U.S. Dist. LEXIS 22445, at \*6 (W.D. Mich. July 28, 1995)* ("A prison inmate cannot bootstrap **[\*59]** his complaints with conclusory allegations of retaliation . . . .") [citation omitted].

Complaint *sua sponte*, under *28 U.S.C. § 1915(e)(2)(B)(ii)* and *28 U.S.C. § 1915A(b)*,[36] to the extent that the Complaint requests, as relief for the constitutional violation(s) alleged, (1) a court order "secur[ing] [Plaintiff's] safety and mak[ing] sure there will be []no[] retaliation from coworkers or staff," and (2) a court order directing that a search be performed of Defendant's "file to see if [a]ny complaints or grievances [have] been filed against him in the past concerning brutality." (Dkt. No. 1, ¶¶ 7, 9 [Plf.'s Compl.].)

**ACCORDINGLY**, for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) be **GRANTED**; and it is further

**RECOMMENDED** that, when dismissing Plaintiff's Complaint (Dkt. No. 1), the Court state that the dismissal constitutes a "strike" for purposes of *28 U.S.C. § 1915(g)*; and it is further

**RECOMMENDED** that the Court certify in writing, for purposes of *28 U.S.C. § 1915(a)(3)*, that any appeal taken from the Court's final judgment in this action would not be taken in good faith.

Pursuant to *28 U.S.C. § 636(b)(1)*, the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)* (citing *Small v. Sec'y of Health and Human Servs., 892 F.2d 15 [2d Cir. 1989])*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72*, *6(a)*, *6(e)*).

Dated: March 17, 2008

Syracuse, New York

/s/ George H. Lowe

George H. Lowe

United States **[*61]** Magistrate Judge.

---

End of Document

---

[36] *See 28 U.S.C. § 1915(e)(2)(B)(ii)* ("[T]he court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis*] at any time if the court determines that . . . the action . . . is frivolous or malicious[,] . . . fails to state a claim on which relief may be granted[,] . . . or . . . seeks monetary relief against a defendant who is immune from such relief"); *28 U.S.C. § 1915A(b)* ("On review, the court shall . . . dismiss the [prisoner's] complaint, or any portion of the complaint, **[*60]** if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted . . . .").