**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NICHOLAS ZIMMERMAN,

                              Plaintiff,

          v.                                    9:17-CV-0375
                                                (CFH)
DEPUTY BROWN, SHU SERGEANT
RANDALL, SHU LIEUTENANT RIEF,[1]

                              Defendants.

---

**APPEARANCES:**                    **OF COUNSEL:**

NICHOLAS ZIMMERMAN
02-A-1663
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821
Plaintiff pro se

New York State Attorney General          AMANDA K. KURYLUK, ESQ
The Capitol
Litigation Bureau
Albany, New York 12224-0241
Attorney for defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION & ORDER

#### I. **Background**

         Parties appeared for trial on September 25, through September 27, 2023, to

address plaintiff's claims that defendants Randall, Reif, and Brown violated his

---

[1]   As Former Superintendent Steven Racette was dismissed from this case on September 20, 2022, the Clerk of the Court is directed to update the caption to reflect those defendants who remained in the case at the time of trial.  See Dkt. Nos. 109, 110.

constitutional rights under the Eighth Amendment as it related to the condition of his cell in the special housing unit ("SHU").  At the close of plaintiff's proof, defendants made Rule 50 motion, which the Court granted as to defendant Brown.[2]  See Text. Min. Entry dated Sept. 26, 2023.  On September 27, 2023, the jury verdict was returned in favor of defendants Randall and Rief.  See Dkt. Nos. 156. 159.[3]

Plaintiff now moves, pursuant 59(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") to vacate the verdict and award a new trial.  See Dkt. No. 160. Defendants oppose.  See Dkt. No. 167.  Plaintiff filed a reply.  See Dkt. No. 169. Plaintiff submitted a "supplement," on July 12, 2024.[4]  Dkt. No. 171.  Upon the Court's direction, defendants submitted a response to the supplement.  See Dkt. No. 173.

## II.  Legal Standards

Rule 59 of the Federal Rules of Civil Procedure provides that "[a] new trial may be granted . . . for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59(a)(1). The Second Circuit has interpreted this standard to permit the granting of new trials when "in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir.1998) (quotation marks and citation omitted). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." Id.

Under Rule 59(a), "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." Id. In considering a motion for a new trial, the court is free to weigh the evidence independently and need not view it in the light most favorable to the verdict winner. See Manley v. Ambase Corp., 337 F.3d 237, 244-45

---

[2]  The Court reserved as to defendants Randall and Rief, and thereafter denied the motion as to those defendants.

[3]  On October 30, 2023, plaintiff filed this motion.  See Dkt. No. 160.  On October 31, 2023, plaintiff filed a notice of appeal of the judgment to the Second Circuit Court of Appeals. See Dkt. No. 164, 166.  The appeal was stayed pending a determination of this motion.  See Dkt. No. 170.

[4]   The Court accepted the significantly belated submission on a fully-briefed motion "out of an abundance of special solicitude to plaintiff."  Dkt. No. 172.

(2d Cir. 2003). The standard for granting such a motion is high and rulings on motions under Rule 59(a) "are committed to the sound discretion of the district court." Severino v. Am. Airlines, No. 07 CV 941, 2009 WL 1810014, *2 (S.D.N.Y. June 24, 2009) (quoting, inter alia, Sequa Corp. v. GBJ Corp., 156 F.3d 136, 143 (2d Cir.1998)). "While a jury's credibility assessments are entitled to deference, these principles of deference to the jury do not override the trial judge's duty to see that there is no miscarriage of justice." Livingston v. Escrow, No. 08-CV-6576-FPG, 2014 WL 1466469, *2 (W.D.N.Y. Apr. 15, 2104) (citations omitted). "The Second Circuit has instructed district courts to 'abstain from interfering with [a jury] verdict unless it is quite clear that the jury has reached a seriously erroneous result' that would result in 'a miscarriage of justice.'" Fioto v. Manhattan Woods Golf Enter., LLC., 304 F.Supp. 2d 541, 545–546 (S.D.N.Y.2004) (citing Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978)). "'Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite of the apple.'" Carlson v. Parry, No. 06-CV-6621P, 2013 WL 5354517, *5 (W.D.N.Y. Sept. 24, 2013) (quoting Kogut v. Cnty. of Nassau, 2013 WL 3820826, *2 (E.D.N.Y. July 22, 2013)).

Somerville v. Saunders, No. 9:11-CV-556 (MAD/DEP), 2014 WL 1679950, at *1

(N.D.N.Y. Apr. 28, 2014).

A new trial on the basis of improper evidentiary rulings will be granted only where the improper rulings "affect[ ] a substantial right of the moving party." Mem'l Drive Consultants, Inc. v. ONY, Inc., 29 F. App'x 56, 61 (2d Cir. 2002) (summary order) (citing Malek v. Fed. Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993)). Whether an evidentiary error implicates a substantial right depends on "the likelihood that the error affected the outcome of the case." Malek, 994 F.2d at 55.

Hansen v. Warren Cnty., No. 1:17-CV-1134 (TWD), 2020 WL 4877186, at *2 (N.D.N.Y.

Aug. 20, 2020).

[C]ourts in the Second Circuit accord a "high degree of deference . . . to the jury's evaluation of witness credibility," and caution "that jury verdicts should be disturbed with great infrequency." ING Glob.[,] 757 F.3d at 97–98 (quoting Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012)); see also Am. Tech. Ceramics Corp. v. Presidio Components, Inc., 490 F. Supp. 3d 593, 623 (E.D.N.Y. 2020) (quoting Fireman's Fund Ins. Co. v. Great Am. Ins. Co., F. Supp. 3d 460, 475 (S.D.N.Y. 2014)) ("A motion to alter or amend judgment is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"). As such, where "a verdict is predicated almost

entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." Raedle, 670 F.3d at 418-19.

Saleh v. Pretty Girl, Inc., No. 09-CV-1769 (RER), 2022 WL 4078150, at *8 (E.D.N.Y. Sept. 6, 2022).

"To the extent any such motion for a new trial is premised on an objection to a jury instruction, Federal Rule of Civil Procedure 51 requires the movant to have raised that objection before the jury retires, in order to preserve the objection." Robinson v. Ballard, No. 9:13-CV-01213 (TWD), 2019 WL 4686355, at *5 (N.D.N.Y. Sept. 26, 2019) (citing Brenner v. World Boxing Council, 675 F.2d 445, 456 (2d Cir. 1982), cert. denied, 459 U.S. 835 (1982)). "A jury instruction is erroneous, and a new trial warranted, only if it misleads a jury as to the correct legal standard or does not adequately inform the jury on the law." Id. at *6 (citing Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994).

### III.  Arguments[5]

### A.  Discovery Documents

At the final pretrial conference on September 19, 2023, plaintiff argued that an envelope that defense counsel mailed to him on September 11, 2023, did not contain

---

[5] "[F]or the bulk of Plaintiff's arguments, he fails to cite to any transcript or record from the trial to support them. These "unsupported contentions . . . are insufficient to justify the grant of a new trial." Hansen v. Warren Cnty., No. 1:17-CV-1134 (TWD), 2020 WL 4877186, at *2 (N.D.N.Y. Aug. 20, 2020) (quoting AMW Materials Testing, Inc. v. Town of Babylon, No. 01 CV 4245 (ADS) (ETB), 2008 WL 11449231, at *18 (E.D.N.Y. Mar. 13, 2008) and citing Robinson v. Ballard, 9:13-CV-01213 (TWD), 2019 WL 4686355, at *3 (N.D.N.Y. Sept. 26, 2019)). Plaintiff appears to contend that it was defendants' burden to order trial transcripts. However, as plaintiff is the moving party, if he wanted use of the transcript to use in support of his motion, such request and associated cost would be his burden to bare, regardless of his pro se status. Despite his failures to provide such cites, out of special solicitude to plaintiff pro se, the Court has considered and will address plaintiff's arguments. See Hansen, 2020 WL 4877186, at *2.

the documents that she told plaintiff and the Court she would provide.  See Dkt. No. 176 at 46.  Plaintiff stated that the only document that was included in that envelope was "cell movement" but that he was not provided with the full documents he requested: no mental health records, medical records, pictures of SHU Cell 13, or "to/froms".  Id.  Ms. Kuryluk says she sent him copies of summary judgment motions and depositions "prior to September 11." Id. at 46.  Ms. Kuryluk contended that the first envelope that was sent out to plaintiff was "quite voluminous" and stated that she also sent them to Mr. Rehfuss by e-mail and "did not get a kickback." Id. at 47-48.  She further stated that she sent plaintiff, "right after our phone call from our first conference [August 11, 2023], I sent him copies of everything he should have already had including the two summary judgment motions, the declaration, his deposition transcripts.  I have a separate declaration of service for that submission." Id. at 47.  Ms. Kuryluk stated that, after the second conference, she sent further document and that she "ha[s] a second declaration of service for the additional documents that I sent on September 11.  I would have no reason to hide any documents from him or keep anything from him, and I would certainly not have staff in my office sign a declaration of service of it was fraudulent." Id. at 48.  Ms. Kuryluk offered to "have my secretary pull everything" and "resend." Id.  Ms. Kuryluk also stated that she sent all of the documents to Mr. Rehfuss, plaintiff's standby counsel, by e-mail, and that Mr. Rehfuss indicated that he did not receive them, but that Ms. Kuryluk "did not get a kick-back" and that she sent them again to Mr. Rehfuss "as soon as we got off the phone last week, and I did not get a kick-back." Id. at 48-49.

The Court noted that Ms. Kuryluk had affidavits of service that she sent plaintiff the documents they discussed, and that it is directing Ms. Kuryluk to provide binders of

all of the documents she planned to use at trial to be provided to plaintiff and Mr. Rehfuss before trial starts.  See Dkt. No. 176 at 49.  The Court indicated that he could also direct that the documents be resent, but that the Court was "not certain you're going to get it between now and when this trial starts on Monday." Id.

Plaintiff responded that he would be unable to prepare for trial if he does not receive these documents until the morning of trial.  See Dkt. No. 176 at 49.   The Court reminded plaintiff that discovery ended five years ago, and that plaintiff could have asked those documents for the Court at an earlier time and that Ms. Kuryluk was providing them as a "pretty generous effort" considering that discovery had long ended. Dkt. No. 176 at 50.  Plaintiff stated he has been "fighting" to obtain his medical and mental health records for three years, attempting to obtain his records through FOIL. See id. at 50.  The Court advised plaintiff that he could have reached out to the Court at any time in past five years to asked for assistance in obtaining documents, but did not do so until "less than two weeks ago." Id. at 50-51.  Court reminded plaintiff that he was given multiple adjournments so he had sufficient time to review information and respond and all time after decision when he sent in further opposition.  See id.

What plaintiff continues to ignore in his motion to vacate is that plaintiff requested these documents five years after the close of discovery and shortly before trial was set to begin.  Although he contends that he attempted to earlier obtain those documents through FOIL, he did not seek the Court's assistance until the eve of trial nor through the discovery process.  Even pro se plaintiffs have the duty to adhere to discovery deadlines, and the Court afforded plaintiff significant special solicitudes with deadlines in this case.  See Kotler v. Jubert, 986 F.3d 147, 156 (2d Cir. 2021) (quoting Triestman

v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006) (internal citations omitted) (noting that, although courts have "long accorded pro se litigants 'special solicitude' to protect them from 'inadvertent forfeiture of important rights because of their lack of legal training,' . . . solicitude for pro se litigants does not require [the Court] to excuse failure to comply with understandable procedural rules and mandatory deadlines.")

Plaintiff contends that the undersigned "told Kuryluk to give me the documents, and she agreed to do that, but ultimately did not[,]" which plaintiff states is a "blatant discovery violation" which the undersigned "ignored."  Dkt. No. 160 at 4, ¶14.   The Court disagrees.  Although Ms. Kuryluk agreed, during the August 23, 2023, phone call with plaintiff, to provide additional copies of certain materials – which to the Court's knowledge at the time, seemed would resolve plaintiff's concerns – Ms. Kuryluk was doing so as a courtesy because, after the expiration of the discovery deadline (by at least five years), she was not under duty, nor Court order, to produce those documents. That plaintiff did not receive all of the documents is not cause for a new trial because plaintiff neglected his initial discovery responsibilities.  Further, Ms. Kuryluk provided that she did, in fact, provide the documents she stated to have sent on the record. It was not Ms. Kuryluk's responsibility to ensure that plaintiff timely received those documents when plaintiff requested at the eve of trial, after discovery had bene long closed.  As plaintiff is aware, there are sometimes mail delays within the DOCCS facilities and other factors outside of Ms. Kuryluk's control.

As noted, although plaintiff contends that he had been "asking for those documents for years," he did not timely[6] or properly file a motion to compel these

---

[6]  Plaintiff filed a letter that the Court received on September 6, 2023, though the letter is dated August 23, 2023.  See Dkt. No. 145.  The return address is a private address, not plaintiff's facility address, and

documents, despite being a self-proclaimed experienced pro se litigator.  Dkt. No. 160 at 3¶12.  Plaintiff has had the representation of counsel in the past and appears to have declined the option to ask his counsel to timely seek certain documents he failed to request when discovery was open.  Although plaintiff disputes the utility or skill of his former assigned counsel, that he did not properly or timely engage in discovery or seek their experience to assist him in the discovery process is not now cause for vacatur of trial.  See Dkt. No. 176 at 30.

## B. **Redaction of Grievances**

Plaintiff argues that the Court inappropriately redacted the grievances plaintiff filed against Randall, Rief, and Brown "regarding the fact that they placed me in Cell # 13 as retaliation for asking for my property."  Dkt. No. 160 at 5, 19.  Plaintiff argues that his full grievances supported his testimony that plaintiff was placed in SHU Cell 13 "as retaliation for asking for my missing property and my prior litigation against DOCCS[.]" id.  Plaintiff further argues that the full grievances should have been admitted because they "provided all other elements of my case (unreasonable risk of serious harm, deliberate indifference, etc . . . .)." Id. at 19.

---

was sent via UPS.  See Dkt. No. 145-1.  In this letter, plaintiff references a conversation he had with Ms. Kuryluk, outside of the presence of the Court, after the August 11, 2023, phone conference had ended.  In his motion to vacate, plaintiff refers to this letter as a motion to compel.  See Dkt. No. 160 at 3 ¶7.  Plaintiff also refers to a document he labels his second motion to compel, dated September 15, 2023.  See Dkt. No. 160 at 1.  It appears that the document he labels his second motion to compel is the "status report" filed with this Court on September 26, 2023, where in eh states that Ms. Kuryluk "did not send the Discovery she promised" during the August 11, 2023, phone conversation between plaintiff and Ms. Kuryluk.  Dkt. No. 153. The deadline to file a motion to compel expired years prior.  Regardless, even if these letters can be considered motions to compel, filing such motions days before the trial is to start is anything but timely.  In light of the shortened timeframe, on September 13, 2023, the Court held a conference to address the concerns raised in the first purported motion to compel, filed on September 6, 2023.

Firstly, the Court did not perform the redactions.  Instead, the Court advised plaintiff that if he wanted his grievance admitted, hearsay and information related to matters not in the case needed to be removed.  The Court told plaintiff, "if you want to endeavor to redact the grievance, talk to Mr. Rehfuss [standby counsel] about parts that are admissible or not admissible, you can do that.  It is not my job to tell you what to do[,]" that Mr. Rehfuss could "help you to do it," and that he "need[s] to react hearsay statements and things that don't relate to the issues here, which is what happened to you in SHU in late April of 2014 to June of 2014.  Beyond that, it's not admissible."  Trial Trans. at 122, see also id. at 162-65 (allowing part of plaintiff's grievance into evidence, advising defense counsel and Mr. Rehfuss to "look at that limited section" and stating that Mr. Rehfuss will redact the nonrelevant portions, and the Court will allow, over defense counsel's objection, the jury to "consider the very limited part of the document."), id. at 169-70 (advising plaintiff that he can try to redact non-hearsay portions of plaintiff's exhibit 17); id. at 175 (Court referring to Mr. Rehfuss' redacting Plaintiff's Exh. 14).

Secondly, plaintiff argues that his full grievances should have been admitted, despite their inclusion of heresay and information irrelevant to his one remaining conditions of confinement claim, at least in part because they would demonstrate that he was placed in SHU Cell #13 as retaliation.  Yet, as the Court already ruled in prior decisions and explained at the final pretrial conference in ruling on the motions in limine, the issue of retaliation was not a part of the trial as there were no remaining retaliation claims.  See, e.g., Dkt. No. 176 at 36.  Accordingly, plaintiff's motion is denied on this ground.

## C. **Conspiracy**

Plaintiff argued during the motion in limine conference that he sought to testify as to conspiracy.  The Court held, in ruling on the motions in limine, that it would allow plaintiff to ask defendants if they acted together or had conversations when he cross examines defendants, but would not allow plaintiff to argue that defendants engaged in conspiracy to keep him in the cell 13 as there is no remaining conspiracy claim in this case.  See Dkt. No. 176 at 19.  That the Court adhered to its earlier ruling, which dismissed all conspiracy claims from the case, is not legal error.  The conspiracy claims were dismissed from the case and to permit further testimony beyond what the Court permitted would undoubtedly confuse the jury.

Next, throughout his motion to vacate, plaintiff accuses the Court of conspiring with defendants to ensure a verdict in their favor.  See, e.g., Dkt. No. 160 at 3, 13-14, 17.  With respect to nearly every ruling, plaintiff states that it was done in furtherance of the Court's desire for plaintiff to lose or for defendants to be "acquitted."[7]  Specifically, plaintiff contends that the undersigned conspired, under 42 U.S.C. 1985(3) with Ms. Kuryluk "to violate my rights to obtain discovery materials in order to sabotage my case." Id. at 13-14.  Plaintiff "offers no substantiation to support this serious allegation." Baasch v. Reyer, 827 F.Supp. 940 (E.D.N.Y. Aug. 10, 1993).  That plaintiff did not

---

[7] For example, plaintiff contends, the undersigned refused the adverse inference charge "to ensure the defendants get an acquittal."  Dkt. No. 160 at 20.  First, as this is a civil case, not criminal, a verdict in favor of defendants is not an acquittal.  Secondly, as indicated herein, plaintiff's claim that the undersigned conspired with defendants to obtain a verdict in their favor is entirely without merit and support.

receive the outcome he desired on certain rulings on his motions in limine or at trial is not evidence of conspiracy.  Accordingly, plaintiff's motion is denied on this ground.

D. **Civilian Clothing; U.S. Marshals in Courtroom; Visibility of Leg Irons, Waist Chain, Shackles, Handcuffs; Staying Seated**

During the final pretrial conference, plaintiff's standby counsel requested that the jury not be in a position to see plaintiff in shackles.  See Dkt. No. 176 at 63.  The Court concluded that it would have plaintiff be seated and jury brought in and then out if plaintiff is going to take witness stand.  See id.  Court made clear that plaintiff will be seated when jury comes in with his legs covered by table skirt.  See id. at 64.  During the final pretrial conference plaintiff did not object to being placed in leg shackles or being required to remain seated, but did raise the issue immediately before the trial commenced.  See Trial Trans. at 6.

Plaintiff argued on the morning of trial, as he does in his motion to vacate, that although the jury will not be able to see the shackles, they will infer that he is shackled because defense counsel will be permitted to approach the bench, but he will not.  See Trial Trans. at 6.  He argued that he has been present at two or three trials with no issue, has no history of "attacking anyone in the courtroom or attacking anyone in the prison," and "do[es]n't see the reason to have these shackles on me."  See id. at 7.  The Court overruled plaintiff's objection to the shackles, pointing to its concern "about the fact that he has an escape-related conviction," and although that conviction is older, plaintiff has been "largely incarcerated" during the period between the escape conviction to now, leaving the Court further concerned that "removing the shackles would present a danger to people in the courtroom, specifically perhaps the jurors."  Id.  The Court noted that it took "great steps" to ensure that the jury would not see his legs or leg

shackles, arranging the courtroom to be cleared and plaintiff to be placed in the jury box during his testimony, and making sure his legs were not visible while he was in the jury box.  See id. at 7-8.

Plaintiff raises for the first time, in his motion to vacate, that, throughout the trial, the shackles, waist chain, and handcuffs were kept on a table behind plaintiff in view of the jury.  See Dkt. No. 160 at 23.  He contends that the jury would have seen his shackles when his standby counsel leaned back in his chair are further reasons that a new trial is warranted.  See id. These claims are without force.  Plaintiff did not point out to the Court during or after trial that restraints were kept on the table behind him and were visible to the jury.  The Court has no memory of the restraints being kept on the table and this is not the usual practice.  Further, plaintiff did not indicate to the Court that he believed the jury could see his shackles when his standby counsel leaned back in his chair or make any indication that his counsel was intentionally leaning back.  There is also no indication that the jury saw plaintiff's leg shackles at any point and, thus, there is no indication that plaintiff suffered any prejudice.

Next, the Court addresses the standing issue.  Plaintiff claims that, although the AAG was permitted to stand during trial, he was "forced to sit at all times . . .  to convince the jury that I was a violent escape artist and a danger to the courtroom. Plaintiff cites another case of his where he contends MAD ordered the AAG to remain seating "so as not to give off the impression that I was a danger to the courtroom."  Dkt. No. 160 at 23.  Plaintiff raised this issue before trial, after the Court afforded him an opportunity to be heard.  See Trial Trans. at 6.  Plaintiff reiterated his arguments that he has no history of physically attacking anyone, attempting to harm anyone during a trial,

attempting escape during a trial or medical trip, and that his escape conviction was over twenty years old.  See id. at 6-7.  Defendants "defer[red] to both the Court and Department of Corrections."  Id..  The Court overruled plaintiff's objection, noting that it was "concerned about the fact that he has an escape related conviction," and although "it's a long time since that occurred he's been largely incarcerated."  Id. at 6.  The Court expressed "concern that removing the shackles would present a danger to people in the courtroom specifically perhaps the jurors."  Id.

The Second Circuit has held that the Supreme Court of the United States' concerns in Illinois v. Allen, 397 U.S. 337 (1970) apply in civil cases.  See Davidson v. Riley, 44 F.3d 1118, 1122 (2d Cir. 1995) ("[T]he concerns expressed in Allen are applicable to parties in civil suits as well.").  The Court there held that requiring a party in a civil trial to appear in shackles "may well deprive him of due process unless the restraints are necessary."  Davidson, 44 F.3d at 1122.  District courts have a "responsibility to determine whether [a prisoner-plaintiff's] due process right not to appear before the jury in shackles . . . [is] outweighed by considerations of security").  When a district court determines that restraints are necessary, it is to "impose no greater restraints than are necessary, and [ ] must take steps to minimize the prejudice resulting from the presence of the restraints." Id. at 1123; see also Holloway, 957 F.2d at 530 (holding that when the court determines physical restraints to be necessary, it "should take appropriate action to minimize the use of shackles, to cover shackles from the jury's view, and to mitigate any potential prejudice through cautionary instructions").  Within the context of criminal trials, the Second Circuit has held, "[a]ny finding of necessity and all accommodations made to minimize the extent of the defendant's

restraint during trial or to ensure that the jury does not become aware of any physical restraints on the defendant must be made on the record by the District Court." [United States v. Haynes, 729 F.3d 178, [190] (2d Cir. 2013)].  'When the trial court has followed the proper procedures, its decision is reviewable for abuse of discretion.' Hameed v. Mann, 57 F.3d 217, 222 (2d Cir. 1995)."  United States v. Melendez, No. 20-3876-CR, 2022 WL 3640449, at *5 (2d Cir. Aug. 24, 2022), cert. denied sub nom. Jones v. United States, 143 S. Ct. 2560 (2023).

Here, the Court held that leg shackles were necessary.  Although plaintiff's escape conviction is a good deal in the past, as the Court stated at the time of its ruling, plaintiff has been largely incarcerated since that conviction, meaning he has been in very controlled environments for the majority of the time since that conviction.  The Court ensured that the jury was unable to view plaintiff's legs by angling the tables in such a way that his legs would not be visible and in having a full skirt on the tables. The Court also took efforts to ensure that they would be unable to view his legs while testifying by removing the jury while plaintiff was brought to and from the stand. Although it is possible the jury could infer that plaintiff was wearing shackles if they noticed that he remained seated while Ms. Kuryluk stood, this detail was unlikely to have caused plaintiff prejudice to warrant a new trial because the jury was also aware he was presently incarcerated.  Although plaintiff claims that his attorney leaned back in his chair, causing his leg shackles to be visible to the jury, there is no indication beyond plaintiff's baseless and general claim that any juror saw his shackles, plaintiff never raised this issue to the Court regarding Mr. Rehfuss' alleged conduct, and such scenario is greatly unlikely as the tables were covered in a full skirt and angled in such a

way that the jury would be unable to see his legs.   However, even if a juror or jurors somehow viewed plaintiff's shackles, that alone would not be "so inherently prejudicial" as to warrant vacatur of the verdict.   United States v. Taylor, 562 F.2d 1345, 1359 (2d Cir. 1977) (noting, the context of criminal cases, that "[n]umerous cases support the proposition that an inadvertent view by jurors of defendants in handcuffs, without more, is not so inherently prejudicial as to require a mistrial.").

To the extent plaintiff contends that being required to stay seated, while Ms. Kuryluck is permitted to stand and speak from the podium, created some kind of prejudice or would cause the jury to believe that he was kept sitting because he was a risk, he has failed to demonstrate that his inability to stand, while Ms. Kuryluck was permitted to stand, was sufficiently prejudicial to warrant a new trial.   As already noted, the jury was aware that plaintiff was presently incarcerated.   See, e.g., Jones v. Davis, No. CV-19-08055-PCT-MTL, 2021 WL 5771157, at *1 (D. Ariz. Dec. 6, 2021) (after noting it was the plaintiff's responsibility to arrange himself access to civilian clothing during trial, the Court concluded that if the jury were to see the plaintiff in prison clothing, it would not cause significant prejudice because " the jury will necessarily find out that Jones is incarcerated because of the nature of his claim, so no prejudice will result from the jury seeing Jones in prison clothing.").   Considering that the jury would have had knowledge of his present incarceration status, the risk prejudice by the jury inferring that plaintiff was wearing leg restraints based on the fact that the defense attorneys could stand but he could not is low.   Here, the Court made the assessment that the risk of plaintiff's attempt to escape outweighed the low prejudice is not an error. See generally Holloway v. Alexander, 957 F.2d 529, 530 (8th Cir. 1992) (holding, as a

general rule, that plaintiffs should not have to appear in court in shackles, but shackles were approved because the Court found that the need was high and the risk of prejudice was low).

The Court next addresses plaintiff's arguments regarding releasing of funds from his prison account.  Plaintiff first advised the Court, at the final pretrial conference, that he asked for permission from DOCCS to release funds such that he could provide them to his wife so she could purchase him a suit to wear for trial.  Plaintiff indicated that he wanted the Court to order DOCCS to release funds so his wife can purchase suit and get rental car to come to the Court.  At this conference, the Court reminded parties that DOCCS was directed to produce plaintiff for trial in civilian clothes and told plaintiff he would not be produced in his prison jumpsuit because of this order.  See Dkt. No. 176 at 56.  The Court advised plaintiff that if he does not have his own civilian clothes or has difficulty getting the funds released for the purchase of a suit, there are clothes at the courthouse that are available to him to wear for trial.  See id.  The Court further asked Mr. Rehfuss to call the DOCCS' business office to inquire as to status of Zimmerman's request.  See Dkt. No. 176 at 55.

Plaintiff did not tell the Court about this request or his difficulty in getting DOCCS to release his funds in advance.  The Court ensured plaintiff during the final pretrial conference that he would not be produced in his prison jumpsuit by ordering DOCCS to produce him in civilian clothes.  The Court did not deny plaintiff the opportunity to have funds or make any determination regarding the release of his funds; this was a determination of DOCCS.  Plaintiff states in his motion to vacate that the Court "refused to order DOCCS to release the funds from my prison account to my wife so that she

could purchase a suit for me for the trial.  Therefore, I was forced to wear my prison uniform (or wear clothes that other prisoners wore in the past and risk corona virus.)" Dkt. No. 160 at 24.  Plaintiff's arguments are without merit and proven false by the record.

The Court provided plaintiff the option for Court-provided civilian clothes, asked stand-by counsel to contact DOCCS to find out status of his request, and ordered he be produced in civilian clothing.  Plaintiff chose to wear the civilian clothing made available from the Court on the first day of trial.  On the second day, before the jury was brought in, the Court noticed that plaintiff was wearing his "prison greens" and stated, "[y]ou understand, sir, there are clothe[s] available for you to wear during the trial like we did yesterday."  Trial Trans. at 127.  Plaintiff replied, "[y]es, I do, your Honor.  I'm not particularly keen about wearing anybody else's clothes.  I didn't want to take that chance again.  I don't get showers like everyone else so I just rather take my chances and greens, I couldn't get my suit for trial.  So --."  Id.  The Court advised plaintiff, "if at some point you change your mind and you'd like us to provide you with clothes, you can do so."  Id.  Plaintiff then reiterated, "I don't wear no one else's clothes."  Id.  Plaintiff did not raise concerns about Coronavirus 19 at that time or at any time prior to his motion to vacate.

That plaintiff may have preferred to purchase and wear a new suit that is more to his taste or wear his "own" clothes, rather than wear appropriate, Court-provided civilian clothing – which he wore on the first day of trial[8] – does not warrant a new trial.  The

---

[8]  Although the Court does not place any weight in this possibility, it notes that the fact that plaintiff chose to wear Court-provided civilian clothing on the first day of trial and thereafter chose to wear his prison uniform may indicate that plaintiff was engaging in a strategy that he believed would bolster a future request for a new trial if the verdict were not in his favor.

Court took all reasonable efforts to ensure plaintiff had access to non-prison issued clothing for trial.  See generally Encarnacion v. Spinner, No. 9:15-CV 1411 (BKS/ML), 2023 WL 2785745, at *3 (N.D.N.Y. Apr. 5, 2023) ("Indeed, at the outset of trial, the Court noted that Plaintiff was permitted to wear clothes other than his prison uniform, and both Plaintiff's pro bono counsel and Plaintiff himself, after translation, indicated Plaintiff's consent to wearing his prison uniform. Thus, the Court will not grant a new trial on this basis.") (citing Jones v. Lantry, No. 04-3967, 2011 WL 5402463, at *2 (E.D.N.Y. Nov. 4, 2011) ("finding that a plaintiff wearing 'full prison garb' during trial—despite the court issuing a pre-trial order permitting the plaintiff to wear civilian clothing—did not provide sufficient grounds for the court to grant a new trial where the plaintiff did not timely object.")).  Accordingly, the motion is denied on this ground.

## D. Missing Evidence Charge

### 1. Video Footage

In their motion in limine, defendants requested that plaintiff be precluded from testifying about the presence or absence of fixed cameras and related video footage under Fed. R. Civ. P. 403.  See Dkt. No. 140-1 at 10. Defendants argued that "there were no fixed cameras in the clinic at the time for the alleged incident, any evidence of allegedly available," rendering testimony regarding missing cameras or video footage "wholly irrelevant to Plaintiff's claims."  Dkt. No. 140-1 at 10.

At the final pretrial conference, defense counsel similarly stated that she inquired of the facility and were advised that there were no fixed cameras in 2014.  See Dkt. No. 176 at 21-22.  The facility explained to defense counsel that it was not until later that facility obtained fixed cameras, and that it is her understanding that in 2014, "if there

was a use of force or something there would be a remote camera, like a camera that someone would grab and record but nothing fixed." Id. at 22. In response, plaintiff argued during the conference that there were fixed cameras in the SHU at the time. See id. at 22-23.  Defendants argued that if plaintiff were permitted to testify that there were fixed cameras, they would be prejudiced because there was no video footage being produced.  See id. at 23. The Court inquired of defense counsel why the presence or absence of fixed cameras would not be a question of fact for the jury to decide.  See id.   The Court held that plaintiff cannot suggest there is coverup due to lack of video footage; however, the Court ruled that plaintiff would be allowed to testify Court that, in 2014, there were fixed cameras that show SHU cell 13 in 2014.  See id. at 23-34.

In his motion to vacate, plaintiff argues that the Court should have permitted an adverse inference charge because he contended there were working cameras facing SHU Cell 13 at the time and that there should be, or should have been, footage available.  See Dkt. No. 160.  Plaintiff provides no proof for his contention that there was a fixed video[9] camera facing SHU Cell 13 at the time of the incidents in question.  See id.  The Court cannot compel defendants to produce footage that it states does not exist and never existed.  Plaintiff has not produced evidence before this Court to show that video footage of the incidents existed and that defendants intentionally destroyed it. Even if plaintiff had been able to demonstrate that there were fixed video cameras in place at Clinton in the relevant location – something he did not prove – would not alone mean that there was footage and that the footage was ever defendants' possession.[10]

---

[9]  Plaintiff refers to an audio recording between himself and Randall, not a video recording, nor does he demonstrate that the alleged audio recording was recorded from a camera or recorder fixed outside of SHU Cell 13 rather than elsewhere.  See Dkt. No. 160 at 36.
[10]   Again, as the Court before noted, DOCCS is not a defendant.

Thus, the Court's conclusion that whether there were fixed video cameras that would have captured the incidents in question was a question of fact whether that the jury could resolve is valid.  Accordingly, plaintiff has not demonstrated that an adverse inference charge was warranted, and the motion is denied on this ground.[11]

### 2. **Audio Recording**

During the final pretrial conference, plaintiff referenced an audio recording of an interaction between himself and defendant Randall that he wanted to play at trial.  See Dkt. No. 176 at 27-29.  Defendants argued that plaintiff never produced an audio recording to defendants and they never have been able to review or authenticate it; thus, it should be precluded.  See id. at 28-29.  Defendants further contended that there is no claim of retaliation left in this case so that any such audio recording would not be relevant to the only remaining claim – conditions of confinement – and the Court previously ruled that plaintiff could not raise dismissed claims at trial.  See id. at 29.

Plaintiff argued that the audio recording is "DOCCS own material" and that it was DOCCS itself that gave plaintiff a copy.  Dkt. No. 176 at 29.  Plaintiff argued that he "asked for a Court ordered [sic] within the past [to] get DOCCS to give it to me it's my inmate records in my personal property asking the Court to force them to give it to me." Id.  When the Court reminded plaintiff that he has previously had two attorneys assigned to assist him, and he should have asked for their assistance with discovery materials, plaintiff said that his attorneys were "not doing nothing" and that he "can't force DOCCS" to give him the recording.  Id. at 30.

---

[11]   The Court observes that plaintiff's proposed jury charge about many of the alleged conditions of the cell cite to directives as source for requirements.  See Dkt. No. 153 at 1-2 (filed Sept. 26, 2023).  Any alleged violations of directives are not constitutional violations, and violations of directives was not a matter before the Court for trial.

The Court held that if plaintiff has a copy of the audio recording, the Court will listen to it "in the presence of all counsel and make a determination before you make use it [sic] having heard this it's rehard hard [sic] for me to determine whether or not it's relevant to the claims in thin platter [sic] do you understand."   Dkt. No. 176 at 31. Plaintiff contends that DOCCS will not give him the copy of the audio recording he paid for; they will only let him listen to it.  See id.  He said he has requested the copy from Great Meadow Correctional Facility multiple times but does not get a response.  Id.

During trial, plaintiff argued that his standby counsel did not "call for the recording," despite plaintiff's asking him to do so.  Trial Trans. at 153.  Mr. Rehfuss stated that his paralegal called "the business office" who informed him that "it was impossible to get the property [audio recording] here in time for the trial, that the process would have required that he contact whoever it is who was assigned to his case, a discussion would be had and review would be done, and they indicated that would take anywhere over two to three weeks in order for the property to be available." Id. at 154.  Defense counsel also indicated on-the-record that despite the audio recording "never [having] been turned over to us during the course of discovery," "immediately" following the Court conference, she contacted "the IRC, the records office to see if they could find any audio or video and they said they had nothing on file."  Id. The Court reminded plaintiff that, despite his contention that a CD audio-recording relevant to his trial was in his property, he did not request the Court to assist him "until last week."  Id. at 155.

Plaintiff's inability to access the audio recording, and the Court's refusal to allow an adverse inference charge about the audio recording is not an error warranting

vacating the verdict.  As discussed at trial, plaintiff did not present the audio recording as evidence for the Court.  He did not advise the Court in a timely manner that he was not permitted to access the audio-recording, and did not timely request Court assistance in ordering DOCCS to release the audio recording.  Plaintiff appears to suggest that because the audio recording is in his personal property and held at a DOCCS facility, defendants have access to it.  However, this video is not in defendants' possession.  As the Court advised plaintiff during the final pretrial conference, DOCCS is not a defendant, and plaintiff did not produce the video to defendants in the course of discovery.  If plaintiff wished evidence to be introduced at trial, such evidence needed to be overturned during the course of discovery.  Plaintiff's failure to appropriately proceed with the discovery process as it relates to this audio recording or timely seek access to this recording does not warrant an adverse inference charge as it was not defendants' duty to produce this audio recording.  Accordingly, plaintiff's motion is denied on this ground.

### 3.  **Pictures of Cell 13, Medical Records**

Plaintiff argues that defendants' failure to produce videos and additional pictures of SHU Cell 13 warranted an adverse inference charge.  See Dkt. No. 160 at 20. Plaintiff contends that the jury was only shown pictures of the conditions of Cell 13 "now" and not the conditions of Cell 13 on or about April 27, 2014.  Id.  Plaintiff contends that such photographs were "in the control of the defendants and it is not cumulative to any other evidence in the case."  Id. at 20.  Plaintiff contends, "[t]he importance of this evidence has already been well explained throughout the entirety of this motion. Therefore, it does not need to be explained here."  Id.  For the reasons set forth above,

the Court concludes that the defendants' failure to produce different photographs of Cell 13 from April 2014, or current images that show Cell 13 in a way different from those depicted in the photographs shown at trial, did not warrant an adverse inference nor does it warrant a new trial.

Plaintiff notes that Randall testified that after receiving plaintiff's grievance about the conditions of SHU Cell 13, he "did not take pictures and/or video of the cell to preserve the evidence depicting the conditions of the cell as I had requested." Dkt. No. 160 at 5. Plaintiff was able to, and did, question defendant Randall about the conditions of SHU Cell 13 and whether he took photographs. Plaintiff notes that the pictures of SHU Cell 13 admitted into evidence were not taken at the time plaintiff was residing in the cell. Indeed, when Randall initially testified that Cell 13 was "identical" to Clinton's other SHU cells, plaintiff noted that he "changed his testimony when confronted with pictures of Cell # 13 in front of the jury and confirmed that Cell # 13 did not have a desk, a mirror, a headphone outlet, and that the bedframe was made of a block of cement." Id. at 5. Plaintiff was able to question Randall about what he felt were differences were between what SHU Cell 13 looked like in April to June 2014 and what it looked like when the pictures were taken, including asking about a "fresh coat of paint"[12] that plaintiff surmised was added "right before the picture were [sic] taken" and about "a mattress [that] was covering the bedframe [in the photograph] so that the jury could not see it was made out of cement." Id. Plaintiff also acknowledges that he was able to question defendant Rief, who similarly testified that he did not take any photographs or

---

[12] Plaintiff was unable to testify about the conditions of Cell 13

videos of SHU Cell 13 after plaintiff filed a grievance about the conditions of his cell.  Id. at 6.

In being able to confront defendants Randall and Reif through cross examination, plaintiff was able to present his position to the jury that the photographs of SHU Cell 13 entered into evidence depict that SHU Cell 13 differs from other cells in certain ways and was able to argue that the bedframe of SHU Cell 13 was made of cement.  See Trial Trans. at 315.

Plaintiff suggests that defendants intentionally failed to inspect and photograph SHU Cell 13 when plaintiff filed a grievance about its condition and then, in taking pictures of SHU Cell 13 as part of this litigation, defendants intentionally changed the condition of the cell by painting the walls and covering up the cement bed to impede jurors from viewing the "true" conditions of SHU Cell 13 which existed during April to June 2014.  See Dkt. No. 160 at 5, 9.  As repeatedly noted at the final pretrial conference and trial and stated throughout this decision, there is no conspiracy claim remaining in this case as plaintiff suggests by contending that defendants were acting to "cover up" conditions of the cell.  An adverse inference charge is not warranted where plaintiff has not demonstrated that pictures of SHU Cell 13 taken at the time, or close in time, to when plaintiff resided in SHU Cell 13 existed, and that defendants engaged in intentional spoliation of those photographs.  The only testimony elicited was that photographs of SHU Cell 13 were taken approximately two weeks prior to trial. Accordingly, a new trial is not warranted on this ground.

E.  **Stickney and Delisle**

Plaintiff set forth in his purported motion in limine that he wanted to call as witnesses Chad Stickney and Justin Delisle, who were dismissed from this case, in order to demonstrate that "they issued me several disciplinary reports for filing to [sic] many grievances (and getting other prisoners to file grievances) regarding the refusal of SHU staff to EVER do cell cleanup in the SHU and to never allow the porter to clean the showers, the company, the hallways, etc" and that they "ransacked my cell and took all the grievances and documents related to this issue and they (amazingly) admitted to doing this in their reports. Dkt. No. 149 at 2. The truth of the matter is Clinton staff NEVER issued cell cleaning supplies during my stay there from 2014 till 2017 until I started the 'Clean Up The Clinton SHU Campaign." Id. at 2-3. Plaintiff stated at the final pretrial conference that he wanted to call these individuals because defendants are lying when they contend that they offered him cleaning materials. See Dkt. No. 176 at 36-38. The Court held that if Stickney can testify about condition of SHU Cell 13 from April to June 2014, based on his personal knowledge, the Court will allow it, but advised plaintiff that it is his obligation to produce him and he'll need to be subpoenaed. See id. at 39. The Court further held that plaintiff can also question Sergeant Delisle "to the extent [he] has specific information regarding the condition of your cell in spring of 2014," and stated it is also his responsibility to subpoena him to testify. Id. at 39-40. The Court clarified that evidence about the "Clean the Clinton SHU Campaign" is not an issue before the Court, that plaintiff can testify about the condition of his own cell, but that "[t]hings that happened beyond that or involving other inmates are not coming in during this trial." Id. at 40.

Thus, the record is clear that the Court did not deny plaintiff the ability to call Chad Stickney and Justin Delisle.  The fact that plaintiff did not earlier seek to arrange their production or seek Court subpoenas in a timely manner is not denial of this party to testify, and plaintiff's failure does not warrant the vacatur of the trial.

## F.  **Admission of Convictions**

"Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.  But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about."  FED. R. EVID. 608(a).

> Rule 609, as amended in 1990, governs the admissibility of criminal convictions for impeachment purposes in civil actions. The rule authorizes the admissibility of such evidence under two circumstances. First, Rule 609(a)(1) permits the impeachment of a witness with convictions punishable by imprisonment in excess of one year, subject to the balancing test of Rule 403. FED. R. EVID. 609(a)(1).  Second, under Rule 609(a)(2), evidence that a witness has been convicted of a crime involving "a dishonest act or false statement" must be admitted "regardless of the severity of the punishment or any resulting prejudice." Daniels v. Loizzo, 986 F. Supp. 245, 248 (S.D.N.Y. 1997); see FED. R. EVID. 609(a)(2). Rule 609(a)(2) has been described as "inflexible," Daniels, 986 F. Supp. at 248, and evidence of the dishonest act or false statement "'must be admitted, with the trial court having no discretion.'" Gonzalez v. Morris, No. 14-CV-1438, 2018 WL 4471625, at *1 (N.D.N.Y. Sept. 18, 2018) (Sannes, J.) (quoting United States v. Bumagin, 136 F. Supp. 3d 361, 375 (E.D.N.Y. 2015)); see United States v. Hayes, 553 F.2d 824, 827 (2d Cir. 1977). Crimes within the scope of Rule 609(a)(2) are those that are indicative of truthfulness, such as "perjury, false statement, fraud, or offenses in the nature of crimen falsi which involve deceit, untruthfulness, or falsification." Somerville v. Saunders, No. 11-CV-556, 2014 WL 272415, at *7 (N.D.N.Y. Jan. 24, 2014) (D'Agostino, J.) (emphasis added) (quoting Eng v. Scully, 146 F.R.D. 74, 78 (S.D.N.Y. Feb. 1, 1993)).

"The presumption under Rule 609(a)(2) . . . is that the 'essential facts' of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed, are included within the 'evidence' that is to be admitted for impeachment purposes." United States v. Estrada, 430 F.3d 606, 615 (2d Cir. 2005).

Del Pesce v. Ingraham, No. 9:16-CV-0818 (DEP), 2019 WL 2462275, at *3 (N.D.N.Y. June 13, 2019).

"If a witness's character for truthfulness is attacked by evidence of a criminal conviction for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, evidence of the criminal conviction must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant." FED. R. EVID. 609(a)(1)(A).   Rule 403 allows a court to exclude relevant[13] evidence if its probative value is substantially outweighed by a danger of one or more of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

Plaintiff is currently serving a twenty-four-year sentence based on a conviction for Criminal Possession of a Weapon in the Second Degree, Criminal Possession of a Weapon in the Third Degree, Bail Jumping in the Second Degree, and Bribery in the Third Degree.  See Dkt. No. 140-1 at 4 (citing Dkt. No. 140-2).  "He also previously served a term of imprisonment for his criminal conviction of a criminal possession of a forgery device."  Id.

In their motion in limine, as relevant here, defendants argued that they should be permitted to inquire into the plaintiff's felony convictions, specifically the "fact," statutory names of the offenses, dates of conviction, and sentences imposed or, alternatively,

---

[13] Rule 401 defines evidence as "relevant" if it is material evidence having "any tendency to make a fact more or less probable than it would be without the evidence." FED. R. EVID. 401.

"the fact that Plaintiff was convicted of felonies, the dates of Plaintiff's felony convictions, and the overall sentence imposed." Dkt. No. 140-1 at 4-5. During the final pretrial conference, plaintiff opposed defendants' motion in limine and argued that admission of his prior convictions was prejudicial, argued that convictions that did not show "untruthfulness or some veracity of my character" should not be admitted and that "criminal possession of a weapon or bail jumping, none of that relates to truthfulness." Dkt. No. 176 at 15.

The Court, applying the Rule 609 balancing test, concluded that defense counsel could question plaintiff about the statutory name and dates of convictions. See Dkt. No. 176 at 15-16; Dkt. No. 160 at 22. The Court held that there would "be no questions about the underlying details of the offense or any sentence that may have been imposed with respect to that particular offense." Dkt. No. 176 at 16.[14] The Court did not permit questioning about plaintiff's disciplinary history. See id. at 16-17.

In his motion to vacate, plaintiff argues that attempted escape and criminal possession of a weapon convictions are "'generally not particularly probative as to honesty and veracity' and therefore should not have been admitted."[15] Dkt. No. 160 at 22 (quoting United States v. Estrada, 430 F.3d 606, 618 (2d Cir. 2005)). He next contends that none of the convictions should have been admitted because they are too

---

[14]   The Court did not permit admission of plaintiff's disciplinary history. See Dkt. No. 176 at 17.

[15] Plaintiff refers, as he does throughout the motion, to Zimmerman v. Wolcyzk, 9:15-CV-1437, wherein he argues that Judge D'Agostino "refus[ed] to allow any of my prior convictions to be used at trial because of their prejudicial effect." Dkt. No. 160 at 23. First, this case was not assigned to Judge D'Agostino, but Judge Kahn and Magistrate Judge Peebles, later reassigned to Magistrate Judge Lovric. See, e.g., Dkt. No. 25. Further, this case was decided on summary judgment. Zimmerman v. Wolczyk, 9:15-CV-1427 (LEK/DEP), 2016 WL 3702987 (N.D.N.Y. July 8. 2016). Regardless, rulings in another case are not necessarily precedential over this decision. Here, as discussed above, the Court concluded, through applying the Rule 609 balancing test, that these particular convictions were not too far remote and were directly relevant to the point of impeachment. See Dkt. No. 176 at 15.

remote: his possession of a forgery device conviction "was well over 26 years ago"; his criminal possession of a weapon "was a 15-year sentence which ended in a conditional release in 2013, which was more than 10 years ago"; and "[w]hile I am currently incarcerated on the Attempted Escape and Bribery conviction, which ran (consecutive and separate) to the Weapons charge, this conviction (although it has not ended) is more than twenty years old itself."  Dkt. No. 160 at 23.

Plaintiff also argues that, "[a]kin to the cases of Thousand and Lewis . . . there were dangerous 'similarities . . . [] to the incident at issue in the pending case, to the convictions."  Dkt. No. 160 at 23.  Plaintiff contends that defendant Randall argued at trial that he placed plaintiff in SHU Cell 13 due to plaintiff's past history of escape and that Cell 13 "had a more secure prison cell door and that's why I was placed there."  Id. Plaintiff argues that "this was extremely prejudicial because the main and central point in the pending case (which was why did Randall place me in Cell # 13?) was dangerously similar to my previous (and clearly unconstitutional) conviction for attempted escape."  Id.[16]

Plaintiff argues that the prejudicial effect of the admission of his convictions "was compounded by" the fact that there were six United States Marshals, wearing bulletproof vests, in the courtroom, "with two sitting right next to me at all times"; "Irom Waist Chain Shackles and Handcuffs" on the table behind him, in plain sight at all times throughout the trial; that his standby counsel "kept pushing his chair back exposing the leg chains I was forced to wear (for no reason) to the Jury"; and the fact that Ms.

---

[16]  Plaintiff again accuses the undersigned of allowing "all of this to go down, over my pre – trial objections, even when I cited the blatant similarities, (and when he tried to shut me up about it) because, as stated previously, he wanted me to lose."  Dkt. No. 160 at 23.

Kuryluk was able to stand and speak from the podium but he was required to sit throughout the trial, which "was done to convince the jury that I was a violent escape artist and a danger to the courtroom."  Dkt. No. 160 at 23.  He also argues that Ms. Kuryluck should have been required to provide the Court "with a detailed explanation as to how these convictions are relevant to their examination."  Id.

Lastly, plaintiff argues, as he did in response to defendant's motion in limine and at the final pretrial conference, that if convictions were to be admitted, he should be permitted testify as to actual innocence.  See Dkt. No. 176 at 45; see also Dkt. No. 160 at 4 ¶15.  In admitting the convictions, the Court applied Rule 609's balancing test.  It ruled that defendants can inquire about the date of conviction and name of charge, but no underlying details or sentence, and the Court denied admission of any disciplinary history.  See Dkt. No. 176 at 15-16.

"In balancing probative value against prejudicial effect under this rule [Rule 609], courts examine the following factors: (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness."  Daniels v. Loizzo, 986 F.Supp. 245, 250 (S.D.N.Y.1997) (citations omitted). "Although all of these factors are relevant, 'prime among them is the first factor, i.e., whether the crime, by its nature, is probative of a lack of veracity.'" United States v. Brown, 606 F.Supp.2d 306, 312 (E.D.N.Y. 2009) (citing United States v. Ortiz, 553 F.2d 782, 784 (2d Cir. 1977)).

First, the admission of plaintiff's bribery and possession of a forgery convictions is not cause for a new trial.  Despite their age, these convictions are crimes involving a "dishonest act" or "false statement" or otherwise indicative of truthfulness.  See, e.g.,

<u>Del Pesce</u>, 2019 WL 2462275, at *3 ("In this case, there is no serious dispute that the court was without discretion regarding the admission of plaintiff's 2013 conviction because it involved dishonest acts or false statements, which were automatically admissible pursuant to Rule 609(a)(2)).   "However, Rule 609(b) contains a time limitation on the admissibility of prior criminal convictions for impeachment purposes [under either Rule 609(a)(1) or (a)(2)]." <u>Somerville v. Saunders</u>, No. 9:11-CV-556 (MAD/DEP), 2014 WL 272415, at *4 (N.D.N.Y. Jan. 24, 2014) (quoting <u>Robinson v. Troyan</u>, No. CV 07-4846(ETB), 2011 WL 5416324, *2 (E.D.N.Y. Nov. 8, 2011)). Federal Rule of Evidence 609(b) states, as relevant here, "[t]his subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later.  Evidence of the conviction is admissible only if [ ] its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect[.]"  FED. R. EVID. 609(b). "Thus, by its terms, Rule 609(b) provides that evidence of a crime is not excludable if the witness is still incarcerated for that crime." <u>Somerville</u>, 2014 WL 272415, at *5 (citing <u>Blake v. Coughlin</u>, 205 F.3d 1321, 2000 WL 233550, *1 (2d Cir. 2000) (summary order) and <u>Eng. v. Blood</u>, No. 9:04-CV-1146, 2008 WL 2788894, *7 (N.D.N.Y. July 17, 2008)).

Next, the Court addresses plaintiff's argument that the admission of his Escape in the First Degree, of which he was convicted in 2005,[17] is too far remote to be admissible and does not speak to "untruthfulness or some veracity of [his] character." Dkt. No. 176 at 15.  Plaintiff concedes he is currently incarcerated on the escape and bribery convictions, but asserts that they should not be admissible because the

---

[17] <u>See</u> Dkt. No. 140-2 at 3.

"conviction (although it has not ended) is more than twenty years old in of itself."  Dkt.

No. 160 at 23.  As plaintiff is presently incarcerated on the escape and bribery

convictions and the bribery conviction goes to the truthfulness, these convictions are

relevant for impeachment purposes; therefore, their admission is not an error requiring a

new trial.  See Somerville, 2014 WL 272415, at *5.

Further, despite plaintiff's objection to the escape conviction's admission plaintiff

did and ask follow-up questions of defendant Randall relevant to his escape conviction.

See Trial Trans. at 59, 60 (asking about "that heavy . . . metal door" in SHU cell 13 and

whether that door is on other SHU cells; asking, "So you said I as placed in there [SHU

Cell 13] because of my history of escapes. Correct?"; stating he "didn't mind" when

Randall spoke about plaintiff's past escape attempt).  Thus, although the Court ruled

that plaintiff's escape conviction would be permitted, plaintiff further opened the door to

the issue of escape and his line of questioning increased the focus on this conviction.

See id. at 61 (asking Randall series of questions about why he was permitted to be in

SHU Cell 36, which did not have the more secure door, before being placed in SHU Cell

13, with the more secure cell door, if there were concerns about his past escape

attempt).

To the extent plaintiff argues that his escape conviction is too similar to the

underlying claims of this case such that its admission was prejudicial, the Court

disagrees.  Plaintiff contends that defendants' reason for being placing him in Cell 13 is

the "central point" of this case; however, plaintiff is mistaken.  Dkt. No. 160 at 23.  The

arguments plaintiff makes in support of this claim are relevant to a retaliation claim,

which was not before the Court or jury.  Instead, plaintiff's trial solely involved a

conditions of confinement claim.  That Randall testified that he assigned plaintiff to Cell 13, in part, because of his past history of escape, does not render the underlying claims of the case so similar to plaintiff's past conviction of escape to be prejudicial under the Rule 609 balancing test.  <u>See</u> Trial Trans. at 61.

The criminal possession of a weapons conviction is not considered a crime of dishonesty.  <u>See generally</u> <u>Somerville</u>, 2014 WL 272415, at *8 (citing <u>U.S. v. Estrada</u>, 430 F.3d at 617).  However, plaintiff's credibility is "a central issue in this case" and "[W]here the credibility of a given witness is particularly important because there is little other documentary or supporting evidence and 'success at trial probably hinges entirely on [the witness's] credibility with the jury,' the fourth factor weighs in favor of admission of the prior conviction."  <u>Somerville</u>, 2014 WL 272415, at *10 (quoting <u>Jean- Laurent</u>, 840 F.Supp. 2d at 544).  Thus,

> the court finds that the probative value of the fact of Plaintiff's felony convictions outweighs the prejudicial effect of this evidence. "As plaintiff's complaint concerns events that occurred during his incarceration [ ], the jury will be informed that plaintiff has been convicted of a crime by the very nature of the case." Young v. Calhoun, No. 85 CIV. 7584, 1995 WL 169020, *4 (S.D.N.Y. Apr. 10, 1995).

<u>Somerville</u>, 2014 WL 272415, at *10.

Next, the Court's denial of plaintiff's request to testify as to actual innocence is not an error warranting a new trial or one that amounted to a "miscarriage of justice." <u>DLC Management Corp</u>, 163 F.3d at 133.  Plaintiff has not demonstrated that his conviction has been overturned or otherwise invalidated on the basis of actual innocence.  None of the Rule 609(c)(1) factors apply.[18] Admission of plaintiff's testimony

---

[18] "Evidence of a conviction is not admissible under this rule if . . . the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the

on his belief that he was wrongfully convicted would undoubtedly prejudice defendants and confuse and mislead the jury as no court of law has determined his actual innocence, and plaintiff is presently incarcerated on one such conviction.  See FED. R. EVID. 403.  Accordingly, the Court properly ruled that he cannot testify as such.

In sum, the admission of plaintiff's convictions, limited to the name and date of the convictions, was not an error requiring vacatur of the verdict and a new trial. Accordingly, plaintiff's motion is denied on this ground.

### G. **Rule 50 Motion**

Defendants argue that plaintiff seeks to move this Court pursuant to Rules 50 and 59(a) to set aside the verdict and for a new trial.  See Dkt. No. 167 at 3.  They argue further that plaintiff did not establish his entitlement to judgment as a matter of law under Rule 50.  Defendants argue that plaintiff is required to make a Rule 50 motion for judgment as a matter of law after the close of proof and cannot challenge the sufficiency of the evidence after the case is submitted to the jury.  After the jury presented the verdict, the Court inquired of plaintiff whether there was "anything else before I discharge the jury."  Trial Trans. at 364.  Plaintiff stated, "No, just submit my motion as against the weight of the evidence."  Id.  The Court stated, "You can do whatever you'd like.  If you want to submit such a motion, you can do so."  Id.  The Court advised plaintiff that such a motion did not involve the jury, and the Court needed to discharge the jury.  Id.

Plaintiff's motion does not seek to move under Rule 50.  Plaintiff's motion to vacate states, clearly, that it is seeking to move under Rule 59(a).  See Dkt. No. 160.

---

rehabilitation of the person convicted, and that person has not been convicted of a subsequent crime which was punishable by death or imprisonment in excess of one year . . . ."

However, in his reply, in responding to defendants' arguments about the timeliness of a Rule 50 motion, plaintiff contends that he attempted to argue after the verdict that it was "against the weight of the evidence," but that the Court told him he could "bring any motion I want at a later time, but that he was only concerned with polling the jury," and once the jury was polled he ordered the security Sergeant to usher me out of the courtroom so that I could not continue to put my issues on the record."  Dkt. No. 169 at 2.

It appears both plaintiff and defendant are confusing the issues.  Plaintiff's motion to vacate does not seek to move pursuant to Rule 50, rather it moves pursuant to Rule 59(a).  See Dkt. No.  Rule 50 (a)(2) requires a party to seek to move for judgment as a matter of law "at any time before the case is submitted to the jury," and Rule 50(b) makes clear that the party may "renew" a timely-made motion after the trial if the Rule 50(a) motion was not granted.  See FED. R. CIV. P. 50.  However, plaintiff never made such a motion and his arguments in reply relate to his belief that the verdict was against the weight of the evidence, which clearly does not relate to a Rule 50 motion.  See Dkt. No. 169.

Regardless, as plaintiff never sought judgment as a matter of law before the matter went to the jury nor has not sought judgment as a matter of law pursuant to Rule 50 in his instant motion, and instead seeks to move pursuant to Rule 59(a), the Court reviews this motion under Rule 59(a), about which defendants have appeared to raise no issues of timeliness.   Thus, there is no timeliness concerns in the Court's mind, and defendants' arguments on this matter do not impact plaintiff's instant Rule 59(a) motion.

## H.  **Wanting AAG Amanda Kuryluk to testify**

Plaintiff sought, after the closing of his case in chief, to call Ms. Kuryluk, defense counsel, as a witness.  See Dkt. No. 160 at 9.  Plaintiff says she is only person who had reviewed his mental health records and could testify regarding his hunger strike, suicide attempt, and statements he made to medical staff about impact of Cell 13 on his mental health.  See Dkt. No. 160 at 9 ¶44.  Defendants argue that she "was neither a party to the matter nor did she have any personal knowledge of the events that gave rise to Plaintiff's claims."  Id.  Further, defendants contend that plaintiff had the opportunity to cross examine all witnesses and called all defendants during his case-in-chief.  See id.

The Court agrees with defendants.  Even though Ms. Kuryluk would have likely reviewed certain medical records during her preparation of this case, as she did not create the medical records nor does she maintain them, she would not be able to accurately testify as she would not have personal knowledge of their contents merely from having read them.  She is not a witness to any events within the medical records. It is also unclear which medical records Ms. Kuryluk has reviewed as there is no such information or testimony in the record.  Further, it is unlikely plaintiff would have been able to enter the medical records into evidence during any testimony from Ms. Kuryluk because she would not be able to provide a proper foundation for the medical records. Accordingly, the Court's refusal to permit plaintiff to question Ms. Kuryluk as a witness regarding his medical records is not a miscarriage of justice warranting a new trial.

## I.  **Raising Dismissed issues**

Plaintiff seeks to use this motion to vacate as another attempt to relitigate issues already decided against him. See Dkt. No. 160 at 7 ¶40; see also RT at 30 (claiming that he should have been permitted to testify that he was placed in cell 13 for retaliation for his long-term efforts in attempting to "raise awareness" o/b/o other inmates re: cleaning supplies, teaching other inmates how to file grievances, conspiracy to keep him in his cell) RT at 35 (claiming that defendants engaged in a conspiracy). As the Court has already ruled on those issues[19] and retaliation was not an issue for trial, this does not warrant vacating the verdict and a new trial. Accordingly, the motion is denied on this ground.

### J. **Jury Charge**[20]

Plaintiff initially argues that a new trial is warranted because the Court should have "charge[d] the jury on the 2nd Circuit case law of Willey v. Kirkpatrick, 801 F.3d 51 [2d Cir. 2015][21] that specifically held that a suicide attempt as a result of a prisoner's conditions of confinement is considered to be a physical injury for purposes of the Prison Litigation Reform Act." Dkt. No. 160.[22] Plaintiff acknowledges that the Court

---

[19] In the motion in limine conference, the Court held there would be "no reference made [to] specifically dismissed charges." RT at 21. The Court also specifically held that he could not testify that he was placed in Cell 13 as retaliation for his advocacy on behalf of other inmates/the "Clinton SHU campaign" because it is relevant to conspiracy and no such claim remains in the case. RT at 30, 33-34.

[20] At the jury charge conference, the Court addressed defendants' request to charge the jury with respect to the Prison Litigation Reform Act ("PLRA"). Trial Trans. at 243. Also, at the continuation of the jury charge conference, the Court provided both parties with case law research performed by the Court's law clerks about the physical injury requirement, with which plaintiff indicated he was "very satisfied." Id. at 277.

[21] Willey also cites Crawford v Cuomo, 796 F.3d 252 (2d Cir. 2015), stating that such case "gives new guidance on the meaning of Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir.1997), our Circuit's leading Eighth Amendment case on harassment and abuse that leaves no physical injury." Crawford involved an assessment of whether an inmate needed to show a physical injury following a claim of sexual abuse and analyzed whether the physical contact with an inmate's genitals – which did not result in physical injury but claims of psychological injury – served a legitimate penological purpose.

[22] Within the charge for compensatory damages, the Court charged the jury as such:

denied defendants' Rule 50 motion, which contended that plaintiff did not demonstrate a physical injury.  See id. at 20 ("Suspiciously, Hummel had just ruled that, as a matter of law, a suicide attempt is a physical injury, but on the other hand, he refused to tell the jury the same thing?").  However, plaintiff says the jury was likely to be confused since they were not explicitly told that a suicide attempt or hunger strike could constitute a physical injury under the law.  See id. at 19-20.  Plaintiff contends this confusion was amplified because defense counsel "kept telling the jury, over my objection, that I had to prove that I was ever on a hunger strike or had engaged in a suicide attempt (when in fact both her and Judge Hummel conspired to keep this proof from the jury.)."  Id. at 30.  Plaintiff accuses the Court of declining to charge the jury that a suicide attempt or

---

Under a federal statute called the Prison Litigation Reform Act, for a plaintiff to recover compensatory damages, he must have proven by, a preponderance of the evidence, that he suffered a physical injury.  You cannot award compensatory damages for only mental or emotional injuries.  A physical injury is more than routine discomfort or a de minimis injury.  This requirement is intended to limit a plaintiff's recovery for malicious or frivolous claims, and because compensatory damages may not be based on speculation or sympathy.  If you find plaintiff has proven that he has suffered a physical injury and has also suffered an emotional or mental injury, you may award compensatory damages.  If you believe that plaintiff suffered harm that does not fall precisely within the definition of a physical, mental, or emotional injury, such as an intangible injury, plaintiff may recover compensatory damages.

Finally, in determining the amount of any compensatory damages to be awarded, you should consider the following: (1) any physical pain that Plaintiff experiences and/or is reasonably certain to experience in the future; (2) the nature and extent of the injury; (3) whether the injury is temporary or permanent; (4) whether any resulting disability is partial or total; and (5) whether Plaintiff suffered any aggravation of a pre-existing condition.  No evidence of monetary value of such intangible things as pain and suffering needs to be introduced into evidence.  This is because no exact standard exists for fixing compensation to be awarded for these intangible things.  If you award compensatory damages, the compensatory damages you award must be fair compensation—no more and no less.  They must be based on the evidence presented at trial, and only on that evidence.

Dkt. No. 155 at 9.

hunger strike could satisfy the physical injury requirement because "he wanted me to lose" and wanted "to confuse their decison [sic] making process."  Id. at 19-20.[23]

On July 17, 2024, nine months after the closing of briefing for this motion, plaintiff filed a supplement to his motion.  See Dkt. No. 171.[24]  On July 30, 2024, the Court issued a text order: "out of an abundance of special solicitude to plaintiff, who is proceeding on the motion pro se, the Court will permit this significantly belated filing" and directed defendants to respond.  Dkt. No. 172.[25]  In his supplement, plaintiff to continues to argue that the Court should follow Willey, but further argues that "the holding in Willey . . . has now lead me to argue that not only is this instruction incorrect, but that it should never have been given at all."  Dkt. No. 171 at 2.  Plaintiff argues that Willey held that the plaintiff demonstrated a physical injury under the PLRA where the conditions of his cell "seriously threatened" his mental health and led the plaintiff to attempt suicide.  Id.  Plaintiff appears to argue that the PLRA is unconstitutional and contends that defense counsel was aware of this and of the Willey holding, but still relied on the PLRA "knowing that I would not have time to fully brief this issue before the case went to the jury.  This is yet another example of the trickery and deceit that [AAG] Kuryluk has displayed prior to, during, and after the trial."  Id. at 7.  Plaintiff further

---

[23] In his belatedly-submitted proposed jury charge, as relevant here, plaintiff sought to charge the jury as such:

> if you find that Mr. Zimmerman was denied a mattress from April 27, 2014 till June 4, 2014 and was forced to sleep on a cement bedframe then you must find in Mr. Zimmerman's favor.  If you find that Mr. Zimmerman attempted to take his own life on two occasions and refused to eat for twenty days between April 27, 2014 and June 4, 2014 and that the conditions of his confinement was the cause of his attempts at suicide, then you must find in his favor.  See Dkt. No. 153.

[24] In the introduction to his supplement, plaintiff states, "since this issue has not been decided, I respectfully request permission to submit "a short, supplemental argument, in addition to what has already been said in my initial Rule 59 motion.  Dkt. No. 171.

[25]   The Court advised plaintiff that no reply to defendant's response to the supplement would be permitted, and if he were to make any such filings, they would be stricken.  See Dkt. No. 172.

argues that "courts have held USC 1997 e to be 'flawed', 'meritless', 'seriously misguided', 'pernicious and without foundation', 'a supporter of 'state-sponsored torture', 'unconstitutional as applied' or just flat out 'unconstitutional!'" Dkt. No. 171 at 6.[26] Plaintiff states, "[t]here are at least two Bills bending in the US Congress which seeks to amend or completely repeal this law, and there are several Law Reviews and articles that show that this law does not even achieve its intended goal of curtailing frivolous prisoner lawsuits." Id.  Plaintiff cites to Crawford to argue, "[e]ven without holding that 42 U.S.C. 1997 e is unconstitutional on its face, 'it's applicability must change as the basic mores of society change.'" Id. at 7.

On August 6, 2024, defendants filed a response to the supplemental submission. See Dkt. No. 173.   Defendants argue that the Court's instruction on the PLRA was proper and "the entire record before the Court conclusively establishes that the jury properly determined that Defendants did not violate Plaintiff's constitutional rights" and that plaintiff "failed to offer evidence that the jury's verdict was seriously erroneous or that said verdict represented a miscarriage of justice." Id. at 4.  Defendants contend that 42 U.S.C. § 1997e does not include a statutory definition of physical injury, but case law requires the injury be more than de minimus.  See id. at 5-6.  Defendants argue that courts in this District have held "that physical manifestations of emotional injuries are not 'physical injuries' for purposes of the Prisoner Litigation Reform Act."  Dkt. No. 173 at 6 (citing McCloud v. Tureglio, No. 9:07-CV-0650 (NAM/GHL), 2008 U.S. Dist. LEXIS 124388, at *21-31 (N.D.N.Y. Mar. 17, 2008), report-recommenation adopted 2008 U.S. Dist. LEXIS 30884, at *1 (N.D.N.Y. Apr. 15, 2008).  Defendants assert that "[t]his

---

[26]   Plaintiff does not provide citations for the language he quotes here.

interpretation, as it applied to attempts at suicide, follows Courts in other circuits, where even a more egregious example of attempted suicide was determined not to be a physical injury." Id. at 6 (citing cases).[27]

Defendants argue that the Willey is distinguishable.  The defendants note that Willey was before the Second Circuit for consideration of a Rule 56 motion for summary judgment.  See Dkt. No. 173 at 7.  In remanding to the District Court, the Second Circuit "noted that the trial court had only considered 'threadbare' analysis of the conditions of confinement claim, non sequitur arguments regarding theft, and generally provided defendants more than their motion sought, reaching such other grounds without notice to the plaintiff." Id. at 6. "The Second Circuit then provided extensive dicta on the merits of the underlying claims, including a rejection of the requirement that the plaintiff show 'serious injury.'" Id.  In light of the "distinguishing factors," the defendants urge this Court against "substitut[ing] Willey's interpretation for the PLRA's clear requirement that Plaintiff establish a physical injury."  Id. at 7.

Defendants further argue that plaintiff "failed to establish not just 'serious injury,' but any physical injury during the course of the jury trial."  Dkt. No. 173 at 8. Defendants argue that plaintiff's claims of back injury and needing to take ibuprofen for it "were never borne out by the record."  Id.  Defendants argue that plaintiff "did not testify on the stand about his alleged physical injuries, nor did he enter a single medical record into evidence to substantiate his claims."  Id.  Defendants note that plaintiff

---

[27]   Insofar as plaintiff cites and relies on Crawford v. Cuomo, 796 F.3d 252 (2015), this reliance is "misplaced." See Lewis v. Lyon, No. 2:23-CV-138, 2024 WL 816790, at *7 (D. Vt. Jan. 4, 2024), report and recommendation adopted, No. 2:23-CV-138-WKS-KJD, 2024 WL 809886 (D. Vt. Feb. 27, 2024) ("Lewis's reliance on Crawford is misplaced. In Crawford, the court addressed the physical injury requirement as it related to the objective element of sexual abuse claims under the Eighth Amendment, not the physical injury requirement as it related to mental and emotional damages under the PLRA.") (citing Crawford, 796 F.3d at 257).

"mentioned while under oath" that he "communicated a desire to commit suicide and/or making an attempt to commit suicide in order to escape SHU Cell 13" and that "he participated in an approximately twenty-day hunger strike." Id. However, defendants argue that plaintiff did not "offer testimony that his purported attempt at suicide caused any injuries or was even sincere"; instead, "[p]laintiff's testimony on the issue of suicide was that he did not want to die and that he faked a suicide just to get out of SHU cell 13." Dkt. No. 173 at 8. Defendants contend that plaintiff's mental health records "indicate that Plaintiff was admitted to the mental health unit on threats of self-harm, but that Plaintiff had not engaged in any actual self harm, which is consistent with Plaintiff's own trial testimony." Id. (citing Exh. D-4). Defendants argue similarly with respect to plaintiff's claim of a hunger strike, noting that "weight loss as a symptom of mental health distress does not qualify as a physical injury and Plaintiff failed to offer any testimony that he had either lost weight or suffered any kind of physical injury resulting from his purported participation in a hunger strike." Id.

42 U.S.C.A. § 1997e states:

(e) Limitation on recovery

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

Under 18 U.S.C.A. § 2246(4), "the term 'serious bodily injury' means bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty."

In Willey, the Second Circuit reversed and remanded the District Court's grant of defendants' motion for summary judgment, pursuant to Fed. R. Civ. P. 56, because it rejected (1) "the District Court's conclusion that there is any bright-line durational requirement for a viable unsanitary-conditions claim.  Nor is there some minimal level of grotesquerie required, which goes unmet by an inmate's accumulating human waste that fills a toilet but does not 'overflow[]' into his cell"; and (2) the district court's

> imposition of a . . . requirement [] that an inmate 'claim[] that he suffered sickness or other ill effects' to establish a violation.  Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an Eight Amendment claim." See Hudson v. McMillian, 503 U.S. 1, 4, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Even if such harm were required, Willey plainly alleged that his mental-health problems and attempted suicide followed the campaign of retaliation of which the unsanitary conditions of his confinement were a prominent part.

Willey v. Kirkpatrick, 801 F.3d 51, 68 (2d Cir. 2015).  Thus, the District Court dismissed the plaintiff's condition of confinement case on summary judgment.  The matter was not before the Court for a trial and did not involve a jury instruction.

More recently, in Walker v. Shult, the Second Circuit reviewed and upheld the PLRA's physical injury requirement.

> As pertinent here, § 1997e(e) is generally interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages. See, e.g., Davis v. District of Columbia, 158 F.3d 1342, 1345, 1348-49 (D.C. Cir. 1998) (affirming a sua sponte dismissal for failure to state a claim where no prior physical injury from privacy-violating disclosure of prisoner's medical records was either alleged or possible); Cassidy v. Indiana Department of Corrections, 199 F.3d 374, 376 (7th Cir. 2000) ("Cassidy") ("§ 1997e(e) precludes [a] prisoner's claim for [an] emotional injury" as to which "there is no prior showing of physical injury" (internal quotation marks omitted)).

Walker v. Schult, 45 F.4th 598, 612 (2d Cir. 2022).  The Court further explained,

43

> Whether or not nominal or punitive damages were intended to be permissible, it is clear that § 1997e(e)--perhaps reflecting concern for difficulties in assessing mental or emotional injury, and perhaps mindful that imprisonment entails "routine discomfort," Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)--bars an award of compensatory damages to a prisoner suing for mental or emotional injury resulting from conditions of confinement without a showing of physical injury.

Id. at 613.  In reviewing the case before it, the Walker Court noted, "notwithstanding the anxiety and physical discomfort the plaintiff experienced in his 880-day period of assignment to Cell 127," the jury concluded that plaintiff did not prove he experienced a physical injury.  Id. The Court further concluded,

> [b]ecause § 1997e(e) bars a conditions-of-confinement award of compensatory damages for mental or emotional injury unless the prisoner has also shown physical injury, the jury should have been instructed, before it began deliberations, that if it did not find that Walker proved physical injury, it could not award him compensatory damages for mental or emotional injury. And not having given that instruction, the court, once the jury had made its finding that no physical injury was proven, should at least have concluded that the PLRA's clear prohibition against recovery for mental or emotional injury in such circumstances, as reflected in § 1997e(e), meant that Walker was not entitled to compensatory damages and that the jury's award could not stand.

Walker, 45 F.4th at 613; see also Thompson v. Carter, 284 F.3d 411, 417 (2d Cir. 2002) ("We agree with the majority of our sister circuits that Section 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.").   Thus, it was not an error for the Court to instruct the jury as to the PLRA's physical injury requirement as it relates to compensatory damages.  The Court next addresses whether it required to specifically instruct the jury that, if proven, a suicide attempt or hunger strike may be considered a "physical injury" within the meaning of the PLRA.

At the jury charge conference, the Court, after considering defendants' request to charge the jury on the PLRA's "physical injury requirement," noted that there

> appears to be a split with the various [Circuits] as to what does or does not constitute a serious physical injury. For purposes of the PLRA, I find that the better and well-reasoned cases find that injuries following a suicide attempt which is [sic] a substantial loss of weight can in fact constitute a serious physical injury for purposes of the PLRA. I'm therefore going to find that that is a question that should be submitted to the jury for their consideration.

Trial Trans. at 288. The Court denied defendants' Rule 50 motion with respect to defendants Randall and Reif. See id.

First, plaintiff did not object to the Court's jury charge[28]; thus, this argument is not properly preserved. See Robinson, 2019 WL 4686355, at *5; Trial Trans. at 288-292. Plaintiff also did not, at the time of trial, specifically request to charge the jury that a suicide attempt or hunger strike constitutes a physical injury under the PLRA. See id. Thus, this argument is also not preserved for this Court's review on this motion.

However, even if the arguments could somehow be found to be preserved,[29] plaintiff has not demonstrated that vacatur of the jury's verdict is warranted. The Court concluded that whether plaintiff attempted suicide or engaged in a hunger strike would be a question of fact for the jury. See Trial Transcript at 288-292. The jury had the

---

[28]  Plaintiff indicated that he did have "[j]ust a small issue. I just feel like if the Court has already let this issue go to the jury, then – you know, this issue of – already been decided, I don't see why this new passage needs to be in there. I know the Attorney General wanted it in." Trial Trans. at 291. The Court explained that defense counsel asked for a PLRA charge "so I can explain to them what the PLRA – what it says and what you have to prove to recover" and clarified that the jury charge was not drafted by defense counsel, but by the Court and its law clerks. Id. Once this was explained, the Court inquired of plaintiff, [d]oes that address your concern, sir?" to which plaintiff replied, "Yes, your honor." Id. Thus, plaintiff expressed his belief that the jury did not need to be charged as to the PLRA because the Court already held that the jury would decide whether or not plaintiff's claimed injuries sufficed, but once the Court explained that the defense counsel did not draft the charge, plaintiff stated that his concern was addressed and set forth no further objection to the inclusion of the PLRA charge nor requested any change or addition to the charge. See id.

[29]  The Court considers special solicitude in reviewing the arguments in the alternative, though the Court notes that plaintiff did have access to standby counsel at all times during the trial.

opportunity to consider the conflicting evidence presented and determine the credibility of the parties, including whether they believed plaintiff attempted suicide or engaged in a hunger strike because of the conditions of SHU Cell 13 and whether they believed plaintiff suffered a physical injury.

In response to defendants' request pursuant to Rule 50, following plaintiff's resting on his case-in-chief, plaintiff contended that he suffers hip pain as a consequence from "sleeping on that cement bed" for which he currently takes "1200 milligrams of ibuprofen." Trial Trans. at 241. He also testified in response to defendants' Rule 50 motion that he "reinjured [his] neck from that suicide attempt." Id. at 240. Plaintiff states in his motion to vacate that as a result of his suicide attempt, he has neck pain for which he must take ibuprofen; however, he did not testify as to this during his case-in-chief or on cross.

Insofar as plaintiff appears to argue that proof of a feces-covered cell, without more, amounts to a "physical injury" under the PLRA, the Court disagrees, concluding that the question whether exposure to feces alone amounts to physical injury more nuanced than plaintiff suggests, especially under the specific facts of this case. First, the question of the condition of SHU Cell 13 was clearly disputed and a question of fact before the jury. Defendants argue that plaintiff did not prove that his cell was in poor condition. They contend that: plaintiff was supplied with cleaning supplies on a regular basis, the cell was cleaned before plaintiff was placed there, the cell did not smell, and that plaintiff was provided with a mattress. Defendant Randall further testified that the bed frame for SHU Cell 13 was metal, and the cement portion was underneath the metal frame.

By contrast, plaintiff testified the cell's walls and his mattress were smeared with feces, the cell smelled of feces and urine, and there were "feces in the toilet stuck to the basin of the toilet" and on the sink.  Trial Trans. at 184.   Plaintiff testified that he repeatedly asked for, but was not provided with, cleaning supplies.  See id. at 208  Plaintiff testified that his feces-stained mattress was removed when he complained, but it was not replaced so he was required to sleep on the cement bed frame.[30]  See id. at 188, 241.

As for the suicide attempt, plaintiff testified that due to his "history of depression" and "deaths in the family since I've been incarcerated," "things like" the condition of cell 13 "trigger certain things.  I don't want this cell to get the best of me."  Trial Trans at 185.  Plaintiff also testified that his mental health status was "level one" which is "the highest mental health status you can have in the Special Housing Unit."  Id. at 180.  Plaintiff testified that after being placed in SHU Cell 13, he was taken into a mental health observation unit twice after he told his mental health clinician that he "need[s] to see mental health.  can't deal with this cell like this."  Id. at 185.  "[B]ecause I can't take that cell, they move me to the suicide unit, observation cell.  I'm, asking them to just put me in the cell that I came from or a different cell and they won't do it."  Id.  The "mental health lady comes, I show her the cell.  She says, you know, I'm going to put – best I can do, I can't force them to move you but the best I can do is put you in an observation cell, suicide unit.  So I go to the mental health unit."  Id. at 186.  Plaintiff stated that he explained to a medican provider, Dr. Galando, "I can't take that cell.  I tell him if he puts me back in there, I'm going to kill myself," but plaintiff was released from the

---

[30] As stated, plaintiff raises back pain from sleeping on a cement bed frame and needing to take 1200 milligrams of ibuprofen only in response to defendants' Rule 50 motion.  See Trial Trans. at 241.

observation cell back to SHU Cell 13.  Id.  Plaintiff testified that, upon his release into

Cell 13, he called for mental health nurse and showed her the feces-stained mattress,

was brought back to the mental health unit, and again returned to SHU Cell 13.  See id.

at 188.  Plaintiff testified that upon his second return, the "cell gets to me" so he took a t-

shirt he found in the cell, and attempted suicide:

> I was sitting on the floor, you know, you sure you want to go through with
> this? Is this want you want to do? I say yeah and I just made a noose out
> of it and I just tried to kill myself.  I hang up in the cell.  They came in.
> They cut me down.  They take me to the outside hospital" and upon
> release, was placed back into Cell 13.  Upon being returned to Cell 13,
> plaintiff "now try to deal with stuff whatever.  I didn't  -- I just stopped
> eating because they label it a hunger strike.

Id. at 190.

Plaintiff stated that he "stopped eating because I could not eat in that cell.  Just –

even though I cleaned it up a little bit, still, I know what's in that cell."  Trial Trans. at

190.  Plaintiff testified that he was taken over to the medical unit after missing "a certain

amount of food" and he "Stayed there for a little while and I still wasn't eating over there,

I lost a certain amount of weight."  Id.  Plaintiff testified that his weight loss is

"documented in my medical records and in – everything I'm saying is – is 100 is

documented in my medical records, in my mental health records."  Id.   Thus, plaintiff

appears to testify that he lost 100 pounds during the hunger strike.  See id.

Plaintiff had the opportunity to testify to his allegations of a suicide attempt and

hunger strike.  Plaintiff testified that he underwent a hunger strike because he was

unable to eat food while in SHU Cell 13 due to the unsanitary conditions of the cell.  See

Trial Trans. at 189-90, 199.  Plaintiff also testified that he "stopped eating" "because

when you stop eating medical has to get involved when you miss a certain amount of

food and they take you over to the medical unit." Id. at 189. Plaintiff stated that he "lost a certain amount of weight" and that "100" is "documented in my medical records in mental records." Id. at 190. There were no medical records relating to the hunger strike or weight loss introduced into evidence. Thus, the jury was able to hear testimony from plaintiff that he attempted suicide and that he engaged in a twenty-day hunger strike wherein he lost 100 pounds and were able to make a credibility determination as to that testimony. See Trial Trans. at 190.

Plaintiff also had the opportunity to testify about any physical injuries resulting from a suicide attempt, hunger strike, or other injuries resulting from the conditions of SHU Cell 13. Plaintiff has presented no case law, nor has this Court located any, that states that a hunger strike, without any evidence that the plaintiff suffered a physical injury or physical consequence due to the hunger strike, satisfies the PLRA's physical injury requirement. Some out-of-circuit courts have held that weight loss as a result of a self-inflicted hunger strike "is not sufficient to show physical injury for purposes of a conditions-of-confinement claim" and other districts are split. al -Amin v. Williams, No. CV 0:21-2738-BHH, 2022 WL 4129341, at *4 (D.S.C. Sept. 12, 2022); Murray v. Edwards Cnty. Sheriff's Dep't, 453 F. Supp. 2d 1280, 1292 (D. Kan. 2006), aff'd, 248 F. App'x 993 (10th Cir. 2007) "[W]eight loss in itself has been deemed to be insufficient to demonstrate physical injury under the PLRA.") (citing Davis v. District of Columbia, 158 F.3d 1342, 1344 (D.C. Cir. 1998); Plasencia v. California, 29 F.Supp. 2d 1145, 1151 (C.D. Cal.1998)); cf. Dillard v. Davis, No. 7:19-CV-00081-M-BP, 2022 WL 3045747, at *28 (N.D. Tex. June 17, 2022), ("Substantial weight loss likely satisfies the PLRA's physical injury requirement."), report-recommendation adopted, No. 7:19-CV-00081-M-

BP, 2022 WL 3042901 (N.D. Tex. Aug. 2, 2022), reconsideration denied, No. 7:19-CV-00081-M-BP, 2023 WL 7283932 (N.D. Tex. Nov. 3, 2023), but see Amir-Sharif v. Dall. Cnty., No. 3:06-cv-0143-K, 2006 WL 2860552, at *7 (N.D. Tex. Oct. 5, 2006) ("Sleep deprivation, headaches and weight loss amount to de minimis physical injuries without more," such as evidence the inmate "suffered from side effects which required medical attention as a result of the above conditions.").

The jury was presented with testimony from defendants that factually conflicted with plaintiff's testimony about the condition of his cell, suicide attempt, and weight loss. Defendants testified that it was common practice for all SHU cells to be checked for contraband, inspect the toilet "[f]or function[,]" and cleaned by company officers before a new inmate was moved into it.  Trial Trans. at 72-73.  Randall further testified that if an inmate did not maintain a clean cell, he would be issued a misbehavior report, but that he could not recall plaintiff having received a misbehavior report with respect to the cleanliness of his cell at the relevant time nor does he recall "any foul smells or odors" coming from Cell 13 during the relevant period.  See id. at 72, 92.   Randall testified that plaintiff was supplied with cleaning materials for his cell and that he was unaware of any "deficiencies" with Cell 13 during the relevant period.  Id. at 72, 74.  He also testified that, pursuant to Department Directive, 4933 Special Housing Unit, cell cleaning materials were made available to all incarcerated individuals three times per week and an inmate would not be denied cleaning materials unless there was a specific deprivation order in place for a specific item.[31]  See id. at 75-78.  Randall testified, "to the best of his knowledge," all SHU cells had a metal bedframe, and that plaintiff never

---

[31]   Randall testified that, under his recollection, Mr. Zimmerman did not have a deprivation order that would deny him cleaning supplies.  See Trial Trans. at 79-80.

complained to him about "his actual bed or bedframe during the time frame he was in SHU Cell 13." Id. at 90.

Reif testified that, as part of his duties as watch commander, he would complete rounds. See Trial Trans. at 139. Reif had no memory of "extremely noxious odors or anything that would alert [him] to the presence of unsanitary conditions in SHU 13." Id. at 140. He explained that there are handheld cameras in Clinton, but he does not believe they are available in the SHU." Id. at 140-41. Rief also testified that there were no cameras in the SHU that would be facing into the cells during the relevant time frame. See id. Rief stated that he did not take pictures or videos of Cell 13 on the date plaintiff filed his grievance about the conditions, noting that it was "several," later clarifying "seven to eight days" after plaintiff filed his grievance until Rief saw it, meaning that any photographs or video "would not depict what happened that physical day because it could have changed since then." Id. at 144-45.[32]

In response to defendants' Rule 50 motion, plaintiff stated, "[a]s far as the physical injury I did receive a physical injury but I went to take [sic] outside hospital I reinjured my neck from that suicide attempt. RT2 at 113. Plaintiff also referenced suffering "severe pain in my right hip" from "sleeping on that cement bed" which "comes and goes sometimes but when it does come it is – it is serious" and he takes "1200 milligrams of ibuprofen for that right now." Id. Plaintiff contended, "the Second Circuit did recognize the emotional injury being placed in the dirty cell, feces all over the place."

---

[32] The Court granted the Rule 50 motion against defendant Brown, after hearing plaintiff's arguments. Trial Trans. at 248. The Court held, "[t]here's no evidence in the record that satisfy the subjective or objective prongs [of the] Eighth Amendment conditions of confinement claim." Id. The Court noted that there was "no indication that Mr. Brown had any role whatsoever with respect to this incident" as he "did not speak to anyone, he did not review the grievance, and he did not speak to Mr. Zimmerman." Id. The Court also reserved as to Mr. Brown "with respect to the appeal PLRA argument." Id.

Id. at 114.  Despite these arguments in response to the Rule 50 motion, plaintiff did not testify as to this on direct or cross.

It is possible – indeed, probable, given their verdict – that the jury did not accept plaintiff's testimony and version of events about the condition of SHU Cell 13, his access to cleaning supplies, that he suffered extreme weight loss, or that he was led to attempt suicide due to the conditions of the cell.  See, e.g., Atomanczyk v. Texas Dep't of Crim. Just., No. CV H-17-0719, 2018 WL 3122324, at *5 (S.D. Tex. June 26, 2018) (acknowledging, after accepting an amended complaint claiming significant weight loss, that the plaintiff still "will have to prove the requisite physical injury to recover at trial").  As the jury concluded that plaintiff failed to prove, "by a preponderance of the evidence that . . . defendants [Randall or Rief] violated his Eighth Amendment right to be free from cruel and unusual punishment[,]" it did not reach the question whether plaintiff demonstrated, by a preponderance of the evidence, that he suffered a physical injury.  Dkt. No. 156 at 1-2.

As discussed supra, the Court concludes that plaintiff did not preserve his specific objections to the PLRA jury charge.  Plaintiff did not submit to the Court a proposed jury charge in advance of trial.   Regardless, the Court concludes that its jury charge was not erroneous because it did not "mislead[] a jury as to the correct legal standard or does not adequately inform the jury on the law."  Robinson, 2019 WL 4686355, at *6 (citing Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994).

As noted above, in Walker v. Schult, 45 F.4th 598, 612 (2d Cir. 2022), the Court concluded that the District Court was required to charge the jury that to award a plaintiff compensatory damages for a conditions-of-confinement claim, a plaintiff must

demonstrate physical injury, not just mental or emotional injury.  Here, in charging the jury, the Court instructed that plaintiff must show physical injury for compensatory damages.  See Dkt. No. 155.  It did not specify that suicide attempts or hunger strikes could qualify as physical injury.  See id.  That was not an error, as the case law is not settled that a jury needs to specifically be charged that a suicide attempt or hunger strike leading to weight loss is a physical injury under the PLRA.[33]   The Court's rationale is clear from the record: the jury was left to determine whether his alleged conditions of his confinement and/or injuries on which he testified: suicide attempt, weight loss from hunger strike, exposure to feces in his cell, lack of mattress causing him to sleep on a cement bed frame, amounts to cruel and unusual punishment.  This intent was made clear at the jury charge conference, where the Court responded to plaintiff's proposed charge, Dkt. No. 153-1 at 2, by stating,

> you indicate that you'd like the Court to charge the fact that you didn't have a mattress you must find in your favor, that's not what the law provides.  You must meet objective and subjective parts of the test and . . . to the extent the jury determines that you only met one or none of those then you're not entitled to recover.  The jury has to determine whether or not your allegation you're left [with]out a mattress constitutes cruel and inhuman punishment, I'm not going to direct the jury as a matter of law they must make that finding[;] that's their determination.

Trial Trans. at 274-75.   The jury did not reach the physical injury question, which was the second question on the verdict form, because they did not conclude that plaintiff demonstrated, by a preponderance of the evidence, that Randall and Rief subjected him to cruel and unusual punishment.  See Dkt. No. 156 at 1-2.  They necessarily concluded that plaintiff did not meet one or both of the subjective and objective components, about

---

[33] Again, as noted, supra, plaintiff did not object to this charge nor did he request that the jury be charged that suicide attempts or hunger strikes resulting in weight loss are a physical injury under the PLRA.

which they were instructed – a charge which plaintiff expressed no objection over.  <u>See</u> <u>id.</u> at 1; Dkt. No. 155 at 8.  The jury's result was unlikely to change even if the Court had instructed them that a suicide attempt or weight loss from a hunger strike amounted to a physical injury under the PLRA because the jury first concluded that plaintiff did not demonstrate that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.  <u>See</u> Dkt. No. 156 at 1; <u>Hansen</u>, 2020 WL 4877186, at *2. Ultimately, there is no evidence that the jury charge misled or failed to accurately explain the law to the jury.

> Plainly, upon review of the motion, the accompanying supporting documents, and the trial record, it is clear Plaintiff seeks to relitigate the same issues he raised at trial in reliance upon the same documentation which the jury reviewed and considered in reaching its adverse verdict. Clearly, Plaintiff disagrees with the outcome of the trial and steadfastly believes his claims to be meritorious. However, these concerns are insufficient as grounds for granting a new trial pursuant to Rule 59.

<u>Somerville</u>, 2014 WL 1679950, at *3.  As plaintiff has failed to demonstrate that the jury's verdict was a seriously erroneous result or a miscarriage of justice pursuant to Rule 59(a), plaintiff's motion is denied.

## IV.  **Conclusion**

Wherefore, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's Motion to Vacate and for a New Trial, pursuant to Fed. R. Civ. P. 59(a), Dkt. Nos. 160, 171, is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve this Memorandum-Decision & Order on plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: September 17, 2024
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge